UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

KEITH ROBERTS,

                                     Plaintiff,

                      -against-

THE CITY OF NEW YORK, NYPD POLICE OFFICER
SABRINA ELDER, Shield No. 16157, NYPD POLICE
OFFICER ROBERT ROILAND, Tax No. 865306, NYPD
POLICE OFFICER ELIZABETH GAVAGHEN, Shield No.
28161, NYPD POLICE OFFICER WARREN ROGERS,
Tax ID No. 868987, NYPD POLICE OFFICERS JOHN
AND JANE DOES NUMBERS ONE THORUGH TEN

                                  Defendants.

------------------------------------------------------------------- X

**COMPLAINT**

JURY TRIAL DEMANDED

Case No. 1:25-CV-1917

      Plaintiff, Keith Roberts, by his attorneys, SHULMAN & HILL, PLLC as and for his complaint, alleges upon information and belief as follows:

## PRELIMINARY STATEMENT

      1.      This is a civil rights action arising from defendants' wrongful, violative, and unconstitutional conduct in arresting, prosecuting, and causing him to be denied his liberty for 8 years.

      2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

## BACKGROUND

      3.      On September 15, 1987, at 29-years-old, Keith Roberts (hereinafter "Plaintiff") was convicted of a murder he did not commit.

4.      It was not until October 3, 2024, when Plaintiff was finally cleared of all charges and his conviction was vacated.

5.      Unfortunately, the vacatur was not before Plaintiff was denied his liberty and caused to serve eight (8) years in prison, and forced to fight for approximately 37 years to prove his innocence.

6.      Gross police misconduct was the direct and proximate cause of the series of tragedies to which Plaintiff was subjected over the past nearly four (4) decades.

7.      Specifically, the investigation of Plaintiff, which lasted less than 24 hours; the subsequent trial, which was wrought with falsehoods and misrepresentations sowed by the defendants; and the conviction that ensued, were all gravely tainted by an unduly suggestive identification, multiple *Brady* violations, and a lack of any meaningful investigation.

8.      Despite the lack of any meaningful evidence against him, and in fact clear evidence in the defendants' possession suggesting other suspects, Plaintiff was charged and convicted of murder in the second degree.

9.      All that was done was a rushed investigation and condemnation of an innocent black man by a notoriously corrupt and mislead, militarized police force.

10.      Plaintiff steadfastly maintained his innocence through his false arrest, malicious prosecution, and the subsequent conviction.

11.      At Plaintiff's criminal sentencing, the decedent's family said in their victim impact statements that they did not believe the right perpetrator was apprehended. An unfortunate, despicable failure to do justice.

12.      Plaintiff was sentenced to 18 years to life on October 6, 1987.

13.     When he was admitted to his first correctional facility on October 9, 1987, and interviewed for his intake the recorder noted that "he continues to vehemently deny guilt."

14.     That persistence did not waiver to clear his name and prove that the defendants had wronged him and were ultimately to blame for his conviction.

15.     On November 10, 1992, Mr. Roberts moved to vacate the verdict claiming that there had been multiple *Brady* violations. The first violation put forth that there was a line up conducted with Mr. Roberts by an eyewitness and conducted by defendant officers who failed to make an identification which was not disclosed by defendant officers.

16.     A second Brady violation was that defendant officers came into possession of a list of suspects from the decedent's brother, a mere two days after the shooting inculpating other individuals none of whom were Plaintiff.

17.     Defendant officers never disclosed this information.

18.     On or about December 15, 1993, Plaintiff filed his appeal to the Appellate Division, which ultimately ordered a new trial because of the constitutionally protected disclosure violations to Plaintiffs right to a fair trial, ultimately affecting the outcome of the trial itself.

19.     On April 25, 1994, the Appellate Division ordered a new trial in the interest of justice, having found a Brady violation occurred.

20.     Upon their order of a new trial, Plaintiff was released on bail after approximately eight (8) years of time wrongfully lost.

21.     To avoid another lengthy, trial whereby and risking further misconduct, missteps, malfeasance by the defendants, and the possibility of anymore time away from the outside world, Plaintiff accepted a deal that would assuredly keep him out of prison.

-3-

22.    On September 27, 1995, Keith Roberts pled guilty to manslaughter in the first degree, in full satisfaction of the indictment with a recommended sentence by the Kings County District Attorney of no less than two and a third (2 1/3) years and no more than seven (7) years, thereby ensuring his continued liberty.

23.    Plaintiff never wavered in his innocence, and continued working to prove same.

24.    The Conviction Review Unit of the Kings County District Attorney's office eventually took it upon themselves, after numerous applications by Plaintiff, to review his claims of innocence.

25.    The Conviction Review Unit conducted its own extensive investigation, interviewing numerous witnesses, combing through scores of transcripts, and sorting through thousands of documents. That investigation was published in a 42-page report[1] outlining and asserting that Mr. Roberts conviction should be vacated and that "there is a reasonable probability that [the] defendant [Keith Roberts] was not involved in the crime." (A copy of that report is attached hereto as Exhibit 1).

26.    On October 3, 2024, 38 years and 12 days since his arrest, the Honorable Mathew D'Emic, vacated Plaintiff's conviction and the People moved to dismiss the indictment.

27.    Tragically, the misconduct committed by the defendants was no isolated incident.

28.    Rather, it reflects a policy and practice of defendants to make arrests and shoot for convictions at any cost, even to justice.

---

[1] The Conviction Review Unit, District Attorney Kings County, Report on the Conviction of Keith Roberts (Oct. 3, 2024), http://www.brooklynda.org/wp-content/uploads/2024/10/Roberts-PUBLIC-092524.pdf

## JURISDICTION

29.    This Court has federal question jurisdiction, pursuant to 28 U.S.C §1331 and §1343 over claims arising under 42 U.S.C. §§ 1983 and 1988.

30.    This Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

31.    Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i. Plaintiff served a notice of claim on the Municipal defendants on October 24, 2024, within the time required by New York General Municipal Law Section 50-e. More than 30 days have passed since the service of the Notice of Claim.

32.    On January 8, 2025, Plaintiff submitted to an examination pursuant to New York General Municipal Law 50-h.

33.    Plaintiff demands a trial by jury.

## VENUE

34.    Pursuant to 28 U.S.C. §1391(b), venue is proper in the Eastern District of New York, the judicial in which multiple Defendants reside, where the City of New York conducts its business, and in which all events giving rise to the claim took place.

## PARTIES

35.    Plaintiff is a resident of the State of New York.

36.    The City of New York (the "City") is a municipal corporation, created and authorized under the laws of the State of New York. Pursuant to Section 431 of its Charter, the City of New York has established and maintains the New York City Police Department (the "NYPD") as a constituent department or agency. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers

37.     The City was the employer of NYPD defendants Elder, Roiland, Gavaghen, Rogers, and the yet unidentified John and Jane Does 1-10.

38.     The City was, at all times relevant to this action, responsible for the policies, practices, and customs of the NYPD, which it maintains.

39.     Defendant, Sabrina Elder, Shield No. 16157 (hereinafter "Elder" or "Officer Elder"), was at all times relevant herein, an NYPD police officer, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York.

40.     At all times relevant herein, Elder was assigned as a police officer to the 67th precinct.

41.     At all times relevant herein, Elder was acting within the scope of her employment.

42.     Elder is being sued in her individual and official capacities.

43.     Defendant, Robert Roiland, Tax No. 865306 (hereinafter "Roiland" or "Detective Roiland"), was at all times relevant herein, an NYPD police officer, acting under the color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York.

44.     At all times relevant herein, Roiland was assigned as a detective to the Brooklyn South Homicide Squad.

45.     At all times relevant herein, Roiland was acting within the scope of his employment.

46.     Roiland is being sued in his individual and official capacities.

47.     Defendant, Elizabeth Gavaghen, Shield No. 28161 (hereinafter "Gavaghen" or "Officer Gavaghen"), was at all times relevant herein, an NYPD police officer, acting under the color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York.

48.     At all times relevant herein, Gavaghen was assigned as a police officer to the 67th precinct.

49.     At all times relevant herein, Gavaghen was acting within the scope of her employment.

50.     Gavaghen is being sued in her individual and official capacities.

51.     Defendant, Warren Rogers, Tax ID. No. 868987 (hereinafter "Rogers" or "Detective Rogers"), was at all times relevant to this complaint, an NYPD police officer, acting under the color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York.

52.     At all times relevant herein, Rogers was assigned as a detective to the Detective Bureau Brooklyn Nightwatch.

53.     At all times relevant herein, Rogers was acting within the scope of his employment.

54.     Rogers is being sued in their individual and official capacities.

55.     Police Officers John and Jane Does Numbers One Through Ten were, at all times relevant herein, employees of the City of New York and members of the NYPD, whose names are presently unknown to Plaintiff. The true names of these officers will be substituted upon motion when their identities are revealed through discovery.

56.    NYPD Police officers John and Jane Does Numbers One Through Ten are being sued in their individual and official capacities.

57.    All defendants, other than the City of New York, are herein collectively referred to as the "individual defendants."

## FACTUAL ALLEGATIONS

### *Plaintiff*

58.    At the time of his arrest, Plaintiff was a 29-year-old husband and father; an unlikely and highly improbable suspect in murder.

59.    Plaintiff, a short-haired, Guyanese-born man was six (6) feet tall, weighing 135 pounds.

60.    Plaintiff was gainfully employed as a driver for Quality Car Service.

61.    On September 21, 1986, Plaintiff came into the defendants' crosshairs, after an investigation that lasted no more than 24 hours.

62.    Unfortunately, Plaintiff was called to answer for a crime he did not commit, which the family of the decedent knew and repeatedly told the defendants. In the victim impact statement, the decedents family stated, "her family is not interested in the sentence of the defendant [Keith Roberts] but apprehending the right person."

63.    This flimsy investigation and persistence by the decedent's family never made the police or the prosecution think twice before pursuing his conviction.

64.     He was a black man living in a working-class neighborhood, and law enforcement, was quick to assume that he had committed this crime. § 1983 and its predecessor were enacted to protect and prosecute the very injustice that Plaintiff had suffered as a result of defendant officers' actions.

65.     The mere 24-hour investigation that ensued revealed no physical evidence, which  meant nothing to the defendants.

### A Murder in Brooklyn

66.     In the early morning hours of September 21, 1986, Pierre Sanon was shot in the back as he ran down Church Avenue towards East 54th street in East Flatbush, Brooklyn.

67.     Sanon ran to the Holiday Social Club at 5413 Church Avenue to gain entrance into the club and avoid his killer. The decedent was thereafter shot at that location in the forehead and was killed.

68.     Defendant Gavaghen and Police Officer Warren Lockley responded to the scene in response to a radio run for a man shot.

69.     EMS personnel responded at or about 4:34 a.m. and pronounced Sanon dead.

70.     As the first to respond, Gavaghen was interviewed at the scene by other officers. She stated to Officer Messerschmitt that before arriving at this scene, she had responded earlier at 2:22 a.m. where there were shots at or about East 55th Street and Linden Boulevard. Gavaghen stated that a conversation with youths indicated that those shots came from north of Linden Boulevard on East 55th street.

71.     Gavaghen was also informed that unknown individuals fled Eastbound on Church Avenue. The description at that time was for two (2) people; the first a male black with a black jacket and a horizontal white stripe, the second a male black with a beige hat and tan pants.

72.     There was no property recovered from the decedent's body itself, but upon information and belief two (2) spent shell casings were recovered from the location and vouchered.

### Investigation

73.    Detective Krause began to canvass the area of East 55th Street and areas on Church Avenue with no results.

*Witness Elanor Chapman*

74.    The first witness statement was taken from Elanor Chapman at approximately 5:00 a.m.

75.    Chapman stated that at approximately 4:40 a.m. she was at the corner of 54th Street and Church Avenue.

76.    Chapman stated that she saw the decedent speaking with an individual who she identified as a black male, five feet, six inches tall, 27-32 years old, medium build, wearing a dark hat, and a brown striped sport jacket.

77.    She provided that the decedent was running towards 53rd street.

78.    Chapman reported hearing two (2) gunshots and the male who was shot fell in front of the club.

79.    Chapman later gave a recorded that was recorded by a member of the Kings County District Attorney's Office, who was participating in the riding program.[2]

80.    In that statement, Chapman reported that she could not identify the shooter, and although was familiar with the decedent, could not remember his name.

81.    Chapman indicated that in addition to the decedent and the shooter there was another person present.

82.    She said that after the shooting, the shooter said something to the third, unknown person, and threw that same unknown person a set of keys.

---

[2]  Assistant District Attorneys assigned to the riding program routinely respond to crime scenes, take statements, and other aspects of involvement

83.     The shooter then jumped into a car and drove off.

84.     During the subject recording Chapman indicated that she was "quite high."

85.     Chapman was certain that at least three other people could identify the shooter.

86.     Defendant Elder was present for Chapman's statement, knew it had been recorded, and was or became aware of the contradictory information that it contained, which was never disclosed.

87.     Even if Elder was not in actual possession of such material, their withholding of such facts she knew about that were in fact exculpatory, was done so in bad faith, and were withheld from the Grand Jury.

*Witness George Bruno*

88.     Defendant Elder interviewed George Bruno at the 67th precinct.

89.     Bruno stated that he was asleep at 7:30 p.m. on September 20, inside a van parked in the decedent's driveway at 150 East 55th Street.

90.     At approximately 12:30 a.m. on September 21, he exited his vehicle and went into the basement to borrow money from Reggie, while waiting for Reggie to arrive Jean-Jean ("Jean") the deceased brother arrived.

91.     Jean and Bruno became involved in an altercation that continued outside of the home.

92.     Bruno separated himself from jean to cool off and walked around.

93.     While in the vicinity of 54th Street between Tilden and Snyder Avenues, Bruno heard multiple gunshots and proceeded to return to the van at 150 East 55th Street to go to sleep.

94.     Police woke Bruno up and brough him to the scene of the murder where Jean, pointed him out to the police and identified him as the shooter. At the scene Bruno saw the deceased and realized that it was Jeans brother.

*Witness Kelric Hinds*

95.      At approximately 6:50 a.m. on September 21, Officer Rogers interviewed witness, Kelric Hinds at the 67th Precinct.

96.     Hinds stated that he was at the northside corner of Church Avenue and East 54th Street with two (2) female companions.

97.     Hinds stated that he saw a thin black male with a gun chasing another black male, eastbound on Church Avenue between 53rd and 54th Streets.

98.     Hinds stated that the tall black male fired one shot hitting the deceased in the back and fired another shot.

99.     Hinds offered that he might be able to identify the shooter.

100.    Like Chapman, Hinds provided an audiotaped statement at the 67th Precinct, at approximately 12:06 a.m. on September 22, for which defendant Elder and the same riding ADA were present.

101.    Hinds stated in the recording that he saw one person chasing the decedent.

102.    The shooter and decedent were approximately six (6) feet apart.

103.    Hinds heard two (2) gunshots.

104.    Despite being near a phone, he did not call 911 out of fear that he himself would be shot.

105.    The shooter was approximately five (5) feet, eight (8) inches, and wore a jacket with light and dark horizontal stripes.

-12-

106.    After, Hinds reported that the shooter walked toward East 55th Street.

107.    Upon information and belief, while Hinds was at the 67th precinct, he had asked the police department to inform his work supervisor that he would be delayed in getting to work because of the police investigation.

108.    Crucially, at sometime after his original statement but within a day of that statement, Hinds viewed a lineup at the precinct and failed to make any identification that matched the description of the shooter.

109.    Defendant Elder conducted the Hinds lineup.

110.    This lack of identification by Hinds would constitute, at minimum, exculpatory evidence.

111.    The defendant officers' actions in suppressing such evidence not only from the prosecution but from the Plaintiff constituted bad faith, suppression of evidence, or conduct that egregiously deviated from normal police procedure.

*First Statement of Jerome Pierre*

112.    Jerome Pierre ("Pierre") was initially interviewed at the 67th Precinct by Defendant Elder on September 21, 1986.

113.    Pierre stated to Elder that at approximately 4:15 a.m. on September 21, he was parked in a vehicle outside of the Holiday Social Club at 5413 Church Avenue.

114.    A yellow cab was parked in front of him with four (4) black males inside.

115.    Pierre reported that the decedent came up to the passenger's side of the yellow cab. At this point Pierre stated he was exiting his vehicle.

116.    Piere stated that at that time he heard the deceased tell the people in the cab to "go."

117.    Pierre now got back into his vehicle to see who was coming because he believed it to be the police.

118.    The deceased, according to this initial statement by Pierre, then walked to the northwest corner of 55th Street and Church Avenue, looked up the block of 55th Street and made a U-turn running back down Church Avenue, back towards 54th street.

119.    Pierre stated at that point that the deceased was yelling for help.

120.    Importantly, despite multiple witnesses giving various statements the same day, no witness indicated that the decedent said anything other then Pierre.

121.    Pierre then stated that he got out of his car again and saw another male coming from around the corner of 55th street chasing the decedent with a gun.

122.    According to Pierre the male shot at the deceased and the deceased ran to the Holiday Club, in an attempt to open the door but was unable.

123.    Pierre stated that the shooter then shot the decedent at point blank range in the middle of the head.

124.    The shooter, according to Peirre, then walked away toward 55th Street on Church Avenue.

125.    Pierre claimed that upon observing this he followed the shooter, where he then observed the shooter talking to two (2) black males on the corner of 55th Street and Church Avenue.

126.    Pierre stated that he heard the conversation between the three (3) individuals and one (1) of them told the shooter to go into the yellow house.

127.    Pierre observed the other individuals walk down 55th Street towards Snyder Avenue, and the shooter then ran up 55th street towards Linden Boulevard into a yellow house on the east side of the street.

128.    Pierre described the shooter as a six (6) foot, dark skinned black male, short-haired, thin build, light mustache, sideburns, with green pants, black shoes with rubber soles, and a black leather hat.

129.    Pierre informed police that his brother, Tony Valentine, was in the Holiday Social Club that night and saw the victim fighting with another male, who was not the shooter.

130.    Similar to other witnesses, Pierre also gave a recorded statement on September 21, 1986.

131.    Piere then gave a description of the shooter that he indicated the shooter was "basically black, slim, little sideburn" across the ear, and wearing a little black Jamaican hat.

132.    One of the officers took handwritten notes during the interview of Pierre. Upon information and belief those handwritten notes were consistent with the account Pierre gave, except that Pierre indicated Pierre was asked if "Bruno" was the shooter to which he responded in the negative.

133.    This statement was not documented anywhere in any official paperwork and only revealed upon information and belief in reviewing handwritten notes.

*Decedent's Brother, Henry Sanson*

134.    The decedent had a brother, Henry Sanson.

135.    Two (2) days after his brother's murder, Sanson gave police, including defendants, a list of suspects' names, that included Jerome Pierre, among others.

-15-

136.    This document was only discovered in response to a Freedom of Information Law ("FOIL") request after Plaintiff's wrongful conviction.

137.    The document constituted, at minimum, exculpatory evidence. Not merely because it failed to mention Plaintiff as a suspect, but because it named the defendant officers' main eyewitness as a *suspect*.

138.    If such a document was disclosed there would be a reasonable probability that Plaintiff's arrest and prosecution may have gone differently, if they occurred at all.

139.    This withholding of evidence from Plaintiff constituted bad faith, suppression of evidence, or conduct that egregious deviated from normal police procedure.

*Keith Roberts: First Interview*

140.    Armed with merely the knowledge of what Pierre told Elder, Police Officer Morales, and the riding assistant district attorney at the 84th Precinct, defendant Roiland, defendant Elder, Detective Krause, Police Officer Morales, and Police Officer Messerschmitt went to speak with Plaintiff at his residence at approximately 3:00 p.m.

141.    Upon information and belief, the only information leading them to this yellow house was Pierre statement regarding where the shooter went, again no other witness spoke to indicated this at all. *Discussed Supra* ¶ 127.

142.    Plaintiff told the officers that he was at a party at his next door neighbors house until 12:15 a.m. and then picked up two (2) women at Linden Boulevard and East 55th Street.

143.    The three (3) then went to a club on Linden Boulevard and Montauk Street.

144.    At about 6:30 a.m., Plaintiff drove the women home and dropped off his cousin, Joe Cole, at Union Street and Utica Avenue.

145.    Plaintiff returned home at approximately 7:30 a.m.

146.    Detective Roiland asked Plaintiff if he was willing to be placed in a line up and Plaintiff, sure of his lack of involvement, agreed.

*Keith Roberts: Second Interview*

147.    Plaintiff was taken back to the 67th Precinct after the officers interviewed him, and was interviewed by defendant Elder.

148.    Plaintiff's statement was consistent with the statement he gave at his home, he did adding only that his wife returned home around 12:00 a.m. and he told her he was going to a party next door.

149.    Plaintiff was not read his *Miranda* rights at his home nor at the precinct.

*Lineup at the 67th Precinct*

150.    While Plaintiff was still at the 67th Precinct, at approximately 5:05 P.M., Plaintiff was put into a lineup procedure, without a lawyer present or without his Miranda rights being read to him.

151.    The lineup was conducted by Police Officer Elder under the supervision of Sgt. Perham and upon information and belief other NYPD officers John and Jane Does 1-10.

152.    The witness being asked to make an identification was Jerome Pierre who upon information and belief was transported to the 67th precinct by yet to be identified officers and at a unknown time, after his initial interview at the 84th Precinct at approximately 1:15 P.M.

153.    Upon information and belief Plaintiff and Jerome Pierre were at the 67th Precinct at the same time and may have seen one another in the station house. This would have tainted any subsequent identification that Jerome Pierre would later make.

154.    Furthermore, Defendant Elder upon information and belief in sum and substance suggested that he would see the shooter from the homicide he saw.

155.    Upon information and belief Jerome Pierre picked plaintiff as a result of defendants overt suggestiveness, rather than his own ability to identify anyone, to make an identification of Plaintiff.

156.    Upon information and belief that lineup procedure, aside from the overtly suggestive conduct employed to compel Jerome Pierre to identify plaintiff, was unduly suggestive inherently based on the policy and practice of the NYPD and designed by Police Officer Elder and other yet to be identified defendant officers to compel the witness to choose Plaintiff.

### Keith Roberts: Third Interview

157.    At approximately 5:20 p.m. on September 21, Plaintiff was finally read his *Miranda* rights, and waived them.

158.    Plaintiff denied all allegations against him and made a statement that was consistent with his earlier statements.

159.    Plaintiff agreed to give a videotaped statement, however once the video equipment and riding assistant district attorney arrived, he invoked his right to counsel.

160.    Plaintiff was thereafter placed under arrest by defendant Elder for second degree murder and criminal use of a firearm in the first degree.

161.    After being arrested by Elder, Plaintiff was transported to Central Booking for processing, and – just like that – the case was marked closed.

### Sandra Roberts: Interview

162.    On September 22, at approximately 1:50 p.m. Plaintiff's wife, Sandra Roberts, was interviewed at the precinct by defendant Elder and the riding assistant district attorney, who recorded Sandra's statement.

163.    Sandra stated that on September 21, between 12:10 and 12:30 a.m. she returned home from work when Plaintiff told her that he was going to a party next door. Plaintiff used the car to go see his mother first and left home at around 1:00 a.m.

164.    Sandra stated that she was up with the couple's baby until about 4:00 or 4:30 a.m.

165.    Sandra told defendant Elder that at about 6:30 or 7:00 a.m. Plaintiff returned home and ate before going to sleep.

*Pre-Trial*

166.    Based on the false, incomplete, misrepresentative, and bad faith actions and representations by the defendant officers, Plaintiff was arraigned and charged with one count of murder in the second degree, and criminal use of a firearm in the first degree.

167.    Plaintiff was remanded to Rikers Island on or about September 23, 1986, where he would remain until October 9, 1987, when he was transported to Downstate Correctional facility.

168.    Based on the flawed police investigation and the misrepresentations by defendants as described herein, on or about October 21, 1986, Plaintiff was charged via an indictment with murder in the second degree, criminal possession of a weapon in the first degree, and criminal possession of a weapon in the third degree.

169.    Upon information and belief, Plaintiff was arraigned on the Indictment in Kings County Supreme Criminal Court on or about November 14, 1986.

170.    After Plaintiff's wrongful arrest, numerous phone calls were taken by the detective squad regarding this homicide.

171.    There was even a call in which the caller plainly reporter that Plaintiff was not the shooter.

172.    Defendant Elder and other officers knew of these phone calls and, upon information and belief, reported them to superior officers who stated decidedly that the case was closed.

173.    Defendant Elder and the other officers who knew of these phone calls never made any disclosure of them to the prosecutor, grand jury, petit jury, or Plaintiff.

174.    Such actions by Elder and other officers was done in bad faith, intentionally or recklessly designed to suppress evidence, or constituted conduct that deviated so far from normal police procedure.

175.    Had such information been disclosed there would be, at a minimum, a reasonable probability Plaintiffs arrest and subsequent conviction would have been different.

*Pretrial Hearing*

176.    On or about August 26, 1987, a pretrial *Wade* hearing occurred regarding the admissibility of Jerome Pierres identifications so as to facilitate a in court identification at trial.

177.    Defendant Elder testified at the hearing that she was an investigator at the 67th precinct for approximately 14 months.

178.    Elder Further testified that conducted a lineup of the Plaintiff on September 21, 1986, at about 5:05 p.m.

179.    Also present for the lineup were Roiland, and Elder's supervisor, Sergeant Perham.

180.    Elder indicated that the witness, Jerome Pierre, was brought to the precinct that day to be questioned.

181.    Elder gave the instructions to the witness, Jerome Pierre, if he would be able to identify anybody in the lineup that was the shooter of the homicide that happened earlier in the day.

182.    Counsel objected and made abundantly clear that this direction by Elder was suggestive and suggested to the witness that the shooter *was* in the lineup.

*Belated Exculpatory Evidence*

183.    On September 2, 1987, nearly a year after Plaintiffs arrest, the ADA disclosed *Brady* material at the start of Plaintiff's trial.

184.    This was the recorded statement of witness Chapman, as discussed *Supra* ¶¶ 79-87.

185.    That recorded statement was known to exist at the very least to defendant Elder, as she was in the room when it was created and taken.

186.    Elder withheld such information contained within that statement from her disclosure in her Grand Jury testimony and in other police paperwork that she would have drafted and disclosed.

*187.*    The withholding of that statement was found to be a violation of *Brady v. Maryland* by the Second Department of the Appellate Division. *See People v. Roberts*, 203 A.D.2d 600, 601 (2nd Dep't. 1994) (That decision is attached hereto as Exhibit 2).

*Plaintiff's Conviction and Sentencing*

188.    Defendants' missteps and bad faith yielded Plaintiff's conviction on September 15, 1987.

189.    The case assembled against Plaintiff was weak to non-existent.

190.    There was a multitude of misconduct and failures to be investigated by the Police.

191.    Prior to plaintiffs sentencing, the deceased's family gave a victim impact statements whereby they maintained that Plaintiff was not the person who killed their loved one. But rather, that they knew that the deceased had argued with Jerome Pierre and believed he was not only involved, but was the shooter.

192.    Plaintiff maintained his innocence, even as he stood before the court for sentencing.

193.    On October 6, 1987, Plaintiff was sentenced to a term of imprisonment of 18 years to life.

**Post-Conviction**

194.    After Plaintiff was wrongfully convicted, Plaintiff pursued clearing his name by all available avenues.

195.    Plaintiff filed two motions to vacate the convictions, the first one being denied on October 19, 1993, and the second motion being deemed "academic" on May 12, 1994, because of the Appellate Court Reversal.

Direct Appeal to Appellate Division

196.    Plaintiff filed a Notice of Appeal on November 2, 1987.

197.    Plaintiff filed a direct appeal to the Second Department of the Appellate Division on or about December 15, 1993, prior to his second motion to vacate the judgment.

198.    Plaintiff continued to litigate both aspects of post-conviction relief simultaneously.

199.    Among Plaintiff's arguments to the Appellate Division was that the evidence was legally insufficient, and that the verdict was against the weight of the evidence because the only eyewitness testimony was illogical, inconsistent, and unreliable.

200.    Furthermore, Plaintiff again raised the issue of the belated disclosure of Chapman's statement, specifically the portion which contradicted that of Jerome Pierre and that she observed the shooter jump into a car with a second individual and drive off.

201.    The Second Department concluded that the belated disclosure was a *Brady* violation and that there was a reasonable probability that it affected the outcome of the trial.

202.    The Appellate Division did indicate that Pierres testimony "appeared to be exaggerated and incongruent in certain respects."[3]

203.    The Appellate Division found that despite the riding ADA being allowed to testify to the contents of that statement the belated disclosure deprived Plaintiff of a fair opportunity to locate the witness and conduct an adequate investigation.

204.    The Second Department ordered a new trial occur in the interests of justice on April 25, 1994.

**Post-Appeal**

205.    After the Appellate Division's reversal, Plaintiff was released on $120,000 bail on or about August 17, 1994.

---

[3] *People v. Roberts*, 203 A.D. 2d 600 (2nd Dept. 1994). "Incredibility as a matter of law may result when all of the evidence of guilt comes from a single prosecution witness who gives irreconcilable testimony pointing both to guilt and innocence." *People v. Hampton*, 21 N.Y.3d 277, 288 (2013).

206.     Plaintiff attempted to accept an *Alford* plea that would allow him to have pled guilty while maintaining his innocence, as he consistently did through all the litigation that transpired.[4]

207.     The prosecution refused.

208.     After spending nearly eight (8) years in custody, Plaintiff was faced with an impossible choice, again risk trial – the vehicle that previously resulted in his wrongful conviction – years after witnesses and evidence had disappeared, or accept a plea for a crime he did not commit, ensuring that he stayed out of jail.

209.     Having already lost roughly eight (8) years of his life, Plaintiff made the rational decision and accepted the only deal that would keep him out of prison.

210.     Plaintiff pled guilty to manslaughter in the first degree and was sentenced to two and a third (2 1/3) and no more than seven (7) years' incarceration, essentially a sentence of time served.

211.     Plaintiff's plea, to avoid jail time despite maintaining his innocence is not uncommon and has been recognized as a virtual necessity by courts.[5]

*Conviction Review Unit*

212.     Plaintiff repeatedly made efforts on his own even after he was no longer incarcerated to clear his name and prove he should never have been arrested, let alone charged and convicted.

---

[4] *See generally North Carolina v. Alford*, 400 U.S. 25 (1970) (recognizing that an accused may voluntarily enter a guilty pela without admitting culpability).
[5] *See People v. Ba*, 39 N.Y.3d 1130, 1135 (2023 Troutman, J. Concurring) (imbalance of power in the plea bargaining process, where prosecutors have unfettered discretion, "inevitably leads to innocent defendants pleading guilty."); *See also People v. Tiger*, 32 N.Y.3d 91, 115 (2018, Wilson, J. Dissenting) ("We Know that some completely innocent people plead guilty").

213.    The Conviction Review Unit ("CRU") of the Kings County District Attorney's office was established in its current form at or around 2014.

214.    The unit is tasked with investigating claims of wrongful conviction and reassessing closed cases.[6]

215.    The Kings County District Attorney's Office conducted in an investigation into Plaintiff's case, examining evidence, and uncovering the flaws in the defendants' investigation.

216.    CRU's investigation revealed that there was a reasonable probability that Plaintiff was not involved in the crime and that if the police had conducted a thorough investigation, Plaintiff may not even have ever been arrested.

217.    The findings included that defendants knew of Plaintiff's innocence, or at the very least had access to exculpatory material, but failed to disclose during the investigation or prosecution.

218.    One piece of evidence examined was the letter from Lamercie Sanon regarding the fight that occurred between the decedent and Jerome Pierre the night before the shooting occurred.

219.    CRU further investigated a signed statement from Jillian Lessack which provided that a fight ensued between one individual she did not know and the deceased.

220.    Jerome Pierre became involved in the fight and a brawl ensued.

221.    A videotaped statement was taken from Lessack in January 1990 that was consistent with her written statement.

---

[6] The Brooklyn District Attorney's Office, Post-Conviction Justice Bureau, http://www.brooklynda.org/post-conviction-justice-bureau/ (last visited Apr. 2, 2025)

222.    CRU interviewed Dawn Dennis, who was with Plaintiff on the night of the incident, and stated that she was at the Village Hut with Plaintiff, Christine Martin, and Plaintiff's cousin Robert.

223.    Dawn went to the precinct to speak defendants during the course of their investigation.

224.    Defendants had the opportunity to investigate and explore this material and exculpatory alibi evidence.

225.    CRU interviewed Aunya Johnson, who stated that on the date of incident at the club while she was outside she heard a gunshot an saw the Jamaican man who was arguing outside of the club, run from the club toward 55th Street.

226.    Johnson explained that a car then drove off and turned left on 55th Street.

227.    She again identified the Jamaican man as having a light skin complexion, was about 5' 10'' with a medium build, and wore a large wool yellow hat.

228.    Johnson indicated that, curiously, she was never contacted by the police and was only able to give her account when *Plaintiff's* investigators contacted her.

229.    Police possessed ample information that would lead them to Aunya Johnson as an eyewitness who could identify the shooter when they interviewed Chapman on the date of the incident.

230.    CRU interviewed Elanor Chapman, who gave essentially the same details in her statement to CRU that she had previously given since her first interview.

231.    Chapman recalls that there were three men arguing in the club after she left.

232.    She indicated that she was drinking and smoking on the night in question.

233.    Chapman recalled the men fighting in front of the club and two (2) Jamaican men going to the corner of Church Avenue and 55th Street.

234.    According to Chapman, the shooter was wearing a Rastafarian hat, not a small cap.

235.    CRU's interview with the testifying eyewitness, Jerome Pierre revealed a story inconsistent with his earlier statements and testimony.

236.    Pierre could not remember what, when, or where he told the police he saw the shooter run into a yellow house.

237.    Upon information and belief Peirre was forced to leave Brooklyn because three Jamaican men with guns were after him in 1992. Pierre moved out of New York state in 1997.

238.    Pierres account of the cab he stated to police originally changed. When interviewed by CRU Pierre indicated that the cab was behind his car rather than in front of his car.

239.    Further, his account differed when he indicated that the two (2) men told the shooter to go to the yellow house were inside of the cab rather than down the street.

240.    His account again changed when he told CRU that Plaintiff, rather than the deceased, told the four (4) men to leave after they exited the club.

241.    CRU interviewed Tony Valentine.

242.    Tony Valentine is Pierre's brother, and as Pierre indicated in his original statement to police, was present in the club on the date of the incident.

243.    Pierre indicated that he knew that a fight had occurred on the date of incident.

244. He explained that he did not recall speaking with Henry Sanon, the deceased's brother, following the shooting.

245. CRU interviewed the owner of the club, Alix Lefranc.

246. Lefranc indicated he did not witness the shooting, having not left the club on the date of incident, but knew of it.

247. He indicated that he was never once interviewed by the police.

248. CRU interviewed Leslie Bruno and George Bruno.

249. Leslie did not know anything about the shooting and did not keep in touch with his brother George Bruno.

250. George Bruno recalled that roughly at the time of the incident he was living in a van.

251. He recalled that he had an argument with Jean about their respective addictions.

252. Bruno recalled that he was arrested by the police and in interrogated while he was in custody for approximately seven (7) to eight (8) hours.

253. CRU further interviewed multiple Police Officers who were involved.

254. CRU interviewed the Police Officer Elder.

255. Elder indicated that this incident was the first homicide she investigated.

256. She indicated that she was never a detective.

257. Elder stated that when she arrived at the location of incident, she recalls that no one was giving any information regarding what had occurred.

258. One person indicated to her that they knew what happened and recalls that he pointed to a house and went to the house, discovering Plaintiff.

-28-

259.    She thereafter brought the Plaintiff to the precinct and questioned Plaintiff about where he was but could not remember the details.

260.    There was a witness who identified the Plaintiff in a lineup and thereafter she was ordered to arrest Plaintiff.

261.    Officer Elder indicated she only knew of one lineup conducted.

262.    Further Officer Elder indicated that once there was a witness and identification that was it and there was no reason to investigate further or check out an alibi.

263.    Officer Elder also remembered that Pierre said the shooter was Jamaican and believed the defendant had a big hat that covered dreadlocks.

264.    Plaintiff had short hair and no dreadlocks.

265.    Police Officer elder further indicated that a few weeks or month after the shooting, calls were placed that indicated that there was a possibility that the Plaintiff was not the shooter.

266.    Officer Elder stated that when she brought this up to her supervisor, the supervisor stated that the case was closed, period.

267.    Officer elder indicated that she never told the prosecution about this phone call and upon information and belief, did not indicated to anyone else other than CRU.

*CRU Report and Recommendation*

268.    CRU complied a 42-page report that recounted and reinvestigated the case against Plaintiff.

269.    CRU determined that there was a reasonable probability that Plaintiff was not involved in the crime, that Pierre's account was patently incredible, and that had the police conducted a thorough investigation, Plaintiff may never have been arrested.

270.    CRU detailed the failures to investigate and failures of the investigation itself.

271.    CRU recounted that once Plaintiff was identified there was no further investigation considered, despite inconsistency and incredibility procuring his arrest initially.

272.    Elder stated to CRU that it was all about numbers and clearing cases back then.

273.    CRU also identified defendants' lack of follow up regarding the information they had in their possession outside of Pierre's statements.

274.    Defendants knew that the deceased was involved in a fight on the night of the incident with other individuals who were not the Plaintiff but never investigated or spoke to anyone regarding that fight.

275.    Defendants seemingly failed to identify, despite the multiple indications that they had, that Pierre and the decedent were involved in a fight on the night of the incident.

276.    CRU also questioned why there was no examination of Pierre's claims that the shooter was directed to go to his own home.

277.    Defendants also had knowledge from Chapmans statements that other people could identify the shooter, and, despite that, never sought to interview chapman further, conduct a lineup with her, or ascertain the other individuals who upon information and belief would give accounts vastly different then Peirre.

278.    CRU also indicated that there was a strong possibility that a second lineup was conducted with Hinds who failed to identify the Plaintiff.

279.    CRU found that there were multiple examples of failing to document exculpatory evidence by the police or potentially exculpatory evidence such as the lineup,

Plaintiff's mirandized statements if any, and a lack of record keeping as to the contents of Pierre's account outside of the recording and DD5's.

280.    On October 3, 2024, Justice Mathew D'Emic, Justice of the Supreme Court, vacated Plaintiff's conviction pursuant to C.P.L. 440.10(1)(b) and (h) on the motion of the Plaintiff and with the consent of the People.

281.    Dismissal under subsection (b), is appropriate where "[t]he judgment was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or on behalf of a court or prosecutor." *See* N.Y. Crim. Procedure Law § 440.10(1)(b) McKinney 2025.

282.    Dismissal under subsection (h), is appropriate where "[t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States." *See* N.Y. Crim. Procedure Law § 440.10(1)(h) McKinney 2025.

283.    The District Attorney thereafter, in the same vein as the vacatur, dismissed the indictment procured against Plaintiff, clearing him of all charges finally, over 38 years since his arrest for a crime he did not commit.

### *A History of Unconstitutional Policies and Practices of the NYPD as Revealed by the Kings County District Attorney's Office*

284.    The misconduct of the defendants herein was not the result of a few bad actors, but of an office and department wide policy and practice that encouraged arrests and convictions by any means.

285.    These practices and polices routinely deprived criminal defendants of their rights under the state and federal constitution.

286.    These practices were employed in the case against Plaintiff and cost him eight (8) years of his life.

287.    The NYPD has routinely failed to disclose evidence that was required to be disclosed.

288.    This failure to disclose evidence made it easy for disinterested prosecutors to satisfy their constitutional obligations.

289.    The failure to disclose evidence by the NYPD was a department failure to make a full statement of facts and done so in bad faith to secure an arrest that otherwise would be impermissible.

290.    Under governing Supreme Court precedent, a Prosecutor "has a duty to learn of any favorable evidence known to others in the prosecutor's office, as well as others acting on the governments behalf, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

291.    Furthermore under New York law, previous statements of testifying witnesses that can be used to impeach a prosecution witness must be disclosed when those statements relate to the subject matter of their testimony. *See People v. Rosario*, 9 N.Y.2d 286 (1961).

292.    However, upon information and belief the and the NYPD had no effective mechanism to ensure that their constitutional duties of disclosing either *Brady* material or *Rosario* material were fulfilled.

293.    This case represents a stark example of how this grossly deficient and constitutionally infirm method of information storage would lead to the violation of Plaintiff's rights.

294.    Based on the information developed while reinvestigating Plaintiff's case, CRU discuss that there was at least one *Brady* violation regarding the belated disclosure of

Chapmans statement and furthermore, discussed the conceivability that other pieces of evidence were never disclosed.

295.    This included the lineup that CRU stated was conceivable occurred whereby Hinds failed to identify the Plaintiff, the list provided by Herny Sanon identifying Peirre as a suspect, the multiple phone calls made to the precinct indicating Plaintiff was not the shooter, the statement provided to the prosecution by Lamercie Sanon that the deceased had a fight inside of the club with a man name Leslie and Jerome, and the multiple failures CRU found to record key information from witnesses.

296.    All of these materials and or records indicating such were upon information and belief in the possession of the defendant officers.

297.    This failure to turn over evidence or make a full statement of facts was not merely present in the case of Plaintiff but there are countless examples of such nondisclosure or withholding of evidence.

298.    In July of 2020, the KCDA authored a report that examined 25 wrongful convictions in Brooklyn.[7](A Copy of that report is hereto attached as Exhibit 3)

299.    That report detailed many failures on the part of the NYPD, specifically in Brooklyn, that lead to the wrongful convictions of individuals.

300.    Among the various shortcomings and failures, the report identified a multitude of eyewitness misidentifications, significant witness credibility issues, nondisclosure of favorable evidence, and police conduct that led to these wrongful convictions.

301.    The report was published and the names of the wrongfully convicted were changed, identified only by pseudonyms.

---

[7] The Kings County District Attorney's Office et al., 426 Years: An Examination of 25 wrongful convictions in Brooklyn, New York (July 9, 2020), KCDA_CRUReport_v4r3-FINAL.pdf

302.     The names of other witnesses and eyewitnesses likewise were identified not with their names but with abbreviations.

303.     The identifying information was changed as a result of the KCDA obtaining judicial permission to unseal the records relating to these cases that would otherwise remain sealed and confidential under New York law and the court ordering that the individuals were to remain confidential.

304.     The purpose of the report was not to highlight the cases themselves and the individuals wrongfully convicted but to act as a tool to draw from to prevent the same from happening again.

305.     Dylan Gold[8] was wrongfully accused and convicted of a crime he did not commit in 1963. Dylan Gold was left to plea guilty to a murder he did not commit to avoid the death penalty. Gold was arrested and charged for the killing of J.E.[9] This occurred in front of C.E., J.E.'s wife and two children. C.E. identified Gold as the shooter in a show up. CRU uncovered that there was prior statements given by C.E. to Police that were not provided that could have been used to impeach her or negate her testimony as she was the identified witness of the shooter.

306.     Kevin Harrison[10] was convicted in 1991 for a murder he did not commit. Harrison was convicted of murder in the second degree of C.M[11] based off the identification of L.M. L.M. before identifying Harrison identified another individual as the perpetrator but that information was never disclosed.

---

[8] Dylan Gold is the pseudonym of the subject individual.
[9] As indicated *Supra* ¶ 389, these are the initials in the report.
[10] Kevin Harrison is the pseudonym of the subject individual.
[11] As indicated *Supra* ¶ 389, these are the initials in the report.

307.    Zander Wright[12] was convicted in 1995 of felony murder where evidence was wrongfully withheld from him. This incident centered around approximately 8 individuals entering into an apartment demanding money and drugs. Roughly two of the intruders discharged firearms inside of the apartment and killed one individual. Police reports R.B[13]. was one of the victims who was shot and positively identified seven males and R.B. in a photo array. R.B. subsequently disavowed her identification of Wright. This disavowed was never disclosed to the Grand Jury, during a pretrial *Wade* hearing, or at trial when the investigating detective stated that R.B. positively identified Wright as having a gun in the apartment. Most importantly it was never disclosed to Wright despite the police having such information.

308.    The report also found that such withholding of evidence was not simply due to prosecutorial misconduct but specifically attributable to NYPD actions. This was due to the fact that much of the non-disclosed evidence was found not in the prosecutors' file but exclusively in the files of the NYPD.

309.    Additionally, the report didn't just detail how the nondisclosure of evidence caused these wrongful convictions to occur, but how the NYPD's systematic failure to use best practices in identification procedures created a high risk of suggestiveness.

310.    That report indicated that the witness, the person making the identification, should not be told they found a suspect and certainly not provided with any information about that suspect.

311.    The report outlined that this suggestive practice would increase the witnesses likelihood to make an identification they otherwise may not have made.

---

[12] Zander Wright is the pseudonym of the subject individual.
[13] As indicated *Supra* ¶ 389, these are the initials in the report.

312.    Furthermore, that suggestiveness of NYPD stating they have a suspect before a witness views a lineup or photo array effects the confidence that the witness has in making such identification.

313.    In two cases the report examined the Gold[14] case and in the case of Brian Davidson[15] CRU detailed how the NYPD conducting the identification procedure wrongfully suggested that they had found the perpetrator of the crime to which they a witness to and being asked to make an identification of.

314.    This suggesting that the perpetrator is in the lineup being shown to them compels a witness to make an identification based on the pressure exerted onto them by the NYPD rather than their own account.

315.    Upon information and belief that is what happened when an eyewitness was compelled to make an identification of Plaintiff as discussed *Supra* ¶¶ 150-156. By defendant police officers and done so in bad faith.

316.    Furthermore, the procedure, whether done by a photo array or lineup, should be conducted in a double-blind fashion. The administrator should not have any familiarity with the case or witnesses so as to not suggest the identification themselves to the witness.

317.    This is to ensure that the administrator cannot unduly suggest an identification to an eyewitness so as to taint their identification with their own opinions rather then the objective identification of the eyewitness.

318.    Three of the cases that the report examined were shown to be not a double-blind identification procedure which CRU partially attributed to the wrongful convictions of these three individuals.

---

[14] Dylan Gold is the pseudonym of the subject individual.
[15] Brian Davidson is the pseudonym of the subject individual.

319.    Plaintiff here also was deprived of a double-blind lineup procedure as discussed *Supra* ¶ 150-156. Police officer Elder was the lead investigator on the case and upon information and belief free to insert their own bias and opinions on the eyewitness rather then the merits of the identification itself.

320.    In sum, policymakers of the NYPD created a culture where making arrests mattered more than following the rights secured by the state and federal constitution. They acted with deliberate indifference to constitutional violations generally, based on policy and practice, including those that injured Plaintiff, and failed to take any steps to protect against constitutional harms certain to occur without polices, practices, or procedures to prevent, address, or punish police misconduct.

321.    To the contrary, the deliberate indifference and polices and practices of the NYPD policy makers, and their designees, created a culture of misconduct by the police that they knew was highly likely to cause further violations and which, in fact did so in numerous cases, including Plaintiff's case.

322.    These policies and practices which condoned and encouraged the suppression of evidence was done so in the name of securing and arrest and subsequent conviction, were a proximate and direct cause of NYPD officers and detective Elder, Roiland, Gavaghen, Rogers, and John/Jane Doe officer 1-10.

323.    The NYPD's policy, practice, and procedure of allowing Police officers and Detectives to suppress evidence or impermissibly suggest evidence, without consequence, made if foreseeable to Defendant City of New York that NYPD officers would commit misconduct in Mr. Robert's case.

324.    These unlawful policies, practices, and customs of Defendant City were a substantial factor in causing the violations of Plaintiff's rights under the constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

### Mr. Roberts Has Been Grievously Injured

325.    Mr. Roberts spent eight years in prison and fought for roughly 37 years to prove his innocence, never once wavering. In that time, he lost the opportunity to continue his career, develop personal relationships, and live a meaningful life. While Mr. Roberts was incarcerated he missed family celebrations, weddings, birthdays, and watching his children grow up, to name just a few of the significant life events Mr. Roberts lost as a result of his wrongful conviction. Mr. Roberts also missed the opportunity to be with his family during difficult times when his mother became ill. Mr. Roberts promised his mother on her deathbed that he would fight until he was cleared and while he never stopped the fight, she unfortunately passed away before getting to see him clear his name.

326.    Mr. Roberts wife divorced him when he was sentenced to life in prison.

327.    As a result of Defendants' conduct, Mr. Roberts suffered physical, mental and emotional injuries, loss of liberty, and economic harm.

328.    Mr. Roberts was finally vindicated when his conviction was vacated and his indictment dismissed.

329.    While Mr. Roberts is free and cleared from prosecution for a crime he did not commit, he will carry that trauma and profound impact this false imprisonment and false accusations levied against him for the rest of his life.

## **FIRST CLAIM FOR RELEIF**

42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial of a
Fair Trial
(Against Defendants Elder, Roiland, Rogers, and Gavaghen)

330.    Plaintiff repeats, realleges, and incorporates the above paragraphs as if they were fully set forth herein.

331.    The individual defendants, acting individually and in concert, fabricated evidence and concealed material exculpatory and impeachment evidence, thereby depriving Mr. Roberts of his Fifth, Sixth, and Fourteenth Amendment rights.

332.    Defendant Elder had been a part of the interview of eyewitness Elanor Chapman and present when a recording was made containing information that differed from her own interview of the witness regarding the alleged shooter.

333.    Defendant Elder never disclosed such contradictory statements in any paperwork and never disclosed such material to Plaintiff despite having that information from the day after the shooting occurred.

334.    Such material was found by the Appellate Division to contradict the only testifying eyewitness at trial and directly have a bearing on that witness credibility.

335.    Such failure to disclose that material by defendant Elder or at the very least document that statement was withheld not only from Plaintiff but from the grand jury and done so in bad faith to procure an indictment and subsequent conviction.

336.    The suppression of that statement would be likely to influence a jury's decision were that evidence provided to Plaintiff within a meaningful time to be presented at trial.

337.    Even the some of those statements were disclosed at trial they were done so not by the witness, but by an Assistant District Attorney who inserted their own opinions as to the

veracity of that testimony, thereby improperly influencing the jury with regard to the substance of the statement.

338.     Defendant Elder and yet to be identified NYPD officers John and Jane Does 1-10, withheld and suppressed a second lineup procedure conducted with witnesses Kelric Hinds.

339.     That identification procedure as sworn to by Kelric Hinds took place, at the 67th precinct where Kelric failed to make any identification of someone that was the shooter.

340.     This information was never turned over to Plaintiff and never disclosed to the grand jury and trial jury and was done so in bad faith to procure an indictment and subsequent conviction.

341.     The failure to identify a suspect in a lineup by an eyewitness would have been likely to influence a jury decision were the evidence to be presented at trial especially since the only question was as to identity of the shooter.

342.     Defendants Elder, Roiland and other yet to be identified NYPD Police Officers John and Jane Does 1-10 conducted a lineup procedure with Plaintiff and eyewitness, Jerome Pierre, that was unduly suggestive.

343.     The lineup was not conducted in a double-blind fashion, and Elder suggested to the eyewitness that the suspect was in the lineup, thereby coercing the eyewitness into making an identification that he otherwise would have not made.

344.     Such an unduly suggestive eyewitness procedure was false or otherwise in bad faith and influenced the jury's decision in reaching their verdict.

345.     Elder and other yet to be identified NYPD officers John and Jane Does 1-10 suppressed evidence provided by Henry Sanson that identified Jerome Pierre as a suspect in the decedent's murder and failed to identify Plaintiff.

346.    The suppressed list of names was never provided to Plaintiff and only discovered via a FOIL request after his conviction.

347.    Such suppression of evidence, failing to identify Plaintiff and identifying the only testifying eyewitness to the shooting would likely influence the jury's decision if given the chance to be presented at trial.

348.    The individual defendants knowingly and deliberately chose not to document or disclose to the prosecutors or plaintiff information that was favorable to Mr. Roberts defense.

349.    Furthermore, defendants Elder, Roiland, Gavaghan, and Rogers worked in concert deliberately to stop developing evidence where reasonability and logic mandated it was appropriate.

350.    If the fabrications, exculpatory, and material impeachment evidence were known to Plaintiff's defense team and had been documented and or disclosed, such evidence would have tended to prove that Plaintiff was not a likely suspect, and would have at the least cast doubt on the entire police investigation and prosecution.

351.    Defendants' conduct operated to deprive Plaintiff of his rights under the Constitution and the laws of the United Staes to timely disclosure of material evidence favorable to the defense pursuant to the Due Process and Fair Trial clauses of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

352.    As a direct and proximate result of the defendants' actions, Plaintiff was wrongfully prosecuted, convicted and imprisoned for over eight  (8) years and suffered other grievous and continuing injuries and damages.

**SECOND CLAIM FOR RELEIF**
42 U.S.C. § 1983 Malicious Prosecution
(Against individual defendants)

353.    Plaintiff repeats, realleges, and incorporates the above paragraphs as if they were fully set forth herein.

354.    Defendants Elder and Roiland, despite knowing that probable cause did not exist to arrest and prosecute Plaintiff for this crime, and though the grand jury's probable cause determination was vitiated by these defendants' undisclosed conduct, fabrication of evidence, and intentional suppression of evidence done in bad faith, acted individually and in concert to be wrongfully arrested and prosecuted for the crimes charged.

355.    They acted individually and in concert to allow plaintiff to be wrongfully arrested and prosecuted for the crimes charged.

356.    When Elder signed the criminal court complaint acting in concert with Roiland, they lacked probable cause to initiate the prosecution.

357.    Plaintiff's indictment and conviction was procured via fraud, presentation of fabricated evidence, suppression of evidence, unduly suggestive identification procedures and other conduct undertaken in bad faith.

358.    False, fabricated, coerced evidence was given by defendant Elder and other yet to be identified defendant officer so the Grand Jury and the Petit Jury.

359.    Defendants Elder and Roiland acted with malice and knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict, and prosecute Plaintiff.

360.    Upon information and belief such fraud, presentation of fabricated evince, suppression of evidence and other conduct undertaken in bad faith is demonstrated amongst other

instance of conduct by the following instances of conduct: suppression of witness Chapmans statements made to Defendant Elder that contradicted that of Jerome Pierre, suppression of other witnesses that were known or able to be known based on Chapman informing police other individuals could identify the shooter as well, the overt suggestive identification procedure conducted by Police officer Elder and other yet to be identified defendant officers, suppression that Kelric Hinds viewed a lineup procedure failing to make any identification, suppressing phone calls that were made to Police officer Elder indicating plaintiff was not the shooter, and suppression of a list of names inculpating defendants eyewitness as a suspect of the shooting.

361.    Defendants Elder and Roiland initiated Plaintiff's prosecution, though they knew the only evidence against him was a witness identifying him as a result of an unduly suggestive identification procedure.

362.    Defendants Elder and Roiland learned or were deliberately and recklessly indifferent to the overwhelming evidence that such witness was not credible.

363.    The criminal proceedings terminated in Plaintiff's favor when his conviction was vacated and the indictment dismissed on October 3, 2024.

364.    Elder and Roiland, and other individual defendant officers acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

365.    As a direct and proximate result of defendants' actions, Plaintiff was wrongly prosecuted, convicted, and imprisoned for over 8 years and suffered other grievous and continuing injuries and damages.

## THIRD CLAIM FOR RELEIF
### 42 U.S.C. § 1983 *Monell* Claim for actions of the NYPD
### (Against Defendant City of New York)

366.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

367.    Chapter 18 of the New York City Charter provides that a Police Commissioner is appointed by the Mayor, who serves at the pleasure of the Mayor.

368.    The Commissioner is the chief officer of the police force and is charged with its governance, discipline, and administration.

369.    The Mayor, the City Counsel, and the Commissioner had final policymaking authority regarding establishment of written policies and training programs governing the conduct of NYPD officers performing duties on behalf of the City.

370.    The Mayor, the City Counsel, and the Police Commissioner established and/or ratified the NYPD's written policies and training governing the conduct of NYPD officers performing duties on behalf of the City.

371.    The written policies and training established and/or approved by the Mayor, the City Counsel, and the Police Commissioner constitute the official policy of the City and were the moving force behind and causing the wrongful arrest and conviction of Plaintiff.

372.    The City, acting by and through its mayor and/or other policymakers, had knowledge of the NYPD's unconstitutional patterns and practices, and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

373.    The City, acting by and through its mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from

the NYPD's unconstitutional patterns and practices and was deliberately indifferent to, and/or tacitly authorized same.

374.    At the time of Plaintiff's arrest, trial, and conviction, the NYPD had a custom and practice to rely on unduly suggestive identification procedures, suppress evidence or intentionally omit evidence, and failures to investigate.

375.    As discussed *Supra* ¶¶ 298-324 the KCDA examined numerous instances in which eyewitness misidentification occurred across a span of cases and specifically attributable to the suggestiveness of the identification procedures themselves.

376.    The report outlined that this suggestive practice would increase the witnesses likelihood to make an identification they otherwise may not have made.

377.    Furthermore, that suggestiveness of NYPD stating they have a suspect before a witness views a lineup or photo array effects the confidence that the witness has in making such identification.

378.    In two cases the report examined the Gold[16] case and in the case of Brian Davidson[17] CRU detailed how the NYPD conducting the identification procedure wrongfully suggested that they had found the perpetrator of the crime to which they a witness to and being asked to make an identification of.

379.    This suggesting that the perpetrator is in the lineup being shown to them compels a witness to make an identification based on the pressure exerted onto them by the NYPD rather than their own account.

---

[16] Dylan Gold is the pseudonym of the subject individual.
[17] Brian Davidson is the pseudonym of the subject individual.

380.    Upon information and belief that is what happened when an eyewitness was compelled to make an identification of Plaintiff as discussed *Supra* ¶¶ 150-156. By defendant police officers and done so in bad faith.

381.    Furthermore, the procedure, whether done by a photo array or lineup, should be conducted in a double-blind fashion. The administrator should not have any familiarity with the case or witnesses so as to not suggest the identification themselves to the witness.

382.    This is to ensure that the administrator cannot unduly suggest an identification to an eyewitness so as to taint their identification with their own opinions rather then the objective identification of the eyewitness.

383.    Three of the cases that the report examined were shown to be not a double-blind identification procedure which CRU partially attributed to the wrongful convictions of these three individuals.

384.    Plaintiff here also was deprived of a double-blind lineup procedure as discussed *Supra* ¶ 150-156. Police officer Elder was the lead investigator on the case and upon information and belief free to insert their own bias and opinions on the eyewitness rather then the merits of the identification itself.

385.    This custom and practice facilitated the suppression of evidence in bad faith and allowed exculpatory or potentially exculpatory evidence that defendants would be entitled to, to be withheld from defendants, their attorneys, grand juries, prosecutors, and petit juries alike.

386.    At the time of Plaintiff's arrest, trial, and conviction, the NYPD also had a custom and practice not to internally investigate, reprimand, sanction, or otherwise discipline NYPD officer for their misconduct.

387.    This custom and practice encouraged, condoned, and ratified the individual officers deliberate and reckless disregard of their constitutional duties.

388.    Multiple extensive reports have been issued describing the failures to discipline the NYPD for their wrongful conduct

389.    Specifically in the Knapp Commission report issued on December 26, 1972 and the Mollen Commission Report issued on July 7, 1994, are two specific examples of reports that specifically discuss the failures to discipline. [18]

390.    This participation by the City caused and allowed for officer to act with impunity and without fear of retribution.

391.    The unconstitutional policies, practices, and customs defined herein – the true extent of which may only be further supported through discovery – were the moving force behind Plaintiff's arrest, prosecution, and conviction.

392.    Plaintiff was arrested and convicted as a direct and proximate result of the acts and omissions of the City, specifically the ratified practices and policies permitting the suppression of evidence and intentional omission of evidence, the use of unduly suggestive identification procedures, and failures to investigate.

393.    As a direct and proximate result of the acts and omissions described herein, he suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

394.    Plaintiff is entitled to recovery of costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

---

[18] N.Y. City Comm'n to investigate allegations of Police Corruption and the City's Anti-corruption procedures (Dec. 26, 1972) (Whitman Knapp, Chair) (hereinafter referred to as the Knapp report; N.Y. City Commission to investigate allegation of police corruption and the Anti-corruption procedures of the police department (July 7, 1994) (Milton Mollen, Chair) (hereinafter referred to as the Mollen Report).

395.    These unlawful policies, practices, procedures, and customs of defendant City were a substantial factor in bringing about the violations of Plaintiff's rights under the constitution and laws of the United States in causing his wrongful conviction, imprisonment, and related damages.

### FOURTH CLAIM FOR RELEIF
Common Law Malicious Prosecution
(Against individual defendants and the City of New York)

396.    Plaintiff repeats, realleges, and incorporates the above paragraphs as if they were fully set forth herein.

397.    Defendants Elder and Roiland, despite knowing that probable cause did not exist to arrest and prosecute Mr. Roberts for this crime, and though the grand jury's probable cause determination was vitiated by these Defendants undisclosed conduct, fabrication of evidence, and intentional suppression of evidence done in bad faith, acted individually and in concert to be wrongfully arrested and prosecuted for the crimes charged.

398.    Upon information and belief when Elder signed the criminal court complaint acting in concert with Roiland, lacked probable cause to initiate Plaintiff's prosecution.

399.    The indictment and conviction were procured by fraud, presentation of fabricated evidence, suppression of evidence, and other conduct undertaken in bad faith.

400.    False, fabricated, coerced evidence was given by defendant elder and other yet to be identified defendant officer so the Grand Jury and the Petit Jury.

401.    Upon information and belief such fraud, presentation of fabricated evince, suppression of evidence and other conduct undertaken in bad faith is demonstrated amongst other instance of conduct by the following instances of conduct: suppression of witness Chapmans statements made to Defendant Elder that contradicted that of Jerome Pierre, suppression of other

witnesses that were known or able to be known based on Chapman informing police other individuals could identify the shooter as well, the overt suggestive identification procedure conducted by Police officer Elder and other yet to be identified defendant officers, suppression that Kelric Hinds viewed a lineup procedure failing to make any identification, suppressing phone calls that were made to Police officer Elder indicating plaintiff was not the shooter, and suppression of a list of names inculpating defendants eyewitness as a suspect of the shooting.

402.    Elder and Roiland acted with malice and knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict, and prosecute Plaintiff.

403.    Elder and Roiland initiated Plaintiff's prosecution though they knew the only evidence against him was a witness identifying him as a result of an unduly suggestive identification procedure, and that they learned or were deliberately and recklessly indifferent to the overwhelming evidence that such witness was not credible.

404.    The proceeding was terminated in Plaintiff's favor when his conviction was vacated and indictment dismissed on October 3, 2024.

405.    In announcing the decision to seek the dismissal of the indictment and the vacatur of Plaintiff's conviction, the KCDA stated that "there is a reasonable probability that defendant was not involved in the crime and that Pierre's account which the Appellate Division essentially questioned, was patently incredible." Additionally they went on to state "had the police, from the outset, conducted a thorough investigation, defendant might not have been arrested."

406.    Mr. Roberts is in fact innocent and there is overwhelming evidence of Mr. Roberts' innocence.

407.    Defendant Elder and Roiland, and other individual defendant officers acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

408.    Defendant the City of New York, as employer of defendant Elder and Roiland, is responsible for the officer's wrongdoing under the doctrine of *respondeat superior*.

409.    As a direct and proximate result of defendants' actions, Mr. Roberts was wrongly prosecuted, convicted, and imprisoned for over 8 years and suffered other grievous and continuing injuries and damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, jointly and severally, as follows:

a)  In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

b)  Awarding Plaintiff punitive damages in an amount to be determined by a jury;

c)  Awarding Plaintiff compensatory and special damages in an amount to be determined by a jury;

d)  Awarding Plaintiff reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

e)  Granting such other and further relief as this Court deems just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  April 7, 2025
       New York, New York

Respectfully submitted,

*Michael F. Pecorella*

*Michael Pecorella, Esq.*
Bar Number: MP0063
Attorney for Mr. Roberts
Shulman & Hill, PLLC
1 State Street Plaza – 15th FL
New York, NY 10004
(212)-203-1090
mpecorella@shulman-hill.com


*Cary London*

*Cary London, Esq.*
Bar Number: CL2947
Attorney for Mr. Roberts
Shulman & Hill, PLLC
1 State Street Plaza – 15th FL
New York, NY 10004
(212)-203-1090
Cary@Shulman-Hill.com