

# DISTRICT ATTORNEY
# KINGS COUNTY

## DISTRICT ATTORNEY ERIC GONZALEZ

REPORT ON THE CONVICTION
OF
KEITH ROBERTS

By: The Conviction Review Unit

## THE CRIME

According to the People's evidence at trial, on September 21, 1986, around 4:15 or 4:30 a.m., defendant shot Pierre Sanon ("the deceased") in the back while chasing him on Church Avenue from East 55th Street toward East 54th Street. The deceased ran to the Holiday Social Club ("the Club") at 5413 Church Avenue (between East 54th and 55th Streets) and tried to get in. There, defendant shot the deceased once in the forehead, killing him.

In 1994, after having served eight years of his sentence, defendant's murder conviction was reversed on direct appeal, and a new trial was ordered. The Appellate Division, Second Department ("Appellate Division"), held that there was a reasonable possibility that belated disclosure of *Brady* material—the statement of a second eyewitness, which showed that defendant could not have been the shooter— bore "directly on the credibility of the People's sole eyewitness and the reliability of his testimony," and affected the outcome of trial.[1]

On September 27, 1995, when defendant's new trial was set to commence, defendant accepted the People's offer to vacate the murder conviction in exchange for a plea of guilty to Manslaughter in the First Degree, and a sentence amounting to time served.

Defendant is at liberty.

## OVERVIEW OF THE ERRORS

CRU has determined that defendant's conviction, pursuant to the plea of guilty to first-degree manslaughter, should be vacated and the indictment dismissed. First, there is a reasonable probability that defendant is innocent and that the account of the sole eyewitness, who testified at trial, which the Appellate Division essentially questioned, was patently incredible. Furthermore, defendant's alibi was plausible. In addition, had the police conducted a thorough investigation, defendant might not have been arrested. Last, that defendant pleaded guilty does not contravene CRU's conclusion.

## THE POLICE INVESTIGATION[2]

The one-day police investigation commenced shortly after the shooting and ended with defendant's arrest. Police Officer ("PO") Sabrina Elder, of the 67th Precinct Det. Unit ("PDU"), was the lead investigator, assisted by PDU Dets. and Brooklyn South Homicide Squad ("BSHS") Det. Robert Roiland.[3]

---

[1] *People v. Roberts,* 203 A.D.2d 600, 601 (1994).

[2] Unless otherwise stated, the police investigation account is obtained from the documents in the People's trial file. Numbers in parentheses preceded by "H." refer to the pages of the pretrial hearing transcript; these preceded by "T." refer to the pages of the trial transcript; those preceded by "S." refer to the original sentencing minutes; those preceded by "P." refer to the pages of the plea proceeding; and those preceded by "S2." refers to the sentence minutes following the manslaughter plea.

[3] Elder was not a detective but had the same duties. (*see* below, Pretrial Hearing [H3-4]) This was her first murder investigation. (*see* below, CRU Interview)

**The Responding Officers**

On September 21, 1986, at 4:29 a.m., POs Elizabeth Gavaghen and Warren Lockley responded to the scene pursuant to a radio run of a man shot. Minutes later, Nightwatch Det. Edward Eck and PO W. Rogers (first name not indicated) arrived at the scene.[4]

The deceased was found lying in the vestibule of the Club. He had on a tee shirt and pants. His shoes were next to his bare feet.[5] An unknown Black male, performing CPR on the deceased, stated that he had removed the deceased's shoes.[6] Gavaghen was informed that the shooter went eastbound on Church Avenue (toward East 55th Street [*see* witness interviews below]).[7]

EMS responded and pronounced the time of death as 4:34 a.m.[8] After the Crime Scene Unit ("CSU") responded and left, when it became daylight, Lockley recovered two discharged .32 caliber shell casings from the front of the Club.[9] CSU Det. Cipolla indicated that the deceased had one gunshot wound to the head, and one to the back.[10] Two deformed .32 caliber bullets were recovered from the deceased's body during the autopsy.[11]

The case was referred to the PDU.[12]

**Canvasses**

At 3:10 a.m., Det. R. Krause (first name not indicated) canvassed myriad homes on East 55th Street and certain locations on Church Avenue, with negative results.[13]

**The Interviews**

Eleanor Chapman

On September 21, at approximately 5:00 a.m., at the scene, PO Rogers interviewed Eleanor Chapman.[14] She stated the following:

---

[4] Messerschmitt DD5, "Interview First Officers"; Eck DD5, "Response to Scene, Initiate Investigation"; *see also* T.335 [Gavaghen's trial testimony])

[5] Eck DD5, "Response to Scene, Initiate Investigation."

[6] Messerschmitt DD5, "Interview First Officers"; Eck DD5, "Response to Scene, Initiate Investigation."

[7] Complaint Report. There is no indication as to who provided the information about the shooter.

[8] Eck DD5, "Response to Scene, Initiate Investigation."

[9] Messerschmitt DD5, "Interview First Officers"; Complaint Report; Detective Bureau Unusual Occurrence Report; Ballistics Unit Case Worksheet.

[10] Eck DD5, "Response to Scene, Initiate Investigation."

[11] Ballistic Unit Case Worksheet.

[12] Eck DD5, "Response to Scene, Initiate Investigation."

[13] Krause DD5, "Canvass of area, E 55 St. & Church Ave." One of the residents interviewed was Fleary, who was a defense witness at trial (*see* below, the Trial, The Defense Case) Someone on the second floor at defendant's house "refused" an interview. Defendant's father-in-law lived on the second floor. (*see* below, T.520 [defendant's trial testimony])

[14] Chapman did not give the police her full name, Chapman-Legg, because she did not want to be involved (*see* below, CRU Investigation, Chapman Interview). She is referred to herein as Chapman.

At approximately 4:30 a.m., she was on the corner of Church Avenue and East "54th" Street when she saw a male (the deceased) speaking to a Black male. The deceased ran toward "53rd" Street, and the Black male shot him. The deceased fell in front of the Club. The shooter ran toward "54th" Street. The shooter was approximately 5'6", 27-32 years old, with a medium build, and was wearing a dark hat, and a brown striped sports jacket.[15]

*Chapman's Audiotaped Statement*

At approximately 11:50 p.m., after defendant's arrest, at the 67th Precinct, Chapman gave an audiotaped statement to an ADA ("the riding ADA").[16] PO Elder was present. Chapman's statement was consistent with her prior statement. Chapman added the following:

She was standing on the corner of Church Avenue and East 55th Street (she previously said 54th) and saw the deceased and another man (the shooter) talking to each other. The shooter was two to three doors down from the Club, facing "Nostrand Avenue" and the deceased faced East 55th Street.[17]

The deceased turned to run, and the shooter shot the deceased twice. The shooter said something to his friend, threw the friend a set of keys, and jumped in a car, which drove off.

Chapman looked at the deceased after he was shot. She thought he was her friend, Michael, but then saw he was "Pete or something like that." She did not know the shooter and did not recall seeing his face. She was "quite high." Chapman was certain that at least three other people could identify the shooter.[18]

<u>George Bruno</u>

On September 21, at the 67th Precinct (time not stated), Elder interviewed George Bruno. Nightwatch Dets. brought Bruno to the precinct from the scene. Bruno stated the following:

On September 20, at 7:30 p.m., he was asleep in a van parked in the deceased's driveway at 150 East 55th Street. On September 21, at 12:30 a.m., he got up and went into the basement of the deceased's house to borrow a dollar from Reggie. While waiting for Reggie, Jean-Jean ("Jean"), the deceased's brother, arrived. An altercation ensued between Jean and Bruno, which continued outside. When the altercation ended, Bruno walked around to let Jean cool off. At about 2:30 a.m., while on East 54th Street between Tilden and Snyder Avenues, Bruno heard four or five gunshots. He returned to his van and went to sleep.

The police woke Bruno and brought him to the scene of the murder. Jean was in the crowd and yelled out to the police, "He [Bruno] did it. It was him." Jean hit Bruno in the face. The police separated

---

[15] Rogers DD5, "Interview with Witness." It was established that the deceased was shot as he ran on Church Avenue from East 55th to 54th Street and collapsed in front of the Club on Church between 54th and 55th Streets. Chapman stated in her subsequent audiotaped statement she was on Church and East 55th. (*see* below) Defendant was 6', 29 years old, and 135 lbs.

[16] The riding ADA responds to the precinct after the crime and conducts recorded interviews of witnesses. The riding ADA in this case conducted all precinct interviews except for Pierre's. (*see* below)

[17] Nostrand Avenue is not close to the Club.

[18] Audiotape A86-1500 and accompanying transcript.

them and brought Bruno into the Club. Bruno tripped over the deceased and saw the deceased was Jean's brother.[19]

<u>Jerome Pierre</u>

On September 21, at the 67th Precinct (time not stated), PO Elder interviewed Jerome Pierre. Pierre stated the following:

At approximately 4:15 a.m., Pierre was parked in front of the Club. Four Black males were in a yellow cab parked in front of Pierre's car. The deceased approached the cab's passenger side and told the passengers, "Go! They're coming! Go!"

The deceased walked to the northwest corner of East 55th Street and Church Avenue, looked up 55th Street, turned around, and ran back down Church toward East 54th Street, yelling for help. A Black male, (whom Pierre later identified as defendant), appeared from around the corner of East 55th Street, armed with a gun. Defendant was chasing the deceased.

Defendant shot at the deceased. The deceased reached the Club and tried to open the door, but could not get in. The deceased turned, now facing defendant. Defendant shot the deceased "point blank" in the middle of the head. The deceased fell backward. Defendant looked like he was going to shoot again, but he did not.

Defendant walked away toward East 55th Street. Pierre followed. Defendant spoke to two Black males on the corner of East 55th Street and Church Avenue. One of them told defendant to go into the yellow house. The two males walked south down East 55th Street towards Snyder Avenue. Defendant ran north on East 55th Street toward Linden Blvd. and into the yellow house on the east side of the corner.

Pierre described the shooter as a Black male, 6', dark-skinned, with a thin build, a light mustache, sideburns, and short hair. The shooter was wearing green pants, black shoes with rubber soles, and a black leather hat.

Pierre's brother-in-law, Tony Valentine, had been inside the Club and saw the deceased fighting with a male—who was not the defendant—earlier that evening.[20]

*Handwritten Notes of Pierre's Interview*

The handwritten notes of Pierre's interview were consistent with the account in Elder's DD5, except it included the following notation: "Bruno is the shooter. Pierre said no."

---

[19] Elder DD5, "Interview of George Bruno [pedigree]." George Bruno was apprehended as a suspect (*see* below, CRU Investigation, George Bruno and Henry Sanon Interviews)

[20] Elder DD5, "Interview of Eyewitness."

*Jerome Pierre's Audiotaped Statement*

At approximately 1:15 p.m., at the 84th Precinct, Pierre gave an audiotaped statement to an ADA.[21] POs Elder and Morales (of the PDU) were present. Pierre's statement was consistent with his prior statement. He added the following:

The four men were about to get into the cab. The deceased told them to leave because "the man is coming." They got into the cab and left. Pierre reiterated that the deceased then went back to East 55th Street. The deceased then came running back. Pierre never saw the shooter or the deceased before. Pierre was about 15 to 20 feet away from them at the time of the shooting. He thought the gun was a .38. It was black with a brown handle. After the shooting, the shooter walked away, "like nothing happened."

After Pierre saw the shooter go to the yellow house, Pierre returned to the scene. The police arrived about seven minutes later. Pierre told an officer, whose name Pierre believed was "Locky," the "same story."[22] The shooter had on a striped sweater and shirt. Pierre thought the shooter was Jamaican because the shooter had on a little black "Jamaican" hat with no "spots" [sic] on it.[23]

<u>Kelric Hinds</u>

On September 21, at approximately 6:50 a.m., at the 67th Precinct, PO Rogers interviewed 59-year-old Kelric Hinds. Hinds stated the following:

At about 4:25 a.m., Hinds was on the northside corner of Church Avenue and East 54th Street with two female companions, "(names unknown)." Hinds saw a tall, thin, Black male with a gun chasing another Black male (the deceased), eastbound on Church Avenue between "53rd and 54th Streets." The tall Black male fired one shot, hitting the deceased in the back, and then fired a second shot. The deceased fell. Hinds said he might be able to identify the shooter.[24]

*Kelric Hinds' Audiotaped Statement*

On September 22, at 12:06 a.m., after defendant's arrest (*see* below), at the 67th Precinct, Hinds gave an audiotaped statement to the riding ADA. PO Elder was present. Hinds stated the following:

He crossed from the northern side of Church to a public phone on the south side of Church. As he crossed, he saw a person chasing the deceased. They were about six feet apart. He did not see the deceased with a weapon. He heard two gunshots. He thought about calling 911 from a nearby phone booth but was concerned the shooter would notice and shoot him. The shooter was about 5'8" and

---

[21] CRU found no explanation as to why Pierre's audiotaped interview occurred at the 84th Precinct, and by a different riding ADA, rather than the 67th Precinct.

[22] Lockley responded to the scene with Gavaghen. (*see* above, Police Investigation, Responding Officers) There is no documentation of Pierre's statement to Lockley or any other officer at the scene.

[23] Audiotape A86-1870 and accompanying transcript.

[24] Rogers DD5, "Interview with Witness." The ballistic evidence shows that the deceased was shot as he ran to the Club on Church Avenue between 54th and 55th Streets, where he collapsed and died.

wore a jacket with light and dark horizontal stripes. After the shooting, the shooter walked toward East 55th Street.[25]

Off tape, Hinds said he "could not recognize the shooter."[26]

<u>Peter Everton Thomas</u>

On September 21, at 8:50 a.m., at the 67th Precinct, Det. Krause interviewed Peter Everton Thomas. Thomas stated the following:

He arrived at the scene when the police were there. He was curious as to whether he knew the deceased. He was about to leave when the police stopped him and brought him to the precinct. He had never been to the Club before. He did not see the shooter. At about 3:00 a.m., he had been at a bar on East 53rd Street and Rutland Road. He met and girl at the bar, and at 4:00 a.m. he walked her home.[27]

<u>Defendant</u>

*First Interview*

On September 21, at approximately 3:00 p.m., Det. Roiland interviewed defendant at his residence (a yellow house). PO Elder, Det. Krause, and POs Morales and Messerschmitt were present. Roiland noted that Pierre had indicated that the shooter ran to this house (after being instructed to do so by the two unidentified men on the corner of Church and East 55th Street [*see* above, Pierre interview]). Defendant stated the following:

He was at a party next door to his house until 12:15 a.m. He then picked up two girls at Linden Blvd. and East 55th Street and they went to a club on Linden Blvd. and Montauk Street. At 5:30 a.m., they left. At about 6:30 a.m., defendant drove the girls home and then dropped off his cousin, Joe Cole, at Union Street and Utica Avenue. Defendant returned home at around 7:00 a.m.

Defendant said he had last shaved the previous day, but it appeared to Roiland that defendant had shaved within the past several hours.

Roiland spoke to a woman "over the fence," who said defendant always had a light mustache.

Defendant agreed to go to the precinct. He put on a black leather hat "sitting back on his head." Roiland noted that Pierre had said that this was the way the shooter wore a black leather hat. Roiland asked defendant if he was willing to be placed in a line-up. Defendant agreed.[28]

*Second Interview*

At the 67th Precinct (time not stated), PO Elder interviewed defendant. Defendant's statement was consistent with his prior statement. He added the following:

---

[25] Audiotape A86-1780 and accompanying transcript.

[26] Homicide Bureau Information Sheet, follow-up.

[27] Krause DD5, "Interview at the 67 PDU office of Peter Everton Thomas [pedigree]."

[28] Roiland DD5, "Interview [Defendant]." There is no indication as to when Roiland spoke to the "woman over the fence."

His wife returned home from work at about 12:00 a.m. He told her that he was going to a party next door. He had one drink at the party and left. He then picked up the two girls, and they went to the Village Hut on Linden Blvd. and Montauk Street.[29]

**Pierre Identifies Defendant in a Line-Up**

On September 21, at approximately 5:05 p.m., at the 67th Precinct, Pierre viewed a line-up with defendant as the subject. Defendant was in position number four. Pierre identified defendant as the shooter and stated, "[E]verything is the same from the neck up except that he shaved off his mustache."[30]

**Defendant's *Mirandized* Statement, Request for an Attorney, and Arrest**

At 5:20 p.m., defendant was *Mirandized* and waived his rights. "He then made the same statement he had made earlier, basically [a] denial."[31]

Defendant agreed to make a videotaped statement to the riding ADA. After the riding ADA arrived at the precinct and the videotape was set up, defendant asked for a lawyer.

Elder arrested defendant, charged him with second-degree murder, and brought him to Central Booking for processing. The case was marked closed.[32]

Defendant was 6', 135 lbs., had short hair, was from Guyana, and had the nickname, "Silky."[33]

**Sandra Robert's Audiotaped Statement**

On September 22, at approximately 1:50 a.m., at the 67th Precinct, Sandra Roberts, defendant's wife, made an audiotaped statement to the riding ADA. PO Elder was present. Roberts stated the following:

On September 21, between 12:10 and 12:30 a.m., she returned home from work. Defendant said he was going to a neighbor's party next door. He asked for the car because he first had to go to his mother's. Defendant left at about 1:00 a.m. Roberts was up with the baby until 4:00 or 4:30 a.m. She did not hear noise coming from the backyard.

Defendant returned home between 6:30 and 7:00 a.m. There was food on the table, which defendant brought from the party next door. Defendant ate and went to bed.

---

[29]Roiland DD5, "Interview [Defendant]." There is no indication defendant was *Mirandized*.

[30] Elder DD5, "Lineup Conducted Suspect Positively ID."

[31] CRU could not locate any documentation memorializing the actual substance of defendant's *Mirandized* statement.

[32] Elder DD5, "Closing of Case with One Arrest"; Elder DD5, "Arrest of [Defendant]" The People authorized the arrest and directed "P.O." to canvass the scene for more witnesses, among other things. *See* Homicide Bureau Information Sheet, Follow-up.

[33] Elder DD5, "Closing of Case with One Arrest."

When Roberts was about to leave for work, the police rang the doorbell, waking defendant. The police asked for defendant. Because she was late for work, Roberts left, and the police went inside to speak to defendant.[34]

## THE INDICTMENT[35]

On October 22, 1986, defendant was charged with one count each of Murder in the Second Degree (P.L. § 125.25[1]); Criminal Possession of a Weapon in the First Degree (P.L. § 265.03); and Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02[4]).

## THE PRETRIAL HEARING

On August 26, 1987, a *Wade* hearing was conducted.[36]

### The People's Case

PO Elder

Elder testified as follows:

She had been an investigator in the 67th PDU for about 14 months. Her duties were essentially the same as those of a detective. (H.3-4) She conducted defendant's line-up on September 21, 1986, at about 5:05 p.m. (H.5-6) Defendant agreed to the line-up, "He didn't mind." (H.7) Det. Roiland and Elder's supervisor, Sgt. Perham, were present at the line-up. (H.32)

Jerome Pierre was brought to the precinct as a witness. There were no suspects at that time. (H.11, 13) Elder had seen Pierre earlier that morning. (H.13) When Elder met defendant, she did not have any plan to put him in a line-up. Defendant was brought to the precinct at about 3:00 p.m. (H.61-62)

When Pierre viewed the line-up, Elder asked if he could identify the shooter. (H.17, 19) Pierre was the only witness to view the line-up. He identified number four (defendant) and remarked that defendant shaved off his moustache. (H.11) Pierre's description of the shooter included that he had a light mustache, sideburns, and wore a black leather hat. (H.46) Defendant was not wearing a hat in the line-up. His arrest photo did not show a beard, facial hair, or a mustache. (H.48) Elder vouchered defendant's hat after the line-up. She did not show it to Pierre. (H.55)

A detective may have shown photos to Pierre when Pierre arrived at the precinct. To Elder's knowledge, Pierre did not identify anyone in the photos. (H.58, 63)

---

[34] Audiotape A86-1796, and accompanying transcript; Homicide Bureau Information Sheet, follow-up.

[35] Because grand jury proceedings are secret (C.P.L. § 190.25[4][a]), discussions of the proceedings are redacted. Notably, the presumption of secrecy can be overcome by demonstrating "a compelling and particularized need" for access to the grand jury material. *Matter of District Attorney Suffolk County*, 58 N.Y.2d 436, 444 (1983). If that threshold is met the court must then balance various factors to determine whether the public interest in the secrecy of the grand jury is outweighed by the public interest in disclosure. *James v. Donovan*, 130 A.D.3d 1032, 1039 (2d Dep't 2015) (refusing to release the grand jury transcripts in the investigation into the death of Eric Garner in Staten Island, citing the strong presumption in favor of grand jury secrecy and the "chilling effect" that a release of transcripts would have on witnesses before such a tribunal).

[36] The purpose of a *Wade* hearing (*United States v. Wade*, 388 U.S. 218 [1967]) is to determine whether identification procedures were so improperly suggestive as to taint an in-court identification at trial.

**The Defense Request to Call Pierre**

At the end of the People's case, counsel requested to call Pierre as a witness. Counsel maintained that Pierre's identification was mistaken because Pierre described that the shooter had a mustache and wore a hat, neither of which defendant had in the line-up. (H.71)

**The Hearing Court's Decision**

The court determined that Elder was credible, and the line-up was not unduly suggestive. (H.80-81) However, in order to determine whether there was any issue to reconsider, the court allowed the defense to move to reopen the hearing to call Pierre as a witness prior to Pierre's trial testimony. (H.69-70, 82)

**THE TRIAL**

On September 2, 1987, jury selection commenced. On September 3, during jury selection, the trial ADA gave the defense Chapman's audiotaped statement to the riding ADA and said that the People did not intend to call Chapman as a witness. (T.91)[37]

**The Reopened *Wade* Hearing**

Prior to People's case, the court granted counsel's motion to reopen the *Wade* hearing. (T.103-04) Pierre, called by the defense, testified as follows:

He arrived at the precinct at about 7:30 a.m. Sometime later, he looked through three albums of photographs and did not identify anyone. (T.107-08, 127) At some point, he viewed a line-up. (T.108-09) He was asked whether he saw anyone that he had seen that day. Pierre looked back and forth and recognized number four. (T.115-17) The shooter had been wearing a black leather hat with a front brim and had a thin, light, mustache. (T.117-21) Number four was not wearing a hat and had no moustache. (T.124) Pierre did not base his identification on any distinguishing factor. (H.129)

The court adhered to its original decision. (T.132-33)

**The People's Case**

<u>Jerome Pierre</u>

Pierre's testimony was more detailed than his prior statements. He testified as follows:

There were two doors to enter the Club. The first door went into a vestibule, which had a bell to ring to gain entry into the Club. The second door opened into the Club. (T.205)

Prior to going to the Club, Pierre was at a wedding with his family. When driving his family home, he met a friend who told him, "All your guys are inside the club." (T.222-23) Pierre's brother-in-law, cousin, and wife's cousin were in the Club. After driving his family home, Pierre drove to the Club but did not go in. He parked his car. First, he testified that he sat in the car smoking a cigar. Then he

---

[37] On 9/4/87, jury selection was complete, and the trial commenced. (T.93)

testified that he sat outside smoking a cigar. (T.223) When he was done smoking, he went into the Club and talked to "the guys." (T.223)

Pierre heard that there had been a fight in the Club. He did not see the fight and was not involved in one. (T.292) The Club was crowded, and he went outside to get some air. It was about "4:15 a.m. or so." (T.223) Pierre did not drink that night. He was not a drinker. (T.223-24)

Outside, he sat on the hood of his car, which was parked in front of the club. (T.225) A yellow cab was parked right in front of his car, "bumper to bumper." (T.225)

Before 4:30, between 4:14 and 4:20 a.m., he saw a man (the deceased) come from the corner of 55th Street. (T.224-25, 227) Pierre had never seen the deceased before. (T.226) Pierre saw four men. He inconsistently testified about whether they came out of the Club or the yellow cab—first testifying they came out of the Club; then testifying they came out of the cab and were going into the Club; then testifying, again, they just came out of the Club; and last testifying they got out of the cab. (T.225-26) Pierre recognized them but did not know their names. (T.293)

The deceased went up to "him" and said, "Leave now and go because they're coming." (T.225-26) The "guy" got out of the cab and went "straight to Church Avenue." (T.225-26) Pierre then testified that after the deceased told the men to leave, "They hopped in the car and start[ed] the car and le[ft]." (T.228) Pierre was sitting in his car. He opened the door to see "what's coming." (T.228)

Pierre first testified that the deceased went back inside the Club. Then he testified that the deceased did not go inside. He just looked inside and went back out. (T.226, 228) Pierre then testified that the deceased went inside for a minute or two. (T.229, 293) Pierre was confronted with his audiotaped statement that after telling the men to leave, the deceased went back to East 55th Street. (T.295) Pierre testified that he was not asked whether the deceased went into the Club. (T.296)

After the deceased told the men to leave, Pierre just stood there. (T.229) Within minutes the deceased went back to the corner. Someone then yelled, "Help, help, they're coming," and the deceased and defendant came running from the corner of East 55th Street heading towards Pierre. (T.230)[38] Pierre stood on "the stoop." (T.231) First, Pierre testified that when he first saw them running, the deceased and defendant were about a foot and a half apart. (T.232) Then he testified that they were "like four, five feet" apart. (T.264) Defendant shot at the deceased, who ran back to the Club and struggled to open the door. The deceased turned around and defendant shot him in the forehead. (T.232-34)

Pierre testified that he initially saw defendant when defendant shot the deceased in front of the Club. The defendant was "right in front of [Pierre]." (T.236) Then Pierre testified that he first saw defendant when defendant was chasing the deceased. Pierre was about 15 feet away. (T.237) To illustrate 15 feet, Pierre pointed to a wall in the courtroom, which was determined to be about 25 feet away. (T.264-65) Pierre did not see the shooting, he "just heard a bang." (T.263)

The deceased was not armed. (T.237-38) As defendant chased the deceased, Pierre was about seven or eight feet away. (T.238) Pierre saw defendant's face when defendant shot the deceased at the door.

---

[38] During his testimony Pierre identified defendant in court. (T.235)

(T.239) About a minute elapsed between the first and second gunshots. (T.266) Pierre was about four feet away at that time. He also testified that it was less than four feet. (T.239) Defendant's back was to Pierre at that time (T.239), for "a split second." (T.269) The area was well-lit. (T.240)

After the deceased fell, defendant turned around and Pierre and defendant stared at each other. (T.240) They took a "deep" look at each other. (T.240-41) It was momentary, like the snap of the finger (which Pierre demonstrated in court). (T.270)

Pierre acknowledged that he had also stated that the closest he was to defendant and the deceased was eight to 10 feet. He testified that he did not have a ruler with him. (T.298-99) He also testified that he did not remember the case because he did not talk about it until "they called" him last month. (T.301)

Pierre looked at defendant closely "just in case they needed an identification." (T.241) Defendant walked back to 55th Street. Pierre slowly followed to see whether defendant would get into a car. Pierre intended to get the license plate number—as they do on TV. Pierre stayed 10 or 12 feet behind defendant. (T.241) Pierre was not afraid to follow defendant "for the simple reason: If I was afraid, he would have shot me." (T.274, 318) Also, he was not afraid because defendant did not shoot him right away. (T.319)

Defendant walked slowly and turned on East 55th Street toward Linden Blvd. Two very tall guys, one wearing khaki pants, were coming down the street from Linden Blvd. (T.242, 279) Pierre never saw them before. (T.281) They met up with defendant and talked as they walked. Pierre leaned against an apartment building on the corner and watched. (T.242) Pierre was 10 to 15 feet away. (T.275)

The two guys told defendant, "Go over there, go to that house there. Go to that yellow house." (T.242-43) Defendant went across the street, opened the gate in the back of the yellow house, and went into the yard. (T.242) Pierre could not see the back of the house, and he did not see defendant after that. (T.276) Pierre also testified that as soon as defendant opened the gate, he did not see defendant, because he walked back to the scene. (T.275, 278) The police arrived when Pierre returned to the scene. (T.248)

Counsel confronted Pierre about his prior statement that he went up to one of the two individuals and accused that individual of the shooting.[39] Pierre denied saying that he went over to the individual but claimed that he said to both individuals, "You caused to kill the guy. That means you the one that ordered to kill him." (T.280) Pierre did not have any knowledge about that, but "it seemed like" that happened since they told defendant to go to the yellow house. (T.282) Pierre considered this information important but did not tell the police about it because there was nothing he could say. (T.283)

The yellow house was about three or four houses down the block, closer to Church. (T.242) Pierre learned at trial that defendant lived in the yellow house. (T.275)

---

[39] Counsel mentioned that Pierre made the statement during an interview at the KCDA with counsel and the prosecutor. CRU does not have any document, recording, or transcript of this interview.

Counsel asked Pierre whether there were any other people standing at the corner (55th and Church) besides the two men who told defendant to go to the yellow house. Pierre testified he saw two ladies and a man in his 60s. He had never seen them before. (T.278)

When he returned to the scene, Pierre just sat there. He talked to the police "at the last minute." (T.248) He told the police defendant was 5'11" or 6', in his late 20s, not in his 30s, with a slim build, approximately 140 to 145 lbs., and Black, with a lighter complexion than Pierre. (T.248-50)[40]

He testified that he did not recall whether defendant had any facial hair, but then testified that defendant had a thin mustache, "a tiny little thing," and thin sideburns "up to the ears." (T.250) Defendant wore a black leather hat, which looked like a "regular cap." (T.251) He wore black shoes with dark-colored pants, and a jacket with stripes. (T.250)

Pierre identified defendant in a line-up and told the police defendant shaved off his mustache and had a hat on. Pierre recognized defendant's face. (T.252) During his testimony, Pierre was shown the hat recovered from defendant. Pierre testified that it was the same type of hat, the same style as the shooter's, but Pierre had not seen the top of the hat. (T.252-53, 61) He had not seen whether there was a star on the top. (T.259) Pierre had seen the same type of hat on the street, and he, himself, had a similar one. (T.258) He did not know whether the hat shown to him during his testimony was the same hat as defendant's. (T.262)

Pierre acknowledged that he previously said that he thought defendant was Jamaican. (T.305; *see* above, audiotaped statement) Pierre based his belief on "the star" on defendant's hat. He denied that he had testified that he could not see the star on the top of the hat, insisting that he said "style," even after the court reporter read back his testimony. (T.305-06)

Pierre then testified that he thought defendant could have been Haitian, or from Trinidad, or a "Black man." (T.307, 309) He did not know defendant "personally." (T.307) Pierre never saw defendant before. But defendant "probably" saw Pierre before since Pierre usually went to that neighborhood. But they "never talked." (T.311)

PO Gavaghen

Gavaghen testified as follows:

She and her partner PO Lockley were on routine patrol when, at about 4:29 a.m., they received a radio run of a male shot in the head. (T.329) They arrived at the scene within minutes. (T.330) There was a large crowd outside the Club, which dispersed when she and Lockley approached. A man was performing CPR on the deceased. (T.332) The man said he had removed the deceased's shoes. Gavaghen did not attempt to get that man's name, and she did not know when the man arrived at the scene. (T.338)

Gavaghen and Lockley safeguarded the scene until about 8:00 a.m. Gavaghen did not interview any witnesses. (T.334) When the sun came up, at about 6:00 a.m., Lockley recovered two spent .32 caliber

---

[40] Pierre's complexion was not described.

shells from the sidewalk a couple of feet from the Club door—one "straight ahead" and one a little to the side. (T.335)

Gavaghen did not see defendant at the scene. (T.341)

PO Elder

Elder testified as follows:

She worked in the 67 PDU investigating crimes, both misdemeanors and felonies. Her duties were the same as those of a detective. (T.344)[41] Elder became involved in the investigation when she arrived at work at 8:00 a.m. (T.345)

In connection with the investigation, Elder questioned witnesses. Elder spoke to Pierre and gained information about the shooting. After questioning Pierre, she attempted to apprehend the shooter. (T.345) At about 3:00 p.m., she and five other officers went to the yellow house at East 55th Street, where a woman, who was leaving, directed Elder to the back. (T.346, 348, 365) Some of the detectives went into the house. (T.369) At the back of the house, Elder spoke to someone, whom she assumed was the woman's father. (T.346-47, 367) He brought defendant outside. A detective spoke to defendant. (T.346-47)

Defendant was wearing pants and no shirt. Defendant put on a shirt and a black leather hat with a brim and a star on the back of it. (T.348)[42] It looked as though defendant had just shaved. (T.349)

Pierre was the only witness who viewed the line-up. After the line-up, Elder arrested defendant. (T.351) Defendant's pedigree included that he was 6', 135 lbs., and 29 years old. (T.352) He had short hair and no mustache. (T.352-53, 359)

After Elder left defendant's house, she did not go to the crime scene. Elder did not know that someone at the scene administered CPR to the deceased. (T.366)

**The Defense Motion to Dismiss**

At the conclusion of the People's case, the defense moved to dismiss the indictment, based on the untimely disclosure of exculpatory information contained in Chapman's audiotaped statement—that Chapman saw the shooter jump into a car and leave the scene. (*see* above, Police Investigation, Chapman Audiotaped Statement to the riding ADA; T.500-02)

The court listened to the recording and noted that Chapman's DD5 did not contain this information. (T.752) As a remedy for the late disclosure, the court allowed the defense to call the riding ADA, who interviewed Chapman, to testify about that portion of Chapman's audiotaped statement, which directly contradicted Pierre's trial testimony. (T.754, 762-63)

---

[41] The prosecutor thereafter addressed Elder as "Detective." (T.344)

[42] The hat was admitted into evidence through Elder (T.355; [Ex. 6])

13

**The Defense Case**

<u>Defendant</u>

Defendant's testimony was substantially the same as his prior statements. He added the following:

Defendant lived with his wife, two children, and father-in-law. (T.513) He had been a taxi driver for two years until his taxi was stolen. He was not working on September 21. (T.514) Defendant was not in the vicinity of the crime scene on September 21. (T.527) The deceased's family lived down the street from defendant. (T.658) He knew some of the deceased's family, but not the deceased. He had never seen the deceased or Pierre before. (T.527, 529)

On September 20, at around 11:30 p.m., defendant put his son to sleep, showered, shaved, and dressed. (T.514) He was always clean-shaven, but sometimes he had light hair on his upper lip. (T.666)

At around 12:15 a.m., he went to his next-door neighbor, Cheryl Burke's, surprise birthday party. (T.514) He told his wife that he was going to Burke's party, and not that was going out with Dennis and Martin. (T.631) At the party, defendant saw Burke's father, Guy Pear, and her mother, Helen Pear. (T.634-35) Defendant also saw Fred Fleary. (T.634-36)

At the Village Hut, a disco, defendant stayed between the bar area and the door. (T.645-46) He danced with Dennis and Martin. (T.648) Defendant did not see Roger Maddison there. (T.677)

Defendant was sleeping when the police arrived. PO Elder said they were investigating a murder and "the kid ran through the yard." (T.520) In response to Det. Kirscher's questions, defendant said he was from Guyana, South America, his father-in-law owned the house and lived on the top floor, and no one lived in the basement. Kirschner asked the father-in-law for permission to search the basement. Kirschner and another male officer went down to the basement. (T.520-21)

Defendant did not recall whether he gave PO Elder Dennis' address, but he believed that he told Elder that Dennis lived on Linden Blvd. He was certain he provided Dennis' phone number. (T.669-70)

<u>Cheryl Burke</u>

Burke testified as follows:

Burke had known defendant for three to four years; he was her next-door neighbor. (T.681) Defendant always had light facial hair above his lip. (T.686)

On September 21, she was thrown a surprise birthday party at her house. She did not see defendant there. (T.682, 685)

At around 5:00 a.m., Burke was outside and heard a murder occurred. She walked over to the scene. (T.684, 687) She did not see defendant there. (T.684) She did not see defendant drive by. (T.688)

Burke returned home and at about 7:00 a.m., defendant came up from 55th Street. Defendant had a red car, but he did not arrive in the car. (T.687-88) Defendant said he was hungry. Burke was with defendant for about five to ten minutes. He said he was tired and went into his house. (T.684-85)

14

Defendant was not wearing a hat. (T.688) He was wearing white pants and shoes, a gray striped shirt, and a gray leather tie. (T.689)[43]

Fred Fleary

Fleary testified as follows:

Fleary lived on the same block as defendant. (T.694) He was at Burke's party. (T.695-96) At around 1:00 or 2:00 a.m. (on September 21), he saw defendant at the party. (T.697) Defendant was not wearing a hat and he did not have a moustache or any facial hair. (T.699)

Christine Martin

Martin testified as follows:

She knew defendant for about six months. (T.714) On September 21, at 12:30 a.m., Martin was at Dawn Dennis' house when defendant arrived with a male friend. (T.715-16) Defendant was wearing a striped gray shirt, gray tie, and light beige pants. He was not wearing a hat. He did not have a mustache or any facial hair. (T.715) She never saw defendant with facial hair. (T.723)

Defendant left to drive his friend home and returned to Dennis' house at about 1:00 a.m. They then went to pick up defendant's cousin, Robert, and they then went to the Village Hut. (T.716-17) Defendant drove a red car. (T.720)

They arrived at the Village Hut at about 2:00 a.m. (T.717) Martin was with defendant the entire time and never lost sight of him. (T.718) Defendant spoke to a couple of his friends there. He danced with Martin and Dawn and never left. (T.719, 750)

At about 5:20 a.m., Martin, defendant, Robert, and Dawn left the Village Hut together. (T.720) When defendant started the car, the digital clock read 5:20 a.m. (T.718, 720, 747)

They were going to drive Robert home but decided to stop at KFC. (T.720-71) En route, they passed the Club and saw the police, an ambulance, and a lot of people in front. They slowed down but did not get out of the car. (T.721) Defendant did not eat anything at KFC. After that they drove his cousin home, arriving at about 5:45 a.m. From there defendant drove Dennis and Martin home. They arrived at around 6:00 a.m. (T.721-22)

---

[43] On 9/1/87, at the KCDA, just before the trial commenced, the prosecutor separately interviewed Burke's parents, Helen and Gervela ("Guy") Pear. Helen stated that she saw defendant at the party but did not know the time. She also saw defendant 6:00 or 7:00 a.m. (on 9/21), on the sidewalk talking to Cheryl, who brought defendant food. She did not recall whether defendant had a light moustache. (*see* A87-1696, transcript) Guy stated he did not know defendant. (*see* A87-1697, transcript)

Roger Maddison[44]

Maddison testified as follows:

On September 21, Maddison went to the Village Hut at around 11:00 p.m. to 12:00 a.m. (T.766) Around 4:30 a.m. he left and stayed outside talking to friends. At approximately 5:00 or 5:30 a.m., defendant came out of the Village Hut with two girls and a man. (T.767-68) Defendant did not have a mustache, a beard, or a hat. (T.768-69) Maddison did not see defendant at the bar inside between 2:00 and 5:00 a.m. (T.775) Maddison went home at about 6:00 a.m. (T.766) He had known defendant for about five years. (T.774) He did not know why he did not contact law enforcement with his information. (T.772, 774)

The Riding ADA

*Direct Examination*

Following an off-the-record discussion, the riding ADA testified as follows:

On September 21, at about 4:30 a.m., Chapman saw two guys standing at Church Avenue and 55th Street, talking. Chapman did not know what they were talking about. One guy turned and "went around." The other fired two shots, ran, said something to his friend, and threw his friend a set of keys. The shooter and his friend jumped in the car and left. (T.782-84)

*Cross Examination*

The court told the jury that the parties could not locate Chapman, and it would allow the People to cross-examine the riding ADA "to ensure fairness to everyone at this trial." (T.787-88) The riding ADA testified as follows:

Chapman said she was very high at the time of the shooting and was not clear on exactly what transpired. (T.786) The riding ADA believed that Chapman was unreliable. Chapman said she would not be able to make an identification. (T.788) Chapman had told the police when she was first interviewed that she saw the shooter running on the street and did not mention the shooter going into a car. (T.789-90)

**The People's Rebuttal Case**

PO Elder

Elder testified that defendant did not give her Dennis or Martin's phone numbers. (T.798-99)

---

[44] On 9/10/87, at the KCDA, the trial ADA interviewed Maddison on audiotape. The trial ADA said she understood that Maddison was going to testify for defendant and wanted to know what he had to say. Maddison's statement was consistent with his trial testimony, except he stated that he was outside the Village Hut from 4:30 or 5:00 a.m., and probably not 5:15 a.m., He saw defendant come out with two girls and guy probably around 4:30 or 5:00 a.m. or earlier, but it could have been 5:00 to 5:30 a.m. Maddison headed home at 5:30 a.m. He said was not sure of any of the times. (*see* Audiotape A87-1743, and accompanying transcript)

**The Verdict**

On September 15, 1987, defendant was convicted of Murder in the Second Degree (P.L. § 125.25[1]). (T.968)

**The Victim Impact Statement**

The deceased's aunt, Fernande Eliano ("Fernande"), gave a victim impact statement for defendant's presentence report ("PSR") on behalf of the deceased's entire family. She stated the following:

She was one of the last people that spoke to the deceased before he died. The deceased argued with Jerome. Fernande believed that Jerome may have murdered the deceased or was otherwise involved. The deceased's family was not interested in defendant's sentencing. They wanted the right person apprehended.[45]

**The Sentence**

Defendant obtained new counsel who represented him at sentencing. (S.2)

On October 6, 1987, before sentence was imposed, defendant maintained his innocence. He said that numerous individuals told the People and the police that a friend of Pierre's had blood all over his shirt. Letters were also sent to the police about this. These individuals came to court to testify but the prosecutor did not allow it because they were not eyewitnesses to the shooting. (S.6) The deceased's family told the People about it as well. (S.7-8)

The court remarked that the defense could have called these individuals. The prosecutor maintained that the individuals, including the deceased's family members were not eyewitnesses, and that defendant did not provide the names of any eyewitnesses. (S.8-9)

The court sentenced defendant to a term of imprisonment of 18 years to life. (S.12)

**POST-CONVICTION PROCEEDINGS**

**Defendant's First Motion to Vacate the Judgment of Conviction**

By papers dated November 10, 1992, defendant moved, through counsel, to vacate the judgment, pursuant to C.P.L. § 440.10. Among other claims, defendant argued that the People committed two *Brady* violations.[46] First, the People failed to disclose that Kelric Hinds viewed a line-up with defendant as the subject and did not make an identification.

---

[45] *See* PSR at 4.

[46] Under *Brady* and its progeny, the People are required to disclose exculpatory evidence that would be material to the outcome of the case. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); Where a defendant does not specifically request the information (or make any request), the materiality element is satisfied if there is a "reasonable probability" that had the evidence been disclosed, the result of the proceedings would have been different. *People v. Bryce*, 88 N.Y.2d 124, 128 (1996). Where—as here—a defendant makes a specific request, the evidence is material if there is a "reasonable possibility" that had it been disclosed, the result of the proceedings would have been different. *People v. Fuentes*, 12 N.Y.3d 259, 263 (2009).

Second, the People failed to disclose that two days after the crime, Henry Sanon, the deceased's brother, gave the police a list of names, which included a potentially inculpatory reference to Jerome Pierre. The defense obtained the list from NYPD pursuant to a FOIL request.

In support, defendant submitted, among other exhibits, an affidavit from Hinds dated June 19, 1992, and Sanon's list.

Kelric Hinds' Affidavit

Hinds stated the following:

On September 20, at about 10:00 p.m., Hinds, Chapman, and her niece "Onya" (Aunya Johnson [*see* below, Second Motion to Vacate]), went to Monique's Affair, a bar on Church Avenue between 55th and 56th Streets. After a few hours, they went to the Club. They left after a half hour because Hinds had to work in the morning.

They walked to the corner of 55th Street and Church Avenue to get a taxi. Chapman walked down the street to talk to a friend. Hinds walked across the street to the south side of Church Avenue and 55th Street to use the phone to call a taxi.

Hinds looked back at Johnson and saw a man chasing another west on Church Avenue. After the men ran a few yards, Hinds heard two rapid gunshots. The men were less than eight feet apart from each other. Hinds' view was unobstructed. Hinds did not see any cars in front of the Club, or anyone standing outside the Club other than the two men. The man being chased fell. The shooter turned and walked toward 55th Street. Hinds was scared and did not call the police. He stood by the phone and tried to stay out of the shooter's view.

The shooter was slender, dressed in a striped black and white jacket, and had a head covering. Hinds did not see the shooter's face, but he had a good view of the shooter's build. Within a few minutes, the police arrived and questioned people at the scene. Hinds told them he witnessed the shooting. Hinds was brought to the 67th Precinct and made a statement.

Hinds had to leave the precinct to go to work. He asked the police to call his supervisor to say he would be late. Sometime later, he thought it was the next day, he was brought to the 67th Precinct to view a line-up. He did not see anyone in the line-up with the shooter's build.

Henry Sanon's List of Witnesses

The list had Henry Sanon written on the side, and included, "Gerome (s[h]ooter)," who defendant claimed was Jerome Pierre; Tony Valentine; and "2-waitress[es]' Pocfette (sp) and Lesly." Other names were illegible.

The People's Opposition

The People opposed on procedural grounds and the merits. Regarding the merits, the People submitted the following: (1) PO Elder's written statement that one line-up procedure was conducted, which Pierre viewed, and she was not aware of Sanon's note; (2) Sgt. William Matusiak's affidavit stating that pursuant to the People's FOIL request, he searched for all reports concerning identification procedures in this case and found that one line-up procedure was conducted on August

18

21, 1986, which Pierre viewed; and (3) the trial ADA's affirmation stating she recalled only one line-up, which Pierre viewed, and she did not recall seeing Sanon's note.

The Court's Decision

On May 25, 1993, the court denied the motion without a hearing. It held that because Hinds stated in his affidavit that he did not see the shooter's face, the alleged line-up did not constitute *Brady* material. Furthermore, the court held that the handwritten note did not contain exculpatory information. (H.31-32)[47]

On October 19, 1993, defendant's application to the Appellate Division for leave to appeal the denial of his motion was denied.[48]

**The Direct Appeal**

On or about December 15, 1993, defendant, through counsel, filed his direct appeal to the Appellate Division. Defendant claimed, among other things, that the evidence of guilt was legally insufficient, and the verdict was against the weight of the evidence because Pierre's testimony was illogical, inconsistent, and unreliable. Defendant also claimed that the People's belated disclosure of Chapman's statement—that she saw the shooter leave the scene in a car—constituted a *Brady* violation.

On April 25, 1994, the Appellate Division held that defendant presented "a plausible alibi defense" but the People's evidence was legally sufficient to disprove that defense beyond a reasonable doubt. *Roberts*, 203 A.D.2d at 601. Moreover, the verdict was not against the weight of the evidence. The Appellate Division stated, "Although Pierre's testimony appears to be exaggerated and incongruent in certain respects, it is not incredible as a matter of law." (*id.*).

The Appellate Division, however, determined that the belated disclosure of Chapman's statement constituted a *Brady* violation, and there was a reasonable probability it affected the outcome of the trial. In pertinent part, the Appellate Division stated that Chapman's statement contradicted Pierre's testimony and "obviously has a direct bearing on his credibility." (*id.* at 602). The Appellate Division observed that although Chapman's statement was read into evidence, the People elicited on cross examination the riding ADA who took the statement, information not contained in the statement, including that Chapman was drunk, could not identify the shooter, or recall what happened, and the riding ADA deemed Chapman unreliable. (*id.*).

The Appellate Division held that although the issue was not properly preserved for appellate review, a new trial was required in the interest of justice (*id.*).

The People did not appeal the Appellate Division's decision.

---

[47] CRU does not have a copy of the 5/25/94 transcript and relies on the People's procedural history account in their opposition to defendant's second motion to vacate. (*see* below)

[48] *See* Appeals file.

**Defendant's Second Motion to Vacate**

While his appeal was pending, on or about January 23, 1994, defendant, through counsel, filed a motion to vacate judgment claiming, among other things, that newly discovered evidence showed that Eleanor Chapman and Aunya Johnson both witnessed the shooting and stated that defendant was not the shooter.

In support, defendant submitted, among other things, a videotaped statement and affidavit from Chapman; an affidavit from Johnson; and Hinds' affidavit. (*see* above, First Motion to Vacate) The evidence was obtained by private investigators, who located the witnesses.

<u>Chapman</u>

*Chapman's Videotaped Statement*

On September 29, 1993, on videotape, Chapman stated the following:

On September 21, she was with her friend Aunya Johnson. She and Johnson were partying at the Club, a Haitian club when a fight broke out between three guys. The fight escalated, so Chapman and Johnson left and walked to the corner.

Two of the men who had been fighting came out of the Club, arguing. One of them, who was short and wearing a Rastafarian hat, walked backward and the other man was behind him. The man in the Rastafarian hat fired two gunshots at the other man.

The shooter ran in Chapman's direction, holding a gun. He threw a set of keys to another man standing by a car and said, "Drive mon." The friend and the shooter got into the car. The shooter was in the back passenger seat. The car drove off.

Chapman returned to the Club, where someone was performing CPR on the deceased. A man came out of the Club and told the police that Chapman witnessed everything, but she denied it.

The police brought her to the precinct, and she reported everything she saw. She provided only her maiden name, Chapman, and not her full name, Chapman-Legg, because she did not want to be found. She was nervous and falsely claimed she was high because she feared for her life if she had to testify against Jamaicans. Chapman was no longer afraid because no one knew her name or where she lived, and they would have forgotten what she looked like by now.

The shooter was approximately 5'8" or 5'9", medium build, brown skin. His Rastafarian hat covered his dreadlocks. His hair went around the hat. He was wearing a yellow and blue striped jacket. Chapman got a good look at his face when she saw him in the club. Chapman did not observe anyone follow him after the shooting. She was about four feet or less away from him.

During her videotaped statement, the defense investigator showed Chapman a 1989 DOC photo of defendant.[62] Chapman said he was not the shooter—defendant was too dark, too small, and did not have enough hair. The shooter had thick hair around his head.

No one ever came to speak to her about the case and she never viewed a line-up.

*Chapman's Affidavit*

Chapman's affidavit dated December 17, 1993, was substantially consistent with her videotaped statement. She added the following: On September 21, she and Aunya Johnson first went to Monique's Affair, a club on Church Avenue near 55th Street. There she ran into a friend, Kelric Hinds. At around 3:30 a.m., Chapman, Johnson, and Hinds went to the Club. About 45 minutes after they arrived two Jamaican men and a Haitian began arguing. She was familiar with the accents. She and Johnson left the Club and stood on the corner of East 55th Street and Church Avenue.

About three minutes later, the same three men came out of the Club, still arguing. One of the Jamaican men walked toward where Chapman was standing. The other Jamaican man and the Haitian man continued to argue in front of the Club. The Haitian man said, "Shoot me, mon." Chapman heard a gunshot. The Jamaican man shot the Haitian man. The Jamaican man shot a second time and the Haitian man fell.

The shooter and the other Jamaican man ran toward Chapman, and she was face-to-face with them at one point. The shooter threw keys to a third Jamaican man (in a car) and said, "Drive." The shooter jumped into the front passenger seat of the car and the first Jamaican got into the rear of the car. The car was parked on the corner of East 55th Street. It drove to Church Avenue and turned left.

Chapman went to the front of the Club where people were performing CPR on the deceased. When the police arrived, a man told them that Chapman had seen everything. She agreed to give a statement. She was afraid to be involved and falsely said she was high and could not identify anyone. She said her last name was Chapman.

She had several good observations of the shooter: When he first entered the Club; during the fight in the Club; in front of the Club arguing; during the shooting; and when he ran past her. The shooter was about 5'8" or 5'9" and had light brown skin. He wore a large wool Rastafarian-type hat, with hair sticking out. He also had on a wide-striped jacket.

At the time of her affidavit, the defense investigator showed her a photo of the man who was in jail for the shooting. He was not the shooter. The skin complexion of the man in the photo was too dark. She did not know defendant or his family. She was willing to testify in court.

<u>Aunya Johnson</u>

In her affidavit dated December 16, 1993, Johnson stated the following:

On September 21, around 12:00 a.m., she and Chapman were at Monique's Affair where they met up with an older man, whose name she could not recall. At about 3:30 a.m., the three of them went across the street to the Club. About an hour later, three men started fighting inside the Club. Johnson and Chapman left and walked to the corner of 55th Street and Church Avenue where they waited for a ride.

As they stood on the corner, two of the men who had been fighting in the Club came out and argued. Their argument became loud, and Johnson could tell by their accents that one was Jamaican and one was Haitian. Johnson crossed Church Avenue and as she was crossing, she heard a gunshot. She

turned and saw the Jamaican man running from the front of the Club toward 55th Street. The Haitian man fell.

The Jamaican man had a very light-skinned complexion, was approximately 5'10", with a medium build, and was wearing a large wool red, green, and gold Rastafarian hat over his dreadlocks.

Johnson went into a Chinese restaurant opposite the Club. She looked back and saw a car that had been parked on East 55th Street drive off. She did not see the shooter after that.

Johnson was not intoxicated or high on drugs that night. She did not speak to the police or get involved because she was afraid for herself and her family.

The defense investigators showed Johnson a photo of defendant and she stated that he was not the shooter. The man in the photo had a much darker complexion than the shooter. Johnson did not know defendant or his family.

### The People's Opposition

By papers dated March 15, 1994, the People opposed defendant's motion on procedural grounds and the merits. Regarding the merits, the People argued that Chapman's and Johnson's statements were unreliable because they were inconsistent with Chapman's prior statements and with statements from other eyewitnesses. By contrast, Pierre, a disinterested witness, gave an unequivocal and consistent account.

### The Court's Decision

By written decision dated May 12, 1994, the court held that defendant's motion was rendered academic by the Appellate Division's decision, and the motion was deemed withdrawn.

### DEFENDANT PLEADS GUILTY TO MANSLAUGHTER IN THE FIRST DEGREE

On September 27. 1995, the parties appeared in court. Defense counsel informed the court that a disposition had been reached. (P.2) The People agreed to a plea of guilty to Manslaughter in the First Degree, in full satisfaction of the indictment, and a prison sentence of two and a third to seven years. (P.2-3)

In pertinent part, defendant's plea allocution was as follows:

> THE COURT: Do you now admit that on September 21 of 1986 at approximately 2:30 a.m., in front o[f] a social club on Church Avenue between East 54th and East 55th streets here in Brooklyn, you intentionally shot Pierre Richard Sanon with a handgun with intent to cause him serious physical injury, and as a result of this shooting, Mr. Sanon died?[49]
>
> THE DEFENDANT: Yes, Your Honor.

---

[49] The crime occurred at about 4:30 a.m., not 2:30 a.m.

(P.10) Defendant had been free on bail since the reversal of his murder conviction. Bail continued and he remained free awaiting sentencing. (P.11-12)

**The Sentence**

On November 6, 1995, defendant was sentenced as promised. He was surrendered to the correctional facility to be processed for release. (S2.3-4)

## THE CRU INVESTIGATION

CRU learned from the defense that as part of the plea agreement, the defense asked for an *Alford* plea, which would have allowed defendant to plead guilty while maintaining his innocence. The People refused. Defendant pleaded guilty to first-degree manslaughter to avoid a possible conviction and return to prison. Under the terms of the offer, he would not have to serve a prison sentence or be under parole supervision. Defendant wrote to CRU that:

> There is hardly a day that I do not regret pleading guilty to a crime I did not commit. Avoiding the risk of losing again at trial and returning to prison seems less worth it in hindsight and sparing my mother and champion during my incarceration of that hardship brought its own pain and consequences. My life since has been hard and filled with much loss. I promised my mother before she died that I would continue to fight to establish my innocence and honor her fight and sacrifice to free me and clear my name.

Defendant continues to maintain that at the time of the shooting, he was at the Village Hut with friends Dawn Dennis, Christine Martin, and his cousin Robert Cole. He states that he never met the deceased or Pierre.

CRU's investigation included reviewing transcripts of the pretrial hearing and trial, and the People's trial and appeals files. In addition, CRU interviewed numerous witnesses. Lessack, Hinds, the deceased's aunt Fernande Eliano, and Chopette (discussed below) are deceased and were not interviewed.[50] The relevant evidence is discussed below.

**The People's Trial File**

<u>Documents Regarding the Fight Inside the Club</u>

In addition to Pierre's statement to PO Elder that the deceased fought with someone in the Club (*see* above, Police Investigation, Pierre's interview), and Chapman's and Johnson's statements in their respective affidavits regarding a fight in the Club (*see* above, Post-Conviction Proceedings, Defendant's Second Motion to Vacate), CRU located the following documents and evidence regarding the fight:

---

[50] Chopette is spelled numerous ways in the documentation. For the sake of consistency, "Chopette" is used. CRU heard from various witnesses that Chopette was deceased, but they did not know when she died, and CRU could not determine her full or real name. Investigative databases showed that Hinds died on 12/28/2010, and Lessack died on 12/27/2016. Reggie St. Pierre informed CRU that his aunt, Fernande Eliano, passed away but did not indicate when.

*Lamercie Sanon*

Less than three months after the shooting, the deceased's mother indicated that his murder was related to a fight inside the Club. Specifically, in a form letter dated December 4, 1986, addressed to Lamercie Sanon, the deceased's mother, KCDA Investigator Brown (first name unknown) requested that Lamercie fill out the form with updated contact information and her pedigree information. The form letter indicated that a self-addressed, stamped envelope was included to use to return the form. Sanon filled out some of the requested information and handwrote at the bottom the following:

> Fig[h]ting with 2 men after the fig[h]t they through [sic] him at the rear with his shoes on the side. My son died inside the club from having a fight with a man named Leslie and Jerome and two witnesses as waitress Cho[]pette the other one I don't know.[51]

*Fernande Eliano*

While the appeal was pending, the People spoke to Fernande, the deceased's aunt, regarding a fight in the Club. Specifically, a February 14, 1994 notation indicates that pursuant to a conversation with Fernande, a man named Leslie told her that he had been in a fight inside the Club before the shooting, but Leslie did not see the shooting. The notation also stated that she said her son was in jail with defendant and that she "doesn't want to get involved – very high strung. Refused to give her son's name."

*Jillian Lessack*

By letter dated March 9, 1995, defense counsel provided the People with a signed written statement, and a videotaped statement from Jillian Lessack, who indicated that she had witnessed a fight in the Club. The statements were obtained by defense investigators.

1. Lessack's Signed Written Statement

Lessack's written statement was undated, but counsel's March 9 letter indicated that the statement was made in August 1988. Lessack stated the following:

On September 21, at around 1:40 a.m., Lessack went to the Club with six friends. She only knew two of their names: Jerome and his brother-in-law, Tony Valentine. One of the friends, whose name she did not know was short with a big stomach, fought with the deceased. Jerome jumped in and they were all punching each other.

When the fight ended, the deceased argued with other people in the Club, and the manager threw him out. Lessack did not recall if Jerome or the man with the big stomach were still in the Club at that time.

---

[51] *See* Form letter. It is clear that Investigator Brown did not write the quoted statement because it does not match Brown's handwriting, and simple words are misspelled. Presumably, Sanon wrote it since the letter was sent to her, and includes, "my son." There is no indication as to when or how the form was returned to the People.

About half an hour later, someone came into the Club and told Lessack and Valentine **to go** outside. Lessack went out and saw the deceased lying in between the two front doors. Valentine told Lessack to close her eyes as she stepped over the deceased's body.

Between about 3:30 and 4:40 a.m., Lessack left the Club and went to Valentine's residence at 270 East 53rd Street. Lessack knew defendant and did not see him that night.

2. Lessack's Videotaped Statement

On January 28, 1990, Lessack gave a videotaped statement, which was substantially consistent with her written statement.

<u>The People's Interview of Henry Sanon</u>

On July 18, 1995, a newly assigned ADA (the "plea ADA") interviewed Henry Sanon, the deceased's brother**.** Defendant's attorney was present (and asked a few questions). Sanon stated the following:

At the time of the crime, Sanon was living in Canada. He taught French and had a restaurant. That day, his friends called and told him about the murder. He came to New York the same day.

Sanon and the deceased spoke on the phone almost every day. Six or seven days before the shooting, the deceased told Sanon that he had trouble with Jerome Pierre, and they had gotten into a fight. Pierre threatened to kill the deceased.

The deceased lived on East 54th Street, in the basement of their aunt, Fernande. Sanon knew Pierre and Tony Valentine, who were brothers-in-law. Sanon used to play guitar with Valentine. Sanon had known Pierre for about a year. At the time of the shooting, Valentine and Pierre lived on East 53rd Street between Church Avenue and Linden Blvd. Sanon often saw Pierre when Sanon passed by there. Sanon also saw Pierre by the Chinese restaurant on East 55th and Church Avenue. Pierre was always there.

When he came to New York, Sanon went to the precinct and spoke to PO Elder and gave her Pierre's name. He called her often and at one point he was told she did not work there anymore.

About six to seven months after the shooting, Sanon spoke to Valentine and Pierre about the deceased. He found them through Mario, a mutual friend, who is now deceased. Sanon confronted Pierre that he heard Pierre killed the deceased. Pierre said "no," that he saw "Silky" shoot the deceased and Silky tried to shoot Pierre too. The plea ADA asked Sanon who is Silky? Sanon said Silky is defendant.[52]

Pierre said that the deceased beat him twice. Sanon had heard that Pierre told Sanon's cousin, Manuel, that on the day of the shooting the deceased beat Pierre. Pierre showed Manuel his "shirt" and said, "You see what [the deceased] did to me?" Sanon's sister was there at the time and told Sanon the same thing.

Valentine told Sanon that he was present during the first fight, which occurred in the Club on the day of the shooting. Serge and Chopette, a waitress at the Club, were also present. Valentine thought Pierre

---

[52] Defendant's arrest report indicates his nickname is Silky. (*see* above, defendant's arrest)

killed the deceased and he did not speak to Pierre for two weeks. However, after "the killer" was arrested he spoke to Pierre again. Pierre had invited Sanon to a party, where Sanon saw Pierre with a gun. Pierre always had a gun with him. Sanon never saw Pierre without it.

Sanon heard the shooting happened because of a problem over Chopette. Chopette went out with Pierre and then the deceased. Pierre was jealous. The plea ADA asked about Chopette's whereabouts. Sanon said he tried to find her, because "she knows everything" about what happened, but no one could find her.

The plea ADA asked Sanon about several individuals: Sanon did not know Leslie well but knew Leslie was friends with Pierre. Reggie St. Pierre ("Reggie") was Sanon's cousin. Reggie had information about the case but would not discuss it. Sanon heard that Reggie's brother, Emmanuelle, was at the Club. He did not see the shooting but saw blood on Pierre's shirt after the shooting.

Sanon never heard of Jillian Lessack. He did not know George Bruno, or that George fought with Sanon's brother Jean. He did not know that Jean accused George of killing the deceased and that the police arrested George. Sanon did not know Peter Everton, who the police interviewed after the shooting. (*see* above, Police Investigation)

The plea ADA showed Sanon the list of names that was submitted with defendant's first motion to vacate (*see* above). Sanon said it was a list of the people at the Club, which he got from Serge, who is deceased. Sanon wrote the list for the police. It was hard to read, even for Sanon, because Sanon was upset when he wrote it soon after the murder. Sanon did not know all the people on the list.

The plea ADA wanted to know whether any witnesses to the fight were still around. Sanon said Valentine, Chopette, and Kennell—who was with Valentine and on the list. The plea ADA wanted to know how to find them. Sanon did not provide that information.

Sanon knew of defendant from the neighborhood. He believed defendant knew the deceased because they lived on the same street. There were no problems between defendant and the deceased. Sanon did not know anyone, other than Pierre, who had problems with the deceased.

The plea ADA asked about Fernande's son (Ronald Eliano ["Ronald"]) who was in jail with defendant. Sanon said Ronald asked defendant why he killed the deceased, his cousin. Defendant said he did not do it. Ronald told Sanon that he believed defendant.

Sanon believed that Pierre either killed the deceased or had someone else kill the deceased. His mother swears that defendant was not involved, and believes Pierre was responsible. Defendant was a "good guy."

**CRU Witness Interviews**

<u>Dawn Dennis</u>

CRU conducted a recorded interview of Dennis at her residence. She stated the following:

At the time of the crime, she was at the Village Hut with defendant, Christine Martin, and defendant's cousin Robert, and they drove by the crime scene on their way home.

When they drove by the Club, defendant pulled over and asked a man, who defendant knew, what happened. The man said someone had been shot. After speaking to the man for about five minutes, defendant drove everyone home. Dennis later learned that the man to whom defendant spoke identified defendant as the shooter. She did not recall when she learned that, or from whom. Dennis no longer recalled what defendant was wearing that night, whether he had facial hair, or whether they all went to KFC.

Dennis went to the precinct, but she did not say when. She also went to court, but she was not asked to testify. Dennis did not know the deceased.

Aunya Johnson

CRU interviewed Johnson at her residence. The interview was recorded. Her statement was substantially consistent with her affidavit in support of defendant's second motion to vacate (*see* above), but differed as follows:

Johnson was at the Club that night with Chapman for about 10 minutes She did not remember a fight between three men in the Club. She recalled that a Haitian man and a Jamaican man argued outside the Club. She did not know what they were saying. Johnson left the Club because she was afraid and because the Club was overcrowded.

It was crowded outside too. Johnson waited outside for Chapman to finish talking to someone when "all hell broke loose." People ran in all directions, and she almost was thrown to the ground.

Johnson heard a gunshot and saw the Jamaican man, who had been arguing outside the Club, running from the Club toward 55th Street. A car then drove off and turned left on 55th Street.

She did not see either the deceased or the shooter at the moment of the shooting. The Jamaican man was wearing a yellow jacket. The Haitian man fell to the ground. The Jamaican man had a light skin complexion, was about 5'10" with a medium build, and wore a large wool yellow hat.

The police never contacted Johnson. The first time Johnson spoke to anyone about the case was in 1993 when the defense investigators came to speak to her.

Defendant

CRU conducted a recorded interview defendant, at the KCDA, in the presence of his attorney. Defendant's statement was substantially consistent with his previous statements and testimony. He added the following:

After his arrest, while at Rikers, he saw Ronald, the deceased's cousin. Defendant knew Ronald from high school. Ronald called his mother, Fernande, from Rikers and defendant spoke to her.

Fernande informed defendant of the following: The deceased, her nephew, regularly went to the Club to see Chopette, a waitress there. Fernande heard that, on the night of the shooting, the deceased was drunk, and fought with a man named Leslie over Chopette. Pierre joined in the fight, and he and Leslie beat the deceased. The manager, Serge, threw the deceased out. The deceased returned had another altercation and was thrown out again. After the shooting, Serge threw a bloody rug in the back. Fernande heard all this from witnesses who came to her house immediately after the shooting.

Defendant asked Fernande to tell the court about this, but she refused. Defendant wanted more information and tried calling Fernande for nine months. Defendant also called Reggie—the deceased's cousin. Reggie claimed he told the police that defendant was not the shooter, but defendant did not believe him.

Defendant did not know the whereabouts of his cousin, Robert (with whom he was with that night). He did not know the deceased or Sanon. Defendant knew the deceased's cousins, Reggie, and Emmanuelle. Defendant did not know Jermone Pierre, Tony Valentine, Aunya Johnson, Kelric Hinds, Eleanor Chapman, Leslie, or Chopette. Defendant heard of, but did not know, George Bruno.

Elder told defendant, "You know you did it, you had on this hat." He asked for an attorney because he did not know what to say when the police did not believe him.

Defendant told CRU he had never killed anyone. He did not know why he was falsely accused. His life has been destroyed. He never returned to his home after he was released from prison.

Reggie St. Pierre

CRU interviewed Reggie St. Pierre ("Reggie"), the deceased's cousin, at his residence. The interview was recorded. He stated the following:

He was certain that defendant was innocent. CRU repeatedly pressed him to explain, but he would not do so. Jerome (Pierre) was the shooter. Reggie heard that after the shooting, the deceased was dragged into the Club's hallway. A few days later, Reggie saw Pierre on 53rd Street between Church Avenue and Linden Blvd. Pierre's demeanor changed upon seeing Reggie—Pierre looked extremely nervous, and like he had "seen a ghost."

Reggie heard the shooting was over a girl—the deceased was dating Chopette and Pierre was jealous. Reggie also heard that Valentine and Leslie were at the Club the night of the shooting.

Reggie was friends with defendant. Defendant had no reason to be at the Club because it was a Haitian club (defendant was from Guyana). Reggie knew the Club owner Alix LeFranc, who lived on East 55th Street between Church and Snyder Avenues.

Eleanor Chapman

CRU interviewed Chapman at her home. The interview was recorded. Her statement was essentially consistent with her previous interviews and affidavit, but she did not recall certain details until she read her affidavit. At the time of the interview, Chapman had recently been diagnosed with brain cancer.

She did not recall if she went to the Club with a man (Hinds). She recalled that three men argued in the Club, and she left. She was high. She had been drinking and smoking.

Chapman vaguely recalled two men fighting in front of the Club and two Jamaican men going to the corner of Church Avenue and 55th Street. She thought the shooter was Jamaican because she was familiar with the dialect, as her husband was Jamaican. She did not recall where she was when the first shot was fired.

After CRU reviewed Chapman's affidavit with her, she recalled the details and agreed with them, including that the shooter threw keys, jumped into the front passenger seat of a car, and another man got into the rear of the car. Using a map, she showed where the car was parked.

She was certain that defendant was not the shooter. She saw a photo of defendant and defendant had much darker skin than the shooter. She had never seen the shooter or the deceased before that night. CRU showed Chapman current photos of Pierre and Valentine. She did not recognize them. CRU showed her a photo of defendant's hat recovered from him when he was arrested. It was not the hat the shooter was wearing—she recalled the shooter had on a Rastafarian hat, not a small cap. Chapman did not recall if the shooter had facial hair. Chapman never saw the shooter or the other Jamaican man after that night. She did not know Leslie, George, Pierre, or Lessack.

<u>Jerome Pierre</u>

CRU interviewed Pierre at his residence. Pierre did not allow CRU to record the interview. His statement differed from his previous statements and testimony as follows:

When Valentine came out of the Club, Pierre had already left. Pierre never went into the Club that night because he did not go to clubs. He later said in the interview that before that night, he had been in the Club three to four times.

The shooter was about 5'8", a little taller than Pierre (he testified at trial the shooter was 5'11" or 6'), wearing blue jeans, a black cap, and a black and blue shirt (he stated at the precinct, the shooter had on green pants [*see* above, Police Investigation]). After he spoke to the police at the precinct, they sent him home and brought him back to view the line-up (he testified at the pretrial hearing that he was at the precinct all day).

Pierre did not recall whether he told the police at the scene, or at the precinct, that he saw the shooter run into the yellow house.[53] He returned to the scene with the police.

In 1992, Pierre had to leave Brooklyn because three Jamaican men with guns were after him. He called the KCDA. The People said they might need him and relocated.[54] In 1997, Pierre moved out of state.

The yellow cab was behind him, and not in front of him (as he testified at trial). The two men who told the shooter to go to the yellow house were in the cab (he testified at trial that they came down 55th Street from Linden). Defendant told the four men to leave after they came out of the Club (he testified at trial that the <u>deceased</u> told them to leave, and he inconsistently testified that they came out of the Club and the cab).

Pierre did not know Reggie, Eliano, Leslie, Lessack, or Chopette. Pierre did not think there were any other witnesses to the shooting. Pierre did not see the shooter jump into a car after the shooting. Pierre denied that he told Sanon that, after shooting the deceased, the shooter attempted to shoot

---

[53] Pierre stated this in a follow-up phone call with CRU.

[54] The People's file indicates that Pierre was relocated in 1994.

him, too, and Pierre denied that he knew Sanon. Pierre denied that he fought with the deceased over a woman. He never owned a gun.

<u>Tony Valentine</u>

CRU interviewed Valentine at his residence. Valentine did not allow CRU to record the interview. Pierre was present during the interview.[55] Valentine stated the following:

Valentine was in the Club that night. The Club owner was Alix LeFranc. The deceased was in the Club but left. There was some fighting in the Club, but by the time Valentine arrived, the fighting was over. Valentine did not know Lessack or Sanon. He did not remember speaking to Sanon a few months after the shooting. He did not know a waitress named Chopette. Valentine walked past the deceased's body. Neither Valentine nor Pierre fought with the deceased.

<u>Alix LeFranc</u>

CRU interviewed Alix Lefranc at his residence. The interview was recorded. His daughter translated from Creole to English. His wife was present. He stated the following:

He owned the Club and was there on the night of the shooting. He heard that someone was shot outside but he did not leave the Club. LeFranc did not see anyone fighting that night.

Lefranc volunteered that someone argued with a female employee, whose name he did not know. She worked at the Club for one day. CRU asked about what happened with the woman, and why he mentioned her. He said that nothing happened with her, and the shooting did not happen the one day she worked there. CRU asked, again, why he mentioned the woman and he said (incorrectly) that CRU had brought her up, and that nothing happened with her.

The police did not interview him. He knew Pierre and Valentine. He did not recall whether they were at the Club that night. LeFranc did not hear that Pierre was involved in the shooting and he had not been in touch with Pierre for a long time.

LeFranc knew Leslie, but he tried not to deal with him because Leslie caused problems. Leslie argued with people for no reason. Leslie was friends with Valentine and Pierre, they all partied together.

LeFranc's wife interjected during the interview and stated the following:

She heard that the deceased had a fight with someone outside of the Club. He was shot while he was trying to get back into the Club. LeFranc did not know anything. Someone called her that night and told her there was a shooting at the entrance of the Club.

---

[55] Valentine and Pierre lived at the same residence. Valentine was not present at Pierre's interview. Before CRU interviewed Valentine, Pierre told CRU that Valentine would not agree to an interview. CRU urged Pierre to allow Valentine to make that decision. Valentine then agreed to speak to CRU.

PO Elder

CRU interviewed Elder at her residence. The interview was recorded. She stated the following:

She joined the NYPD in 1980. She was first assigned to the 83rd Precinct and then the 67th Precinct. She was a police officer and never a detective. Her partner was a detective. She did not recall his name or recognize the name Roiland. Cases were assigned on a rotating basis, regardless of the type of crime. This case was her first murder investigation. She recalled defendant's name because her ex-husband had the same first name, and her friend had the same last name.

On September 21, Elder's tour was from 8:00 a.m. to 4:00 p.m. Someone was shot at a club prior to her tour, maybe the prior evening. When she arrived at the scene, other officers were there. Several people were still there, maybe because the police were there. She "guess[ed] we just started questioning people." She did not recall. She believed the deceased's body had been removed by then. She believed she went into the Club to try to talk to witnesses, but no one was talking.

One person said he saw what happened. Elder thought the witness knew defendant. She believed he pointed to a house, and they went to the house and defendant was there. Defendant agreed to go to the precinct. They questioned defendant about where he was, but Elder did not recall details. The witness identified defendant in a line-up and she was told to arrest defendant. She recalled that only one line-up was conducted.

Elder had no recollection of Pierre's statement, or his name. She did not recall if he had blood on his shirt.

She remembered that defendant said that he was with some girls at a different club at the time of the shooting. That "stuck" with Elder because she knew defendant was married. She did not recall interviewing the girls. She believed defendant was evasive about their names. She did not go to the bar where defendant claimed he was at the time of the shooting. She did not know if any officers went there. When there was a witness and an identification, "that was it," there was no reason to investigate further or check out an alibi.

She did not remember speaking with the deceased's family or the deceased's name. CRU showed Elder copies of memo books from the People's file and she recognized her handwriting. CRU read Elder's notes aloud to her (which comported with the DD5). Elder said it sounded "vaguely familiar" and "those are pretty good notes."

Elder's notes reflected that Pierre told her that Tony Valentine saw a fight in the Club. She did not recall whether she interviewed Valentine. But if she had, there would have been a DD5. She did not recall her notation, "Bruno is shooter? Jerome said no."

Elder recalled that Pierre said the shooter was Jamaican. She believed that defendant had dreadlocks and wore a big hat covering the dreads.[56] She did not recall Chapman's account. And she did not recall any discrepancies between Chapman's description of the shooter's hat (Rastafarian hat) and the cap

---

[56] Defendant had short hair and no dreadlocks.

that defendant wore to the precinct. Elder did not remember that Chapman stated that after the shooter ran from the shooting, he got into a car and drove off with several others.

Elder did not recall the names of anyone, including George Bruno, Reggie St. Pierre, and Kelric Hinds. CRU asked if the deceased's brother, Henry Sanon, had come to the precinct to speak to her. She said it was possible, but she was not certain.

When asked if she recalled anything else, Elder volunteered that a few weeks or a month after the shooting, the detective squad received calls. In one, an unidentified caller stated that there was a possibility that defendant was not the shooter. Elder reported this to her supervisor, who told her that "the case was closed, period." She did not recall any media or pressure on the squad. Back then "it was all about numbers, clearing cases." The call was not investigated. She did not recall her supervisor's name. Elder did not tell the People about the call. She did not know whether her supervisor did.[57] Elder asked CRU a few times if defendant was still in jail. CRU said he was not.

Elder resigned from the NYPD after she was injured in a car accident. She was hit by another officer. She was also accused of using drugs, but she believed the allegation was found to be "unsubstantiated."[58] She then worked for the Workers Compensation Board for 29 years and retired in 2019.

The Plea ADA

CRU interviewed the plea ADA at his office. At his request, the interview was not recorded. He reviewed all relevant documents, which CRU sent to him before the interview, including handwritten notes, witness statements, and the plea minutes. He stated the following:

He identified many of the handwritten notes in the People's file as his handwriting. He did not recall the case at all, including Lessack's statement, which defense counsel had sent to him (*see above*, Lessack's statement), or his interview of Sanon (*see above*), which CRU played for him. He did not recall the circumstances of the plea, including who supervised him at the time, or who authorized it.

The Trial ADA

CRU interviewed the trial ADA at the KCDA. At her request, the interview was not recorded. She stated the following:

She was first assigned to the Homicide Bureau in 1987. She inherited about a dozen homicide cases. She was assigned defendant's case post-indictment. Pursuant to her practice, she learned everything about a case.

She believed Pierre was a "solid witness" who clearly observed defendant's face, and just happened to be at the scene at the time of the shooting. Pierre seemed certain in his identification, he was articulate,

---

[57] Elder told this to CRU in a follow-up phone call.

[58] CRU obtained Elder's disciplinary records from the NYPD Internal Affairs Bureau, which indicated that Elder failed a random drug test and had cocaine in her system. She then resigned.

appeared to be a "solid" citizen, his account was consistent, and he had no motive to lie. She did not have any doubt about defendant's guilt, and if she had, she would not have prosecuted the case.

She recalled that Chapman went to the precinct after the shooting but did not view a line-up. Prior to trial, the People attempted to locate Chapman to testify. The trial ADA did not recall PO Elder or the claim by deceased's family that Pierre and Leslie were the shooters. She did not know that someone called the precinct a few weeks after the shooting saying that defendant was not the shooter. Had she had that information, she would have disclosed it. She did not recall whether she spoke to the ADA who was going to retry the case (the plea ADA).

PO Gavaghen

CRU interviewed Gavaghen via Zoom. The interview was not recorded. She stated the following:

Gavaghen joined the NYPD in July 1985, and she resigned in 1993. She was assigned to the 67th Precinct for less than a year. She worked steady midnight shifts. It was her first time responding to a homicide. When she arrived at the scene, the deceased was lying on the ground.

Gavaghen called for an ambulance. Many of the Club patrons had already left the scene and she did not obtain much information or cooperation. Everyone denied seeing anything. Gavaghen stated that she recovered spent shell casings on the sidewalk. (her partner, PO Lockley recovered the casings [*see* above Police Investigation], to which she testified at trial [T335])

Gavaghen did not recall Pierre.

Det. Roiland

CRU spoke to Det. Roiland by phone. He did not recall the case.

Leslie Bruno

CRU interviewed Leslie Bruno at his residence. The interview was not recorded because Bruno was hesitant to speak and CRU did not want to lose its only opportunity to interview him. He stated the following:

In 1986, his mother lived on 55th Street and Snyder Avenue. He never went to the Club, did not know anything about the shooting, and did not keep in touch with his brother George. He did not know Pierre, Valentine, LeFranc, or the deceased.

George Bruno

CRU conducted a recorded interview of George. He stated the following:

He had served in the military in the 70s and returned addicted to drugs. He got his life together, obtained a GED, and attended college. However, freebasing cocaine was popular at the time, and he became addicted and homeless. At the time of the crime, he was a crack addict and committed crimes.

He knew Fernande Eliano's sons, Reggie, and Emmanuelle. George did not really know the deceased or the deceased's family. Although Henry Sanon sounded familiar.

CRU reviewed his statement with him (*see* above, Police Investigation, George Bruno interview). He recalled that he was homeless and living in the van. He argued with Jean that night about their respective addictions. He was high and abusive. He surmised that maybe that was the reason Jean told police he was the shooter. He recalled the police picked him up from the van and brought him to the Club. As they walked him into the Club, he tripped over the deceased.

He was arrested and taken to the precinct where he was questioned for seven to eight hours. He was left alone in a room. Ultimately, he was not charged with anything. He did not hear anything about the shooting. He went about his business, which was using crack.

George did not know defendant, Pierre, Valentine, Chopette, Lessack, Dennis, Martin, Chapman, Hinds, or Johnson. George had never been in the Club. It was not something he would do because he was homeless and just smoked crack. He might have known of the owner of the Club, but not personally.

George had a brother named Leslie, who lived in the Bronx. George had not seen Leslie in years. They talked on holidays. When CRU mentioned that Leslie was in the Club that night and friends with Pierre, George said "No." At the time of the crime, Leslie lived with his wife in the Bronx. Leslie was responsible, did not use drugs, and was employed. He had a "clean" family life and was in no way involved.

<u>Ronald Eliano</u>

CRU conducted a recorded interview of Ronald Eliano ("Ronald"). He stated the following:

He was the deceased's cousin. Just prior to the shooting, the deceased had arrived from Haiti. Ronald heard that on the night of the shooting, the deceased had been robbed on 55th Street. He was then shot inside a Haitian club and his body was dragged outside.

At first, Ronald stated that he knew the shooter by face, but he did not know the shooter's name. He then recalled that he had heard that the shooter's name was Leslie, but he did not know the last name. The shooter was fair-skinned and a little chubby.[59] The shooter used to play music with Ronald in Ronald's basement. The deceased and the shooter were both alcoholics. Ronald never heard of Jerome Pierre

Ronald knew defendant—defendant smoked marijuana and drove a cab. Ronald did not know why defendant was named as the shooter. He heard about the shooting from his mother, Fernande, when he was in Rikers. Defendant was at Rikers the same time. His mother would not tell him details about the shooting for fear that something would happen to him.

**CRU ANALYSIS**

Based on the testimony of a single eyewitness, Jerome Pierre, defendant was convicted of second-degree murder for the 1986 shooting of the deceased. On appeal in 1994, due to a *Brady* violation—

---

[59] When CRU interviewed Leslie Bruno, he appeared to have a medium complexion and was not fair skinned. CRU cannot conclude with certainty that Leslie Bruno is the same Leslie whom the deceased's family believes was involved in the shooting.

the belated disclosure of a statement made by another eyewitness, Eleanor Chapman, which raised the reasonable possibility that the verdict would have been different—the conviction was reversed, and a new trial was ordered. In 1995, on the eve of the retrial, defendant pleaded guilty to first-degree manslaughter in exchange for a prison sentence resulting in his immediate release.

After reviewing the entire record and interviewing material witnesses, CRU has concluded that there is a reasonable probability that defendant was not involved in the crime and that Pierre's account, which the Appellate Division essentially questioned, was patently incredible. Furthermore, as the Appellate Division observed, defendant's alibi was plausible.[60] In addition, had the police, from the outset, conducted a thorough investigation, defendant might not have been arrested. Finally, that defendant pleaded guilty does not contravene CRU's conclusion. Accordingly, defendant's manslaughter conviction should be vacated and the indictment dismissed.

**Evidence That Defendant Was Not Involved in the Crime**

According to Pierre's trial testimony, after shooting the deceased twice, the shooter walked down Church Avenue to East 55th Street where two men told the shooter to go into the yellow house. Defendant happened to live in that house and was later apprehended there. Defendant denied his guilt and provided an alibi, but he was arrested after Pierre identified him in a line-up.

However, just after the shooting, Eleanor Chapman made an audiotaped statement to an ADA, which "obviously has a direct bearing on [Pierre's] credibility, and the reliability of his testimony."[61] Chapman stated that at the time of the shooting she was on the corner of Church Avenue and East 55th Street, when she saw the deceased shot, twice. The shooter said something to his friend, threw the friend a set of keys, and jumped into a car, which drove off. Chapman said that at least three others could identify the shooter.

Since then, Chapman consistently repeated her account several times, which was corroborated by two other eyewitnesses, Aunya Johnson and 60-year-old Kelric Hinds. Furthermore, other evidence, and even Pierre, corroborated significant portions of Chapman's account.

<u>Chapman's Accounts</u>

Chapman did not know defendant. She thought she recognized the deceased but did not know his name. She was a disinterested witness, who, at the time of the crime, did not reveal her full name because she was scared and did not want to be found.

In 1993, Chapman provided an affidavit and videotaped statement to defense investigators.[62] CRU watched the video. Chapman's demeanor, the candid way she spoke, and the consistency of her statement with her prior statement and affidavit suggested that she was telling the truth. Chapman

---

[60] *Roberts*, 203 A.D.2d at 601.

[61] *Roberts*, 203 A.D.2d at 601.

[62] Chapman's affidavit, and those of Johnson and Hinds (*see* below), were submitted with defendant's second motion to vacate judgment. The court never ruled on the motion because it was rendered academic by the Appellate Division's decision. (*see* above, Post-Conviction Proceedings, Second Motion)

provided more details and explained how she ended up on Church Avenue and 55th Street from where she observed the shooting.

She had been with Johnson and Hinds at a bar, Monique's Affair, and they then went to the Club, a block away. They left the Club when a fight broke out. Chapman, Johnson, and Hinds went to the corner of 55th and Church. From there Chapman observed the men who had been fighting come out of the Club. They argued outside the Club. Based on their accents, one was Haitian, and one was Jamaican. The Jamaican man shot the Haitian man twice, ran in Chapman's direction, and jumped into a car.

The shooter was 5'8" or 5'9", had light brown skin, and wore a large wool Rastafarian-type hat, with his hair sticking out. Chapman viewed a photograph of defendant during her interview and was certain that he was not the shooter, noting that his skin color was too dark, and his hair too short. She is willing to testify about her observations.

Chapman readily agreed to a recorded interview with CRU. More than 35 years later, her independent recollection had somewhat faded. But after reviewing her affidavit, she recalled the details and said they were accurate. Significantly, Chapman recalled the shooter throwing keys to another man, and getting in the car. She used a map to show where the car was parked. CRU found Chapman credible.

Eyewitness Johnson's Accounts and Corroboration

Johnson did not know the deceased or defendant. She, too, was a disinterested witness. In 1993, she provided an affidavit to defense investigators indicating that she was an eyewitness to the shooting and corroborated key aspects of Chapman's account. She went to Monique's Affair with Chapman, and they met up with an "older man" whose name Johnson did not recall. At about 3:30 a.m., the three of them went across the street to the Club. About an hour later, a fight broke out and they left. They went to the corner of Church Avenue and East 55th Street and waited for a ride.

From the corner, Johnson saw two of the men who had been fighting in the Club come outside. They were arguing loudly. One had a Jamaican accent and the other had a Haitian accent. Johnson heard a gunshot, turned, and saw the Haitian man fall. The Jamaican man ran from the front of the Club toward 55th Street. A car that had been parked on 55th Street drove off. She did not see the shooter after that.

The Jamaican man had a very light-skinned complexion, was approximately 5'10", had a medium build, and had on a large wool red, green, and gold Rastafarian hat over his dreadlocks.

Johnson viewed a photograph of defendant during her interview and said he was not the shooter. Defendant's complexion was too dark.

Johnson readily agreed to a recorded interview with CRU. Based on her demeanor, consistency with her prior statement, and candor, there was no reason to doubt her account. She recalled significant details—a Jamaican man and a Haitian man argued outside the Club; she heard a gunshot; saw the Jamaican man running from the Club toward 55th Street; and saw a car drive off. She also recalled that the shooter had a light-skinned complexion, was approximately 5'10", had a medium build, and had on a large wool hat.

<u>Eyewitness Hinds' Accounts and Corroboration</u>

Hinds was also a disinterested eyewitness. He did not know defendant or the deceased. In 1992, Hinds provided an affidavit to defense investigators, corroborating that he was with Chapman, and "Onya," at Monique's Affair, a bar on Church Avenue between East 55th and 56th Streets. From there they went to the Club. When they left the Club, they walked to the corner of 55th Street and Church Avenue to get a taxi.

While on the corner, the shooting occurred. Hinds heard two rapid gunshots and saw the shooter turn and walk toward 55th Street. The shooter was slender, dressed in a striped black and white jacket, and had a head covering.

Significantly, just a few hours after the crime, at 6:50 a.m., Hinds gave a statement to the police at the precinct. His initial statement adds further credence that he, Chapman, and Johnson were together on the corner of Church and 55th at the time of the shooting. Hinds said that he was with two female companions when he observed the shooting from the corner of Church Avenue and East "54th" Street. Moreover, in his audiotaped statement, on September 21, at 12:06 a.m., Hinds, like Chapman, described the shooter as 5'8." (*see* above, Police Investigation, Hinds' Interviews)

*Hinds Might Have Viewed Defendant's Line-up and Not Identified Him*

In his affidavit, Hinds said he did not see the shooter's face, but he clearly observed the shooter's build. After his initial statement at the precinct, he left to go to work. Sometime later, he thought it was the next day, he was brought back to the precinct to view a line-up. He did not recognize anyone with the shooter's build.

At first blush, Hinds' claim appears implausible. First, Hinds could not have viewed a line-up the next day, on September 22, because defendant had already been sent to Central Booking in the early evening on September 21, after his arrest. Moreover, this claim was raised in defendant's motion to vacate based on a *Brady* violation, and the People provided evidence that only one line-up occurred—at 5:05 p.m., on September 21, and was viewed by Pierre only. (*see* above, Post-Conviction Proceedings, First Motion to Vacate)

However, the absence of a record that Hinds viewed the line-up is not dispositive. The police apparently failed to document other events. (*see* below) Indeed, it is conceivable that Hinds viewed defendant's line-up and did not recognize the shooter. In his initial statement (6:50 a.m.), Hinds said he "might" be able to identify the shooter. But when Hinds made an audiotape statement at 12:06 a.m., on September 22, hours after the line-up, he told the riding ADA that he "could not recognize the shooter."[63] Notably, in its decision regarding this claim, the court did not address whether Hinds viewed the line-up. Rather, it held that because Hinds did not see the shooter's face, the alleged line-up did not constitute *Brady* material. (*see* above, Post-Conviction Proceedings, First Motion to Vacate,

---

[63] This brief statement was not recorded on the audiotape but was noted on the follow-up Homicide Bureau Information Sheet, without explanation.

Decision) CRU did not interview Hinds, who is deceased, and cannot determine the veracity of his claim with any certainty.

<u>Additional Corroboration</u>

Additional evidence, including Pierre's statements and testimony, corroborated several important aspects of the eyewitnesses' accounts—(1) the deceased was engaged in a fight inside the Club before he was shot outside the Club; (2) the deceased was Haitian, and the shooter was Jamaican; (3) defendant did not fit the description of the shooter because, among other things, defendant was from Guyana; and (4) Chapman, Johnson, and Hinds were on the corner at the time of the shooting.

*The Deceased Had a Fight Inside the Club Before He Was Shot*

Pierre told the police that, prior to the shooting, his brother-in-law, Tony Valentine, had been inside the Club and saw the deceased fighting with a male who was not the defendant. (*see* Police Investigation, Pierre's statement to Elder)

In 1988, Lessack provided an affidavit and videotaped statement to defense investigators saying that she was in the Club with Valentine and Pierre, she saw the deceased fighting an individual, and Pierre jumped in. Thereafter, Lessack went outside and saw the deceased's body at the Club's front door.

*The Shooter Was Jamaican and the Deceased Was Haitian*

Chapman's and Johnson's observations that the shooter was Jamaican and the deceased Haitian, were also corroborated. After the shooting, Pierre told the ADA on audiotape that the shooter was Jamaican (*see* above, Police Investigation). Ronald Eliano, the deceased's cousin, established that the deceased was Haitian. (*see* above, CRU interview of Ronald Eliano)

*Defendant Did Not Fit the Description of the Shooter*

Chapman's and Johnson's claims that defendant was not the shooter were also supported. First, if the shooter was Jamaican, then he could not have been defendant, because defendant was from Guyana. (T.520-21 [defendant's trial testimony]; Elder DD5, "Closing of Case with One Arrest"; On-Line Booking System Arrest Worksheet)

Moreover, Chapman described the shooter as 5'8" or 5'9", with light brown skin, and wearing a large wool Rastafarian-type hat, with his hair sticking out. Johnson recalled that the shooter had a light-skinned complexion, was approximately 5'10", had a medium build, and had on a large wool hat. Although Hinds only saw the shooter's build (and maybe did not recognize defendant in the line-up), Hinds observed the shooter was 5'8."

Defendant did not fit these descriptions. He was 6', with short hair, and a dark skin tone. (*see* Elder DD5, "Closing of Case with One Arrest"; On-Line Booking System Arrest Worksheet.) In fact, both Chapman and Johnson viewed photos of defendant and noted his skin tone was much darker than the shooter's.

38

*Chapman, Johnson, and Hinds Were on the Corner at the Time of the Shooting*

At trial, counsel asked Pierre whether there were any other people standing at the corner (East 55th and Church) besides the two men who told defendant to go to the yellow house. Pierre testified he saw two ladies and a man in his 60s. He had never seen them before. (T.278) It is reasonable to conclude that Pierre saw Chapman, Johnson, and 60-year-old Hinds.

**Pierre's Account Was Incredible**

In sharp contrast to the credible and corroborated accounts of the eyewitnesses, Pierre's account lacked credibility. In fact, his claim that he observed and followed the shooter was nonsensical. The Appellate Division recounted much of Pierre's testimony—Pierre took a deep look at the shooter just in case he had to make an identification. Unafraid, he followed the shooter to get a license plate number in the event the shooter was going to get into a car. He then accused the two men who directed the shooter to the yellow house (which was defendant's own house) of orchestrating the murder. And when he returned to the scene, Pierre did not immediately speak to the police.

The Appellate Division stated that Pierre's testimony seemed to be "exaggerated and incongruent in certain respects."[64] To be sure, among other things, Pierre testified inconsistently about: whether the deceased went into the Club prior to the shooting; whether Pierre was in his car, or sat on the hood, and when; whether four men came out of the Club or out of a cab; his distance from the shooter at various times; whether he first saw the shooter at the door to the Club or chasing after the deceased on Church Avenue; whether he saw the shooter just enter the gate to the yellow house, or go into the back yard; and whether the shooter had facial hair. (*see* above, Pierre's trial testimony)

Not only was Pierre's trial testimony inherently inconsistent, but it was also manifestly contradictory to his ever-changing accounts. For example, regarding the two men who inexplicably directed defendant to his own house on East 55th Street between Church Avenue and Linden Blvd—which was <u>north</u> of Church—Pierre initially told the police the two men walked towards Snyder Avenue— which is <u>south</u> of Church. (*see* above, Police Investigation, statement to Elder) And then Pierre never mentioned the two men in his audiotaped statement. But, at trial, Pierre placed the two men in the right location—north of Church—coming from Linden Blvd. (T.242, 279) Ultimately, Pierre's version to CRU was that the two men came out of the cab parked in front of the Club. (*see* above CRU's interview of Pierre)

As to the four men, who according to Pierre's alternating trial versions were in the yellow cab, or came out of the club, Pierre always maintained that the <u>deceased</u> told them to leave. (*see* above, both of Pierre's interviews and his trial testimony) In his version to CRU, it was now <u>defendant</u> who told the four men to leave. Pierre also provided a new version of the location of the cab—from the front of his car to behind his car. (*see* CRU interview of Pierre).

---

[64] *Roberts,* 203 A.D.2d at 601. However, the Appellate Division held that it was "not incredible as a matter of law." (*id.*). "Incredibility as a matter of law may result when all of the evidence of guilt comes from a single prosecution witness who gives irreconcilable testimony pointing both to guilt and innocence." *People v. Hampton,* 21 N.Y.3d 277, 288 (2013) (internal quotation marks and citations omitted). This legal standard is not relevant to CRU's analysis.

Unlike Chapman and Johnson, Pierre absolutely refused to allow CRU to record the interview. Moreover, he clearly did not want CRU to interview Valentine (*see* above, Valentine interview, footnote), and insisted on being present for Valentine's interview. Pierre's demeanor and behavior demonstrated that he was not truthful.

<u>Pierre's Credibility Is Further Undermined by Evidence That He Knew the Deceased, Fought with the Deceased, and Apparently Had Motive to Kill Him</u>

Pierre maintained that he did not know the deceased. (*see* above, audiotaped statement to ADA; trial testimony [T.226]) But days before the shooting, the deceased told his brother, Henry Sanon, that he had trouble with Pierre. The deceased and Pierre had gotten into a fight, and Pierre had threatened to kill him. Sanon heard that the shooting happened because the deceased started dating Chopette, a waitress, who had dated Pierre. (*see* above, CRU Investigation, People's Trial File, People's Interview)

After the murder, Sanon spoke with Pierre and Valentine. Sanon confronted Pierre, saying he heard Pierre killed the deceased. Pierre denied it, but he admitted that he fought with the deceased. Pierre claimed that the deceased beat him up twice. (*id.*)

Valentine confirmed to Sanon that Pierre and the deceased fought. Valentine said he was present during the first fight between Pierre and the deceased in the Club prior to the shooting. Valentine told Sanon that he believed that Pierre was the shooter and he stopped talking to Pierre. Valentine no longer believed that when defendant was arrested. (*id.*)

Jillian Lessack, who was at the Club with Pierre and Valentine, also observed Pierre fighting inside the Club with the deceased prior to the shooting. She observed the deceased fight with someone, whose name she did not know, and then Pierre jumped into the fight. (*see* above, CRU Investigation, People's file, Lessack 1988 affidavit and 1990 videotaped statement)

Tellingly, Pierre has repeatedly attempted to distance himself from being in the Club prior to the shooting. In his first statement to PO Elder, Pierre maintained that Valentine saw "the deceased fighting inside the Club" with someone; he testified at trial he went into the Club but soon thereafter left to get air, and he heard there was a fight. Pierre tried to convince CRU that he never went into the Club that night because he did not go to clubs, in general. But, later in the interview, he slipped up and said he had been to the Club several times before that night.

**Defendant's Alibi Is Plausible**

Unlike Pierre, there is no evidence that defendant had any motive to kill the deceased. According to Pierre's account to PO Elder at the precinct, defendant was not the one who fought with the deceased inside the Club (*see* above, Police Investigation). Notably, responding officer Gavaghen did not see defendant at the scene. (T.341) And aside from Pierre's claim, there is no evidence that defendant was ever at the scene. Under all of the circumstances, defendant's alibi is believable.

Defendant readily agreed to go to the precinct and participate in a line-up. He gave three statements providing a full account of his whereabouts from the time he went out at 12:15 a.m. on September 21, to the time he returned home at around 7:00 a.m. His accounts were consistent (*see* above, Police Investigation, defendant's statements).

Defendant testified on his own behalf at trial and presented the testimony of alibi witnesses. The Appellate Division stated that defendant's alibi was "plausible."[65]

CRU interviewed Dawn Dennis, who did not testify at trial although she was prepared to do so. Dennis's account was consistent with her prior account and corroborated defendant's alibi. CRU agrees with the Appellate Division that defendant's alibi was plausible.

**The Police Investigation Was Inadequate**

Defendant was arrested less than 24 hours after the fatal shooting based on the statement of one person. Unlike most homicides, which are typically investigated by detectives, PO Elder was assigned to handle the investigation. She told CRU she was never a detective, and it was her first murder investigation. She had a partner who did not recall anything about the case.

PO Elder cogently summed up the extent of the police investigation to CRU. Once someone was identified in a line-up, he was arrested, and no further investigation was considered. "It was all about numbers, clearing cases" back then. The investigation here entailed apprehending George Bruno based on a claim made by Jean, a brother of the deceased, that Bruno was the shooter (*see* above, Police Investigation, George Bruno; CRU investigation, George Bruno), and going to the yellow house and bringing defendant to the precinct. Once Pierre identified him in a line-up, the case was closed.

Although Elder's memory did not serve her well, without any prompting by CRU Elder remembered that soon thereafter calls came into the detective squad regarding this case. One caller said it was possible that defendant was not the shooter. This apparently concerned Elder. She reported the call to her supervisor, who told her that "the case was closed, period."

There were many avenues of investigation that should have and could have been pursued. For example, based on Pierre's statement alone—that Valentine said the deceased was involved in a fight in the Club, but not with defendant—the police could have investigated Pierre's claim that he did not know defendant, and also investigated the circumstances regarding the deceased's fight in the Club.

Inexplicably, Valentine was not interviewed. The police could have learned from Valentine, just as Sanon did (*see* above, CRU Investigation, People's file, Sanon Interview) that Pierre fought with the deceased in the Club. This would have cast doubt on Pierre's account. Moreover, once the police learned that defendant lived in the yellow house, the police should have questioned Pierre's claim that two men directed defendant to go to his own home.

In addition, Chapman's statement that three other people could identify the shooter was never explored. Nor did Chapman view defendant's line-up.

It is conceivable that Hinds viewed the line-up and did not recognize defendant, and it was not documented. CRU did not find any documentation of defendant's *Mirandized* statement. A notation in Elder's memo book read, "Bruno the shooter, Pierre says 'no.'" It is troubling that this was not documented in Elder's DD5, or that the basis of Pierre's response was not memorialized. There are no documents showing that any type of identification procedure was conducted with Bruno, or that

---

[65] *Roberts*, 203 A.D.2d at 601.

Pierre knew Bruno by name. If Hinds failed to recognize defendant in a line-up, this should have been factored into assessing Pierre's credibility (and disclosed to the defense).

**Defendant's Plea of Guilty Is Not Inconsistent with CRU's Conclusion**

Defendant has maintained his innocence since his arrest. In agreeing to the People's plea offer, defendant requested an *Alford* plea, which the People refused.[66] That defendant pleaded guilty is not necessarily inconsistent with his claim of innocence. It is well-recognized that innocent persons plead guilty (just as they falsely confess) for myriad reasons, including that the alternative of going to trial could result in a far longer sentence.[67]

Here, defendant had served eight years in prison for his murder conviction. He was at liberty since his conviction was reversed and the People offered him a deal that would not require him to return to prison. It was rational for defendant to not want to "roll the dice" and chance a conviction that would return him to prison.[68] Accordingly, since CRU's investigation reveals a reasonable probability that defendant is innocent, CRU does not place too much emphasis on his plea of guilty because it is based on his motivation for his liberty.

**CONCLUSION**

Defendant's manslaughter conviction should be vacated. After reviewing the entire record and interviewing material witnesses, CRU has concluded that based on the consistent and corroborated accounts of three eyewitnesses, there is a reasonable probability that defendant was not involved in the crime. Any consideration of retrying defendant is untenable. Almost 30 years later, memories have faded, and witnesses cannot be found or have passed away. Accordingly, the indictment should be dismissed.

---

[66] Notably, although not improper, the court, and not defendant, recited the facts underlying the crime. The court misstated the time of the crime as 2:30 a.m., rather than 4:30 a.m. Defendant simply said "yes" to the recitation without correcting the mistake.

[67] *See People v. Ba*, 39 N.Y.3d 1130, 1135 (2023 Troutman, J. concurring op.) (imbalance of power in the plea bargaining process, where prosecutors have unfettered discretion, "inevitably leads to innocent defendants pleading guilty" [internal quotation marks and citations omitted]); *People v. Tiger*, 32 N.Y.3d 91, 115 (2018, Wilson, J. dissenting) ("We know that some completely innocent people plead guilty," only recently has there been public and scholarly attention to the problem [citations omitted]).

[68] *Schmidt v. State*, 909 N.W.2d 778, 787-88 (Iowa 2018) ("When the deal is good enough, it is rational to refuse to roll the dice, regardless of whether one believes the evidence establishes guilt beyond a reasonable doubt, and regardless of whether one is factually innocent") (internal quotation marks omitted).