

# 426 YEARS:

An Examination of
25 Wrongful Convictions
in Brooklyn, New York

July 9, 2020



## DISTRICT ATTORNEY
## KINGS COUNTY
### 350 JAY STREET
### BROOKLYN, NY 11201-2908
### (718) 250-2202
### WWW.BROOKLYNDA.ORG

**ERIC GONZALEZ**
DISTRICT ATTORNEY

July 9, 2020

Dear Reader,

This Report chronicles the first twenty-five wrongful convictions identified by my office's Conviction Review Unit ("CRU") since its inception in 2014. I have long been proud of the CRU—the anchor of my office's Post-Conviction Justice Bureau—and the commitment to justice that it represents. I hope that this Report will be useful to colleagues around the country who are similarly engaged in this critical work.

The magnitude of years lost to wrongful imprisonment in these cases is almost unbearable—together, they add up to 426 years spent in prison. And each case described in these pages is itself a complete tragedy, for the person who was wrongfully convicted and incarcerated, for his or her community, for the victims and survivors of these cases, and indeed for all of us. One of these cases has always weighed on me particularly heavily—a case of mistaken identification in a brutal sexual assault and robbery, committed at gunpoint, which resulted in Brian Davidson (a pseudonym) spending 30 years in prison for a crime he did not commit.

Brian and I were born just one year apart and raised in Brooklyn by mothers who came here from somewhere else to make a life for themselves and their families. But our lives were set on very different courses—irreversibly so—in March of 1988, when Brian was arrested for a crime he had nothing to do with. That spring, I was in my first year of college. Brian spent the next 30 years in prison, while I graduated from college and law school, became a prosecutor in the very county in which he was convicted, and ultimately, was elected District Attorney of Brooklyn. I met Brian in December 2017, the day my office successfully requested that his conviction be vacated and all charges against him dismissed. It was an emotional day, gratifying because justice was done and heartbreaking that it came so late and at such cost. I identify with Brian, and we all should. All of us are diminished when the criminal justice system fails, and makes people's lives worse rather than better.

I am mindful that we are publishing this Report at a time when the killing of George Floyd in Minneapolis and the racial violence it has called up have filled so many Americans—including me—with anger and despair. Much of that anger and despair is directed at the criminal justice system, and those who work in it. We are asked to do better, and I believe we can and will. And I believe that to do better, we must reckon with and be transparent about the mistakes of the past—particularly in the institutions in which we now work. In that spirit, I am hopeful that this Report will contribute to the work ahead.

Finally, I want to express my thanks for the efforts of the CRU and my KCDA colleagues, as well as the expertise of the Innocence Project. And I am very grateful for the pro bono contributions of Wilmer Cutler Pickering Hale and Dorr LLP, whose steadfast commitment made this Report possible.

Eric Gonzalez

Eric Gonzalez
District Attorney
Kings County, New York

# TABLE OF CONTENTS

I.   INTRODUCTION                                              1

II.  BACKGROUND ON THE CRU                                    3

III. BACKGROUND ON THE CASES                                  6

IV.  SUMMARY OF COMMON EXONERATION FACTORS                   10

V.   METHODOLOGY                                             17

VI.  FINDINGS                                                18

      A.  False or Unreliable Confessions                   20

      B.  Eyewitness Misidentifications                     31

      C.  Significant Witness Credibility Issues            45

      D.  Nondisclosure of Favorable Evidence               50

      E.  Police Conduct                                    56

      F.  Prosecutor Conduct                                60

      G.  Defense Conduct                                   68

      H.  New Evidence and Expert Consultations             71

VII. CONCLUSION                                              78

APPENDIX: CASE SUMMARIES                                     79

ACKNOWLEDGEMENTS                                             96

# I. INTRODUCTION

In 2014, under the leadership of then-newly elected District Attorney of Kings County, the late Kenneth P. Thompson, and then-Counsel to the District Attorney, Eric Gonzalez, the Kings County District Attorney's Office ("KCDA") launched its Conviction Review Unit ("CRU"). The CRU was created to investigate and remedy wrongful convictions by examining certain prior prosecutions and determining whether the convictions were reliable, fair, and just, in light of the facts known at the time or discovered subsequently. Where the CRU's reassessment determines that this standard is not met, it is empowered to recommend that the KCDA seek to overturn the conviction and dismiss the charges.

*426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York* describes and analyzes the CRU's recommendations in twenty cases—involving twenty-five convicted persons from 2014 to through the first half of 2019—to the District Attorney that he seek to overturn (or, in legal terms, to "vacate") a conviction. In each of these cases, the CRU determined after investigation that there was either clear and convincing evidence of the convicted person's actual innocence; insurmountable reasonable doubt that the convicted person committed the crime in question; or through a variety of factors the convicted persons were deprived a fair trial or due process such that the convictions were wrongful. In all of these cases, the KCDA agreed with the CRU that it would be a grave miscarriage of justice to allow the conviction to stand. Accordingly, the KCDA took steps to vacate each conviction and dismiss the underlying indictments.

The mission of the CRU is vital because the consequences of wrongful convictions are staggering. In the aggregate, the people whose convictions are examined here served approximately 426 years under the sentences meted out following their wrongful convictions. Many of the convicted persons in these cases were incarcerated for decades with very serious personal, familial, and broader community consequences. Three exonerees died in prison and were only exonerated posthumously. Wrongful convictions and the factors that cause them also foster distrust in the criminal justice system and erode the ability of that system to keep communities safe. In addition, wrongful convictions compound the harms caused by criminal acts to the victims of those acts and to society at large, because they often mean that the real perpetrators evade justice.

After District Attorney Thompson's passing in 2016, Eric Gonzalez became Acting District Attorney and then assumed office as the elected District Attorney in January 2018. This Report builds upon his Justice 2020 initiative, a 17-point action plan, which framed his vision for keeping Brooklyn safe and strengthening trust in the justice system by ensuring fairness and equal justice for all and by shifting the KCDA's priorities toward preventative and accountability solutions with a track record of success and away from over-reliance on criminal convictions and incarceration.

In his Justice 2020 initiative, the District Attorney identified transparency as a core value underlying his plan for criminal justice reform. The CRU's work has been largely invisible to the public—exonerations occur in open court, but typically, under New York law, the proceedings and underlying papers are "sealed" from public view. As explained in further detail below, CRU writes internal memoranda in the course of its work, recounting its investigation and analysis of individual cases and explaining why it does—or does not—recommend that the District Attorney seek to vacate a given conviction. Until recently, however, the CRU did not publish the memoranda. Likewise, around the country, the reasons why a prosecutor's office chooses to support a convicted person's exoneration are not usually disclosed in detail. The District Attorney made the decision to do something different here—to invite the public to look inside these cases and to reveal the KCDA's own assessment as to what went wrong in each of them. And insofar as we are aware, this is the first time any prosecutor's office in the nation has done so.

Given the importance of this work to the justice system as a whole, the KCDA obtained judicial permission to unseal, for purposes of writing this Report, certain records from these cases that would otherwise have remained confidential under New York law and make those records available only to the Report's researchers and authors on a confidential basis.

Consistent with that court order, the names of the defendants have been replaced with pseudonyms and witnesses are referred to only by initials. The memoranda will be re-sealed now that the Report is complete. This Report does not discuss grand jury matters, which remain sealed by law.

Understanding the flaws underlying wrongful convictions and their causes cannot cure the incalculable personal losses associated with the wrongful convictions in these cases, but it may help to prevent future miscarriages of justice. In order to share the experiences, actions, and errors that affected the instant cases, the Report breaks down the CRU's determinations into key common factors and draws on substantial work and literature by researchers focused on the causes of wrongful convictions. These include issues that generally speak to the reliability of the evidence that was presented at trial including false or unreliable confessions, eyewitness misidentifications, and witness credibility issues. They include serious errors or misconduct by police, prosecutors, and defense attorneys that compounded these reliability problems or otherwise denied the defendant a fair trial. Many of these wrongful convictions resulted from more than one of these underlying defects.

By giving the public a view into the facts that led to these wrongful convictions—and the ways wrongful convictions were identified and understood—our hope is that this Report will aid the public, including surviving victims and victims' families— in understanding why this work had to be done, even if the result was to vacate convictions that many had considered "final" decades ago. We hope that it will add to the body of literature that aids existing and future conviction review units and innocence advocates across the country in recognizing when a prior conviction was wrongful. And perhaps most of all, we hope that it will help police, prosecutors, defense attorneys, judges, and the public more broadly determine what each of us must do to reckon with failures in the criminal justice system, to respond as best we can now to injustices, and to ensure that the tragedies of wrongful convictions do not persist.

The District Attorney's Office asked the Innocence Project ("IP") and Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale") to assist in authoring this Report. All findings and recommendations in the CRU memoranda were researched and issued by the CRU prior to and entirely independent of this Examination and Report. The IP is a national nonprofit organization based in New York, NY, which was founded in 1992 by Barry Scheck and Peter Neufeld and is affiliated with the Cardozo School of Law at Yeshiva University. The IP works to exonerate the wrongfully convicted and advocates for broader changes in the criminal justice system to prevent wrongful convictions. In recent years, the IP has worked closely with many District Attorneys— including the KCDA—to establish independent conviction review units (sometimes called "conviction integrity units") within prosecutors' offices and to develop best practices for those units to reinvestigate claims of wrongful conviction. WilmerHale is an international law firm that maintains a steadfast commitment to pro bono representation, public service, ensuring equal access to justice for underserved communities around the world, and the rule of law.

# II. BACKGROUND ON THE CRU

When District Attorney Thompson created the CRU in 2014, it succeeded a much smaller Conviction Integrity Unit ("CIU") created in 2011 as one of the first such units in the country. The name change reflected a new concept and enhanced commitment to post-conviction case analysis, examining not just whether prosecutors and police performed ethically in securing a conviction or whether actual innocence could be established scientifically, but more broadly whether prosecutors exercised their discretionary power with prudence to secure a reliable, fair, and just conviction, considering facts, events and circumstances known at the time or discovered later.

Under the leadership of District Attorney Gonzalez, the CRU is now an integral unit of KCDA's Post-Conviction Justice Bureau, which was founded in 2019 to emphasize the importance of prosecutors' ongoing responsibility to pursue just outcomes even after convictions are final. The CRU is the largest such dedicated unit in the United States, staffed by eight full-time prosecutors, one part-time pro bono attorney, two detective-investigators, two paralegals, and a secretary/clerical assistant.

The CRU accepts for review all petitions that present colorable claims, capable of investigation and review, and that, if substantiated, would result in a finding of a wrongful conviction and vacatur of a felony conviction. The CRU will consider petitions for review even if the convicted person completed a custodial sentence and/or a post-release sentence or probation or, in exceptional cases, even if the subject of the petition is deceased. While most petitions relate to jury verdicts of conviction, the CRU also reviews convictions obtained in bench (non-jury) trials or as a result of guilty plea.

The CRU selects its cases from a pool of applicants referred by a broad range of sources. These include requests for review made directly from convicted persons and their family members or advocates. Requests also come from innocence organizations, private attorneys, law school post-conviction clinical programs, community leaders, and elected officials.

The CRU initially screens each petition in a preliminary investigation to assess whether the claims it asserts are non-speculative and capable of resolution by investigation and whether, if substantiated, the claims are capable of establishing that a conviction was wrongful. If the petition meets the established criteria, the case is assigned to an Assistant District Attorney who conducts a full investigation. Accepted CRU investigations are not limited to the issues raised by the person's application or prior/pending litigation; the CRU considers all relevant issues uncovered in the course of the investigation, even if such issues were not raised during the initial prosecution.

The CRU has established a process, the goal of which is to provide each matter under review with a full, fair, and equitable evaluation. The process is supported by three pillars: (1) non-adversarial approach; (2) sharing of information; and (3) independence.

First, the CRU is designed to establish a non-adversarial relationship between CRU prosecutors and petitioners seeking review of their convictions. This stands in contrast to the adversarial model of the American criminal justice system. The CRU encourages a post-conviction case review norm in which the prosecutor and petitioner engage in a joint exercise to find the truth.

Second, the CRU offers a mutually binding confidentiality agreement that petitioners and CRU prosecutors may choose to execute in order to facilitate open and robust sharing of information. The agreement assures each party that the other will not use disclosures and discoveries made in the CRU process to advance their respective interests

in the adversarial context. The CRU does not ask the defense for a blanket waiver of attorney-client privilege, but may request limited waivers or access to certain information in the possession of the defendant's counsel if such an inquiry becomes relevant (for example, to assess whether certain material was disclosed to the defense).

Third, the CRU's work is independent. Independence is accomplished through two mechanisms: the use of an Independent Review Panel ("IRP") and the autonomy of the CRU within the KCDA. Regarding the former, the District Attorney established a "hybrid" model: each case is evaluated by both the internal CRU and the external IRP. The IRP consists of three lawyers, each with expertise in criminal matters, who volunteer their time and who are completely independent of the KDCA. After the CRU evaluates the petitioner's claims and provides a written recommendation to the District Attorney, the IRP completes its own independent review of the CRU's findings and makes an independent recommendation to the District Attorney. The District Attorney considers the views of the CRU and the IRP, and then renders a final decision on whether the office will seek to vacate a conviction.

Importantly, the CRU has a second level of independence. The CRU reports its findings and analysis directly to the District Attorney through the KCDA General Counsel. No other units or individuals within the office other than the General Counsel, and no former employees of the office, are permitted to participate in or influence the scope and course of the investigation, the analysis of information generated by the investigation, or the ultimate recommendation of the CRU (though they may provide historical information as needed). This means, among other things, that the CRU remains separate and independent from the KCDA's Appeals Bureau, the unit that defends the office's convictions in court. And the fact that a convicted person may have unsuccessfully litigated prior claims for post-conviction relief (including claims opposed by the Appeals Bureau) does not preclude the CRU from reviewing and reinvestigating the case.

Likewise, the original investigating agency—in almost all cases, the NYPD—and its current or former officers and analysts are barred from active participation in the CRU investigation (except, again, by potentially providing historical information). If the CRU retains or consults an outside expert or agency, such agencies or experts must have no connection or relation to those who were involved in any way in the original investigation and prosecution.

The CRU also operates independently from the New York City Law Department, the agency which represents the City in civil matters, including civil litigation for compensation for wrongful conviction. Financial considerations related to follow-on civil matters have no bearing on the CRU's work.

The CRU recommends that a conviction be overturned when the investigation reveals the defendant is "legally innocent" of the offenses for which he/she was convicted. A person is legally innocent under any one of the following circumstances: (1) the investigation establishes the defendant was, factually, actually innocent of the crime, or the crime did not occur; (2) the investigation establishes that the evidence that was presented against the defendant and resulted in a judgment of conviction was grossly insufficient to support a finding of guilt beyond a reasonable doubt, notwithstanding previous adjudications of legal sufficiency; or (3) the investigation establishes an insurmountable reasonable doubt, or doubts, of guilt, whether known or exploited at the time of prosecution and conviction, or discovered since the time of conviction, in an otherwise legally sufficient case. CRU will not recommend disturbing the decision of the finder of fact unless the evidence, taken as a whole, is grossly deficient to support the conviction. In all cases in which there is a determination of legal innocence, the underlying indictment is also dismissed.

The CRU may also recommend the conviction be vacated when its investigation reveals credible facts, circumstances, and/or events which so grossly corrupted the fact-finding process as to substantially deny the defendant a fair adjudication of his/her guilt or innocence at trial, or, if the conviction was obtained by a guilty plea, prevented the defendant from making a knowing and voluntary decision to plead guilty. Such facts, circumstances, and events may include, but are not limited to: police investigative error or misconduct, prosecutorial error or misconduct, ineffective

performance and assistance of trial counsel for defendant, forensic art or science analytical error, repudiation or modification of forensic art or science, judicial error or misconduct, juror misconduct, witness misconduct, and witness error, whether occurring singly or in combination one with another. Such a determination by the CRU may be made with deference to, but notwithstanding, previous adjudication(s) denying a defendant's claim of a due process violation based upon the same or similar facts, circumstances or events.

In rare circumstances, the substantiated facts, circumstances, and events can be cured and leave a legally sufficient case which, in the discretion of the District Attorney, may be retried to verdict. In all of the cases discussed in this Report, however, the District Attorney determined that no retrial could or should occur.

# III. BACKGROUND ON THE CASES

The sample size of the twenty cases described in the Report is small, but there are some demographic facts and trends worth noting. Of the twenty-five exonerees discussed in this Report, twenty-four of are male, twenty-four are Black or Latinx, and three of them were younger than age 18 at the time of the crime.

Most of the cases are based on crimes that occurred in the 1980s and 1990s, with the oldest crime occurring in 1963 and the most recent in 2011. The majority of the crimes in these cases were homicides; most were single-victim homicides. Most of the crimes involved the use of a dangerous weapon, usually a gun. Sixteen of the cases involved one exonerated defendant, three cases involved two exonerated defendants, one case involved three exonerated defendants, and three cases involved other, non-exonerated defendants. In two of the cases, the exonerated defendants plead guilty; the other 18 cases involved guilty verdicts after jury trial.

## Table 1 | Descriptive Characteristics of Exoneration Cases

| | Cases (N=20) | | Exonerated Defendants (N=25) | |
|---|---|---|---|---|
| | N | (%) | N | (%) |
| **Gender** | -- | | | |
| Male | | | 24 | (96) |
| Female | | | 1 | (4) |
| **Racial/Ethnic Background** | -- | | | |
| Black and/or Latinx | | | 24 | (96) |
| White | | | 1 | (4) |
| **Age When Charged (years)** | -- | | | |
| < 18 | | | 3 | (12) |
| 18 | | | 2 | (8) |
| > 18 | | | 20 | (80) |
| **Type of Crime** | | | | |
| Homicide[a] | 16 | (80) | 21 | (84) |
| Sexual Assault | 2 | (10) | 2 | (8) |
| Other (election – residency fraud; burglary) | 2 | (10) | 2 | (8) |
| **Cause of Death or Weapon Used in Crime[b]** | | | | |
| Gun | 13 | (76) | 15 | (68) |
| Strangulation | 2 | (12) | 3 | (14) |
| Blunt force | 1 | (6) | 1 | (5) |
| Arson | 1 | (6) | 3 | (14) |
| **Year of Crime** | | | | |
| 1960s | 1 | (5) | 1 | (4) |
| 1970s | 0 | (0) | 0 | (0) |
| 1980s | 8 | (40) | 12 | (48) |
| 1990s | 8 | (40) | 9 | (36) |
| 2000 - 2011 | 3 | (15) | 3 | (12) |
| **Number Exonerated Defendants Per Case[c]** | | | | |
| 1 | 16 | (80) | -- | |
| 2 | 3 | (15) | -- | |
| 3 | 1 | (5) | -- | |
| **Proceedings** | | | | |
| Plea (single defendant) | 1 | (5) | 1 | (4) |
| Plea during trial (single defendant) | 1 | (5) | 1 | (4) |
| Guilty verdict (single defendant or all co-defendants)[d] | 18 | (90) | 23 | (92) |
| **Incarceration History** | | | | |
| Died in prison | | | 3 | (12) |
| Mean years in prison (minimum, maximum)[d] | | | 17 | (0, 32) |

ᵃ Two homicide cases involved three victims each and the rest were single-victim homicides.

ᵇ Total n = Seventeen cases and twenty-two defendants because three cases did not involve a weapon. One strangulation case also involved stabbing and one also involved blunt force; these cases are only counted in the strangulation category.

ᶜ Three cases also included other defendants who were not exonerated.

ᵈ In one case, one defendant was tried first and convicted and agreed to testify against his co-defendant in exchange for concurrent rather than consecutive sentences. Both were later exonerated.

ᵉ Includes pre-trial detention.

To provide context for the Report's findings and assist in reading the Report, below are short summaries of the cases that are the subject of the review. Throughout the Report, we have changed names or represent them as initials. The appendix includes fuller descriptions of each of the cases.

• **Dylan Gold** (1963)[1] pled guilty to Murder in the Second Degree and was sentenced to 30 years to life.  After 9 years in prison, the New York governor commuted his sentence.  The CRU recommended that Gold's plea be withdrawn given the problematic testimony of the prosecution's main witnesses, the likelihood that favorable information was withheld from defense counsel, and the fact that shortly after Gold pled guilty the law changed to provide substantial additional protections for criminal defendants.

• **Lucas Martinez, Dante Velasco,** and **Milo Vargas** (1980) were charged with one count of Arson in the Second Degree, and six counts of Murder in the Second Degree (felony murder) stemming from six deaths that occurred during a residential fire. They were convicted of all counts at trial and sentenced to concurrent terms of 25 years to life imprisonment on each of the six counts of Murder and 8 1/3 to 25 years to life imprisonment on the Arson in count. The CRU recommended that their convictions be vacated based on current understandings of fire science and issues with the prosecution's main witness's account. Velasco and Vargas each served approximately 32.5 years in prison. Martinez died in prison after close to 10 years.

• **Alan Anderson** and **Nathan Jones** (1985) were convicted of Murder in the Second Degree. They were sentenced to 18 years to life in prison. The CRU recommended their convictions be vacated given inconsistent testimony offered at trial and the non-disclosure of materials important to the defense's ability to cross-examine witnesses. Jones served approximately 20 years in prison, and Anderson died in prison after 12 years.

• **Scott Moore** and **Tony Stevens** (1985) were convicted of murder, kidnapping, robbery, and weapons charges. Both men were sentenced to the maximum allowable term of imprisonment: 25 years to life. The CRU recommended vacating their convictions, which were unsupported—and in many instances directly contradicted—by physical or testimonial evidence. Moore served 29 years in prison and Stevens died in prison after 15 years.

• **Nicholas Warren** (1986) was convicted of Burglary in the Second Degree. He was sentenced to 1.5 to 4.5 years' imprisonment and released from custody after serving the minimum term of his sentence. The CRU recommended that the conviction be vacated because it was based solely on the testimony of one witness, who admitted to fabricating the burglary.  Warren served approximately 1.5 years in prison.

• **Brian Davidson** (1987) was convicted of one count of Rape in the First Degree, two counts of Sodomy in the First Degree, one count of Robbery in the Second Degree, and two counts of Coercion in the First Degree for which the aggregate term of concurrent sentences was 19 to 57 years' imprisonment. The CRU recommended his conviction be vacated based on several factors, including its conclusion that the main witness for the prosecution had misidentified Davidson as one of her assailants. Davidson spent approximately 30 years in prison.

_____

[1] The years in this section indicate the year of the alleged crime of conviction.

- **Ethan Hart** (1988) was convicted of Murder in the Second Degree and sentenced to 18 years to life in prison. The CRU recommended that Hart's conviction be vacated due to serious concerns with the prosecution's main witness. Hart served 27 years in prison.

- **Sonny Dawson** (1988) was convicted of Criminal Possession of a Weapon in the Second Degree and sentenced to 7.5 to 15 years in prison. The CRU recommended that Dawson's conviction be vacated due to serious concerns about the credibility and reliability of the prosecution's main witness. Dawson served approximately 8 years in prison before being released on parole.

- **Nathan Fitzgerald** (1989) was convicted of Murder in the Second Degree and was sentenced to 25 years to life in prison. The CRU recommended his conviction be vacated based principally on the recantation of the sole identifying witness and the apparent failure to disclose a key document to the defense that directly supported Fitzgerald's alibi. Fitzgerald served approximately 24.5 years in prison.

- **Carly Green** (1991) was convicted of Manslaughter in the Second Degree, Robbery in the First Degree, and Burglary in the Second Degree. She was sentenced to 5 to 15 years' imprisonment. Given the issues with Green's confession—the sole piece of evidence upon which the prosecution was based—the CRU recommended that Green's conviction be vacated. Green served approximately 10 years in prison.

- **Robert Hicks** (1991) was convicted of Murder in the Second Degree and sentenced to a prison term of 25 years to life. The CRU recommended vacatur because medical and scientific evidence proved that the prosecution's main witness testified falsely. Hicks served approximately 20.5 years in prison and was placed on lifetime parole.

- **Kevin Harrison** (1991) was convicted of Murder in the Second Degree. He was sentenced to a term of 25 years to life. The CRU recommended that his conviction be vacated largely due to problems with the sole identifying witness at trial and because Harrison's physical condition at the time would have made it difficult for him to commit the crime. Harrison served approximately 25 years in prison.

- **Patrick Oakley** (1992) was charged with various election fraud crimes. After three separate trials, he was convicted on all counts and sentenced to probation. The CRU concluded that his conviction was politically motivated and recommended that it be vacated. Oakley did not spend any time in prison.

- **Julian Yeats** and **Curtis Watson** (1992) each were charged with three counts of Murder in the Second Degree and both defendants were convicted at trial. Based on newly discovered DNA evidence, which excluded both Yeats and Watson and was consistent with DNA from the scene of another unsolved homicide, the CRU recommended their convictions be vacated. Yeats and Watson each served approximately 21.5 years in prison.

- **Zander Wright** (1995) was convicted of several charges, including Felony Murder. He was sentenced to 25 years to life on that charge. The CRU recommended his conviction be vacated based on multiple factors that denied him a fair trial, including that the prosecutor elicited inadmissible testimony regarding a witness's alleged identification and likely failed to disclose critical evidence to the contrary. Wright served approximately 20 years in prison.

- **Nelson Lewis** (1997) was convicted of Murder in the Second Degree.  He was sentenced to a term of imprisonment of 25 years to life. The CRU recommended vacating the conviction largely due to a key witness's false testimony. Lewis served 17.5 years in prison.

- **Jeremy Alvarez** (2001) was convicted of Murder in the Second Degree, two counts of Attempted Robbery in the First Degree, and Assault in the Second Degree. The jury acquitted him of two weapons possession charges. He was sentenced to 20 years to life in prison. The CRU recommended his conviction be vacated in light of several errors in the case, including the prosecution's failure to carefully scrutinize the substantial false fact Alvarez's confession contained and to disclose detectives' notes from the investigation. Alvarez served approximately 17.5 years in prison.

---

- **Spencer Mitchell** (2005) was convicted of Murder in the First Degree and various other charges in connection with two murders that occurred during an attempted robbery of a tire shop. He was sentenced to life imprisonment without the possibility of parole. The CRU recommended that his conviction be vacated because of issues with the integrity and origin of the physical evidence used to convict Mitchell, evidence undermining the reliability of the prosecution's eyewitness testimony, and failure to disclose exculpatory evidence. Mitchell served approximately 11 years in prison.

- **Miguel Foster** (2007) was convicted of murder in the second degree. He was sentenced to 25 years to life. For several reasons, the CRU recommended that his conviction be vacated: the only identifying eyewitness was not credible, while four other eyewitnesses did not identify Foster; Foster's confession was obviously false; the police may have influenced identifications and did not pursue more fruitful theories of the case; the prosecution overlooked and withheld *Brady* materials; and both defense counsel and the prosecutor performed objectionably at trial. Foster served about 7.5 years in prison.

- **Charlie Bloom** (2011) pled guilty to Rape in the Second Degree and was sentenced to 4 years' imprisonment and 10 years of post-release supervision. The CRU recommended his conviction be vacated based on its conclusion that Bloom was likely mentally disabled at the time of the alleged offense. Bloom served close to 3.5 years in prison.

# IV. SUMMARY OF COMMON EXONERATION FACTORS

The heart of this Report discloses, organizes, and explains the findings that the CRU made across the different cases. The first three sections address different issues regarding the reliability of critical evidence: (1) confessions, (2) identifications, and (3) third-party witness accounts. These sections describe how the CRU determined that evidence was not reliable, and the role that police, prosecutors, and defense played in generating those reliability issues or failing to identify them.

The fourth section addresses one particular such compounding factor—the failure of law enforcement to disclose important evidence to the defense, sometimes referred to as "*Brady* material" under the United States Supreme Court case *Brady v. Maryland*.[2] The following three sections then examine the roles of police, prosecutors, and defense in the wrongful convictions in more detail. The final section examines how new or newly discovered evidence that the CRU identified in its investigation contributed to its determinations. The table below summarizes the number of cases and defendants on which these key factors had an impact on the CRU's vacatur recommendation.

**Table 2 | Descriptive Characteristics of Exoneration Factors Found by CRU**

|  | Cases (N=20) | | Exonerated Defendants (N=25) | |
|---|---|---|---|---|
|  | N | (%) | N | (%) |
| False or Unreliable Confessions | 7 | (35) | 9 | (36) |
| Eyewitness Misidentifications | 5 | (25) | 5 | (20) |
| Significant Witness Credibility Issues | 8 | (40) | 11 | (44) |
| Nondisclosure of Favorable Evidence | 9 | (45) | 10 | (40) |
| Police Conduct | 13 | (65) | 18 | (72) |
| Prosecutor Conduct (other than/in addition to nondisclosure of favorable evidence) | 17 | (85) | 21 | (84) |
| Defense Conduct | 8 | (40) | 11 | (44) |
| New Testimonial and Documentary Evidence | 7 | (35) | 9 | (36) |
| New Expert and Scientific Evidence | 7 | (35) | 10 | (40) |

In previewing here the analyses that appear in this Report, it bears mentioning that some important analyses or items do not appear. First, the Report does not offer specific policy recommendations. The KCDA has already implemented a number of policy reforms designed to address issues discussed herein. The IP has also long advocated for specific policy reforms designed to prevent wrongful convictions and to remove legal and structural barriers to exoneration. That work is ongoing, and reasonable minds may differ about exactly what steps should be taken to prevent and rectify wrongful convictions. This Report is intended to help inform that conversation, which will continue to occur outside

---

[2] 373 U.S. 83 (1963).

these pages, and which involves many informed and committed advocates, public officials, researchers, and impacted persons whose voices are not represented here.

A second significant subject that is not a focus of this Report is the role that racial bias has played and continues to play in wrongful convictions. As noted above, all but one of the wrongfully convicted people in these cases were people of color. But, as discussed, this Report is built principally upon the CRU's internal memoranda to the District Attorney recommending exoneration in individual cases. The CRU's task when reviewing a given case was to determine only whether the evidence supporting a conviction was reliable and fairly presented; it was not to assess whether investigatory or prosecutorial decisions were influenced by racial bias, or to opine on the structural or underlying causes of the injustice. This is not to say that racial bias was no factor in any of the wrongful convictions presented here or in wrongful convictions generally. The role of race in the criminal justice system is important and on this subject, too, this Report is intended to help inform a conversation which will continue outside these pages.

**All but one of the wrongfully convicted people in these cases were people of color.**

Third, this Report does not address accountability or discipline for law enforcement. To be sure, the CRU identified errors by police and prosecutors that compromised the validity of the subject convictions—and in certain cases, even more troubling misconduct. Avenues for subsequent action, the restrictions imposed by statutes of limitations and various individuals' retirements, and other issues related to discipline are beyond the scope of this Report.

Fourth, this Report is an analysis of cases that resulted in exoneration; it does not review or address in any way cases that the CRU chose not to accept for review, or which it reviewed and the District Attorney did not seek to vacate.

Finally, this Report says little about DNA. This is not to understate the transformative impact that DNA exonerations have had on the criminal justice system, particularly in the 1990s and early 2000s when such technology first became widely available. And to this day, advances in DNA technology continue to be invaluable in clearing many wrongly convicted persons and solving the underlying crimes. Of the twenty-five cases from 2014-2019 chronicled here, however, few involved DNA testing (whether because of the nature of the crimes; the fact that potentially probative evidence from the pre-DNA era was not preserved; or because the evidence was already subjected to DNA testing before the CRU began its review). Accordingly, as discussed below, the exonerations examined in this Report were typically based on scrutiny of other evidence and the trial record.

We next preview each of the common factors that supported the CRU's recommendations to vacate one or more convictions and that are discussed in greater detail in the body of this Report.

## A.    False or Unreliable Confessions

A confession is powerful evidence in court. Yet, it is now well-established that, in response to the pressures of police interrogation, individuals can and do confess to crimes that they did not commit. Seven defendants (in five of the cases) provided confessions in response to police interrogations that the CRU determined were not reliable indicators of their guilt. These defendants claimed that they were induced to confess by the intense psychological coercion of their police interrogations, and in certain cases, physical abuse.

Because not all police interrogations at issue were recorded by audio and/or video, the CRU could not and did not determine precisely what occurred in the interrogation rooms, and thus in particular did not assess convicted persons' claims of physical abuse or fabrication. Nonetheless, the confessions included indicators of unreliability: internal inconsistencies, inconsistencies with other evidence, implausibilities, or generalizations with inadequate detail.

A particularly powerful indicator present in several of the confessions that led to these wrongful convictions is a "false fed fact"—a statement in the confession that is false, but that happened to be consistent with what police believed was true at the time of the interrogation. Other confessions showed "minimization," where the suspects confessed to what they perceived to be lesser crimes but said another person killed the victim. And five of the seven defendants were 18 years old or younger; youth is a well-known risk factor for false confessions.

In each of the cases we discuss, after a confession was obtained, law enforcement should have scrutinized it for reliability, like any other evidence. Instead, in many instances described in this Report, law enforcement exhibited a form of confirmation bias and tunnel vision—focusing solely on an initial theory of the case, ignoring new contrary evidence, and closing off promising investigative leads. As the CRU put it in one case, rather than eliminating suspects when they did not fit the evidence, the police and prosecutors discarded evidence when it did not match the selected suspects.

**As the CRU put it in one case, rather than eliminating suspects when they did not fit the evidence, the police and prosecutors discarded evidence when it did not match the selected suspects.**

Two other cases concern a distinct but related issue: false guilty pleas. One defendant pled guilty towards the end of trial due to the pressures of a potential death penalty; another pled guilty notwithstanding that he likely had an intellectual disability that made him incapable of committing the crime and/or understanding his guilty plea. In both cases, as with the other confessions, law enforcement failed to adequately assess the reliability and validity of the pleas.

## B.    Eyewitness Misidentifications

Five exonerations involved eyewitnesses who made identifications that the CRU concluded were unreliable. Like a confession, an eyewitness identification is particularly powerful evidence in court. But also like a confession, an eyewitness identification can be wrong. In fact, courts and scholars have recognized how the potential for eyewitness misidentification poses a unique threat in our justice system and that cross-racial eyewitness identifications pose special risks. Identifications rely on complex psychological processes involving vision and memory that can be prone to error and inadvertent suggestion. Yet once an error is made, the witness can become increasingly certain that they are right, creating a powerful impact on a jury that is not easily tested by the adversarial process.

The CRU identified limitations on the witnesses' ability to view and retain an identification in each of these cases. In one case, the witness was the victim of a brutal rape by multiple assailants; she was under tremendous stress during the attack and had limited ability to view her attackers. Her varying accounts over time—and in particular details she appeared to recall only as time went on—suggested she was not properly encoding memories of the attack and had made an honest but tragic mistake in ultimately identifying the defendant as an assailant.

In another case, a witness identified the defendant for the first time at trial—even though in-court identifications are known to be of limited value, given the inherent suggestiveness of the proceeding. Other witnesses identified the respective defendant in a pretrial procedure, such as a photo array, lineup, or show-up. And while best practices have been developed for pretrial procedures to minimize suggestiveness, in several cases those best practices were not followed fully. Of particular concern is that in two cases the CRU concluded that the police likely engaged in misconduct by coaching the witness on whom to select.

The CRU also assessed the reliability of the identifications by examining consistency with other evidence. In two cases, other witnesses with better views of the perpetrators notably did not identify the defendant. In several others, the identifying witnesses had at another point in time identified someone else as the perpetrator. Taking all of these factors together, the CRU determined that the identifications were unreliable.

A particular challenge in these cases is that once an eyewitness misidentification is made, it often proves difficult to dislodge, whether by law enforcement, courts, the witnesses themselves, or the jury. While New York law provides pretrial procedures for courts to suppress identifications that were unduly suggestive, those procedures have significant limitations. For example, New York courts allow admission of the in-court identification notwithstanding an improperly suggestive identification procedure if the court finds that the witness had an "independent source" for the identification.

That leaves trial. Jurors tend to judge identifications based on the confidence of the witness at trial, and witnesses who may have been hesitant in their initial identification can become 100% certain in a misidentification by trial (a phenomenon known as confidence malleability). Jurors also tend to overvalue eyewitness identification testimony even when the identifications have been seriously discredited; a confident (but mistaken) witness makes this problem more severe. This also makes it challenging to draw out the misidentifications through cross-examination, the primary way a defense lawyer can challenge a witness's account at trial. In several cases, the defendants faced such issues at trial, which were compounded by prosecutors failing to disclose key evidence or mischaracterizing key points relevant to the reliability of the identification.

## C.    Significant Witness Credibility Issues

In addition to the credibility concerns with inculpatory statements and eyewitness identifications, the CRU found significant credibility issues with key witnesses, and that such issues were not adequately presented to the jurors at trial. Similar to the factors undermining the reliability of confessions and identifications, the CRU identified inconsistencies across different witnesses' accounts, inconsistencies between a witness's account and other evidence, and physical or logical implausibilities. In one case, a shooting simply could not have occurred as the key witness described it: she claimed that the victim chased after the shooter after the shooting, but the victim's injuries would have incapacitated him almost instantly. In another, the two prosecution witnesses' descriptions of the shooting were so different that it seemed they were describing two separate murders.

In addition to these content problems, the CRU cited witness-specific factors that impacted the credibility of the testimony including personal grudges or interests, a reputation for erratic behavior or lying, or coming forward long after the incident or under suspicious circumstances. For example, one witness admitted to the CRU that she had fabricated the claim she was burglarized because she believed the defendant had previously stolen her car. The CRU generally does not seek to revisit credibility determinations made by a jury after a fair trial. In certain cases, however, the CRU concluded that the jury was not presented with the complete set of circumstances surrounding a witness's testimony, at times due to the prosecution mischaracterizing the testimony, and thus the jury could not make a fully informed assessment of the witness's credibility. In a few cases, witnesses ultimately recanted their testimony when speaking to the CRU.

> **In addition to the credibility concerns with inculpatory statements and eyewitness identifications, the CRU found there to be significant credibility issues with key witnesses, and  that such issues were not adequately presented to the jurors at trial. . . . In one case, a shooting simply could not have occurred as the key witness described it. . . . In another, the two prosecution witnesses' descriptions of the shooting were so different that it seemed they were describing two separate murders.**

## D.    Nondisclosure of Favorable Evidence

In the American criminal justice system, an accused citizen is entitled to timely disclosure of all favorable evidence in the possession of law enforcement prior to trial. Prosecutors are the guardians of that constitutional guarantee and have both a legal and ethical obligation to ensure that defense counsel receives all information that tends to negate the accused's guilt or mitigate punishment, including information in the possession of other law enforcement agencies. When it emerges that favorable, material evidence was withheld from the defense—even inadvertently—due process requires that the conviction be vacated. After examining files from the KCDA and NYPD as well as other sources, the CRU found that in ten of the cases, favorable—and in some cases, highly exculpatory—evidence appeared not to have been disclosed to the defense, thus keeping juries from having critical information before issuing their verdicts. In these cases, failure to disclose such evidence deprived the affected convicted persons of fair trials.

> **After examining files from the KCDA and NYPD as well as other sources, the CRU found that in ten of the cases, favorable—and in some cases, highly exculpatory—evidence appeared not to have been disclosed to the defense, thus keeping juries from having critical information before issuing their verdicts.**

The undisclosed information across the cases fell into four main categories: (1) prior statements of the prosecution's testifying witnesses, (2) statements from non-testifying witnesses, (3) information about the prosecution's witnesses' prior criminal history, and (4) documentary evidence that supported a claim of innocence. The CRU generally did not assess the cause of the apparent nondisclosure or determine whether the nondisclosure was intentional or due to negligence. In most cases, the information was found in the prosecutor's casefile and the CRU expressed concern over the prosecutors' failure to ensure that key disclosure obligations were met. In other instances, such information was found only in police files. At least one case raised concerns of intentional withholding: the CRU concluded that the police learned a fact undermining the government witness's identification, understood the significance of the development, and yet apparently did not tell the prosecutor.

## E.    Police Conduct

Once a certain kind of evidence is available—be it a confession, identification, or third-party account—the police are obligated to scrutinize that evidence and test it for reliability against the other available evidence in that case. In most of the CRU exonerations, the reliability issues with confessions and witness testimony raised serious "red flags" that should have prompted further investigation. But through a combination of tunnel vision and confirmation bias, they were not.

All of the above issues can arise even with well-meaning and dedicated police officers. But in some cases, the CRU concluded that police engaged in what appeared to be serious misconduct. For instance, in three of the cases, the CRU found that police had engaged in a combination of police coaching for an identification, an apparent failure to provide crucial information to the prosecutor that should have been disclosed to the defense, and/or had provided false testimony in pretrial hearings. In another, the CRU found incredible the police's account of where they claimed to have found critical evidence.

## F.    Prosecutorial Conduct

A prosecutor's role is not to simply win cases, but to ensure that justice is done. Taken together, the wrongful convictions discussed here all point to failures of prosecution as an institution—whether through the acts of individual prosecutors, collective decisions, or failure to train or guide prosecutors adequately.

The law vests prosecutors with enormous discretion in the decision to bring charges against a suspect, and with that discretion comes commensurate responsibility. The CRU found that many of the cases discussed in this Report—whether based on confessions, identifications, or third-party witness accounts—presented significant questions about reliability or sufficiency of the evidence that should have been, but were not, addressed before the prosecution was pursued. In one case, the CRU identified what appeared to be a politically motivated prosecution.

> **Many of the cases discussed in this Report—whether based on confessions, identifications, or third-party witness accounts—presented significant questions about reliability or sufficiency of the evidence that should have been, but were not, addressed before the prosecution was pursued.**

Doing justice also means doing everything in the prosecutor's power to ensure that the trial is fair. That means not just meeting disclosure obligations, as discussed above, but ensuring the utmost candor by the prosecution and its witnesses with the court, defense, and jury. Prosecutors in a number of these cases failed to meet this standard, whether on direct examinations, cross-examinations, or openings/summations, at times exaggerating or mischaracterizing testimony on critical questions presented to the jury.

On direct examinations, prosecutors must do their due diligence to ensure that their witnesses do not lie or misrepresent the facts. Yet, in multiple cases, witnesses made false statements on direct examination that the prosecutors should have known were false and should have corrected on the record but did not do so. On cross-examination, prosecutors must not use their questioning as a vehicle to put facts before the jury that are baseless, prejudicial, or otherwise inadmissible, but the CRU identified at least one case in which the prosecutor used questioning to impermissibly inform the jury that the convicted person's co-defendants had been convicted at trial, and that one had implicated the defendant in an otherwise inadmissible confession. Finally, in openings and summations prosecutors must represent the evidence fairly. In at least two cases, prosecutors emphasized or reiterated testimony from their witnesses that they knew or should have known was baseless. In another case, the prosecutor argued that the physical evidence corroborated the eyewitness's testimony when it did no such thing.

## G.    Defense Conduct

In assessing the reliability and integrity of the convictions it reviews, the CRU focuses primarily on the actions of the prosecution and other law enforcement agents. The prosecution itself must be satisfied at all stages of a prosecution that a conviction would be fair and just regardless of whatever defense is advanced. Nevertheless, the CRU at times assesses defense counsel's conduct as the Sixth Amendment to the U.S. Constitution protects defendants' right to the effective assistance of counsel. The CRU cited deficiencies of the defense counsel as a key factor supporting its recommendation to vacate the convictions in eight cases.

The deficiencies included the defense counsel's failure to conduct adequate pre-trial investigations to inform their defense strategy. In cases that proceeded to trial, the most significant issue was the defense lawyers' failure to advance obvious and crucial arguments—based on evidence known to the defense at the time—that could

> **The CRU cited deficiencies of the defense counsel as a key factor for supporting its recommendation to vacate the convictions in eight cases. . . . For instance, in one case, the defense attorney failed to elicit that multiple eyewitnesses did not identify the defendant as the shooter and that one even said he was 100% certain that the defendant was not the shooter.**

have impacted the verdict had the jury had the opportunity to assess them. For instance, in one case, the defense attorney failed to elicit that multiple eyewitnesses did not identify the defendant as the shooter and that one even said he was 100% certain that the defendant was not the shooter. In another case, the defense failed to make the argument that the defendant was physically incapable of committing the offense because of his significant medical injuries. The CRU found that other defense counsel were simply unprepared for trial and made minimal efforts to defend their clients, including in some cases waiving opening argument or giving perfunctory summations.

Finally, while it is unquestionably the prosecution's responsibility to meet its obligations, in some cases the CRU concluded that defense counsel could have helped prevent injustices or preserved legitimate claims for appeal by objecting to prosecutorial misconduct.

## H.      New Evidence, Witness Interviews, and Expert Consultations

The CRU seeks to investigate its cases thoroughly, beyond reviewing the original proceedings and evidence, to identify any new evidence that may impact the decision to recommend a conviction be vacated. This may include speaking to new witnesses, speaking to prior witnesses, or conducting new expert analyses. Importantly, the CRU does not impose a "due diligence" threshold to limit its investigations—that is, the CRU consults with experts or interviews witnesses who may shed light on the integrity of the conviction, even if the defense could have conducted that investigation itself but failed to do so.

The CRU's interviews of the defendants, or review of newly discovered statements of the defendants, meaningfully contributed to the CRU's assessments in three cases. For example, in one case, the CRU interviewed the convicted person and reviewed recordings of phone calls he made from jail soon after his arrest as well as a letter he sent to the victim's mother years after his trial, all of which demonstrated that he told a consistent, credible, and corroborated account of how the murder happened and how he came to falsely confess to it.

**In seven cases, the CRU conducted new expert or scientific analysis in the areas of DNA testing, fire science, medical evidence, and forensic psychology that was not available in the original trials.**

In other cases, the CRU spoke to prior witnesses or new witnesses with relevant information. Most significant were the few witnesses who recanted their testimony. In one notable case, a new witness told police that a man told him in prison that he was responsible for the murder for which the defendant had been convicted. The man was the same person the defendant had long identified as the perpetrator.

Lastly, in seven cases, the CRU conducted new expert or scientific analysis in the areas of DNA testing, fire science, medical evidence, and forensic psychology that was not available in the original trials.

# V. METHODOLOGY

All the factual information in this Report regarding the wrongful convictions of these twenty-five exonerated persons was derived from the twenty case memoranda prepared by the CRU in making the recommendation to vacate a conviction. These memoranda generally set forth all the facts that the CRU concluded were relevant to its recommendation, including those that (in the view of the CRU ADA who conducted the review) may have supported upholding the conviction and those that supported overturning it. These memoranda thus typically contain a detailed history of the investigation, the trial, the CRU's investigation and analysis, and where relevant, other procedural aspects of the case.

The Report's authors relied on those memoranda and did not conduct any independent investigation into the subject cases. Nor did we include any new information that may have come to light about these cases after a conviction was vacated (for example, information obtained during an exonerated person's civil litigation). The Report focuses on the factual/historical information about each case that was relied upon and found to be significant by the CRU, the Independent Review Panel and, ultimately, the elected District Attorney in deciding that the conviction of a wrongly convicted person should be vacated. Other actors may have conducted the investigations differently or emphasized different aspects of the cases. But because the memoranda represent the CRU's own assessments of these wrongful convictions, they provide a useful data set on their own for understanding how a prosecutor's office might review and analyze claims of wrongful conviction in its own county.

The initial review of the memoranda was performed by a minimum of two reviewers from outside the KCDA (one from the IP's Department of Science and Research, and at least one attorney from WilmerHale) using three structured questionnaires developed by the IP researchers in consultation with KCDA. The first questionnaire was designed to extract information about attributes of the crime, evidence, investigation, and prosecution that may have contributed to the CRU's recommendation to vacate the convictions. The second questionnaire gathered information about lay witnesses who were key to the prosecution's case (with separate questionnaires completed for each witness), and covered the type of information the witness provided, the witness's relationship to the defendant, identification procedures, and other information that might go to the credibility or reliability of the witness. And the third questionnaire covered a broader range of categories across the investigation and prosecution of the defendant, including actions and failures by police, prosecutors, and defense, and the different kinds of nontestimonial evidence considered by the finder of fact. It also asked reviewers to indicate which factors contributed to the CRU's recommendation to vacate the conviction and dismiss the indictment.[3]

Following compilation of the questionnaires, the IP's research team performed summary analyses of the data to categorize the cases and identify common themes. With the benefit of these summary analyses and further close analysis of the CRU memoranda, KCDA, WilmerHale, and the IP, jointly authored this Report to draw out those common themes and summarize the CRU's findings.

---

[3] Options on the questionnaire included, but were not limited to: decreased credibility of key prosecution witness(es); increased credibility of alibi; inaccurate testimony from expert witness at original trial; new analysis of forensic evidence (not previously available); analysis of forensic evidence previously available but not pursued; findings from social science (e.g., eyewitness, confessions) experts; plausible alternative suspect; plausible alternative theory of crime; ineffective assistance of counsel; police error or misconduct; and prosecutorial error or misconduct (including failures to disclose evidence).

# VI. FINDINGS

Eight recurring issues contributed to the CRU's recommendations to vacate each of the twenty-five wrongful convictions described in this Report. Below we examine each.

First, we examine three issues that relate to the reliability of core aspects of the prosecution's case: statements by the defendants themselves, identifications by witnesses who generally did not know the defendant before the crime, and accounts by witnesses who generally did know the defendant before the crime. In nearly all of the exonerations, at least one of the elements of the prosecution's case exhibited significant credibility problems. We describe the core considerations that led the CRU to conclude that such statements and testimony were unreliable as well as actions by police, prosecutors, and defense counsel that either contributed to the generation of unreliable accounts or compounded their effect.

**In nearly all of the exonerations, at least one of the elements of the prosecution's case exhibited significant credibility problems.**

Next, we describe several cases in which it appeared that relevant evidence was not disclosed, making it was impossible for the jury to fairly assess guilt.

We then examine three main players in the criminal justice system—the police, prosecutors, and defense—and how their failings contributed to the wrongful conviction. While not a subject of this Report, it bears mentioning that jurists, too, share responsibility to help prevent wrongful convictions, and it is apparent in some of the cases recounted here that court action—or inaction—contributed to a wrongful conviction.

Finally, we discuss the role that new or newly discovered evidence played in the CRU's analysis—including new witness testimony, newly discovered documents, new testing, and new expert analyses.

There was considerable variation among the cases in the number and extent of factors that supported the CRU's recommendation of vacatur. For instance, in the case of Nathan Fitzgerald, the CRU's recommendation was based principally on an apparent failure to disclose a single document that supported his alibi. On the other hand, the case of Miguel Foster involved a wide variety of failures and issues: an unreliable confession, a problematic identification from a witness with compromised credibility, a failure to disclose significant evidence, and errors or misconduct on the part of police, prosecutors, and defense counsel.

The CRU's analysis in these cases always looks to the totality of the circumstances. Thus, when the CRU cites a number of issues in a particular case, its decision to recommend vacatur is based on all of the issues taken together. That said, there were cases that had one or more issues which on their own fatally undermined the validity of the conviction.

The cases also vary with regard to the CRU's final determination. As discussed above, the CRU will recommend vacatur if the defendant is legally innocent or was denied a fair trial. In certain cases, the CRU did not conclude that the record established the defendant's factual or legal innocence, but nevertheless concluded that the actions of prosecutors and others denied the defendant a fair trial.

**Table 3 | Summary by Case**

| | False or Unreliable Confessions[a] (C) | Eyewitness Misidentifications (EW) | Significant Witness Credibility Issues (Cr) | Nondisclosure of Favorable Evidence (Nondis) | Role | | | New Evidence | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Police Conduct (Police) | Prosecutor Conduct (other than / in addition to nondisclosure of favorable evidence) (Pros) | Defense Conduct (Def) | Interviews, Testimonial and Documentary Evidence (New-Int) | New Expert and Scientific Evidence (New-Exp) |
| Gold | C* | EW | | Nondis | Police | Pros | Def | New-Int | |
| Martinez, Velasco, Vargas | | | W-Cr | | Police | Pros | Def | New-Int | New-Exp |
| Anderson and Jones | | | W-Cr | Nondis | Police | | | | |
| Moore and Stevens | C | | | | Police | Pros | Def | | |
| Warren | | | W-Cr | | | | | New-Int | |
| Davidson | | EW | W-Cr | | Police | Pros | Def | New-Int | New-Exp |
| Hart | | | W-Cr | | | Pros | | | |
| Dawson | | | W-Cr | | | Pros | | New-Int | |
| Fitzgerald | | | | Nondis | | Pros | | | |
| Green | C | | | | Police | Pros | | | New-Exp |
| Hicks | | | W-Cr | Nondis | Police | Pros | | | New-Exp |
| Harrison | | EW | | Nondis | Police | Pros | Def | | New-Exp |
| Oakley | | | W-Cr | | Police | Pros | | New-Int | |
| Yeats and Watson | C | | | | Police | Pros | | | New-Exp |
| Wright | | | | Nondis | Police | Pros | Def | | |
| Lewis | | | W-Cr | Nondis | Police | Pros | | | |
| Alvarez | C | | | Nondis | Police | Pros | | | |
| Mitchell | | EW | | Nondis | Police | Pros | | | New-Exp |
| Foster | C | EW | | Nondis | Police | Pros | Def | New-Int | |
| Bloom | C* | | | | Police | Pros | | | New-Exp |

a "C*" is used for cases which were resolved by a guilty plea, and so could be said involve a false confession or admission (i.e., during the plea hearing), but the circumstances around the false confession are different from the other cases in this group.

## A.    False or Unreliable Confessions

The Supreme Court has observed that a defendant's confession is "probably the most probative and damaging evidence that can be admitted against him."[4] Yet, it is now well established that in response to the pressures of a police interrogation, individuals can and sometimes do confess to crimes that they did not commit.[5] In fact, the National Registry of Exonerations estimates that 321 of a recorded 2,640 exonerations (or 12%) have involved false confessions.[6] The same analysis identified that, among exonerations of defendants convicted of homicide, false confessions were a factor in 22%.[7]

Often, a false confession is the result of coercion. As the Supreme Court has explained, "[b]y its very nature, custodial police interrogation entails 'inherently compelling pressures.'"[8] These pressures can be accentuated by use of the commonly-applied Reid Technique, in which interrogators isolate the suspect and follow a combined strategy of "maximization" and "minimization" to convince a suspect to confess.[9] Specifically, the interrogator "maximizes" by using "a cluster of tactics designed to convey the interrogator's rock-solid belief that the suspect is guilty and that all denials will fail."[10] And then the interrogator "minimizes" by "provid[ing] the suspect with moral justification and face-saving excuses for having committed the crime in question," thereby convincing the suspect that it is rational to confess.[11] These techniques can be highly effective in eliciting truthful confessions from the guilty, but they can result in false confessions when applied to the innocent.[12] For this reason, it is essential to corroborate facts provided in a confession.

Among the exonerations that have resulted from the CRU's work, seven defendants across five cases provided confessions that they later claimed were coerced: Alvarez, Foster, Green, Moore/Stevens, and Yeats/Watson.[13] In these cases, the defendants were interrogated by police, confessed to committing a crime, went to trial alleging that the confession was false, and then were convicted by the jury in significant part on the basis of the confession. In all of these cases except that of Miguel Foster, the respective confessions were the only direct evidence presented at trial connecting the defendants to the crimes charged.[14] In each, the CRU determined that the confessions were either false or insufficiently reliable to support their convictions.

For example, Carly Green confessed to what amounted to felony murder in the course of a home robbery. Green testified at trial that the detective told her he had physical evidence connecting her to the crime, including her

---

[4]  *Parker v. Randolph*, 442 U.S. 62, 72 (1979) (citations and internal quotation marks omitted).

[5]  *See Corley v. United States*, 556 U.S. 303, 321 (2009) ("[T]here is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed[.]") (citing Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post–DNA World*, 82 N.C. L. REV. 891, 906–907 (2004)).

[6]  The National Registry of Exonerations, % Exonerated By Contributing Factors (last updated July 4, 2020), https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx.

[7]  *Id.*

[8]  *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).

[9]  Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 7 (2010).

[10]  *Id.* at 12.

[11]  *Id.*

[12]  *Id.* at 18.

[13]  Although Wright claimed that his confession was coerced, CRU did not find the confession to be unreliable and recommended vacatur of his conviction for other reasons.  In addition, Lewis provided a statement to police that placed him at the scene of the crime that he later claimed was false and coerced. CRU did not make findings about the reliability of this statement or the claims of coercion, and while the prosecution presented it at trial, the CRU found it had only a slight impact on the outcome. For these reasons, neither case is discussed here.

[14]  Yeats was convicted on the basis of his confession as well as based on the testimony of Watson, who at that point had already been convicted and testified consistent with his prior confession.

---

fingerprints. (This statement, if made, would have been false as there was no physical evidence tying Green to the crime.) Green further stated that the detective repeatedly insisted that she was lying about her innocence, told her lurid tales of what happened to women in prison, and said that she could go home if she confessed. Green admitted that she knew the detective's statement that she could go home was untrue when he made it, but said she nevertheless felt coerced to confess based on the threat of prison and the fingerprints, which she believed could have been planted by the detective.

To cite another example, Miguel Foster confessed to participating in a murder with a friend, D.L., but later said that neither he nor D.L. was involved; rather, a local gang member was the perpetrator. At trial and then later to the CRU, Foster claimed that the detectives coerced the confession through a combination of verbal threats and physical abuse.[15] He also said that the detectives said a witness had identified him as the shooter (which was true, a witness had identified Foster as the shooter at this point) and that D.L. was speaking to the police and had pinned the murder on him (which was false, the police had not spoken to D.L. by this time). Foster said that he confessed because he thought it was what the police wanted to hear and that he would be released, at which point he could tell the truth and people (like his lawyer) would believe him. He also said that if D.L. was blaming him for the murder then he would have to place himself at the scene, so he could say he saw D.L. do it. And although he knew who the real shooter was, that person was dangerous and it would endanger Foster and Foster's family to implicate him.[16]

False confessions also may result from a related but distinct set of improper interrogation tactics. One question in false confession cases is how the suspect can confess if they know no details of the crime. It is textbook interrogation practice for police to "hold back" details and then see if the suspect accurately fills in the gaps. And the most compelling confessions are those in which the suspect provides information about the crime that the police did not know at all, but later are able to corroborate. By contrast, it is axiomatic that police should not feed salient facts of the crime to the suspect, as then it is impossible to know whether the suspect independently knew those details and thus, whether the confession is reliable.[17] This feeding of facts can happen inadvertently, just by asking leading questions and/or giving positive feedback when the suspect provides the "right" answer.

The defendants in these cases differed somewhat in how they claimed that their false confessions were constructed. Green, for instance, claimed that the detective interrogating her simply fashioned her written statement himself, supplying various key details, although there were some details that she chose herself in discussion with the detective. Green even stated that the detective changed his mind about how some of the details should be reflected as the statement was constructed.[18] She then signed the statement and used it as the basis to provide her videotaped statement.[19]

---

[15]  In particular, he said that among other things, the detectives grabbed and shook him, and one of the detectives "hemmed [him] up, slammed [him] to the floor, and told him, 'You better tell me something I want to hear,'" or he would "go down" for the homicide.

[16]  Alvarez, Moore, Stevens, Yeats, and Watson also all claimed coercion by police. Moore and Stevens claimed that they were each told they could go home if they inculpated the other, and Moore claimed that the detective repeatedly struck him with an open hand to the face and told him that he would be struck with the chair if he did not confess.

[17]  Feeding facts to a defendant during an interrogation not only makes it more likely that a false confession will be elicited; it makes it harder to defend a truthful confession.

[18]  For instance, in her confession, Green stated that she and her accomplice took $60 from the victim. Green claimed that at first the detective said she should say that she kept $20 and her accomplice kept $40, but then reversed his instruction, telling her she should say that she kept $40 and her accomplice kept $20.

[19]  Like Green, Moore and Stevens testified at trial that the detective scripted their statement (though this contradicted Moore's prior testimony at a court hearing that he fabricated the factual assertions of his statement and was not provided details by the detectives). Watson similarly told CRU that one detective fed him the lines to say to prevent another detective's verbal assault.

---

On the other hand, Foster testified that the detectives did not force him to give any particular details or tell him what to say. Rather, Foster said that he made his statement partly based on whatever details the detectives provided him through their questioning, and partly based on details he himself invented.

The CRU was limited in its ability to determine exactly what occurred in the defendants' respective interrogations, and its recommendation to vacate the defendants' convictions should not be taken as necessarily crediting any particular aspect of their accounts. Although the final confessions of the defendants were generally videotaped, the preceding interrogation sessions were not generally recorded, and in many cases the police denied the claims that the defendants made.

> **[The CRU examined] whether the convicted persons' confessions constituted reliable evidence of their guilt. . . .  [In seven cases,] after analyzing the content of the confessions, the facts of the investigations, and the available evidence, the CRU determined that the answer was no.**

Ultimately, however, the question the CRU considered in each of these cases was not what precisely occurred during the interrogation. Nor was it to assess whether the defendants' confessions were "voluntary" and thus could be introduced at trial consistent with applicable legal requirements.[20] Rather, the CRU's focus was whether the convicted persons' confessions constituted reliable evidence of their guilt.

In each of these cases, after analyzing the content of the confessions, the facts of the investigations, and the available evidence, the CRU determined that the answer to these latter questions was no.[21] Below, we discuss the factors that supported the CRU's determinations that certain confessions were unreliable, including: (1) problems with the content of the confessions; (2) indicia of coercion; and (3) other improper police practices. Finally, we discuss two cases in which the CRU identified an analogous but distinct fatal flaw: defective guilty pleas.

### 1.    Problems with the Content of the Confession

**False Fed Facts:** One of the most powerful signs that a confession contains facts fed to the suspect by police—whether intentionally or inadvertently through suggestive questioning—is when the confession contains "false fed facts." This is a fact in the confession that is ultimately found to be inconsistent with other evidence or implausible *but* was consistent with the police's understanding of the facts at the time the confession was made. The CRU identified such false fed facts in a number of the cases. For example:

- Jeremy Alvarez confessed to stabbing the victim in the chest, near the heart. This matched the police's view at the time of how the victim died, based on an initial report by a doctor who saw the body. The next day an autopsy revealed, however, that this report was wrong and in fact the victim had been shot, not stabbed. So how could Alvarez confess to a stabbing that never occurred? The CRU concluded that the police likely suggested to Alvarez that this was how the victim died.

---

[20]  The New York Court of Appeals has said that to present a confession at trial, prosecutors must prove beyond reasonable doubt that the defendant's statements "were not products of coercion, either physical or psychological, or in other words, that they were given as a result of a free and unconstrained choice by their maker." *People v. Thomas*, 22 N.Y.3d 629, 641 (2014) (citations omitted).

[21]  Although CRU concluded that the confessions in these cases were not reliable, note that CRU's determination in each case to recommend vacatur was based on the totality of the information CRU considered, including information unrelated to the confession. For instance, in the Yeats/Watson case, the most significant evidence that undermined CRU's confidence in the result was the discovery of a third-party's DNA that could not be explained by the confessions (and was connected to a separate, unsolved murder), thus creating reasonable doubt.

---

- In the initial phase of the investigation involving Scott Moore and Tony Stevens, police learned that shortly before the abduction, a woman in the area was washing her red car when two men walked by and one said, "that's a nice looking car." When Stevens was later arrested and confessed, he said that he and Moore had indeed walked by a woman washing a red car and it was Moore who provided the compliment. When police identified Moore, however, it became clear that Moore and Stevens in no way resembled the clear descriptions of the two men provided by the woman. The prosecutors then eliminated the woman as a witness, and their theory at trial and beyond was that it was two different men who had walked by the woman and complimented the car. But then how to explain Stevens's original admission that he and Moore had done it? The CRU concluded that this was a fact fed by police to Stevens, who then adopted it into his narrative.

- In the Carly Green case, an initial police report documented the time of the home robbery at 6 P.M. The CRU was unable to establish the source of this apparently arbitrary timing, but it became the "official" time in police records. Green's confession—which came in an interrogation 5 years after the robbery—adopted the 6 P.M. timing, even though there was evidence that it was not accurate. The CRU concluded that this timing was likely a fact supplied by the detective and then adopted by Green.

The existence of false fed facts does not, of course, automatically mean the confession is unreliable. For instance, Green could have acquiesced, years after the fact, to the detective's suggestion that 6 P.M. was the time of the assault while still truthfully confessing to the rest of the crime. But it does create a significant reason for concern and further inquiry. That is because a false fed fact strongly suggests that *other* facts contained in the confession (including even the accurate ones) may not have come independently from the suspect. After all, if this particular "fact"—which later turned out to be false—was fed to the defendant, there is no reason to believe it was the only one.

**Inconsistencies, Implausibilities, and Omissions:** Although false fed facts are a particularly concerning sign of a false confession, they are not the only one. Other hallmarks of false confessions are that they can be overly general and lack detail, or conversely can be full of detail that cannot be corroborated, contain implausibilities, and/or conflict with other evidence. The CRU found that all of these confessions had additional problems along these lines, which further supported a conclusion that they were adopted through acquiescence to police questioning or through invention.

In some cases, believing the confessions required accepting a chain of events that was simply implausible. For example:

- Carly Green claimed that she and her accomplice took three $20 bills from the victim in the attack, but based on the victim's financial situation, it was implausible that he had $60.

- The evidence indicated that neither Scott Moore nor Tony Stevens (both 16 at the time of the crimes of which they were convicted) could drive, had ever driven a car before, had access to a car, or had a license. Yet to believe their confessions, one would have to accept that the two boys drove continuously for hours in traffic during the day from Queens to Brooklyn—while holding their victim in the backseat of the car at gunpoint—and then later gassed up the vehicle at a self-serve filling station and parallel parked on a street.

**The evidence indicated that neither Scott Moore nor Tony Stevens (both 16 at the time of the crimes of which they were convicted) could drive, had ever driven a car before, had access to a car, or had a license. Yet to believe their confessions, one would have to accept that the two boys drove continuously for hours in traffic during the day from Queens to Brooklyn—while holding their victim in the backseat of the car at gunpoint—and then later gassed up the vehicle at a self-serve filling station and parallel parked on a street.**

- The timeframe described in the confessions of Julian Yeats and Curtis Watson called for an incredible amount of activity to occur within just thirty minutes, including the defendants sexually assaulting and stabbing the victims, moving and binding the bodies, cutting appliance cords to tie around the victims' necks, cleaning the scene, and reporting the murders. The CRU concluded that the proffered motive for Yeats to sexually assault and kill his sister and her friend—that they were "witnesses" to his killing his mother even though they were still sleeping in another room after the killing—defied logic.

In some cases, the issue was that the confessions did not line up with other testimony or evidence:

- The confession provided by Jeremy Alvarez said that he acted with one other person, but initial reports from a detective and a witness were that three people were involved.

- Multiple eyewitnesses to the shooting in the Foster case were clear that there was just one shooter, but Miguel Foster's story was that there were two. And although these witnesses all said the shooter then ran northbound, Foster said he ran eastbound. Finally, Foster did not match the physical description of the shooter provided by multiple witnesses.[22]

- Carly Green's narrative claimed that the victim was in a wheelchair when she entered the home, but the victim did not have a wheelchair. And the victim told police afterward that he was attacked by three individuals, but Green's confession involved just two people.

- The appearance of Scott Moore and Tony Stevens significantly differed from even the general descriptions of the perpetrators provided by multiple witnesses. Stevens's confession indicated that he kept a gun under his mattress, but police could not find any gun there.[23]

- The timeframe recounted by Julian Yeats and Curtis Watson was in conflict with the medical evidence, which suggested that the victims died much earlier in the night.

Finally, sometimes the confessions failed to explain key aspects of the physical evidence, and this omission was significant:

- Carly Green's narrative did not explain the victim's various scratches and a dislocated thumb.

- The autopsy in the Yeats/Watson case showed that the victims were not just stabbed but also strangled. The confessions only mentioned the stabbing, but strangulation is a fact unlikely to be omitted by someone providing a truthful account.

Again, the existence of any particular inconsistencies, omissions, or implausibilities is not necessarily a basis for rejecting a confession. An otherwise reliable confession may be inaccurate in certain respects—for instance, due to faulty memory or minimization. But these factors create a reason for concern, and taken together, may be sufficient to reject the confession as unreliable.

**Lack of Detail:** Another significant issue with some of the confessions was their lack of detail and generalized nature. The Moore and Stevens videotaped statements were, in the CRU's determination, shockingly brief and perfunctory given the extended nature of the abduction and murder to which the defendants were supposedly confessing. In addition, the Green videotaped statement consisted almost entirely of the her answering leading questions framed by the prosecutor and the detective. According to subsequent police testimony, it appears Green was never able to articulate a comprehensive or coherent narrative of the crime from start to finish.[24]

---

[22] And multiple witnesses did not identify him as the shooter.  (CRU found the identification of the one who did identify him to be thoroughly discredited, as discussed infra at Section VI.B, VI.D.).

[23] Stevens was later questioned about this and he claimed that friends came to his house and may have taken the gun when Stevens was out of his bedroom.  He did not explain how anyone would have known a gun was hidden there.

[24] This was particularly notable because Green' first statement, taken five years earlier when she denied any involvement with the crime, was much more coherent without prompting by any detective.

---

In these cases, it was notable to the CRU how little detail the police and prosecutors taking the statements sought from the defendants. Green was never asked many basic questions about the crime, such as where specifically in the home the assault took place, what the victim was wearing, or what injuries Green observed. Moore and Stevens similarly were never asked to describe in any fashion the gun that was used to commit the murders, and although police had learned that the victim's credit card was used at a gas station in Brooklyn after the murder, the police and prosecutors did not ask Moore and Stevens about this.

> **In some cases, the lack of questioning on obvious topics suggests the detectives did not ask because they were afraid of the responses: that is, if the suspects gave contradictory descriptions, or if their answers conflicted with the evidence, the statements would complicate any future prosecution.**

Obtaining details would have permitted law enforcement to ensure that the defendants' statements was consistent with and corroborated by external evidence. In some cases, the lack of questioning on obvious topics suggests the detectives did not ask because they were afraid of the responses: that is, if the suspects gave contradictory descriptions, or if their answers conflicted with the evidence, the statements would complicate any future prosecution. Thus, the lack of details—combined with the various inconsistencies and implausibilities discussed above—further undermined the CRU's confidence that the confessions could be treated as reliable.

### 2.    Indicia of Coercion

In light of these various content problems, the CRU was able to determine that these confessions were not reliable, even if it could not determine precisely what occurred in the interrogation room and whether in fact the confession was "coerced." But it does bear mentioning how these cases appear to fit within the general phenomenon of false confessions, and in some cases the CRU did make conclusions about the credibility of the defendants' explanations for why they falsely confessed.

Research generally focuses on two types of risk factors for false confessions: (1) characteristics of suspects that make them more predisposed to falsely confess, and (2) situational factors about a particular interrogation that can encourage false confessions.

As to the first category, research indicates that juveniles and individuals with mental disabilities are especially prone to confessing falsely in response to police interrogation techniques.[25] Although these five cases did not involve any mentally disabled suspects, age may have been a factor in several of them: at the time of their confessions, Watson was 15 years old, Moore and Stevens were 16 years old, and Yeats and Foster were 18 years old.[26]

Situational factors that are often cited as increasing the risk of false confessions are (1) duration of interrogation, (2) minimization, and (3) deception.[27]

---

[25] Saul M. Kassin et al., *supra* note 9, at 19 (discussing "strong evidence that juveniles are at risk or involuntary and false confessions in the interrogation room"); *J.D.B.*, 564 U.S. at 269.

The case of Charlie Bloom, which does involve concerns about mental disability, is described below.

[26] Note that Watson had claimed to police that he was 17 at the time of his confession, and CRU determined that the detectives interrogating him did not nor should have known he was in fact two years younger.

[27] *See* Allison D. Redlich, *The Susceptibility of Juveniles to False Confessions and False Guilty Pleas*, 62 RUTGERS L. REV. 943, 952 (2010).

---

First, although the CRU did not find duration of interrogation to be a factor in most of these cases, it did find it relevant as to Foster: he was interrogated while being held in custody on other charges and gave four statements over 2 days.[28]

Second, there is also evidence of minimization in some of the confessions. For example, although Green was being questioned for a home robbery and assault that led to death, she confessed only to joining another person in the robbery, said that "she did not want to hurt" the victim, and said that it was her accomplice who struck the victim. This apparent shifting of blame might have made it palatable to Green to confess to something she did not do. This minimization similarly may have been a factor in the confessions of Moore and Stevens, where each stated it was the other individual who was the gunman (and thus, in their minds may have each felt they were not actually confessing to a crime).

To be sure, even guilty suspects may minimize their conduct, admitting to participation in a criminal act but insisting that someone else was ultimately responsible. But in combination with the numerous content problems discussed above, this blame-shifting is a factor to consider in assessing whether the defendant decided to confess falsely.

Third, the CRU generally did not assess whether police employed deception in the interrogation, as certain defendants alleged.[29] It did, however, reach certain conclusions as to one case in which such deception was evident and played a key role in bringing about a false confession (Foster). While deception by police interrogators is currently legal in New York and many other jurisdictions, it is also a factor that may increase the risk of a false confession by an innocent suspect.

As explained above, Foster claimed that the detectives falsely told him that his friend D.L. had implicated him as the shooter as part of their dispute with the victim, and that this contributed to his decision to falsely confess. The detectives denied to the CRU that they had made this statement to Foster in the interrogation. But the CRU found that Foster's account was supported by police reports, which confirmed that it was the police's theory at the time that D.L. and Foster had a dispute with the victim and this was why the victim was killed.[30] Ultimately, the CRU found Foster's explanation for providing a false confession to be consistent and plausible, particularly when combined with his prolonged detention and his youth, and the lack of any other reliable evidence supporting the confession.

### 3.    Other Problematic Practices

A proper investigation can avoid pitfalls that might result in a false confession and also can catch false confessions before they turn into wrongful convictions. Unfortunately, in these cases, the CRU found that law enforcement made a number of errors in their investigation that contributed to the unreliable confessions and prevented these reliability issues from being caught.

**Errors in the Decision to Interrogate:** Scholars have noted that one error that can result in false confession—and in fact is necessary to the inducement of a false confession—is the error of suspecting and interrogating an innocent

---

[28] One study reported that an average length of interrogation was 1.6 hours, but that the average length of interrogations in a sample of cases that produced false confessions was 16 hours. Saul M. Kassin et al. *supra* note 9, at 16.

[29] Again, CRU's analysis was not focused on whether any alleged deception in this or any other cases made the confession not admissible at trial, and such a legal analysis is thus not discussed in this Report. The New York Court of Appeals has said that "[i]t is well established that not all deception of a suspect is coercive" so as to violate constitutional due process requirements, "but in extreme forms it may be." *Thomas*, 22 N.Y.3d at 642.  In addition, under New York law, a statement is treated as "involuntarily made" if elicited "by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself." N.Y. Crim. Proc. Law § 60.45(2)(b)(i).

[30] The detectives told CRU that they would not have tried to play one suspect off the other like this because they knew there was only one shooter. CRU found that this explanation made no sense because the tactic of flipping one suspect against another works just as well in a one-suspect case.

---

person.[31] This is known as "misclassification error."[32] In a number of these cases, the CRU found the initial suspicion of the defendant—and thus the decision to even place the defendant in a position where they might falsely confess—to be questionable.[33]

First, the police originally suspected Foster on the thinnest of evidence, relating to a tip about a dispute that the victim allegedly had with the defendant and his friend, D.L.[34] When a witness to the shooting came forward and identified the shooter as a local gang leader named "Ice Cold" who then attended the victim's wake, investigators should have determined Ice Cold's identity and showed the witness a photo array that included him. Instead, the police showed the witness a photo array with Foster, even though they likely knew that Foster was not "Ice Cold" and did not and could not have attended the wake.[35] As discussed elsewhere in this Report, the police then engaged in what the CRU concluded was likely a suggestive and improper identification procedure to cause the witness to identify Foster as the shooter. It was on this basis that they then interrogated Foster as the suspect.

The decision to interrogate Stevens as a suspect was similarly questionable. Before interrogating Stevens, the police had identified two men who for a number of reasons should have been suspects in the abduction.[36] Yet the police did not show either of these two men to any of the witnesses through a photo array or lineup. Instead, they interviewed the two men and received and pursued a vague tip that the men provided concerning an individual trying to sell a gun. The tip eventually led them to suspect Stevens, even though there was no meaningful basis to conclude that the gun that was the subject of the tip was connected to the abduction.[37]

The CRU also questioned the decision to interrogate Green. The police interviewed her shortly after the home robbery/assault and she denied involvement. The CRU concluded that when, 5 years later, the police retargeted Green as their prime suspect, that was not the result of any reasoned reexamination of the case. Rather, the police appeared to be playing a hunch. The police administered a polygraph on Green, even though there was no further evidence of her involvement, and it is generally agreed that a polygraph 5 years after an incident is of little value. When Green failed the polygraph, the police interrogated her as the suspect.

---

[31] Indeed, "police are trained to interrogate only those suspects whose guilt they presume or believe they have already established." Steven A. Drizin & Richard A. Leo, *supra* note 5, at 911; see James L. Trainum, HOW THE POLICE GENERATE FALSE CONFESSIONS: AN INSIDE LOOK AT THE INTERROGATION ROOM (2016).

[32] Richard A. Leo and Steven A. Drizin, *The Three Errors: Pathways to False Confession and Wrongful Conviction, in* POLICE INTERROGATIONS AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE, AND POLICY RECOMMENDATIONS 9, 13 (G. Daniel Lassiter & Christian A. Meissner eds., 2012) (describing misclassification error as "both the first and the most consequential error police will make" in inducing a false confession and yet noting that it is "also one of the least studied and thus least well understood").

[33] As emphasized throughout this Report, in the exonerations CRU was focused on the integrity of the defendants' convictions and not necessarily their ultimate guilt or innocence.

[34] Specifically, a confidential informant claimed that the victim and an associate of his were allegedly together when the associate shot at a group of people with an intent to hit Foster and his friend, D.L.

[35] And they did not show a photo of Foster's friend, D.L., because they happened to have a photo of Foster but did not have a photo of D.L.

[36] In particular, they (1) had been arrested on separate robbery charges days after the abduction, (2) matched the description of the two men seen by witnesses, (3) lived close to where the victim's body was recovered, and (4) one of them worked at the very hardware store that was the source of a kerosene can found in the victim's car (and that was likely used to set a fire in the car after the abduction and murder).

[37] Specifically, the two men told police that they were aware of an individual in the area who was supposedly trying to sell a gun that the individual claimed had been used in a homicide. Based on this tip, the police contacted another individual, whom they were told was the gun's true owner, and who then explained that, through a complicated chain of custody, the gun was now in the hands of Tony Stevens. They did not ask the supposed gun owner anything that could corroborate whether the gun could have been the murder weapon or attempt to corroborate the chain of custody.

---

**Failures to Identify an Unreliable Confession:** The CRU also found problems with the course of the investigation and prosecution in these cases after the false confession was obtained, that prevented justice from being done. Many of the content problems discussed above should have been apparent to police and prosecutors as the confessions were taken. Others would have become apparent as new evidence was uncovered. Either way, they should have prompted law enforcement to reassess the validity and reliability of the confessions. After all, allowing an individual to falsely confess does not just do an injustice to that individual, but also to the victims of the crime and society at large, because the real perpetrators remain free.

Law enforcement's failure to corroborate and reassess the confessions in these cases is an example of confirmation bias or tunnel vision. This is the phenomenon where people tend to unwittingly embrace information that supports their existing beliefs and reject information that contradicts those beliefs. Thus, law enforcement can become wedded to a particular theory of the case, and then, as new evidence or developments arise, fail to reevaluate it.

It is of course always the responsibility of law enforcement to ensure that prosecutions are just and based on reliable evidence, and it is never acceptable for police and prosecutors with reasonable doubt in a case to nevertheless charge a defendant and "let the jury decide." The danger of false confessions requires law enforcement to be particularly vigilant in deciding whether to bring a case before a jury because research shows that juries have difficulty identifying false confessions, and may convict a defendant on the basis of a confession even when there are strong indications of coercion or inconsistencies in the confession.[38] Yet "[n]umerous false confession cases reveal that once a suspect confesses, police often close their investigation, deem the case solved, and overlook exculpatory evidence or other possible leads—even if the confession is internally inconsistent, contradicted by external evidence, or the product of coercive interrogation. This misplaced trust in confessions may extend to prosecutors as well, many of whom, as described in the academic literature, express skepticism about whether police actions actually induced false confessions."[39]

The CRU identified confirmation bias and a failure to reassess the prosecution in nearly all of these cases:

- The autopsy in the Alvarez case, which indicated that the victim died by gunshot, should have prompted a reassessment of how Alvarez could have "spontaneously" confessed falsely to stabbing the victim in the heart, as the detective claimed. Prosecutors with whom the CRU spoke said that this was considered, and it was determined that Alvarez was just trying to minimize his crime, admitting to using a knife to avoid facing more severe gun charges. But that fails to account for the inexplicable coincidence that he admitted to killing the victim in exactly the manner that police had erroneously believed to be the cause of death at that time. And Alvarez's confession contained no evidence that was unknown to the detective at the time, indicating that it could have been fed to him.[40] None of these red flags was ever acted upon.

- As the CRU concluded, rather than eliminating suspects when they did not fit the evidence, the police and prosecutors in the Moore/Stevens case discarded evidence when it did not match the selected perpetrators. Once the confession was in hand, law enforcement simply set aside multiple eyewitnesses without showing the

---

[38] Saul M. Kassin et al., *supra* note 10, at 24 ("Mock jury studies have shown that confessions have more impact than other potent forms of evidence and that people do not fully discount confessions–even when they are judged to be coerced and even when the confessions are presented secondhand by an informant who is motivated to lie"; Steven A. Drizin and Richard A. Leo, *supra* note 5, at 959 (describing confessions as "inherently prejudicial and highly damaging to a defendant, even if it is the product of coercive interrogation, even if it is supported by no other evidence, and even if it is ultimately proven false beyond any reasonable doubt").

[39] Saul M. Kassin et al., *supra* note 10, at 23.

[40] Moreover, as discussed more below, see *infra* Section VI.E, it later became clear that the detective *told* the prosecutor that he had asked Alvarez "how do you explain the knife wound to the chest?" and yet the detective persisted in testifying—in testimony that the CRU determined could not have been truthful—that he had no substantive conversation about this issue with Alvarez.

suspects to them or otherwise reconciling conflicting accounts. And, as discussed above, they never pursued the far more compelling theory that two other individuals might have been the perpetrators.

- As will be discussed in more detail below, after Foster's confession, law enforcement learned two significant pieces of evidence that should have caused a rethinking of the prosecution but did not. *First,* the investigating detectives learned that the eyewitness who had identified Foster as "Ice Cold" and the shooter had identified an entirely *different* person as "Ice Cold" in another shooting. This was crucial information that substantially undermined the eyewitness's identification.[41] *Second,* several months later, Foster provided a proffer that recanted his confession and provided information about the actual shooter that matched key pieces of the government's case. As further discussed below,[42] the prosecutor failed to follow through on investigating this information, failed to review calls that supported the truth of Foster's proffer, and instead went forward with prosecuting Foster on the basis of his confession.

- In light of the Yeats/Watson confessions, the police abandoned promising leads into the likely killers—including exploring the many people who were known to frequent the victims' apartment abusing street drugs. The fact that such promising leads were available should have caused law enforcement to more rigorously scrutinize the believability and consistency of the account that this elaborate triple murder was in fact perpetrated by the 18-year-old son and brother of the victims and his 15-year-old friend.

Another related—but somewhat distinct—type of bias that can arise is called *expectation bias.* This refers to how an investigator's expectations about an outcome influence subsequent analysis. Thus, it is not just that contrary evidence to the false confession may be ignored or rejected—that is confirmation bias—but that confession creates an expectation for what the answer "should" be and future analysis may tend to mold to fit the facts to the confession. Again, this can happen inadvertently without any intentional misconduct. That may have been a factor in the Yeats/Watson case. Based on the victims' rigor mortis, the medical examiner called by the prosecution testified on cross-examination that death was possible at or around 6 or 7 A.M., which is when the confessions indicated that death occurred. The CRU found that this was an incomplete and potentially misleading answer, however, as the state of rigor observed in the bodies, along with other medical evidence, indicated that the most probable time of death was more likely several hours earlier. The existence of the confession may have created a bias for the examiner to validate the confession timeline by affirming the very remote possibility rather than the much more plausible probability.

### 4.    The CRU's Determinations Regarding the Guilty Pleas of Gold and Bloom

Finally, we examine two cases in which the defendants pled guilty. Just as individuals confess to police to crimes they did not commit, individuals can and do plead guilty to crimes that they did not commit. Scholars have noted that false guilty pleas bear a number of similarities to false police-induced confessions—as both involve the defendant falsely admitting to guilt—but they also have important differences, such as in the nature and timing of the potentially coercive pressures.[43]

In two cases—those of Dylan Gold and Charlie Bloom—the defendants entered guilty pleas that the CRU determined, in light of the available evidence, did not reliably support the defendants' convictions.

Gold was charged with murdering a local artist in the artist's home and in front of the artist's family in 1963. Gold maintained his innocence and went to trial, but following the close of evidence, Gold pled guilty and provided an

---

[41]    *See infra* Section VI.B.

[42]    *See infra* Section VI.F.

[43]    Allison D. Redlich, *False Confessions, False Guilty Pleas: Similarities and Differences,* in POLICE INTERROGATIONS AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE, AND POLICY RECOMMENDATIONS 49 (G. Daniel Lassiter & Christian A. Meissner eds., 2012).

allocation—that is, a formal statement to the court—to the facts of the crime. Within days, however, he moved to withdraw this guilty plea, claiming that his plea and allocution were false and made only to avoid the death penalty. The court denied this motion, and his conviction was upheld.

The CRU identified a number of issues with the investigation and prosecution of Gold that are discussed elsewhere in this Report, including most notably regarding the most important evidence against him: the victim's wife's identification of him as the shooter.[44] In light of the evidence that was presented (at times improperly and without adequate disclosure to the defense),[45] extraordinary pressure was brought to bear on Gold by both his family and his attorneys. They told him that the victim's wife was a devastating witness to him, that he would be convicted by the jury, and that he would face the death penalty once convicted. Although these plea-bargaining pressures are different from those of police interrogations, they are also capable of eliciting false confessions.

Similar to the police-induced confessions discussed above, the CRU further found that Gold's allocution was inconsistent with other evidence and testimony in a number of respects. These included inconsistencies with trial witnesses' testimony on how Gold and the victim were positioned in the home at the time of the shooting, his demeanor during the shooting, and where and how he claimed to have discarded the murder weapon. Despite these problems—and despite the fact that the prosecution presumably credited the testimony from its witnesses—both the court and the prosecution accepted the defendant's allocution statement uncritically. To what degree the prosecutor in this case knew whether the plea allocution by Gold was false is not knowable now. However, just as law enforcement has an obligation to scrutinize the truthfulness of a confession made to police, prosecutors cannot accept a plea allocution that they know to be false.

The case of Charlie Bloom involved both a police-induced confession and a guilty plea. Bloom confessed to police to having sexual intercourse with a mentally disabled woman with whom he lived as a household helper. He told police that he knew this sexual activity was wrong in light of her disability, but he had sex with her anyway. Bloom ultimately pled guilty to rape in the second degree.

In concluding that the conviction could not stand, the CRU determined that Bloom was himself likely mentally disabled at the time of the offense, and thus was unable to perceive that the victim was incapable of consent. Accordingly, his confession was likely "false" in the sense that he likely did not understand the legal consequences of his actions and so did not possess the mental state necessary to be guilty of the crime.

The CRU found that Bloom's defense counsel failed to develop and then make any argument along these lines.[46] But the CRU determined that law enforcement and the court also shared some blame. The detective interviewing Bloom either did not detect Bloom's mental disability or failed to inform the prosecution of it. The prosecution failed to make inquiries about the defendant from readily available sources or conduct meaningful investigation which would have shed further light on his disability. And both the prosecution and the court failed to recognize and adequately address instances during Bloom's allocution and sentencing that suggested issues with his mental status.

This case is quite different from the other cases discussed in this section in that there is no doubt that Bloom committed the relevant act—here, having sexual relations with the victim—even though he lacked the necessary mental culpability. And it is also different in that it involves no explicit claim of either the plea bargaining pressures of the Gold case or the allegedly coercive police interrogation techniques of the others.[47] But where it is similar is that,

---

[44]  *See infra* Section VI.B.

[45]  *See infra* Section VI.D.

[46]  *See infra* Section VI.G.

[47]  As discussed above, mental disability is a known risk factor in making someone more likely to falsely confess in response to the pressures of police interrogation. But here the issue was not whether Bloom was more compliant to a police interrogation but rather whether his disability made him capable of committing the crime at all.

---

having secured a confession/plea to the crime—and in what might again be seen as tunnel vision or confirmation bias—law enforcement failed to adequately investigate and scrutinize whether pursuing a conviction would in fact be in the interests of justice. In this case, as with the others in this section, the CRU found that the answer was no.

## B.    Eyewitness Misidentifications

Like a confession, an eyewitness identification is powerful evidence in court. As Justice William Brennan once wrote, "[T]here is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'"[48]

But, also like a confession, an eyewitness identification can be wrong. As early as 1967—before the use of DNA evidence greatly increased the number of exonerations—the United States Supreme Court noted, "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identifications."[49] The National Registry of Exonerations has concluded that out a total of 2,605 exonerations, fully 747 (29%) have involved mistaken eyewitness identifications.[50] This is especially an issue for sexual assault cases, constituting 67% of those exonerations.[51] And the Innocence Project has concluded that among the more than 367 DNA exonerations nationwide, mistaken eyewitness identifications were involved in approximately 69%.[52]

The New York Court of Appeals has explained that the potential for eyewitness misidentifications poses a unique "danger to defendants and the integrity of our justice system."[53] Identifications rely on complex psychological processes involving vision and memory that can be prone to error and inadvertent suggestion.[54] And, cross-racial eyewitness identifications pose special unreliability risks.[55] Yet once an error is made, the witness can become increasingly certain that they are right, creating a powerful impact on a jury that is not easily tested by the adversarial process.[56] This makes it all the more important for law enforcement to scrutinize its identification procedures and assess the reliability of identifications it uses in prosecutions.

The exonerations we examined included five in which witnesses made identifications that the CRU concluded were not sufficiently reliable to support the conviction: Davidson, Foster, Gold, Harrison, and Mitchell. Below, we provide background on identification procedures commonly used by police, then describe the CRU's determinations that the identifications at issue were not reliable, as well as actions by law enforcement that either contributed to or compounded the misidentification.

---

[48]  *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting).

[49]  *United States v. Wade*, 388 U.S. 218, 228 (1967).

[50]  The National Registry of Exonerations, % Exonerated By Contributing Factors (last updated July 1, 2020), https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx.

[51]  *Id.*

[52]  The Innocence Project, *DNA Exonerations in the United States*, https://www.innocenceproject.org/dna-exonerations-in-the-united-states/.

[53]  *People v. Marshall*, 26 N.Y.3d 495, 502 (2015); *see also Perry v. New Hampshire*, 565 U.S. 228, 249 (2012) (Sotomayor, J., dissenting) (describing "unique confluence of features" of eyewitness identifications that make them dangerous, including "their unreliability, susceptibility to suggestion, powerful impact on the jury, and resistance to the ordinary tests of the adversarial process").

[54]  *People v. Riley*, 70 N.Y.2d 523, 530-31 (1987).

[55]  *People v. Boone*, 30 N.Y.3d 521, 528 (2017).

[56]  *Id.*

---

### 1.    Background on Identification Procedures

Once the police have identified a suspect, they often use one or more identification procedures to ascertain whether a witness can identify the suspect as the perpetrator.[57] The three identification procedures discussed in this Report include the following.

- *Photo array.* Police show the witness the suspect's photo as well as photos of at least five "fillers," to see if the witness identifies the suspect as the culprit.
- *Lineup.* The suspect and several fillers appear in-person before the witness.
- *Show-up.* The suspect is presented to the witness, one-on-one and in-person.

Photo arrays are the most commonly used identification technique.[58] A key advantage of a photo array is that it can be performed without tipping off the suspect that they are being investigated. Show-ups have been criticized by experts in the field for their inherently suggestive nature, the extent to which they artificially inflate witness confidence and increase the risk of misidentification, and should be rarely used, *i.e.*, only in exigent circumstances, such as in the immediate aftermath of a crime.[59]

A crucial consideration in choosing and implementing the identification procedure is elimination of "suggestiveness": anything that might indicate the police's interest in the suspect or might otherwise improperly bias the witness to select the suspect.[60] It is out of this concern that show-ups are rare; showing a single person to a witness creates the risk that the witness will simply select that individual. Photo arrays and lineups seek to avoid such suggestion by testing whether the individual selects the suspect out of several options, and best practices have been developed to minimize any unintended suggestion in these procedures.[61] These best practices include: performing photo arrays or lineup "double-blind" (so that the police officer administering the identification does not know who the suspect is); taking a "blended" approach to the selection of the fillers (whether photos or live), such that they are similar in kind

---

[57] There are certain techniques that police can employ even in the absence of an identifiable suspect. For instance, police can have a witness review "mug books" of previously arrested individuals in the area. National Research Council of The National Academies, IDENTIFYING THE CULPRIT: ASSESSING EYEWITNESS IDENTIFICATION, 28-29 (2014) ("NAS Report"). These procedures did not play a significant role in any of the CRU exonerations and are not discussed in this report.

[58] *See* NAS Report, *supra* note 57, at 23 (citing Police Executive Research Forum, *A National Survey of Eyewitness Identification Procedures in Law Enforcement Agencies*, 48 (March 2013)).

[59] *Riley*, 70 N.Y.2d at 531 (holding that "precinct showup procedures should have almost no place in acceptable identification procedures, unless exigency warrants them"). *See also* Jeffrey S. Neuschatz et al., *A Comprehensive Evaluation of Showups*, 1 ADVANCES IN PSYCH. AND LAW 43, 49 (2016); Mitchell L. Eisen et al., *An Examination of Showups Conducted by Law Enforcement Using a Field-Simulation Paradigm*, 23 PSYCH. PUB. POL. & LAW 1, 27 (2017).

[60] *See id.* at 530-31 (opining that "'[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other factor—perhaps it is responsible for more such errors than all other factors combined'") (quoting *Wade*, 388 U.S. at 229).

[61] *See, e.g.*, New York State Division of Criminal Justice Services and Municipal Police Training Council, *Identification Procedures: Photo Arrays and Line-ups Model Policy and Identification Procedures Protocol and Forms Promulgated by the Division Pursuant to Executive Law 837* (21) (June 2017) (hereinafter, "NYS DCJS Model Policy"), https://www.criminaljustice.ny.gov/pio/press_releases/ID-Procedures-Protocol-Model-Policy-Forms.pdf; Memorandum from Sally Q. Yates, Deputy Attorney General, to Heads of Department Law Enforcement Components, All Departments, *Eyewitness Identification: Procedures for Conducting Photo Arrays* (Jan. 6, 2017), https://www.justice.gov/file/923201/download; Third Circuit Task Force, *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 TEMPLE L. REV. 1, 22-23 (2019) (hereinafter, "Third Circuit Report").

to the suspect and/or the witness's description of the culprit, with the goal of preventing the suspect from standing out;[62] and providing certain pre-identification instructions to the witness.[63]

Under the federal Constitution, an identification that comes from a suggestive procedure still may be admitted at trial if it is otherwise reliable in light of the totality of the circumstances.[64] The defendant is generally entitled to what in New York is referred to as a "*Wade* hearing" before trial to determine whether this standard has been met.[65]

### 2.    The CRU's Assessment of the Witnesses' Initial Identifications

The CRU often focused on the first positive identification a witness made of the wrongly convicted person because, as discussed below, subsequent identifications (including the identification at trial) generally build from the first. Further, in many of these cases, the first positive identification came after the witness had not identified the defendant in a prior array or lineup, or after the witness had previously identified a different person.

Researchers generally group the factors affecting eyewitness identification into two categories: (1) estimator variables—those that affect a witness's ability to make an identification that relate to the witness and the environment and (2) system variables—factors that affect an identification that are in the control of law enforcement.[66] Estimator variables include viewing factors such as the length of the time the witness had to view the perpetrator, the distance of the witness from the perpetrator, lighting conditions, stress or fear, and intoxication. They also include the witness's age, whether the witness and perpetrator are of different racial and ethnic backgrounds, the presence of a weapon (which can detract from the witness's ability to accurately perceive and recall the perpetrator's features), and the length of time between the crime and the identification. The potential effect of these factors in these cases are addressed in turn.

### 3.    Limitations on Witnesses' Ability to Identify the Perpetrators

Overview of Vision and Memory: A witness's ability to identify a suspect generally depends on their vision and their memory.[67] The act of seeing is composed of multiple distinct elements: "sensation"—detecting light and the features of an image; "attention"—the mind's selection of what sensations to process; and "perception"—the mind's processing of the sensations to understand and make coherent what is being viewed.[68] Likewise, memory also proceeds in several steps: "encoding"—the process by which images are initially placed into storage; "storage"—the long-term retention of information after encoding; and "retrieval"—the act accessing and bringing into consciousness that memory in a future date.[69]

---

[62]  Gary L. Wells et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 LAW & HUMAN BEHAVIOR 3, 18 (2019), https://content.apa.org/fulltext/2020-06220-002.pdf.

[63]  *See, e.g.,* NYS DCJS Model Policy, *supra* note 61, at 2-14.

[64]  *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). This standard means that the evidence will be suppressed only if there is "a very substantial likelihood of irreparable misidentification." *Id.* at 116 (quotations omitted).

[65]  *See People v. Boyer*, 6 N.Y.3d 427, 431 (2006) (citing N.Y. Crim. Proc. Law § 710.30).

[66]  *See* Third Circuit Report, *supra* note 61, at 18-19, 27-28.

[67]  *See generally* NAS Report, *supra* note 57, at 45-70.

[68]  *See id.* at 46-47.

[69]  *See id.* at 59.

---

Research and caselaw explain how each of these stages of vision and memory can be fundamentally affected by noise and various factors about the witness and their environment.[70] These can include viewing factors such as the length of the time the witness had to view the perpetrator (known as exposure duration), the distance of the witness from the perpetrator, lighting conditions, and disguised or changed appearance.[71] They can also include psychological/cognitive factors such as stress or fear, and intoxication with drugs or alcohol.[72]

Research and caselaw have also identified less obvious factors that may influence eyewitness identifications. One is "weapons focus": the notion that the presence of a weapon may direct attention to the weapon and away from the face of the perpetrator, thereby potentially making it less likely that the witness will make an accurate identification.[73] Another is "own-race bias" or the "cross-race effect": citing social science research, courts including the New York Court of Appeals have recognized that "[g]enerally, people have significantly greater difficulty accurately identifying members of other races than members of their own race."[74]

**Limitations of Vision and Memory in the CRU Exonerations:** In each of the cases at issue, the CRU considered how these factors may have affected the witness's ability to make a reliable identification.

These factors played a particularly important role in the case of Brian Davidson. In that case, the female witness was raped by multiple perpetrators. During much of the attack a cloth was covering her face, the perpetrators wore masks (which were later removed), they held her at gunpoint and at times put the gun to her head, she was placed in a position that greatly limited her view of the perpetrators, and she was in an only partially lit room. The victim's stress and shock increased to the point where she almost passed out. As the assault continued, the perpetrators moved in and out of the room, and she relied mostly on hearing their voices to identify them rather than seeing them directly.

The CRU retained a recognized eyewitness identification expert and psychology professor to analyze the Davidson case, and she explained how a witness's ability to encode memories can be significantly compromised by the stress and fear of trauma like this, as well as by the limitations on her ability to see and perceive her surroundings. In fact, the expert explained that the period where the victim thought she may have passed out actually may reflect a time in which she was not encoding new memories at all. One scholar has likened the experience of the brain recording its memory of a sexual assault to taking lecture notes on tiny Post-its rather than on a full sheet of paper and scattering these tiny notes all over the world's messiest desk.[75] Recollection will be fragmented and disorganized because that is the way the memory is laid down in the brain.

Also significant to the expert's analysis were the inconsistencies in the victim's accounts, which supported the conclusion that she had not fully encoded memories of the attack. She provided ten somewhat differing accounts over the course of the investigation which varied in the number of perpetrators and guns present, the descriptions of the perpetrators, and the acts attributed to each of the perpetrators. In addition, her accounts were more consistent regarding the early part of the attack—when Brian Davidson was not alleged to be present—and much more varied regarding the later part, when she was under even more stress and when he allegedly joined the rape.

---

[70] *See id.* at 47-50.

[71] *See* Third Circuit Report, *supra* note 61, at 86-89.

[72] *See id.* at 92-93.

[73] *See id.* at 77-79.

[74] *Boone*, 30 N.Y.3d at 528 (citing Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCHOL., PUB POL'Y & L. 3, 15 (2001)); *see* Third Circuit Report, *supra* note 61, at 82-85.

[75] *See* Rebecca Campbell, *The Neurobiology of Sexual Assault: Implications for Law Enforcement, Prosecution, and Victim Advocacy*, Nat'l Inst. of Justice Research for the Real World (Dec. 1, 2012), https://nij.ojp.gov/media/video/24056#transcript--1.

---

Further telling in the Davidson case was how the accounts varied over time. The victim testified at trial that immediately after the incident she could not describe or identify her assailants, but that as time went on, her memory became "better," and she was able to provide increasing amounts of information about the attackers. The expert the CRU retained explained that this is not consistent with how memory works. Rather, the most accurate accounts are those closest in time to the event; as time passes, memories fade and become more susceptible to misinformation and distortion. The victim's efforts over time to retrieve memories were thus a red flag that she never encoded this information in the first place.[76]

The victim's description of Davidson, known as the "fourth perpetrator" at trial, reflected other concerns. There was compelling evidence tying three other individuals to the robbery and rape, and so Davidson's guilt was predicated on her testimony that there were four perpetrators. The CRU ultimately concluded that the "fourth perpetrator" was a synthesis of the police and prosecution theory and not the victim's independent memory. In fact, it appears that the victim's memory of a fourth perpetrator may even have reflected her memory of her co-victim, who at one point was forced by the perpetrators to attempt to have sex with her. Notably, the victim recalled that one of the later perpetrators to join had his hair in "Jheri curls"—the hairstyle of her co-victim, but not of any of the accused, including Davidson. Researchers have documented how memory can be distorted in situations of stress, such that the victim could have transposed her memory of her co-victim into another perpetrator.[77] Ultimately, the CRU concluded that due to a combination of factors described above, the victim made an honest and tragic mistake in identifying Davidson as one of her assailants.

Although other cases did not necessarily present the same levels of trauma as that just described in the Davidson case, the CRU in certain cases did find significant that there were certain limitations on the witness's ability to observe and perceive the events in question:

- In the Foster case, by her own account at trial, witness P.A. only saw the shooter for a few seconds before she closed her eyes. In addition, she later told the CRU that she was a heavy user of marijuana and alcohol at the time of the shooting.

- In the Harrison case, witness K.M. admitted to being high on crack at the time of the murder, and only saw the event in question from a distance of thirty to forty feet, at nighttime with dim street lighting, and under conditions in which he claimed he could not even make out the gender of the assailant. Yet somehow, he claimed he could identify the perpetrator as Harrison.

- In the Mitchell case, witnesses W.P. and N.G. had only brief opportunities to view the perpetrator before the shooting in unremarkable circumstances. When the shooter pointed his weapon at them, the witnesses only had seconds to see him.

- The Gold case involved a cross-racial identification: the victim's wife was white and the defendant was black; cross-racial identifications are known to have particular reliability problems.[78]

In addition to the challenges with perceiving the events and encoding memories, there is also the question of how long those memories must be stored until they are eventually retrieved to make the identification (known as the "retention

---

[76] The Mitchell case raised similar questions: two weeks after the shooting, N.G. suffered a significant health event that compromised his mental functioning, and initially made him lose all recollection of the shooting. Sometime in the next year, he said that his memory returned to him and that he could recall the shooting. His identification of Mitchell would not be until nearly 4 more years after that.

[77] *See* Kenneth A. Deffenbacher et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 LAW & HUMAN BEHAV. 687, 699 (2004).

[78] *Boone*, 30 N.Y.3d at 526 (holding party is entitled to a charge on cross-racial identification citing research indicating "that the likelihood of misidentification is higher when an identification is cross-racial.").

---

interval").[79] Research indicates that a longer retention interval may diminish the ability of a witness to make an accurate identification.[80] The shortest retention interval in these cases was a week, but in some cases was much longer: the victim in the Davidson case was not asked to identify Brian Davidson until 3 months after the crime, and W.P. and N.G. were not asked to identify Spencer Mitchell until over 2 years and nearly 5 years after the crime, respectively.

### 4.    Evidence of Suggestiveness in the Identification Procedures

In addition to limitations on the witnesses' ability to view and encode memories of the perpetrator's face, in each of the cases, the CRU also found evidence of suggestiveness in the identification procedures that were used that further undermined the reliability of the identifications.

**Failure to Follow Best Practices:** As discussed above, best practices have been developed to minimize the potential suggestiveness of different identification procedures. In a number of cases, police employed identification procedures that did not follow such practices and therefore created a risk of suggestiveness.

First, best practices counsel that when a witness is brought in for an identification procedure, she should not be told that the police believe they have found the suspect, and certainly provide no information about the suspect.[81] Doing so may increase the risk that the witness seeks to identify someone as the perpetrator and may also affect their confidence in the selection after it is made.[82] In the Gold case, however, the witness testified that the detective told her that they found someone who resembled the "picture"—apparently a reference to the composite sketch that was prepared of the perpetrator. Similarly, in the Davidson case, the witness testified at trial that the detective had told her in advance of a photo array that the police believed they had found the perpetrator, and even told her that his name was Brian Davidson.[83]

Second, lineups and arrays should be conducted "double blind" where possible—that is, the administrator of the procedure should not know who the suspect is.   If an administrator unfamiliar with the suspect is not available, a "blinded" approach may also be used, in which the photographs are shielded from the administrator's view and he or she cannot provide feedback to the witness. While the information available for drafting this Report did not make clear how each identification procedure was performed, it is apparent that at a minimum, the initial photo arrays conducted in the Foster and Davidson cases, and the initial lineup in the Gold case, were not performed double-blind.

Third, lineups and arrays should be constructed so that the suspect does not in any way stand out.[85] But in the Gold case, a lineup was held in which the defendant was well dressed and neatly groomed, while the three fillers were all shorter than him, "sloppily dressed," and "looked like bums."  Additionally, in the Mitchell case, the police arranging the lineup for witness W.P. had a challenge because the defendant was 6'6" tall, and so locating five fillers anywhere near his height was difficult. Police appropriately took a number of precautions to make the lineup as fair as possible—the members were kept seated for instance and wore hospital caps and bulky shirts to cover their build. But even then, the CRU determined that it was almost inevitable that the defendant would stand out and be selected.

---

[79]  *See* Third Circuit Report, *supra* note 61, at 90-92.

[80]  *Id.*

[81]  *See* NYS DCJS Model Policy, *supra* note 61, at 2-3, 8-9.

[82]  Confidence malleability is discussed more below, *see infra* at Section VI.B.6.

[83]  Speaking to the CRU, the detective agreed that saying these things would have been a gross deviation from best practices and that he would never do that. The CRU found it unlikely that the detective would have remembered what she said to this witness thirty years later. But the CRU did not ultimately make any specific determination of what the detective said to this witness.

[84]  *See* NYS DCJS Model Policy, *supra* note 61, at 4, 10.  If a "blind" procedure is not possible in a photo array, then a "blinded" procedure should be used where the administrator knows who the suspect is, but does not know which position the suspect is in. *Id.* at 2-3.

[85]  *See id.*

---

Fourth, best practices provide that multiple identification procedures with the same suspect are to be avoided.[86] In the Davidson case, the victim did not identify Davidson in a photo array, and then 2 days later identified Davidson in a live lineup; Davidson was the only person to appear in both procedures.[87] The CRU found that there was absolutely no basis to subject the witness to another identification procedure with Davidson, after she failed to identify him in the photo array. Research describes a phenomenon called unconscious transference, in which a witness misidentifies a suspect as the perpetrator because they saw that suspect in another setting.[88] Here, the witness may well have identified him because he looked familiar from the photo array 2 days earlier.[89] That is particularly so since at this point, the crime had taken place 3 months prior. The practice of following a negative photographic identification with placing the same subject in a live lineup soon thereafter is inherently unreliable and should be discouraged.

**Police Coaching:** There were two cases—Gold and Foster—in which the CRU determined that police directly suggested to witnesses whom to select. Such direct coaching of witnesses is of course clearly improper, and merits separate treatment from the failures to follow best practices discussed above.

In the Gold case, after the witness did not identify Gold (despite the slanted lineup noted above), the detective proceeded to speak with her for fifteen minutes, directing her to the "tall one" and asking whether he was the perpetrator. The CRU concluded that this questioning amounted to prompting, almost badgering, of the witness to obtain an identification, and yet according to the official record, even then the witness did not identify Gold until, apparently, a subsequent show-up 3 days later.

But there is good reason to believe that the badgering of the witness went even further. In an undated 28-page account written soon after his conviction, Gold said among other things that the detective in the case repeatedly accused him of being a "pimp," of prostituting C.E., and of shooting her husband when she and Gold were caught in bed together. Gold further claimed that, contrary to the official record, there was a second lineup 3 days after the first, and numerous additional show-ups, all of which did not result in an identification. Gold said that C.E. was then taken to another room where the detective could be heard screaming and shouting, accusing her of being a prostitute, of being pregnant with Gold's child, and claiming that she knew Gold was the killer.[90] Immediately after this exchange, Gold said C.E. returned and identified him as the shooter.

Although such a colorful account after-the-fact might in some cases be dismissed out of hand, the CRU found it to be believable. The police were aware C.E. in fact had been in an affair with a black man who lived in the family's home. This was not a fact that Gold appears ever to have known or been told. Thus, either the defendant happened to fabricate a story that blindly stumbled upon the truth, or more likely, the events he described actually happened. In addition, the notion that there was a second lineup fits with otherwise curious testimony Gold provided at trial and that he would have had no reason to make up. It was also corroborated by a letter sent by a prosecutor to the Governor years later, which referenced two lineups. And various other events described in the 28-page account were verified by the police or other witnesses and describe events that otherwise should have been outside of Gold's knowledge.[91]

---

[86]  *Id.* at 5. *See also* Gary L. Wells, *supra* note 62, at 18.

[87]  This non-identification was particularly notable because, as discussed above, the CRU found that the photo array failed to follow a number of best practices: it was not conducted double-blind with appropriate pre-identification instructions.

[88]  *See, e.g.,* Third Circuit Report, *supra* note 61, at 60-61.

[89]  Tellingly, the victim *was* able to identify Davidson's cousin, Z.A., as one of the perpetrators in a separate photo array. This showed to the CRU that it was not simply an issue in which the victim had trouble identifying someone in a photo array but not in a live lineup.

[90]  Specifically, Gold wrote that the detective said to C.E.: "You rotten wh*re you know that is the black bast**d. Who do you love more, this black son of a b*tch or your children, that his black bast**d you are pregnant with now. (sic)."

[91]  These include, for instance, (1) an allegation that his place was ransacked by police, which his landlord spontaneously recounted 50 years later (2) knowledge about the police detective's promotion history, (3) knowledge about when another witness was brought to the precinct.

---

The CRU concluded that if so many varied pieces of the account were true, then it was more likely that much of what he described was true, including his explanation for how C.E. came to identify him.

The CRU also found police coaching to be present in the Foster case. Specifically, after review and its own investigation, the CRU concluded that the identification by P.A. in that case was made only after the detective told that witness who the shooter was and (falsely) told her that two other witnesses had already identified him. Because it is illustrative of how the CRU reaches such determinations, we explain in some detail the basis for this conclusion.

> **[In one case], the CRU concluded that the identification by [the witness] in that case was made only after the detective told that witness who the shooter was and (falsely) told her that two other witnesses had already identified him.**

As discussed above,[92] this witness, P.A., came forward to police shortly after the shooting to say that the shooter was a gang member named Ice Cold whom she had seen at the victim's wake. Shortly thereafter, one detective met with P.A. in a park and administered a photo array in which P.A. identified Foster as that shooter. P.A. subsequently identified Foster at a lineup, but then prior to trial, told the prosecutor that she would not testify and would have to be arrested. The judge spoke to her and said he might have to issue a material witness order, and P.A. then testified against Foster at trial.

The CRU spoke to P.A. as part of its investigation, and in that interview, she recanted her testimony and identification of Foster. She said that she had not actually gotten a good look at the shooter either at the shooting or at the wake, but came forward only because she had been told that the shooter was Ice Cold and that he had been at the wake, which angered her. She claimed that when she could not identify the shooter in the photo array, the detective told her which photo to select, and encouraged her by saying that a "woman driver" and a "security guard" had already identified him as the shooter. She said that months later she told the prosecutor that she never saw the shooter and did not want to testify, but proceeded because the prosecutor said she was locked into her statement and she did not want to go jail.

The CRU found P.A.'s recantation believable, for a number of reasons. First, indisputably, Foster was not at the wake and thus P.A. could not have seen him there. Second, a number of aspects of this identification procedure were quite irregular compared to typical police protocol: (1) the detective met with P.A. alone in the field without his partner, (2) the detective did not memorialize either the initial statement by P.A. or the photo array identification with the standard reporting,[93] and (3) the detective's next steps seemed to indicate a lack of confidence in the identification.[94] The CRU spoke to the detective and requested his detective file, but he said he could not locate it. He had no explanation for why he did not memorialize P.A.'s statement or her identification, and his explanation for his next steps did not make sense.[95]

---

[92] *See supra* Section VI.A.

[93] In particular, he failed to memorialize either her statement or the meeting with a DD-5, a standard NYPD report for recording key investigative events in a case.

[94] Specifically, after the positive array hit, under protocol the next step would be to issue an "I-card" (indicating Foster was a subject of the investigation) and then conduct a lineup. Instead, the detective waited a month and showed the photo array to another witness, even though additional photo array hits after the first are of limited investigative value.

[95] He and the other case detectives claimed that KCDA would not approve an arrest for a lineup without two positive identifications. This was inaccurate even in the context of this case—an earlier suspect in this shooting was arrested and put in a lineup after just one photo identification (but then released when he was not identified at the lineup).

The CRU also found P.A.'s explanation for why she testified falsely to be consistent and plausible. She said that at the time she was a "pleaser," was going through a difficult time in her life, was afraid of going to jail, and did not feel she was doing harm because she was one of three identifying witnesses. In addition, her recantation was corroborated by her hesitation to testify before trial, by the flaws in her identification discussed above,[96] and by details she provided that are too specific to be fabricated. In particular, although there was no witness in the case who was a "security guard," there was a witness who was a city employee and wore a uniform that resembled that of a security guard.[97] And there was a witness who was a female driver. The CRU concluded that it was highly unlikely that P.A. would know so many confidential details of the investigation unless informed by the detectives and the prosecutors.

**Inherent Limitations of the Identification Procedure:** In the above cases, police error or misconduct in *how* the identification procedure was implemented led to suggestiveness that undermined the reliability of the identification. But certain identification procedures have limited value regardless of how they are implemented.

As discussed above, show-ups are recognized to be inherently suggestive and are therefore reserved for limited, exigent circumstances such as in the immediate aftermath of the crime. Yet, assuming for the sake of argument that the official record of the Gold identification is accurate, then even after failing to identify Gold in a live lineup—notwithstanding that lineup's various problems as discussed above—the witness only finally appeared to identify Gold in a one-on-one show-up at the police station 3 days later. This show-up occurred over a month after the crime and thus did not fit any of the exigent circumstances that might permit the use of this suggestive procedure.

In the Mitchell case, the witness N.G. did not identify the defendant as the shooter in any pretrial procedure; rather, his first identification of Mitchell was at trial, over four years after the crime. The New York Court of Appeals has reserved opining on the admissibility of first-time in-court identifications, and this Report expresses no view on that question.[98] At the same time, the CRU recognizes that this identification made for the first time at trial had limited value. The witness was observing the defendant when he was sitting at the defense table, while likely aware of the purpose of the trial and of the prosecution's view that the defendant is guilty, and when no other individual in the room was likely to match the description of the perpetrator.

The CRU also was unable to get a satisfactory answer for why N.G. never was shown a lineup before trial—such as that shown to the other witness, W.P.—that might have better tested his ability to identify the defendant. N.G. experienced a significant health event after the shooting that compromised his mental functioning, and the detective stated that N.G.'s family did not feel he was physically up to viewing a lineup. In contrast, N.G. himself told the CRU he would have been happy to view a lineup if asked, and the detective did not have an explanation for why he did not just ask N.G. directly.[99]

## 5.    Additional Credibility Issues with the Identification

In addition to the vision and memory limitations and evidence of suggestiveness, the CRU assessed the identifications in the context of other evidence in each of these cases to reach its determination.

---

[96] *See supra* Section VI.B.

[97] P.A. was under the impression that the security guard followed the shooter. Though this witness did not follow the shooter, another witness did.

[98] *See Marshall*, 26 N.Y.3d at 508 n.2 (explaining that it "ha[d] no occasion on this appeal to consider any potential suggestiveness and admissibility of first-time, in-court identifications"); *see generally* Dakota Kann, *Admissibility of First Time In-Court Eyewitness Identifications: An Argument for Additional Due Process Protections in New York*, 39 CARDOZO L. REV. 1457 (2018) (surveying this issue).

[99] By that point in time, N.G. was over eighteen, in college, and had spoken to the detective on several occasions.

**Inconsistency with Accounts of Other Witnesses.** The CRU often found it instructive to compare the witness's identification with those of other witnesses with a better ability to perceive their environment. Again, the Davidson case is instructive. Another victim and witness O.C.—who was not raped and did not suffer the same level of trauma as the principal victim discussed above—notably did not identify Davidson as an assailant when shown the same lineup. He testified that there were just three perpetrators, whereas the principal victim ultimately testified that there were four. As discussed above, this was highly significant because physical evidence and guilty pleas tied three other suspects to the crime.

The non-identifications of other witnesses were also important in the Foster case. There, three witnesses other than P.A. did not identify Foster as the shooter after viewing him in a lineup.[100] The CRU found this particularly noteworthy because these witnesses had better views of the shooter than P.A. did, and each witness was more stable and more credible than P.A..[101]

**Inconsistency with Other Accounts of the Same Witness.** The CRU considered whether the witness either failed to identify the defendant as the perpetrator in a prior attempt or identified another person as the perpetrator at a different time during the investigation. In two of the cases—Gold and Davidson—the witness initially was unable to identify the defendant in the first procedure, but only identified the defendant in a later procedure.[102]   Research indicates that the most reliable identification is the initial procedure, and thus the witnesses' failure to identify the defendant in these two cases itself is grounds to suspect their later identifications (even apart from the suggestiveness in the Davidson procedure discussed above).[103]

Then, in three cases—Mitchell, Harrison, and Foster—the identification was put in question in part because the witness seemed to identify *another* individual as the perpetrator at a different point in time:

- In the Mitchell case, just forty-five minutes after the shooting, witness W.P. stated that a different suspect "look[ed] like" the shooter in a one-on-one show-up.[104]

- In the Harrison case, police records indicate that witness K.M. identified a different suspect as the shooter in an inadvertent show-up at the police station, a week after the crime.[105]

- And in the Foster case, witness P.A. said that the shooter was a man named Ice Cold and identified Foster as Ice Cold. Then, a year later, P.A. identified a completely different person as Ice Cold in an unrelated shooting.

In each of these cases, the fact that the witness identified another person as the shooter should have created a significant concern on the part of law enforcement regarding the reliability of the identification. For instance, the CRU found that after K.M.'s erroneous unequivocal identification of a different person as the shooter in the Harrison case, his use as an eyewitness should have come to an end.

---

[100] One of these witnesses, Y.R., did identify Foster as the shooter in a photo array that was administered before this lineup. The CRU placed little weight on this identification, however, because photo arrays may be less reliable than live lineups, and so his failure to identify Foster as the culprit in the lineup was more compelling.

[101] The credibility of P.A.'s identification was further diminished by certain significant inconsistencies between her account and these other witnesses, discussed below. *See* Section VI.B.

[102] The concerns with this approach are discussed in more detail below. *See* Section VI.B.

[103] In the Gold case, C.E. testified at trial that her inability to identify the defendant as the shooter as based on fear. After the defense attacked that claim on cross-examination, she claimed that she did not identify him at first because she felt sorry for him and did not want him to get the death penalty. The CRU found these explanations to be unpersuasive in light of her behavior before and after the lineup.

[104] By comparison, W.P.'s identification of Mitchell as the shooter did not occur until more than two years later.

[105] K.M. would later say that he only said that the other person resembled the shooter. But official NYPD and KCDA files indicated that it was an unequivocal identification of the shooter.

---

**Inconsistency with Other Evidence.** Some cases involved other inconsistencies in the accounts or with other evidence that suggested potential issues with the identification. As explained above, the premise of P.A.'s coming forward was that she saw the shooter, known to her as Ice Cold, at the wake. But Foster was not at the wake, and indeed was incarcerated at the time of the wake. In the Harrison case, K.M. provided accounts with significant inconsistencies; for instance, he initially claimed that the assailant had a crutch, but he then disavowed that claim in all subsequent statements.

The CRU considered whether the identification of the defendant was at odds with the description of the perpetrator initially provided by the witness. In the Gold case, the witness initially identified the shooter as being three inches shorter than the deceased, but the defendant was taller than the deceased.[106] And in the Foster case, witness P.A. described the shooter as "melon-headed" with bulging eyes—a description that far better fit a different suspect than it did Foster.

### 6.    Issues Following the Initial Identifications

In theory, an initial unreliable eyewitness identification would not lead to a wrongful conviction so long as one of the following occurs: (1) law enforcement recognizes issues with the prosecution and declines to proceed; (2) a court suppresses the identification in a pretrial proceeding; (3) the eyewitness recants or does not adhere to the identification going forward; or (4) the jury rejects the identification by acquitting the defendant at trial. This section outlines the limitations of these mechanisms in the cases at hand.

**Failure to Investigate and Confirmation Bias:** As emphasized throughout this Report, it is fundamentally the obligation of law enforcement to ensure the reliability of the evidence that it is using as the basis for a prosecution. Many of the issues with the identifications discussed above were known or should have been known to law enforcement at the time and in each of these cases and should have prompted law enforcement to reevaluate the case.

Moreover, as discussed above with false confessions, in certain cases, including Foster (discussed above), law enforcement exhibited confirmation bias and tunnel vision in failing to pursue appropriate investigative steps once the identification was made. And in the Davidson case, the CRU found that law enforcement became wedded to their case theory that there were four perpetrators, including Davidson, and thus did not let contrary evidence deter them in their effort to prove this theory. In fact, there were several key investigative steps that were not taken that could have provided more guidance for the jury, including (1) testing the obtained semen for blood type, (2) testing the rape kit for DNA, and (3) analyzing a palm print that was at the scene. Taking additional steps was particularly warranted here, where no physical evidence tied Davidson to the crime, the victim initially said she could not identify anyone, and another victim-witness with a better opportunity to view the attackers was adamant that there were only three perpetrators and did not identify Davidson.

> It is fundamentally the obligation of law enforcement to ensure the reliability of the evidence that it is using as the basis for a prosecution. Many of the issues with the identifications discussed above were known or should have been known to law enforcement at the time and in each of these cases and should have prompted law enforcement to reevaluate the case.

---

[106] Although it was possible that she could have badly underestimated his height, the CRU concluded that there were several factors that weighed against this. In particular, the shooter was standing near a ready reference point—her husband—who was shorter than Gold but taller than 5'8". Also, her estimate was in line with that of another witness of the shooter.

**Wade Hearings and Suppression Motions:** As discussed above, in New York a defendant may seek suppression of a pretrial identification procedure as unduly suggestive through a pretrial hearing known as a *Wade* hearing.[107] *Wade* hearings were generally held in these cases, and the motions to suppress denied.[108] *Wade* hearings are necessarily limited in what they cover, however. They typically address only the suggestiveness of the identification procedure, and not the totality of the evidence that might show an identification is not reliable. And they generally focus on the arguments presented by defense counsel and information available to the parties at that time. The fact that suppression motions brought under *Wade* and related caselaw were denied in no way limited or constrained the CRU's review.

Two cases, Davidson and Harrison, merit further mention here. Following Davidson's conviction, the Appellate Division affirmed the trial court's decision to deny Davidson's motion to suppress the lineup identification. It concluded that the witness's negative photo array of Davidson followed by the positive lineup 2 days later was "not a ground for concluding that the procedure was so conducive to the possibility of irreparable misidentification as to require suppression."  The Appellate Division further held that the comments allegedly made by the detective in advance of the photo array were "not fatal to the propriety of the procedure."  In the CRU's view, and for the reasons discussed above, both of these holdings are at clear odds with contemporary understandings of how memory works and best practices for conducting identification procedures. On this basis, it was the CRU's position that decisions of the courts—as well as those of law enforcement—denied Brian Davidson a fair trial and also failed to rectify his wrongful conviction on appeal.[109]

In the Harrison case, the court denied the defense's motion to suppress a lineup identification by a witness named S.N. Though S.N. ultimately did not testify at trial, the CRU noted that, in its view, the court's ruling was erroneous because the procedures used were undeniably suggestive. When S.N. could not identify the suspect and said that a filler "looked like" the perpetrator, the police brought each individual up to the mirror, and only then did she identify Harrison as the killer. This was improper because Harrison had a limp or would have needed to walk with a crutch to the mirror and would have stood out. The detectives relied on this problematic identification rather than investigating more fully.

**Eyewitness Commitment:** In theory, an eyewitness misidentification could be corrected if the eyewitness were to realize the mistake or fail to identify the defendant in future proceedings. The New York Court of Appeals has explained, however, that "after a misidentification occurs, the witness's sense of recall can become impaired—perhaps irreparably—as the defendant's image tends to supplant the image of the actual criminal."[110] Thus, research shows that once a witness identifies a suspect pretrial, the witness is considerably more likely to identify him in a subsequent procedure, including at trial.[111] This is known as *commitment*.[112]

---

[107] In the Lewis case, the court suppressed admission of lineup identifications after a *Wade* hearing because it found that it looked as if a "spotlight" was on the defendant, and the defendant generally stood out from the fillers in terms of build and complexion. The court nevertheless allowed the two witnesses to identify Lewis in court because they both testified that they had seen the defendant many times in the past. In New York, a witness may make an in-court identification—notwithstanding a suggestive pretrial procedure—so long as they can establish an "independent source" for their identification. *See People v. Adams*, 53 N.Y.2d 241, 248 (N.Y. 1981).

[108] Except in Gold: his trial was in 1964, before New York established a right to pretrial hearings to challenge pretrial identifications.

[109] The Appellate Division also held that Davidson could not rely on the trial testimony about the detective's comments to the victim because his attorney should have sought to reopen the *Wade* hearing to make that argument. This is the kind of procedural roadblock that, as discussed at the outset of the report, the CRU's review is designed to look behind.

[110] *People v. Gee*, 99 N.Y.2d 158, 163 (2002) (citing *Simmons v. United States*, 390 U.S. 377, 383-84).

[111] *See* Third Circuit Report, *supra* note 61, at 60-61; *Wade*, 388 U.S. at 229 ("[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on . . . .").

[112] As discussed above, one identifying witness who it appears may have considered recanting her identification before trial was P.A. in the Foster case.

---

Commitment can be reinforced by feedback that the witness receives following the identification. For instance, in the Davidson case if the detective did tell the victim that the suspect's name was Brian Davidson, then the witness would likely have learned later that her identification matched the person police had already believed was the perpetrator. In addition, the victim told the CRU that after the lineup, she encountered Davidson at the police precinct and saw him in handcuffs.[113] Such a sighting would similarly have reinforced her commitment to her selection, and police should not have allowed such an encounter to occur.[114] But feedback adding to commitment, reinforcing the witness's notion that he was "right," can also occur just through the natural process of investigation and prosecution: when the witness learns that the person identified was arrested, when the witness testifies at the grand jury or in a pretrial hearing, or when the witness is prepared for trial testimony and cross-examination.

**Challenging Identifications at Trial.** As discussed above, the identification of an eyewitness in court can be powerful evidence before a jury. But it can also create substantial risks of convicting the innocent when the identification is not reliable.

*Witnesses' Unreliable Confidence Regarding In-Court Identification*

The inherent issues with a first-time in-court identification—as occurred with N.G. in the Mitchell case—are discussed above.[115] But identifications that occur in court after an initial unreliable pretrial identification (as occurred with all other witnesses discussed in this section) have their own inherent challenges as well, largely because witnesses may express an unreasonable confidence in their in-court identifications and because of the inherently suggestive conditions under which they occur (i.e., the witness is asked to identify someone who is sitting at the defense table, already charged with the crime).

Research indicates that jurors will assess the accuracy of a witness' identification based on the witness's expression of confidence in the identification at trial.[116] This is problematic because the very feedback and repeated questioning that leads to an eyewitness's commitment to their pretrial identification also increase the witness's confidence in that identification by the time the witness testifies.[117] This phenomenon is known as confidence malleability, and it means that the witness's expression of confidence at trial—as opposed to the witness's confidence at the time of the initial pretrial identification—is essentially meaningless and should not be credited.[118]

Confidence malleability also can make cross-examination—the standard way to test the reliability of a witness's account at trial—very challenging. The New York Court of Appeals has explained, "[a]s scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate, and because the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness."[119]

---

[113] Davidson also told the CRU that this run-in occurred, but he remembered it as having happened *before* the lineup identification. If that were true, then it would have further tainted N.W.'s lineup selection.

[114] A witness in the Foster case—W.P.—similarly credibly told the CRU that she ran into Foster before being asked to view him in a lineup. She was shaken by this as his face was embedded in her mind and as a result, she decided she could no longer make a selection at the lineup. She did not identify Foster and did not testify at trial.

[115] *See supra* at Section VI.B.

[116] *See, e.g.,* WITNESS CONFIDENCE AND WITNESS ACCURACY: Assessing Their Forensic Relation, 1 Psych. Pub. Pol. and L. 817, 819

[117] *See* Third Circuit Report, *supra* note 61, at 57-58.

[118] This is why best practices counsel that a statement of confidence be taken at the time of the initial identification procedure. *See, e.g.,* NYS DCJS Model Policy, *supra* note 61, at 6-7, 11-12.

[119] *Boone,* 30 N.Y.3d at 531 (citing *State v. Henderson,* 208 N.J. 208, 239 (2011); Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identity, and the Limits of Cross–Examination,* 36 STETSON L. REV. 727, 772 (2007)).

Thus, an eyewitness is often not just "utterly confident about an identification" but "entirely unshakable on cross-examination."[120]

There was evidence of this confidence malleability in the Davidson and Gold cases. In Davidson, the victim testified at trial that she was "100% certain" of her identification of Davidson—even though soon after the rape she said she could not identify anyone, and even though she did not identify him in an initial photo array. And in Gold, C.E. did not identify Gold even after looking at a slanted lineup for two minutes, and yet she testified at trial that there was "absolutely [no] question in [her] mind whatsoever" that he was the shooter.[121] In assessing Gold's conviction, the CRU noted the enormous difficulties his lawyer had in trying to cross-examine C.E. on the accuracy of her identification.

*Compounding Factors*

Unfortunately, in addition to the inherent challenges of testing a problematic identification at trial, actions by police, prosecutors, and defense attorneys (or their failures to act) further compounded the problems and thereby further undermined the CRU's confidence in the convictions.

One factor that prevented several juries from fairly assessing the risk of misidentification arose when law enforcement failed to disclose evidence that could be used to demonstrate the reliability of the identification. In all three of the cases in which a testifying eyewitness identified another person as the perpetrator at a different point in time—Harrison, Mitchell, and Foster—evidence of that other identification was not disclosed and thus the jury was not aware of it. The general issue of inadequate disclosure of exculpatory and impeachment evidence will be discussed in more detail in Section VI.D.

> **One factor that prevented several juries from fairly assessing the risk of misidentification arose when law enforcement failed to disclose evidence that could be used to demonstrate the reliability of the identification.**

Another compounding factor was defense counsel's performance. As will be discussed in more detail below, the CRU found that the defense counsel in Foster, Harrison, and Davidson were ineffective in a number of respects.[122] They failed to present to the jury several of the compelling arguments discussed above that undermined the identifications.

A third issue is prosecutors' misrepresentations and improper arguments—discussed more generally in Section VI.F.—which can compound the very issues that make identifications potentially problematic. For instance, in Davidson, the prosecutor in summation argued, "You heard from [the victim] that she had never seen Brian Davidson before in her life. What mystical wand, what coincidence caused her when she saw him in a lineup to pick out [Z.A.'s] cousin"? The CRU found this to be an improper line of argument, because the prosecutor knew that the victim had seen Davidson's face in a photo array 2 days prior. The prosecutor compounded the problematic line-up by emphasizing repeatedly the victim's certainty in her in-court identification even though, in this case, it was inherently unreliable.

The prosecutor in the Davidson case additionally made a number of other significant misrepresentations that further obscured the issues with the identification.[123] She made a different kind of error when she had the detective testify

---

[120]  *Id.*

[121]  Gold ultimately pled guilty before the jury could provide its verdict. But how damaging C.E.'s testimony was appeared to factor significantly in Gold's decision to plead guilty.

[122]  *See infra* Section VI.G.

[123]  These included (1) claiming that O.C. testified to the presence of four perpetrators, when he only said there were three; (2) falsely claiming that O.C. and the principal victim testified to specific actions Davidson took against them; (3) asserting that the victim was "100% certain" of her identification at the lineup when that was never documented; and (4) asserting without basis that Davidson somehow did not resemble his photo in the photo array.

that the victim identified Davidson in the lineup, clearly violating a longstanding New York rule that such testimony improperly bolsters the witness identification.[124] Taken together, the CRU concluded that the prejudicial effect of these misrepresentations and errors denied Davidson a fair trial.

## C.    Significant Witness Credibility Issues

The credibility of witnesses is a fundamental issue in criminal trials. In the false confession cases discussed above, the question was the credibility of the defendants' original admissions to law enforcement that they committed the crimes. In the eyewitness identification cases, the question was the credibility of the witnesses' accounts, and in particular, of their testimony that they observed the defendants committing the crimes. The identification cases generally involved witnesses who did not know the defendant before the events in question.

This section focuses on eight cases in which the witness claimed to know the defendant before the crime. A central issue in these cases—Anderson/Jones, Dawson, Hicks, Hart, Lewis, Martinez/Velasco/Vargas, Oakley, and Warren— was the credibility of the witnesses' accounts of the crimes and their claims that the defendants, who supposedly were known to them, committed the crimes in question.[125]

Witness credibility questions exist in many cases in which convictions are obtained fairly, and the CRU does not generally seek to revisit credibility determinations made by the jury after a fair trial. In these cases, however, the CRU determined not only that there were significant witness credibility issues, but that those issues for one reason or another were not adequately presented to the jury. This could occur, for instance, because of a failure to investigate, failure to disclose evidence, or issues with how the prosecutors or defense presented the evidence at trial.

Below, we first outline content problems with the witnesses' accounts, such as internal inconsistency and inconsistency with the evidence. We then set forth witness-specific factors that bore on the witnesses' credibility, such as their alleged relationship to the defendant or motivations to lie. Finally, we assess why these factors were not adequately before the jury.

### 1.    Content Problems

The problems that undermined the witness's accounts are much like the issues that raised questions about the confessions discussed above.[126] Often, the issue was inconsistent content in the statements that the witness provided across their different accounts. For example:

- In the Martinez/Velasco/Vargas case, key witness J.P. provided numerous statements that differed from each other about the events in question. The statements varied concerning details including where J.P. was and what she was doing before the fire, her interactions with defendants before the fire, the wording of threats defendants allegedly made to her, and how it occurred to her to look out the window to see the defendants after the fire.[127]

- In the Hicks case, the key witness, N.K., initially told police that she did not see the shooting at all because she was at the store; only later did she claim to have witnessed it.

---

[124] See People v. Trowbridge, 305 N.Y. 471 (1953). Generally a violation of Trowbridge is grounds for automatic mistrial or reversal. Though it is possible for such error to be harmless, People v. Stanley, 185 A.D.2d 827 (2d Dep't 1992), CRU did not deem the error harmless here.

[125] The Foster case discussed above could be included in this grouping as well because witness P.A. initially claimed to know the defendant, but it eventually became clear that this was inaccurate. But since those issues were covered as part of the eyewitness identification discussion, this section omits repeating that case here.

[126] See supra Section VI.A.

[127] Also, J.P. claimed that she could recognize the defendants by the sound of their voices in a common hallway, when they were whispering and speaking Spanish, a language she did not understand. The CRU found that implausible.

---

- One witness in the Anderson/Jones case, J.T., had a glaring discrepancy between his trial account and what he said when polygraphed, regarding his actions after the shooting.

Another issue with the witness's statement was how the witness's account compared to the accounts of other witnesses:

- Also in the Anderson/Jones case, the two witnesses, J.T. and E.F., provided accounts at trial so disparate that they almost seemed to be describing two different murders. One described a robbery attempt involving one armed person; the other described a shootout with all three parties firing.

- The two witnesses (N.L. and S.J.) who testified at trial against Nelson Lewis differed significantly about the clothing of the shooter and when he drew his weapon.

- At Sonny Dawson's trial, the key witness's account of the murder differed from the accounts of five non-testifying witnesses regarding the side of the street that the shooter was standing on, and which way the shooter ran after the shooting.

- The government witnesses claimed that Patrick Oakley's connection to the residence at issue was essentially non-existent, but that was contradicted by numerous credible defense witnesses.

The implausibility or inconsistency of the account in light of the other evidence was also an issue:

- In the Lewis case, the witness's account was provably false because she was incarcerated during the period when she claimed to see the defendant before the shooting. Her account of the shooting was also implausible. She would have had to run more than 200 feet in a matter of seconds; there were no windows in her house facing in the direction of the shooting as she claimed to view it; and any view would have been from 300 feet during a stormy, rainy night and with obstructions in the way.

> **[In one case], the witness's account was provably false because she was incarcerated during the period when she claimed to see the defendant before the shooting.**

- The witness's account in the Hicks case similarly, simply could not have occurred as she described it.[128] She claimed the victim followed the assailants from the vestibule to the street after being shot, but the medical evidence showed that his injuries would have incapacitated him within seconds. They also would have caused massive bleeding, but there was no blood whatsoever in the vestibule, door, or path. And the vestibule was too small to make any sense of the angles and paths the bullets took through the victim's body, or the lack of evidence of close-range gunfire like soot or stippling.

- In the Warren case, the witness's account of the burglary lacked any independent corroboration; in particular, there was no sign of forced entry and no other explanation for how the defendant entered the apartment.

- The witnesses' claim that Patrick Oakley offered to pay their sanitation tickets to allow him to use the space as a sham residence made no sense, because the tickets were issued well after the period he relied on the residence. And their claim he received no mail of significance was contradicted by the records of many companies that had this address as Oakley's mailing address, and evidence that Oakley responded to those mailings with payments.

In some cases, the CRU found it significant *how* the witness got the facts wrong. For instance, in the Hicks case, the medical evidence showed that most of the gunshots entered the victim through his back, resulting in exit wounds through the chest. Someone viewing the body on the street might see the exit wound in the chest and assume that was where he was shot. That is in fact what N.K. testified, suggesting her original account that she only saw the body on the street when she came home, was the correct one. This is in a sense like the "false fed fact" discussed in the false confession section;[129] she was not just wrong, but wrong in a way that corroborates how the error may have arisen.

---

[128]  The CRU consulted with a pathologist from the Office of the Chief Medical Examiner to reach these conclusions, as discussed further below, at Section VI.H.

[129]  *See supra* Section VI.A.

Finally, mindful that the CRU interviews were years after the crime, the CRU considered whether the witness provided a different account to the CRU than at trial:

- The witness in the Lewis case provided a substantially different account of the shooting; particularly in whether she was able to see the final shots from her home.

- The witness was unable to identify Sonny Dawson in a lineup and gave a description of him that was entirely wrong.

### 2.     Witness-Specific Problems

In addition to the content problems discussed above, in most of these cases the CRU identified issues specific to the witness or their relationship with the defendant or victim that undermined the witness's credibility. In some cases, these witness-specific issues pointed to potential motivations for the witness to provide false testimony against the defendant. Common themes included personal grudges or interests, a reputation for being erratic or lying, and coming forward much after the fact or under suspicious circumstances.

> **In some cases, these witness-specific issues pointed to potential motivations for the witness to provide false testimony against the defendant. Common themes included personal grudges or interests, a reputation for being erratic or lying, and coming forward much after the fact or under suspicious circumstances.**

In the Warren case, it came out at trial that witness P.K. held a grudge against the defendant because she believed, without proof, that he was responsible for stealing her car. When P.K. was interviewed during the CRU investigation, she denied that she had ever been burglarized and initially said that she did not recall her testimony at trial. When confronted with her testimony, she admitted that she falsely testified against the defendant to punish him for the purported car theft. Notably, P.K. maintained her accusation against Warren long after she learned that her car had in fact not been stolen, but rather had been borrowed by a relative without her permission or knowledge.

Similarly, in the Martinez/Velasco/Vargas case, key witness J.P. had various disputes with the defendants, believing they had tried to rob her numerous times and owed her money. The CRU spoke to J.P.'s daughter, who said that shortly before J.P. passed away in 2014, J.P. regretfully told her that she had falsely blamed defendants for the fire to get back at them for these purported slights. There were additional factors that undermined the reliability of J.P.'s testimony:

- As owner of the building that burned down (with reason to believe the fire may have been caused by her own negligence), testifying against defendants helped J.P. avoid any personal liability.[130]

- J.P. received probation in a pending drug case (on charges with a maximum 25-years' imprisonment) on the understanding that she would testify for the prosecution in this arson case. J.P. had previously told a probation officer that she would rather die than go to prison.

- J.P. was described by many to CRU as a compulsive liar.[131] In addition, J.P. was engaged in multiple illegal activities and was known as an alcoholic who drank to excess several days a week.

Similar kinds of motivations were at issue in the Oakley case. J.Q. and V.C. showed open hostility to Oakley, believing he had somehow defrauded them out of a house when in fact they had intentionally defaulted on their financial

---

[130] And presumably, it would ensure she did not lose claim to insurance proceeds that it was established at trial she received due to the fire.

[131] One daughter said she would "say anything to survive" and another said that she lied so frequently about so many things that it was hard to know when she was telling the truth.

obligations. In addition, not only did they have extensive criminal records, they ironically both admitted to a crime much like what Oakley was charged with: they used a sham address in Virginia to obtain driver's licenses there because their New York licenses had been suspended.

The Hart and Anderson/Jones cases shared a key witness: a woman named E.F. In fact, E.F. ultimately was a witness in six homicide cases over an 18-month period. This fact on its own was not relied on by the CRU in its conclusion that E.F.'s testimony was unreliable: the homicides were so tightly clustered where E.F. was highly active in drug use, drug sale, and prostitution, that it was conceivable that she could have witnessed six murders in that timeframe. Nevertheless, the CRU did find that with each passing proceeding, E.F. became more erratic, inconsistent, hostile, and incredible so as to make reliance on her highly questionable.[132] In addition, in both of these cases, E.F. came forward under highly questionable circumstances:

- In the Hart case, E.F. did not come forward to say that she witnessed the crime until 2 months after, when she was told that Hart had been acquitted in a separate murder trial at which she also testified, and that Hart was "looking for her." This delay was particularly notable because she had been talking to police and prosecutors closely during this two-month period regarding the other trial. These circumstances raised the concern that she came forward out of personal safety to get Hart back into police custody.[133]

- In the Anderson and Jones case, E.F. did not come forward until almost 2 years after the crime. This was also noteworthy because 4 months prior to coming forward, she provided information to police about guns found in Jones's apartment. Yet she did not mention this murder.

In Lewis, the government's key witness, N.L., did not come forward to tell police that she saw the murder until 5 months later, when she had herself been arrested on charges that were subsequently dropped. These circumstances were explored at trial and no evidence was adduced showing she had been offered a quid pro quo for her testimony against the defendant; nevertheless, in conjunction with the other serious concerns raised by her history and prior statements, the CRU found the delayed timing of her coming forward to be a factor against her reliability.

> **The key testifying witness, A.L., came forward under quite dubious circumstances. Specifically, she claimed for the first time to have witnessed the murder on the very day that the prosecution's original two witnesses refused to testify and the court told the prosecution that it had 24 hours to find a witness or the case would be dismissed.**

Finally, in Dawson, the key testifying witness, A.L., came forward under quite dubious circumstances. Specifically, she claimed for the first time to have witnessed the murder on the very day that the prosecution's original two witnesses refused to testify and the court told the prosecution that it had 24 hours to find a witness or the case would be dismissed. A.L. testified that she had seen the murder when it occurred months prior, but never told police. She also said that she had spoken briefly with the victim's brother, G.R., about what she witnessed a month after the murder. Then, according to A.L., on the very day the prosecution's case was collapsing, she coincidentally happened to reach out to G.R. to see how he was doing, and G.R. put her in touch with the prosecutor. G.R. also testified to these events at trial. These improbable circumstances and coincidences raised questions about whether she had seen the events in question at all, or whether she was procured by G.R. to help save the case against the man indicted for killing his brother.

---

[132] She also had been diagnosed with certain mental health disorders.

[133] Also, she admitted she held a grudge against Hart because he allegedly robbed her at gunpoint.

### 3.    Limitations on Jury Trial

Of course, some of the issues discussed above were raised and presented to the jury as reasons not to credit the prosecution's witnesses. For example, the respective juries heard about the disparities between the accounts of E.F. and R.M in the Anderson/Jones case, a number of the inconsistencies in H.Q's accounts in the Martinez/Velasco/Vargas case, and the lack of corroboration of P.K.'s account and her motive to fabricate in the Warren case, and they heard from the credible defense witnesses who contradicted the government in the Oakley case.

In each of these cases, however, the CRU found that for one reason or another, the jury did not have the full picture and the trials were not fair. In some cases that is because the CRU uncovered new evidence—which was not available to the jury—that undermined or wholly contradicted the witness's testimony after trial. This includes the recantations in the Warren and Martinez/Velasco/Vargas cases, and the increasing unreliability of E.F. that was cited in the Hart case.[134]

> **The CRU uncovered new evidence—which was not available to the jury—that undermined or wholly contradicted the witness's testimony after trial.**

In other cases, the evidence was or should have been available but for various reasons was not presented to the jury. For instance, as discussed below, in several of these cases (Hicks, Anderson/Jones, Lewis) law enforcement failed to disclose key information undermining the credibility of the witnesses to the defense, as required by law.[135]

In Dawson, though the questionable timing of A.L. coming forward was known to the jury, an additional critical piece of information was not: the CRU learned that A.L. had lied in court about her name and date of birth.[136] She also lied when she said she did not live in the neighborhood at the time of the shooting. A.L. claimed to the CRU that she changed her name because she was afraid of testifying against the defendant. But whatever the reason, this meant that the defense was deprived of a crucial opportunity to investigate and cross-examine A.L. about her identity, the nature of her relationship with G.R. and with the defendant (if any), and her knowledge of the people in the neighborhood.

Moreover, the prosecution was aware that several non-testifying witnesses contradicted A.L. in key aspects of her testimony, raising substantial questions about whether A.L. witnessed the crime at all. Although these witnesses also said that the defendant was the shooter, that does not end the matter, for the CRU's mandate is not just about guilt or innocence. It includes determining whether fatal defects in the prosecution should have precluded a guilty verdict.

Other cases demonstrate additional ways in which key evidence may fail to come before the jury, generally due to some combination of failures by prosecutors or the defense:

- Robert Hicks's counsel did not in any way bring out the inconsistencies between the medical evidence and N.K.'s testimony; in fact, there was no cross-examination of the medical examiner at all. As will be discussed below, the prosecutor was also at fault; she should not have simply presented witness testimony that was patently inconsistent with the medical evidence.[137]

- At Nelson Lewis's trial, the physical implausibility of N.L.'s testimony never came out to the jury. The diagram used to illustrate her testimony describing the distance she had run in a short period of time was not drawn to scale and the court instructed the jury that it could not be relied upon for distances. The defense counsel admitted to the court that he had not been to the street, and the prosecution said only that he had been "on the

---

[134] Also, in Martinez/Velasco/Vargas, one aspect of the evidence that would have bolstered J.P.'s credibility was the fire marshal's conclusion that the fire was arson. As discussed below, *see infra* Section VI.H. a fire expert examined that conclusion for the CRU and determined that it is not consistent with the latest fire science.

[135] *See infra* Section VI.D.

[136] This necessarily meant that G.R., the victim's brother, also lied.

[137] *See infra* Section VI.F.

block." It is thus not apparent that either did the investigation to determine that this aspect of N.L.'s testimony was not plausible.

- The defense did not avail itself of the opportunity to inform the jury of the evidence about J.P.'s character at the trial of Martinez, Velasco, and Vargas.

- As discussed more below, the prosecutor in the Oakley case improperly spun the testimony of a credible rebuttal witness to make it seem like the basement was not habitable, when that is not what the testimony showed.[138] This argument encouraged the jury to overlook the significant witness credibility problems.

## D.    Nondisclosure of Favorable Evidence

Under the American criminal justice system, the guilt or innocence of the accused must be determined not by a "prosecutor's private deliberations," but by a fair trial "on the basis of all the evidence that exposes the truth."[139]

Failure to disclose evidence can violate a defendant's constitutional due process rights. Specifically, under the federal and New York Constitutions, a conviction must be vacated when prosecutors fail to timely disclose evidence that is favorable to the defendant and material to guilt or punishment.[140] This is known as the "*Brady* rule." Evidence is material to the outcome of the case if there is a "reasonable probability" that, if it had been disclosed, the result of the proceedings would have been different.

In a number of the CRU exonerations, it appears that law enforcement failed to provide favorable evidence to the defense. The CRU's ability to make that determination was in some cases limited by the passage of time and other factors (such as the unavailability of files and prior counsel). In others, the CRU had strong reasons to conclude, after a thorough investigation, that favorable evidence in the possession of police and/or prosecutors was in fact withheld from the defense.

While in many cases these non-disclosures would have been sufficient to require relief under *Brady*, in considering whether a conviction was wrongful the CRU does not limit itself only to non-disclosures that would be deemed *Brady* violations. Rather, the CRU recommends vacatur of a conviction whenever it concludes that a failure to disclose favorable evidence—including evidence that could be used to challenge the testimony of witnesses—made it impossible for the jury to fairly assess the defendant's guilt.

> **Failure to disclose evidence can violate a defendant's constitutional due process rights. Specifically, under the federal and New York Constitutions, a conviction must be vacated when prosecutors fail to timely disclose evidence that is favorable to the defendant and material to guilt or punishment. This is known as the "*Brady* rule."**

---

[138] *See infra* Section VI.F.

[139] *Kyles v. Whitley*, 514 U.S. 419, 440 (1995).

[140] *People v. Fuentes*, 12 N.Y.3d 259, 263 (2009) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).

[141] *Id.* A "reasonable probability" of a different result is shown when the nondisclosure "undermines confidence in the outcome of the trial," *see United States v. Bagley*, 473 U.S. 667, 678 (1985). Additionally, under New York law, if the defense specifically requested the information, then the materiality standard is lower: there need only be a "reasonable possibility" that the outcome would be different. *Fuentes*, 12 N.Y.3d at 263 (citing *People v. Vilardi*, 76 N.Y.2d 67, 77 (1990)). Under federal law, the materiality standard is the same if the defendant specifically requested the information, but the reviewing court may consider any adverse effect from the prosecutor's failure to respond to a specific request. *See Bagley*, 473 U.S. at 682-83 ("[T]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.").

The CRU indicated nondisclosure of favorable evidence as a factor in its recommendation of an exoneration in ten of the cases reviewed for this Report. This includes two cases that have not been discussed in the prior sections of this Report—Wright and Fitzgerald—and eight of the previously discussed cases: Harrison, Hicks, Foster, Anderson and Jones, Lewis, Mitchell, Gold, and Alvarez. This section outlines the basis for the CRU's determinations that nondisclosure of favorable evidence undermined the integrity of the defendants' convictions in these cases.

**The CRU indicated nondisclosure of favorable evidence as a factor in its recommendation of an exoneration in ten of the cases reviewed for this Report.**

### 1.    Identifying Non-Disclosed Information

The CRU examines all available information pertinent to a conviction that it evaluates. This includes the full record of proceedings, the KCDA files on the case, any available NYPD files, the defense files (if extant and made available), and the files of other pertinent proceedings. Based on this review and interviews of witnesses, prosecutors, defense counsel as appropriate, the CRU identified information that appeared not to have been disclosed.

Determining whether the evidence in fact was not disclosed to the defense is often not straightforward or determinable with certainty. In some cases, nondisclosure could be inferred when the evidence was not listed in cover sheets and other documentation of discovery provided to the defense. Alternatively, in many cases, the CRU could infer that evidence was not disclosed when it was sufficiently significant to the case, it was not raised by defense counsel at any point, and the rest of the trial proceedings indicate that defense counsel would have used the information had it been provided.[142] In some cases, the trial record suggested that the prosecutor was not aware of the information, which would also strengthen the conclusion that it had not been provided to the defense. When possible, the CRU spoke to prosecutors and defense attorneys to determine whether they recalled the information at issue and how they would have acted if provided with it.

### 2.    The Non-Disclosed Evidence and Its Significance

The kinds of evidence that was likely not disclosed in each of these cases varied considerably. Most would have undercut a government witness's testimony—putting an identification or the credibility of an account in doubt. In other cases, the evidence would have supported an alternate theory of the crime or alibi.

The following subsections walk through the evidence that the CRU determined were likely withheld, and their significance to the case.

### a.    Prior Statements of Testifying Witnesses

The most common type of withheld evidence was prior statements made by the prosecution's testifying witnesses. Such nondisclosures are of particular concern because, in addition to *Brady*'s requirement mandating disclosure of

---

[142] Of course, in such circumstances, had the defense counsel been provided the information but failed to use it, that would just indicate that the counsel was ineffective. It thus would still raise questions about the fairness of the conviction (as well as constitutional/due process concerns), but for a different reason.

statements that could be used to impeach a prosecution witness, New York law requires the disclosure of all prior statements by testifying witnesses that relate to the subject matter of their testimony.[143]

**Statements Showing Potential Bias:** In Gold, the prosecution did not disclose prior statements by the government's key witness—the victim's wife, C.E.—that she had been having an affair and that her marriage was a "turbulent" one, beset by frequent arguments and money troubles. This information would have been helpful to the defense, as this witness's identification of Gold was the most powerful evidence against him, and the withheld information would have created a basis for him to question her credibility.

**Statements Undermining Identification:** As discussed above, in three cases—Harrison, Foster, and Mitchell—the credibility of an eyewitness identification was undermined in significant part because the same witness identified another person as the perpetrator. In each of these cases, however, evidence of the misidentification appears not to have been disclosed to the defense and thus the jury never learned about them.[144] The CRU found these nondisclosures to be critical omissions tainting the convictions. In addition, in Harrison, the witness's admission to police that he smoked crack on the day of the crime was likely withheld from the defense, preventing the defense from creating doubt about his ability to identify the defendant on this ground.[145]

> The most common type of withheld evidence was prior statements made by the prosecution's testifying witnesses. Such nondisclosures are of particular concern because, in addition to *Brady*'s requirement mandating disclosure of statements that could be used to impeach a prosecution witness, New York law requires the disclosure of all prior statements by testifying witnesses that relate to the subject matter of their testimony.

Also, in the Wright case, the CRU was unable to determine whether the prosecution disclosed a testifying witness's disavowal of a lineup identification of the defendant. According to police reports, the witness, R.B., had positively identified Wright in a lineup as a perpetrator. A few days later, however, the witness disavowed this supposed identification, telling the prosecutor that she had only said that she knew the defendant from the building and had not identified him as a participant in the crime. At trial, the prosecutor did not directly introduce the lineup identification. But as discussed further below, the prosecutor did ask R.B. a number of misleadingly sequenced questions to give the jury the impression that she did identify him as a perpetrator, and on cross-examination a detective stated that R.B. identified him as a perpetrator as well (without disclosing the disavowal).[146] The defense should have been provided her disavowal so that it could rebut this misimpression. Likely, with knowledge of the disavowal, defense counsel would never have asked a question which "opened the door" for the detective's revelation of the out-of-court identification.

**Other Prior Inconsistent Statements:** In the Alvarez case, the prosecution did not disclose police reports and notes of testifying witness statements that undermined their theory that, per Alvarez's confession, two people were involved in the robbery/murder. The defense argued that the prosecution's theory was wrong because the key witness initially said that three were involved. This argument had more support than defense counsel knew, as nondisclosed evidence indicated that a testifying police officer also initially reported seeing three assailants, and the key testifying witness

---

[143] *See People v. Rosario*, 9 N.Y.2d 286 (1961).

[144] In Harrison, the witness volunteered at trial that he had seen a different person who "resembled" the shooter, but he did not testify that he had unequivocally identified this person as the shooter as the police reports indicated.

[145] In fact, the witness falsely testified to the jury that he had never smoked crack in his life, which the defendant was not in a position to challenge.

[146] *See infra* Section VI.F.

had, soon after the crime, identified another individual as possibly one of the attackers in a show-up identification. That information was vital to the defense's theory and could have significantly strengthened his argument to the jury.[147]

Finally, in the Anderson and Jones case, the prosecution did not disclose the narrative provided by their testifying witness when he was polygraphed. This narrative contained a significant discrepancy in what the witness did after the shooting, which the defense could have used to undermine his (already tenuous) credibility.

### b.    Prior Statements of Non-testifying Witnesses

In several cases, statements of non-testifying witnesses were likely withheld which the defense could have used to support an alternate theory of the crime.

In Gold, the man with whom C.E. was having an affair said that she was the victim of domestic violence, that she had threatened to kill her husband if he ever struck her again, and that he did strike her the morning of the murder. Today, this evidence would obviously need to be disclosed. The Gold trial occurred in 1964, however, when the *Brady* decision was just one year old and not fully developed. So although New York law was well established that C.E.'s statements should have been disclosed, the caselaw was not yet clear that disclosure of these other statements that could have been used to impeach her testimony was required.

No such issues applied to the two other cases in which non-testifying witnesses' exculpatory statements were likely withheld. In Mitchell, the prosecution did not disclose information in its own files documenting that an individual came forward less than 2 weeks after the crime, saying he was at the scene and identifying a different person as the shooter. Notably, his account included details that were not in the public domain, and the person identified bore an uncanny resemblance to Mitchell, notwithstanding that Mitchell would not be arrested until more than 2 years later. Mitchell clearly was entitled to the information to argue to the jury that it created doubt about his guilt, as well as of the identifications of him by W.P. and N.G.

In the Anderson and Jones case, it was likely not disclosed that a non-testifying witness told police that although defendants were present with him at the murder, the shooter was another individual.[148] The CRU determined that defendants were entitled to know that this witness was willing to come forward, and particularly given the weaknesses in the prosecution's case, disclosure of an alternative shooter may well have changed the trial result.

### c.    Original Investigative Materials

In almost all cases, the likely withheld evidence consisted of police reports or notes that summarized police statements taken from witnesses or other information favorable to the defense. The exception was in the Fitzgerald case, where the key evidence at issue was a Florida hotel receipt that had been taken from the defendant at the time of his arrest, showing payment of a phone bill on the evening of the shooting. This evidence was critical because it tended to support Fitzgerald's alibi defense at trial—that he was in Florida at the time of the charged murder and thus could not have been the shooter as the prosecution's witnesses testified.[149]

> [The defendant] was in Florida at the time of the charged murder and thus could not have been the shooter as the prosecution's witnesses testified.

---

[147]  In addition, nondisclosed notes deprived the defense of potential grounds to attack the credibility of a police officer's identification of Alvarez as someone fleeing the scene.

[148]  In addition, likely non-disclosed handwritten notes indicated, per an unknown source, that a third person was the shooter, but also said that defendants robbed the victim in concert with this person.

[149]  In addition, the prosecution appears not to have disclosed a document indicating that two weeks after the shooting, employees at the Florida hotel recalled seeing the Fitzgerald family. The defense attorney told the CRU that this document would not have been significant because the prosecution never disputed that Fitzgerald went to Florida, just whether he came back in time to commit the murder.

### d.    Criminal History of Testifying Witnesses

New York law generally requires the disclosure of testifying witnesses' prior convictions and pending charges.[150] In addition, other aspects of the witnesses' criminal history may need to be disclosed if they constitute *Brady* material— i.e., if they are exculpatory or impeach the witness's credibility. In two cases, the CRU concluded that such evidence was likely suppressed.

First, in the Lewis case, the prosecution likely failed to disclose an arrest report indicating that their main witness, N.L., had been arrested the day before the shooting. Because this charge was voided, it would ordinarily not need to be disclosed. But here, the timing made it independently significant: as discussed above,[151] it showed that she was in custody at the very time she claimed to be viewing the defendant before the shooting getting robbed at a dice game. This was crucial evidence both because (1) revenge for this dice game robbery was purportedly the motive for Lewis shooting the victim the next day and (2) N.L.'s observations of Lewis before the shooting were the basis for her ability to identify Lewis in court.

Second, in the Gold case, the prosecution did not disclose that one of their witnesses, R.J., had likely committed perjury in connection with a robbery to which he pled guilty. Though R.J. was not charged with perjury, an Assistant District Attorney in the KCDA had filed papers recommending he be charged. The CRU concluded that since this history was known to the KCDA, it should be assumed to have been known by Gold's trial prosecutor. The CRU concluded that information that a prosecution witness had lied in the past under oath could have put his testimony in serious question.[152]

### e.    Misleading Disclosure

Finally, in two cases, defects in the nature or timing of the disclosure rendered the disclosures misleading, and thus prejudiced the defense and undermined the fairness of the conviction. A prosecutor's obligations go well beyond simply complying with minimal constitutional requirements.

As discussed above, the government's sole eyewitness in the Hicks case, N.K., had told the first detective on the scene that she had not seen the shooting at all; only later did she say that she saw Hicks commit the crime.[153] In this initial interview, she identified herself as "E.J.," but also told the detective her alternate first name, "N." The prosecutor never realized that N.K. and "E.J." were the same person, and even told the defense that they were not towards the end of trial. Although the detective's notes of this statement were included in a package of materials that the prosecutor provided at the start of trial—and thus disclosure was technically made—the CRU found that the prosecutor's failure to recognize its significance, failure to investigate the issue (such as through the detective who obtained the statement and was available to the prosecutor), and then to highlight this statement to the defense as *Brady* material, fell short of the prosecutor's obligations to do justice.[154]

The Alvarez case also involved what the CRU concluded were inadvertent misrepresentations in the context of a problematic disclosure. The prosecution belatedly disclosed the criminal history of its witness, F.C.—telling the defense only on the morning of the day he testified that he was on probation for a misdemeanor. The court ruled

---

[150]  *See* N.Y. Crim. Proc. Law § 240.44 (2018); N.Y. Crim. Proc. Law § 245.20(p), (q).

[151]  *See supra* Section VI.C.

[152]  As noted above, at the time of this trial the legal obligations of *Brady* were not yet clear. But the CRU did find that there were cases available at this time that indicated this kind of information ought to be provided to the defense. *See Mesarosh v. United States*, 352 U.S. 1 (1956).

[153]  *See supra* Section VI.C.

[154]  As discussed below, the prosecutor compounded the issue by arguing on summation that the first thing the witness did when seeing the police was to tell them that she saw Hicks shoot the victim. *See infra* Section VI.F.

---

that F.C. should still testify (and the defense would have to cross-examine him about the criminal history without investigation), while giving the defense a chance to investigate the history and recall F.C. for more questioning by the end of trial. After F.C. testified about his crime, the prosecutor reached out to local authorities at the defense counsel's request and confirmed F.C.'s account; the defense accepted the prosecution's representations. But the CRU found after its own investigation into F.C.'s criminal history that the local authority with whom the prosecutor spoke was not knowledgeable about all the facts, and in fact F.C. substantially misrepresented his conduct in his testimony. Thus, the defense was deprived of an important opportunity to attack the credibility of a key prosecution witness.

### 3.     Assessing the Potential Causes of the Nondisclosures

In general, the CRU did not endeavor to determine the cause of the nondisclosure, nor whether the nondisclosure was due to negligence or greater misconduct. Ultimately, what is most relevant to a decision by the CRU to recommend vacatur of a conviction is whether the evidence was likely not disclosed and whether the failure to disclose made it impossible for the jury to fairly assess guilt. The CRU recognizes, however, that understanding the causes of nondisclosure is critical to preventing its recurrence, and in some cases, the CRU did consider and discuss potential causes as part of its analysis.

A key initial clue about the cause of a nondisclosure is where the evidence was found. If it was only in the police files, that might indicate that the police never provided it to prosecutors. If the document was in the prosecutor's files, then it is more likely that there was an oversight or deliberate nondisclosure by prosecutors. In the cases of Alvarez, Lewis, Fitzgerald, Harrison, Hicks, Mitchell, and Wright, the CRU found the key evidence at issue (or a copy) in the prosecutor's files. But certain evidence was found only in police files, such as the evidence of an alternative shooter in the Mitchell case and in the Anderson/Jones case.

There is a separate question of whether the nondisclosure was due to oversight or something worse. In nearly all cases, the CRU concluded it did not have enough information to determine whether law enforcement knowingly failed to disclose the evidence in question. But one case raised serious concerns. In Foster, after the prosecution's witness P.A. said that the shooter was local gang leader Ice Cold and then she identified Foster as Ice Cold, she subsequently identified a different individual as Ice Cold in an entirely separate shooting. The detectives working on Foster's case knew about this—they interviewed the witness at the time, over a year before they would testify against Foster in his trial. Yet it appears that the detective did not inform the prosecutor of this.[155] The CRU concluded that the detective could not have missed the significance of this development, which leads one to suspect that they did not share this information with the prosecutor because they did not want to have it disclosed to the defense and undermine the case against Foster.

By contrast, in some cases the CRU found reasons to conclude that the prosecutor had the information but failed to disclose to recognize its significance and thus to disclose it. This seems to have been the case with the arrest report in the Lewis case, and also the detective notes in the Hicks case (the latter of which the CRU concluded was disclosed, but as discussed above, was described erroneously by the prosecutor in a way that obscured the fact that it was *Brady* material).

Another contributing factor in some cases may have been the prosecutors' troubling lack of diligence in meeting their obligations and lack of candor to the court. In Gold, the court specifically asked the prosecutor whether there were additional statements taken of C.E. than what had been provided to the defense. The prosecutor said there were not

---

[155] The CRU spoke to the detectives: they confirmed that they knew this information at the time of the other shooting and said that they did not recall telling the prosecutor about this. The prosecutor was very diligent about documenting discovery in this case and labeled other information as *Brady* when warranted. In light of his impeccable reputation for integrity in the KCDA, the CRU found it almost inconceivable that he had been told of this development and did not share it with the defense.

and what was provided was all he had, but there were additional statements never provided.[156] The CRU found that, while it could not tell if this showed willful ignorance or indifference, the prosecutor's attitude towards his obligations was lacking. In the Harrison case, not only was the prosecution casefile badly disorganized when the CRU received it, the CRU noted that the prosecutor's performance at trial illustrated a profound lack of diligent preparedness and attention to detail, which may have explained the nondisclosure.

## E.    Police Conduct

The sections above show how even well-meaning and dedicated police detectives can take actions which result in wrongful convictions. They also show some instances in which police engaged in even more problematic misconduct that particularly undermined the CRU's confidence in the convictions. Police conduct issues were cited by the CRU in fifteen of the twenty cases, impacting twenty defendants—all except for Dawson, Oakley, Fitzgerald, Warren, and Wright.

**Police conduct issues were cited by the CRU in fifteen of the twenty cases, impacting twenty defendants.**

This section reviews the kinds of police errors and misconduct that the CRU observed across the exonerations that were discussed above, and sets forth some additional police-related issues that were factors in the CRU's analysis.

### 1.    Generation of False/Unreliable Evidence

Coercive interrogation techniques and suggestive identification procedures are two different ways that the police can—often unwittingly—generate false or unreliable evidence.

As discussed above, the first error that police make in false confession cases is suspecting an innocent person, and thereby subjecting that individual to an interrogation that may lead to a false confession, even if proper investigation techniques are applied and especially when they are not.[157] The same could be said about eyewitness misidentifications: the first step is placing an innocent person as a suspect in a photo array, lineup, or other identification procedure. The CRU identified concerns with how the defendant was deemed a suspect by the police in the cases of Foster, Moore/Stevens, and Green.[158] In Gold, there were also credibility issues with the witness who appeared to first inform the police that the defendant was involved.[159]

After this initial step, the errors that lead to the generation of false or unreliable evidence vary. In the police-induced confession cases (Foster, Green, Alvarez, Moore/Stevens, Yeats/Watson), a mix of pressure and a questioning technique that fed key facts of the crime to the suspects led to false or unreliable confessions. While the CRU did not determine whether some defendants' claims of physical coercion and outright police fabrication were accurate, it did find that the police's approach led to the generation of an unreliable confession.

In the eyewitness identification cases—most notably, Davidson, Foster, Gold, Mitchell, and Harrison—the CRU found that police used suggestive identification procedures that likely contributed to unreliable identifications. The suggestion here might be as simple as a prejudicial comment and problematic procedure (as in Davidson), a slanted lineup despite best efforts (as in Mitchell), or more direct coaching (as appears to have occurred in Foster and Gold).

---

[156]  The prosecutor also said he would need to check to make sure that he was correct, but the additional statements were never turned over.

[157]  *See supra* Section VI.A.

[158]  *See supra* Section VI.A.

[159]  The police spoke to R.J. four times in the month following the murder, he had a history of armed robberies, and police saw him as a person of interest in the crime before he pointed them to Gold.

Whether the police help induce a false confession or an eyewitness misidentification, the result is similar: the police's errors lead to the production of false or unreliable evidence that is powerful to a jury and thus heightens the likelihood of a wrongful conviction.

## 2. Investigative Failures and Biases

Whether a confession, an identification, or evidence from third party witnesses, police must test the reliability of the evidence: its internal consistency and plausibility, its consistency with other evidence, and the credibility of the source. Yet, among these three categories of evidence, the CRU found that evidence at issue had significant credibility problems that the police failed to detect and adequately investigate.[160] This ranged from the physical impossibility of the witness testimony in Hicks and Lewis, the implausibility of the confession story in Moore/Stevens and Yeats/Watson, or the significant inconsistencies and witness-specific issues in Martinez/Velasco/Vargas. For instance, in the Moore/Stevens case, as discussed above, the police inexplicably focused on Stevens with very thin evidence, when two individuals who for a number of reasons fit the profile of the perpetrators were known to them. The CRU spoke to these two individuals on multiple occasions and found that they were evasive and deliberately lied to the CRU on key points. The CRU concluded that one or both of them may have played a role in the crime, but because the police failed to show them to the eyewitnesses, the police failed to ascertain what role, if any, they played.

> **Whether the police help induce a false confession or an eyewitness misidentification, the result is similar: the police's errors lead to the production of false or unreliable evidence that is powerful to a jury and thus heightens the likelihood of a wrongful conviction.**

Rather, police showed in many of these cases evidence of confirmation bias—interpreting new evidence as confirmation of existing beliefs—and tunnel vision—focusing single-mindedly on one theory of the case. Confirmation bias was apparent in Alvarez when law enforcement assumed Alvarez was simply trying to minimize his guilt when he confessed to the nonexistent stabbing. Tunnel vision was apparent when police failed to pursue credible alternative suspects or theories, such as in Moore/Stevens, Foster, and Yeats/Watson,[161] or when police failed to test available evidence that could have proved important, such as in Davidson.[162]

Less commonly, CRU identified evidence of expectation bias: in which analyses may have been unconsciously biased to fit the investigator's expectations.[163] In Martinez/Velasco/Vargas, as will be discussed more below, the fire marshal's dual role as investigator and expert meant that he first spoke to J.P., a witness who claimed the fire was arson, before assessing the cause of the fire. The CRU concluded that this prior witness contact likely prejudiced his scientific determination of arson.

## 3. Failure to Disclose Evidence

As discussed above, police have a crucial (and constitutionally required) role to play in ensuring that law enforcement provides the defense with all exculpatory information, and thus the trial can be deemed fair.[164] Although the CRU did not generally assess whether failures to disclose evidence was the fault of the police, prosecutors, or a combination, it

---

[160] The CRU did in some cases benefit from new evidence that was not available to the police at the time. But generally in the above-discussed cases, there were serious issues with the evidence even just as the police had them.

[161] *See supra* Section VI.A.

[162] *See supra* Sections VI.A, VI.B.

[163] *See supra* Section VI.A.

[164] *See supra* Section VI.D.

did find that the nondisclosure in Foster was likely attributable to the police. And in Anderson/Jones and Mitchell, certain important evidence was found by the CRU only in police files, and not in the files of the prosecutor.

### 4.    Handling of Physical Evidence

In addition to investigating and developing evidence against a suspect, it is the duty of police to safeguard the evidence they find. This includes diligently collecting the evidence, tracking it, and storing it—as well as creating an accurate record about the evidence's origins and chain of custody.

In the Mitchell case, the police's failure to meet these responsibilities tainted the conviction. The single most important evidence was Mitchell's DNA in a knit hat found by police outside the store after the shooting. Yet, after careful analysis of police reports documenting the investigation of the crime scene and crime scene photos, the CRU determined that the hat simply could not have been where it was said to be found, or anywhere even remotely nearby. A canine officer testified at trial that he found and picked up the hat,[165] but detectives who canvassed the scene prior to the canine officer's arrival never saw the hat.[166] At the time of the reinvestigation, the CRU concluded that where this hat came from was at that point both unknown and unknowable.[167]

Poor evidence handling was also an issue in the Harrison case. Years after his conviction, Harrison's post-conviction counsel sought the help of the CRU to obtain metal pipes that had been recovered from the crime scene to test for DNA. After a comprehensive check of all NYPD Property Division records and the relevant facilities, the property could not be found and no explanation for this was provided.

### 5.    Police Misconduct

The aforementioned issues were significant shortcomings that, at a minimum, undermined the CRU's confidence in the police investigation and its ability to stand behind the ultimate verdict. But it bears noting that in three cases, the CRU concluded that the police engaged in outright misconduct. Given the extent of the issues, it is useful to recap the different kinds misconduct that occurred at various points in these cases.

#### a.    Foster

Perhaps the most problematic police conduct among the CRU exonerations discussed in this Report was in the Foster case. As set forth above, the police originally suspected Foster on the thinnest evidence.[168] Then P.A. came forward and said she saw the shooter at the victim's wake and said that he was a top gang leader known as Ice Cold. The primary case detective proceeded to show P.A. a photo array with Foster, even though the detectives had attended this wake and, with Foster's rap sheet, knew or should have known that Foster was incarcerated and could not have been the person P.A. said she saw (a fact that police never shared with the investigating or prosecuting ADAs). Worse, the CRU believes that P.A. told the detective at this time that she could not identify anyone in the photo array, but the detective nevertheless encouraged her to select Foster by falsely telling her that three other witnesses had identified him as the shooter.[169]

---

[165] Canine officers can obtain a scent for a police dog to use for tracking purposes from objects at the scene. However, this was not done with this hat, and regardless the canine officer agreed in speaking to the CRU that it was completely against protocol for him to pick up an object on the scene and give it to the crime scene detectives. He could not think of why he would have done so here.

[166] The CRU did see in one photo of a different area an object that might have been a hat. But crime scene detectives said that they would have noticed a hat in that location, and no witness could confirm that this was in fact the hat.

[167] In light of this conclusion, it was not necessary for the CRU to consider even more unsavory possibilities such as the hat being "planted," and the CRU did not uncover evidence indicating that such was the case.

[168] *See supra* Section VI.A.

[169] *See supra* Section VI.B.

---

After a second witness identified Foster in a photo array,[170] Foster was arrested. He denied his complicity for many hours, but after being held overnight he eventually confessed, apparently in part because detectives falsely told him that a friend had named him as the shooter.[171]

A year later, the detectives learned that P.A. had identified an entirely different person, F.M., as Ice Cold and the perpetrator of a new shooting; the detectives knew at this point (if not earlier) that in fact F.M. was a top gang leader known as Ice Cold. The detectives could not have missed the significance of this development, yet it appears that they did not share this information with the prosecutor, resulting in a considerable *Brady* violation.[172] It would have been even more significant after Foster came forward months later to the prosecutor both to recant the confession and to independently say that he knew the shooter was a man named F.M., known as Ice Cold. Yet the police and the prosecutor did not pursue a theory that F.M. might have been the shooter.[173]

Finally, the primary detective testified at a pretrial hearing about how P.A. initially identified Foster as the shooter in the photo array: testimony that was false if in fact told her whom to select, as the CRU believes may have occurred.

**[The eyewitness] told the detective. . . that she could not select anyone in the photo array, but the detective nevertheless encouraged her to select [the defendant] by falsely telling her that three other witnesses had identified him as the shooter.**

### b.    Gold

As discussed above, the police investigation in Gold included a problematic witness identification procedure: the police showed C.E. a slanted lineup and prompted her to select Gold; then, when she did not identify him in the lineup, she identified Gold in a one-on-one show-up three days later. But there was compelling evidence that in fact the suggestion went even further than this, with Gold credibly writing later that C.E. only selected him after the detective threatened her and claimed she was having an affair with Gold.[174]

There were other aspects of the police conduct in this case that were troubling. First, Gold testified that he repeatedly asked for his lawyer in his interviews with police but was told that he did not need one. The CRU concluded that the police obtained statements from Gold apparently in violation of his right to counsel.[175]

Second, according to Gold's written account after trial, the detective told him at one point that he thought Gold was innocent, but that R.J. was involved in the murder. The detective allegedly asked him to implicate R.J. by saying that he saw R.J. running from the crime. When Gold declined to lie in that way, the detective allegedly said that he would have no problem getting R.J. to implicate the defendant. R.J. did in fact testify against defendant. Though the CRU could not and did not specifically determine whether Gold's account was accurate on this point, it did find that many varied pieces of Gold's account were corroborated, raising the possibility that much or all of it was true.

---

[170]  This witness, Y.R., was later unable to identify Foster as the shooter in a live lineup. He told the CRU that police did not direct him whom to pick in this photo array.

[171]  *See supra* Section VI.A. The police later did speak to this friend, D.L., who told them that he was not aware of any dispute between the defendant and the victim and did not believe the defendant had anything to do with the death.

[172]  *See supra* Section VI.D.

[173]  Following the proffer, the prosecutor did obtain an unsealing of the casefile of the other shooting to obtain a photo of F.M. for a photo array. And a detective notebook indicates that this process was started, but for unknown reasons it was never pursued.

[174]  *See supra* Section VI.B.

[175]  The court rejected the defense's attempt to exclude Gold's statements to police on this ground. Gold's trial predated the Supreme Court's decision in *Miranda v. Arizona* by two years.

---

### c.    Alvarez

Finally, the CRU had serious concerns with the candor and credibility of the key detective in the Alvarez case. As explained above, the CRU concluded that detectives likely fed Alvarez the false fact that the victim was stabbed (consistent with the initial police understanding), when in fact the victim was shot. Yet, at a pretrial hearing, the detective testified that, after denying his guilt repeatedly, Alvarez "spontaneously" told the detective he had more to say, and then confessed to stabbing the victim near the heart. The detective further testified that he had no substantive conversations with Alvarez between the denials and the "spontaneous" confession.

The CRU concluded that the detective's pretrial testimony could not have been truthful, given its conclusion that the fact of a "stabbing" was fed to Alvarez by police. And indeed, it later became clear that the detective asked Alvarez in the interrogation, "How do you explain the knife wound to the chest?"[176] Yet at trial, the detective continued to be evasive, refusing to admit that he confronted Alvarez with the "fact" of a stabbing, and even at times denying that he said things that he did say earlier in the trial.

False and evasive testimony by law enforcement is, of course, never acceptable. It was particularly significant here because it allowed the prosecutor to argue that the confession to a non-existent stabbing was merely Alvarez's attempt to minimize his guilt, rather than a fact fed to him by police. Thus, while the detective's credibility was presented to the jury at trial, the CRU concluded that the jury was not presented with all the facts needed to assess his veracity and the reliability of the alleged confession that his interrogation produced.

## F.    Prosecutor Conduct

It is well established that a government prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially."[177] When a criminal case involves error or misconduct by the prosecutor, not only does it risk undermining the fairness of the trial, but it undermines the role of the prosecutor as "a minister of justice and not simply that of an advocate."[178]

**When a criminal case involves error or misconduct by the prosecutor, not only does it risk undermining the fairness of the trial, but it undermines the role of the prosecutor as "a minister of justice and not simply that of an advocate."**

This section describes instances in which prosecutors fell short of this standard in cases the CRU examined. In many of the cases, prosecutors erred by bringing the case at all. In others, as discussed above, prosecutors failed to disclose important relevant evidence. And, in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial.

### 1.    The Decision to Prosecute

Among the most important decisions a prosecutor makes is the decision to prosecute. However the police conduct their investigation into a case, it is ultimately the responsibility of the prosecutor to review the evidence against the defendant and determine whether to proceed. This requires evaluating whether the available evidence is reliable and sufficient to prove the elements of a crime beyond a reasonable doubt and whether bringing that prosecution is in the interests of justice.

---

[176] The prosecutor told the jury in his opening statement that this is what the detective said, which he could only have learned from the detective himself.

[177] *Berger v. United States*, 295 U.S. 78, 88 (1935).

[178] N.Y. R. Prof. Conduct 3.8, Comment 1; *see People v. Savvides*, 136 N.E.2d 853, 855 (N.Y. 1956).

If these thresholds have not been met, then the case should continue to be investigated, or it should be dropped altogether. In a number of cases, the CRU determined that prosecutors proceeded on weak or contradictory evidence when they should have stayed their hand.

### a.    Reliability of Evidence

The most significant issue in these cases was whether the evidence was sufficiently reliable to prove guilt beyond a reasonable doubt. While the CRU admittedly benefited in some cases from new evidence that was not available to the prosecutors at the time,[179] many of the cases discussed in the false confession, eyewitness identification, and witness credibility sections above presented reliability issues and red flags that were available to prosecutors and should have been recognized. For instance, the CRU specifically noted critical reliability issues that were known or should have been known by prosecutors—and thus prosecutors should not have proceeded with the prosecution—in the cases of Davidson, Foster, and Oakley. In cases like Moore/Stevens, Alvarez, Bloom, Yeats/Watson, Gold, and Mitchell, the CRU specifically faulted prosecutors for not scrutinizing or investigating reliability issues before proceeding with the prosecution.[180]

**While the CRU admittedly benefited in some cases from new evidence that was not available to the prosecutors at the time, many of the cases discussed in the false confession, eyewitness identification, and witness credibility sections above presented reliability issues and red flags that were available to prosecutors and should have been recognized.**

**Importantly, the decision to prosecute is not a one-time decision. It is an ongoing decision that a prosecutor must reevaluate throughout the case as new information comes in.**

Importantly, the decision to prosecute is not a one-time decision. It is an ongoing decision that a prosecutor must reevaluate throughout the case as new information comes in. A few cases are instructive in this regard. In the Alvarez case, the CRU concluded that immediately after the confession, police and prosecutors reasonably believed that the defendant was guilty of the crime. As discussed above, however, that determination should have been rethought once the autopsy revealed that the victim had been shot, not stabbed.

Similarly, in the Dawson case, the CRU cited no issues with the initial decision to prosecute, as multiple witnesses credibly and consistently said that Dawson was the shooter. But when the prosecution's witnesses refused to testify at trial and the court gave the prosecutor 24 hours to come up with a witness, he was wrong to grab a lifeline in the form of witness A.L. As discussed above, A.L. came forward in suspicious circumstances, contradicted all the prior witnesses, and, it turns out, lied about her identity. The prosecution should have corroborated her identity and more closely scrutinized her testimony, being prepared to drop the case if not satisfied that she was being truthful.

In the Foster case, unlike in the Dawson case, the CRU concluded that the case indeed should never have been brought in the first place, as it was based on P.A.'s identification that the police and prosecutors knew or should have known

---

[179] *See infra* Section VI.H.

[180] As discussed above, *see supra* Section VI.E, the prosecution in Mitchell should not have been satisfied with the record, since the hat could not have been where the canine officer found it. The prosecution was also separately at fault for failing to develop a coherent chain of custody at trial. The hat was admitted into evidence even though none of the individuals who handled it could say that it was the same item they saw, documented, picked-up, packaged, or vouchered.

was problematic from the start.[181] But Foster was similar to Dawson in that the prosecutor failed adequately to account for new information after the case was filed. In particular, over a year after Foster's arrest, Foster came forward in a proffer to recant his confession, recounting a set of facts that matched two key pieces of evidence in the government's possession that he could not have known about through discovery in the case. Though he was rightly concerned enough about F.M. to seek an unsealing of the other shooting's casefile to show P.A. a photo array with F.M., for reasons unknown this photo array was never created.[182]

### b.      Sufficiency of Evidence

Not only must the evidence be reliable, it should—if credited by the jury at trial—be sufficient to establish beyond a reasonable doubt that each defendant committed the crime in question. In other words, if the prosecution's trial evidence is viewed in its strongest light, is it enough to support a guilty verdict?  In a few cases, the CRU concluded that even that low bar was not met.

In the Oakley case, the premise of the prosecution was that Oakley voted in a district that was not his real residence, through use of a sham residence that he purportedly used only as a mail drop. But the CRU determined that New York election law was quite relaxed on what was required: a person could have multiple residences, and even a meager connection to the residence was sufficient. Thus, even setting aside the credibility issues of the government's witnesses, it was far from clear that the charged conduct was even a crime at all.

Furthermore, the prosecution's case in Oakley suffered from what the CRU determined was a significant gap in the proof. The case was built on the testimony of *renters* of the apartment who claimed that Oakley was using the basement as a sham residence. But the prosecution did not have any testimony from the *owner* of the apartment—as she refused to cooperate—in particular about whether she was allowing Oakley to live in that basement *gratis*, without a lease. That was the circumstance with another apartment Oakley had used, for which prosecutors declined to prosecute Oakley.

There was also a failure of proof in the Martinez/Velasco/Vargas case. The evidence in that case was (1) the fire marshal's conclusion that the fire was set intentionally and (2) J.P.'s testimony about her grudges with the three defendants, that she saw them running away from the building shortly before the fire, and that one of the three defendants had earlier threatened to burn the building down. But the CRU found that there was nothing in her testimony that established what any of the three men did to accomplish the crime (either as principal or accomplice). The prosecution needed to prove that each of the three men shared the intent to burn the building down, and that each performed actions which effectuated or aided in that burning. There was no such proof—even if the problematic fire evidence and J.P. testimony were accepted. On that ground alone, the prosecution should not have been brought.

In the Green case, the defendant was convicted of reckless manslaughter, robbery, and burglary.[183] The CRU noted a lack of proof as to the reckless manslaughter count. Although Green had confessed to participating in the robbery/burglary of the victim's home, neither her confession nor any other evidence showed that Green did anything to aid the assault or that she shared the intent of her accomplice who she said conducted the assault. Such evidence should have been present to convict her of reckless manslaughter.[184]

---

[181]  The CRU concluded that the prosecutor never realized that Foster had been incarcerated during the wake that P.A. said she saw the shooter at, until the prosecutor was forced to stipulate to this at trial. The CRU found that to be severe error.

[182]  Another missed opportunity: the prosecutor requested and received, but appeared never to have reviewed, recordings of Foster's calls to friends and family from Riker's Island. As discussed below, *see infra* Section VI.H, these calls were strongly corroborative of Foster's innocence.

[183]  She was charged with, but acquitted, of felony murder.

[184]  Reckless manslaughter requires among other things proof that the defendant contributes to a substantial and unjustifiable risk that death will occur and knowing and consciously disregards that risk. Courts have consistently rejected the argument that robberies are inherently dangerous and thus any robbery that ends in violence supports a reckless manslaughter charge.

### c.    Abuse of Prosecutorial Discretion

Finally, even when the evidence is reliable and sufficient to prove guilt beyond a reasonable doubt, a prosecutor must consider whether bringing the prosecution is in the interests of justice. Part of that inquiry is whether the prosecution is brought for legitimate reasons. For nearly all of the cases discussed in this Report, this was not an issue: the crimes were rapes, robberies, or murders, *i.e.*, categories of offenses that most prosecutors have broad discretion to prioritize and pursue.

Oakley, however, was a different story. That charge—essentially for voting in a different district than the one in which the defendant actually resided—was not part of a far-ranging investigation to protect public integrity or enforce the law. Nor was it brought to punish a notorious or shocking act. Rather, it was clear from the history of the case that the prosecution was initiated and fueled by political opponents of Oakley. His opponents brought election actions against him, then sought an investigation by the Board of Elections, and eventually convinced the KCDA to pursue the issue as a criminal matter. While the CRU found no evidence of a direct instruction from senior leadership at KCDA to "get Patrick Oakley," it did find that KCDA tacitly went along with his opponents to do exactly that. Particularly as the case went through three contentious trials on a weak and insufficient case, the CRU found KCDA's prosecution of Oakley to be an abuse of prosecutorial discretion.

### 2.    Failure to Disclose Favorable Evidence

As discussed above, in ten cases, the CRU concluded that prosecutors likely failed to disclose relevant evidence to the defense in a manner that prevented the jury from fairly considering the defendant's guilt. As noted, it was not always apparent whether police had failed to provide the information to prosecutors or whether prosecutors knew of the information but failed to provide it to the defense—although the CRU's memoranda make clear that most of the non-disclosed evidence in these cases was found in KCDA files, suggesting that at least one member of the prosecution team had access to that information before trial. Answering this question may be important for accountability and prevention of future violations. When assessing the fairness of the convicted person's trial or plea, however, it does not matter which law enforcement officials failed in their obligation. Under both state and federal law, prosecutors bear ultimate responsibility to ensure that all discovery obligations and standards are met. Thus, the CRU recommended vacating all convictions where it appeared that favorable, material evidence was not disclosed, regardless of fault.

> In ten cases, the CRU concluded that prosecutors likely failed to disclose relevant evidence to the defense in a manner that prevented the jury from fairly considering the defendant's guilt. . . . Under both state and federal law, prosecutors bear ultimate responsibility to ensure that discover obligations and standards are met.

### 3.    Trial and Pretrial Hearings

A number of the CRU's exonerations involved misrepresentations by the prosecution (or its witnesses) during pre-trial hearings or at trial. Such misrepresentations are plainly problematic if they are intentional or made in bad faith.[185] But they can be just as problematic in terms of their effect on the jury or the outcome of the case when they are not made intentionally.[186]

---

[185]  *See, e.g., Berger*, 295 U.S. at 84-85.

[186]  *See Savvides*, 136 N.E.2d at 855 (explaining that a prosecutor's failure to "correct what he knows to be false and elicit the truth," even if his "silence was not the result of guile or a desire to prejudice[,] matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair").

The misrepresentations identified by the CRU occurred at different points during trial, including during (1) direct examinations, in which the prosecution presented its own witnesses; (2) cross examinations, in which the prosecution questioned the defendant or the defense's witnesses; and (3) openings and summations, when the prosecution previewed the case to the jury and summarized its view of the evidence, respectively.

### a.    Direct Examinations

In several cases, the CRU found that the prosecution did not meet its obligation to ensure that any testimony it introduced in support of its case was accurate and not misleading.[187]

**Eliciting False Testimony:** Just as prosecutors in most of the cases in which CRU recommended vacatur should have reconsidered their decision to prosecute in light of the unreliability of their evidence, so too should they have reconsidered putting forward witnesses with particularly problematic testimony. Thus, for example, in the Hicks case, the prosecutor elicited various testimony from witness N.K. that clearly was not true in light of the medical evidence; in the Lewis case, the prosecutor elicited testimony from witness N.L. that was provably false given her incarceration; and in the Harrison case, the prosecution elicited testimony from witness K.M. that he had never smoked crack in his life when he admitted to detectives he was high on crack at the time of the murder. Though the CRU found no evidence that the prosecutors had knowingly elicited this false testimony, it did constitute a failure of prosecutors to investigate their cases and thus fell far short of the expected standards.

> Just as prosecutors in most of the cases in which CRU recommended vacatur should have reconsidered their decision to prosecute in light of the unreliability of their evidence, so too should they have reconsidered putting forward witnesses with particularly problematic testimony.

Even more troubling was when prosecutors elicited false testimony and then, when provided specific information indicating that it was false, did not correct it. As discussed above, the CRU found in the Alvarez case that a detective involved in the investigation provided testimony at the suppression hearing that could not have been truthful when he said that Alvarez "spontaneously" confessed and that the detective had no substantive conversation with Alvarez before that. The prosecutor at the suppression hearing had the same information that the CRU has today and should have recognized this testimony was problematic and not elicited it. The problem was exacerbated when, at some point before trial, the detective told the trial prosecutor (who did not handle the suppression hearing) that he had asked Alvarez, "How do you explain the knife wound to the chest?" This confirmed that the detective was untruthful at the suppression hearing. The trial prosecutor had an obligation to correct the record with the court at this time, which likely would have necessitated a reopening of the hearing and perhaps, suppression of Alvarez's confession.[188]

Another failure to correct arose in the Martinez/Velasco/Vargas case. The fire marshal testified that investigators found "traces of flammable liquid" at the scene. The CRU concluded that this was a demonstrably false statement, as there was no laboratory test result or other physical evidence to support a finding of flammable liquid at the scene. The CRU found that the trial prosecutor either knew or should have known this statement was false and was ethically bound to correct the record but did not.

---

[187]  *See Giglio v. United States*, 405 U.S. 150, 153-154 (1972) (a prosecutor must correct the false testimony of a prosecution witness when it relates to a significant issue in the case); *People v. Colon*, 13 N.Y.3d 343, 349 (2009) (duty of fair dealing requires a prosecutor to correct knowingly false or mistaken material testimony of a prosecution witness).

[188]  The trial prosecutor did not handle the suppression hearing, but he is nevertheless expected to have reviewed those proceedings and thus that in no way alters his duty.

**Intentionally Misleading Testimony:** The most problematic example of misleading direct testimony was in the Wright case. In that case, the CRU found that the prosecutor intentionally created a misleading impression when presenting the testimony of a key witness.

As discussed above,[189] shortly after a lineup, the witness R.B. disavowed her identification, stating that she only identified Wright as someone who lived in her building and who she had known most of her life; she was not identifying him to as a perpetrator. With no usable eyewitness identification, the only evidence against Wright was his confession and the case should have been presented to the jury in that light. Instead, the prosecutor went to great lengths to have both R.B. and the detective testify about the lineup procedure—even though those procedures were entirely irrelevant—and thereby *imply* that R.B. had identified Wright as a perpetrator of the crime.

The prosecutor achieved this implication through a series of deceptive and misleadingly sequenced questions of R.B.:

- First, he had R.B. establish that two of the perpetrators were a man named Q.H. and someone who lived on the *second* floor of 265 Livonia.

- He then immediately had R.B. testify that the only people in the courtroom who lived at 265 Livonia were Zander Wright and his parents. But notably, his question left out what floor they lived on: Wright lived on the twelfth floor, *not* the second.

- The prosecutor ended his direct examination by having R.B. testify that she viewed a line-up and recognized Wright in that lineup. He asked her where she recognized him from, and she said, "as living in the building." But the prosecutor never established that R.B. had not identified Wright as a perpetrator or that Wright lived on the twelfth floor.

After this, the prosecutor had the police detective testify at length about the lineup procedures, including getting fillers who resembled the defendant to further underscore R.B. viewed the defendant in a lineup. None of this testimony was proper to elicit given R.B.'s disavowal because coupled with the testimony of R.B. and the jurors' understanding of the purpose of lineups, it likely would have made the jury believe that R.B. had identified Wright as the perpetrator.

This belief that R.B. identified Wright as a perpetrator would have been crystallized when, in response to cross-examination by the defense, the detective was permitted by the court to read to the jury his partner's notes of the lineup procedure, which stated that R.B. had identified Wright as a perpetrator.[190] This statement was clearly hearsay and should never have been permitted to be read to the jury.[191]

### b.  Improper Cross-Examinations

A main purpose of cross-examination is to discredit an adverse witness before the jury. But in two cases, the CRU found that the prosecutor improperly used cross-examination to put before the jury assertions or facts that would otherwise be inadmissible, unfairly prejudicial, or unsupported.

---

[189] *See supra* at Section VI.D.

[190] This testimony arose after the defense asked the detective whether getting a confession from the defendant was "particularly important" in this case, and the detective replied, "If he didn't get ID'ed it would have been." After further exchange about whether there had been an identification of the defendant as a shooter, the court invited the detective to read from his partner's notes.

[191] The defense did not object, nor did it request a limiting instruction to the jury that could have mitigated some of the damage.

---

> The most problematic example of misleading direct testimony was in the Wright case. In that case, the CRU found that the prosecutor intentionally created a misleading impression when presenting the testimony of a key witness.

Again, the Wright case provides the most problematic example. The prosecution's cross-examination of Wright was improper in several respects. First, the prosecutor asked Wright, "Do you have any reason why R.B. would frame you for a murder you say you didn't commit?" Building on an inappropriate direct examination, this would have further misled the jury to believe that R.B. had identified the defendant as a perpetrator, which she had not done.[192]

Second, the prosecutor improperly asked Wright whether the detective had told him that a co-defendant identified Wright as one of the shooters. This effectively permitted the prosecutor to communicate to the jury that a non-testifying co-defendant implicated Wright, without Wright having the opportunity to cross-examine this co-defendant and challenge this allegation. This was highly prejudicial and also may have violated Wright's rights under the Confrontation Clause in the U.S. Constitution.[193] In fact, New York courts have found such questioning in similar circumstances to be prosecutorial misconduct.[194]

Third, the prosecutor also named each of Wright's co-defendants and asked if the detective had told him that each had been convicted. Again, whether the detective said this had little if any relevance to Wright's guilt. The main purpose of this questioning was just to tell the jury about the co-defendants' convictions, improperly inviting them to convict Wright through guilt-by-association.

In the Harrison case, the CRU found the prosecution's cross-examination of the defendant to be problematic in various respects. Most notably, the prosecutor attempted to cast doubt on the defendant's claim regarding the nature and severity of his injuries (which were relevant to whether he was physically able to commit the assault), but had not subpoenaed his medical records.[195] In fact, there was no dispute that the defendant had been using two crutches on the night of the incident, and the CRU found that his medical records raised significant questions about his ability to carry out the heinous attack.[196]

### c.    Improper Openings and Summations

The CRU concluded that, in several cases, the prosecution misrepresented testimony or facts, or otherwise made inappropriate arguments in openings and summations. The issues can be grouped into a few categories.

**Repeating False or Baseless Witness Testimony:** One improper way that a prosecutor can misrepresent facts or mislead the jury in openings and summations is by suggesting facts that he knows not to be true, even if that suggestion is consistent with what a witness would or did say. In Foster, the prosecutor promised the jury in his opening statement: "[y]ou will hear from P.A. … she will tell you she saw somebody she knew from the street as Ice Cold." This careful phrasing might technically be proper in that it is what P.A. previously said. But the clear implication to the jury was that Foster—*i.e.*, the accused defendant standing trial before the jury—was in fact widely known by the name "Ice Cold;" by the time of the trial, the prosecutor undoubtedly knew this was false. He knew that Foster was

> **The CRU concluded that, in several cases, the prosecution misrepresented testimony or facts, or otherwise made inappropriate arguments in openings and summations.**

---

[192]  The CRU also found that defense counsel was ineffective for failing to object to this line of questioning, *see infra* Section VI.G.

[193]  *See Bruton v. United States*, 391 U.S. 123 (1968).

[194]  *People v. Manuel*, 182 A.D. 2d 711 (2d Dep't 1992); *People v. Johnson*, 777 N.Y.S.2d 190 (2d Dep't 2004).

[195]  The court sustained objections to this line of questioning and admonished the prosecutor.

[196]  Additionally, this cross-examination showed significant lack of preparedness and attention to detail. The prosecutor unsuccessfully tried to introduce a prior violent, bad act by the defendant that the prosecution had not previously disclosed. And in cross-examining another defense witness, the prosecution improperly implied that the witness had previously failed to come forward as an alibi witness when, in fact, that individual had done so.

known as "Scrappy" and that F.M. was known as "Ice Cold." The CRU found this statement particularly problematic, reasoning that, just as a prosecutor cannot allow a witness to testify to a fact he knows is false without immediately correcting it on the record, to impart information he knows is false directly to the jury himself is worse.

Similarly, a prosecutor should not emphasize testimony in summation—even when it is in evidence—if it is false or has no proper basis. In Martinez/Velasco/Vargas, the fire marshal estimated that to create a fire like the one in this case, about a half a gallon of accelerant would be required. There was no evidence that this conclusion was based on any scientific principles or that the fire marshal was trained to make such an estimate. The CRU accordingly concluded that the prosecutor was wrong to re-emphasize this testimony on summation, when he said: "We know. . . from Fire Marshal Cooper that something over a half of a gallon of an accelerant—we know it's gas because we have the testimony of Lieutenant Oliver—a half gallon is poured in her rear bedroom, a half."[197]

**Arguing for Credibility on False Premises:** In other circumstances, prosecutors wrongly argued for a witness's credibility on a basis that they should have known was false but for their failure to investigate. As discussed above, in the Hicks case, the sole eyewitness (N.K.) initially told a detective that she did not see the shooting. The prosecutor apparently did not see the detective's notes or understand their significance, and as a result she argued in summation (incorrectly) that after the witness saw the shooting she immediately told the police that she saw the defendant shoot the victim. The prosecutor made this point to suggest the witness was credible, but since it was inaccurate, she significantly misled the jury about the witness's credibility.

The prosecutor in Hicks further misled the jury about the witness's credibility when she argued that everything N.K. said was corroborated by the physical, medical, and ballistic evidence:

> So we have [N.K.] who's telling us what happened that day, and we have everything that she tells corroborated by the physical evidence, that the shooting happened in the vestibule…her testimony is supported by the Crime Scene detectives who found that ballistic evidence in this vestibule…[i]t's exactly what she told you, corroborated by the medical examiner."

None of this was true. As discussed above, the witness N.K.'s testimony was flatly inconsistent with all of this evidence, including evidence establishing that that the shooting clearly did *not* happen in the vestibule. The prosecutor must fairly present the evidence, and explain in summation why any inconsistencies do not give rise to reasonable doubt. The prosecutor cannot simply declare that the evidence corroborates the witness's testimony when it does not. The prosecutor's obligations to present the evidence fairly is not excused because the defense could have made—but failed to make—arguments about how the testimony was inconsistent with the physical evidence. Whatever the defense argues, the prosecutor must present the evidence fairly and then explain why any inconsistencies do not give rise to reasonable doubt.

**Mischaracterizing or Exaggerating Testimony:** Finally, in several cases, the prosecution mischaracterized or exaggerated testimony. As discussed above, in Davidson the prosecution improperly stated that the witness identified Davidson without ever having "seen [him] before in her life," without acknowledging that the witness had seen Davidson's photo in a photo array two days earlier (and did not select his photograph then). The CRU also found that the prosecution made a critical misrepresentation to the jury when it said that the second victim had testified that four, not three, men were involved in the crime; in fact, the second victim consistently reported (and testified) that only three perpetrators were present.

In Foster, a witness to the shooting identified the defendant in a photo array but did not identify him in a lineup. During cross-examination, defense counsel showed the witness a lineup photo and the witness said the defendant looked "more close" to the shooter but that he was "not 100% sure." In summation, the prosecution said that the witness had made an "in-court identification" of Foster. The CRU found that this was an exaggeration of the witness's

---

192  The names of the Fire Marshal and Lieutenant have been changed.

**426 YEARS:** An Examination of 25 Wrongful Convictions in Brooklyn, New York

testimony, and that it was bad faith for the prosecution to disingenuously argue that the witness's testimony was an "identification," and far more inculpatory than it actually had been.[198]

In Oakley, the prosecution called on rebuttal N.O., the former owner of the building who testified that she had not constructed an apartment in the basement. The prosecution improperly spun this testimony to argue that the basement was not habitable as a residence, and therefore Oakley's use of it was a sham. But she was not testifying about habitability, just whether she herself had designed it to be an apartment. In fact, the CRU found that the testimony, had it been fairly evaluated and presented by a prosecution more intent on finding a just result than securing a conviction, would actually have exculpated Oakley.

## G.    Defense Conduct

One of the protections that the Sixth Amendment to the U.S. Constitution ensures criminal defendants is "the right … to have the Assistance of Counsel for his defense."[199] As the U.S. Supreme Court has explained, "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled."[200] It is not enough, however, that "a person who happens to be a lawyer is present at the trial alongside the accused."[201] Instead, "the right to counsel is the right to the effective assistance of counsel," because only through effective assistance can counsel fulfill "the role necessary to ensure that the trial is fair."[202]

In assessing the reliability and integrity of the convictions it reviews, the CRU focuses primarily on the actions taken by the prosecution and other law enforcement agents. That is because prosecutors must satisfy themselves that a conviction would be just in the first instance, regardless of the defense offered. Nevertheless, the CRU sometimes evaluates the performance of defense attorneys to determine whether it contributed to an unfair result. This may be particularly relevant when assessing whether the jury was fully presented with the relevant facts and arguments such that the CRU can stand behind the jury's determination.

This section discusses the eight exonerations in which CRU concluded that a deficient performance by defense counsel contributed to an unjust result: Bloom, Davidson, Foster, Harrison, Moore/Stevens, Martinez/Velasco/Vargas, Gold, and Wright. Some of these cases involved failures to investigate and adequately prepare pretrial. At trial, the issues ranged

> **The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled." It is not enough, however, that "a person who happens to be a lawyer is present at the trial alongside the accused." Instead, "the right to counsel is the right to the effective assistance of counsel," because only through effective assistance can counsel fulfill "the role necessary to ensure that the trial is fair."**

---

[198] As discussed *supra* Section VI.C, the CRU also found severe error in the prosecution's failure to investigate the easily verified fact that the defendant was incarcerated during the event (a wake) at which the witness allegedly observed the shooter.

[199] U.S. CONST., amend. VI.

[200] *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (quotations omitted).

[201] *Id.*

[202] *Id.* at 685-686 (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[203] *See supra* Section VI.A.

from failing to make obvious and crucial arguments, actively hurting their clients' cases through counterproductive arguments, or failing to object to problematic conduct by prosecutors. Unfortunately, these cases at times revealed defense counsel who, plain and simple, seemed woefully underprepared for and uninterested in performing their vital role in the criminal justice system.

### 1.    Failures to Investigate

Perhaps the most problematic failure to investigate was in the Bloom case. As discussed above,[203] Bloom pleaded guilty to rape in the second degree notwithstanding a likely strong defense based on his own intellectual disability. Notations in the attorney's file show that he was aware that Bloom had difficulty comprehending matters, and the attorney had access to both Bloom himself and his medical records (while the prosecution did not). Yet, Bloom's attorney never investigated or even considered this possible defense.[204] When interviewed by CRU, the attorney said that he did not think that Bloom may have had an intellectual disability because Bloom readily admitted that he had engaged in sexual relations with the victim. Admitting to the act, of course, is irrelevant to his capacity to understand victim's consent to the act.

> **In Harrison, the defendant had serious physical limitations (including the fact that at the time of the crime, Harrison's leg was in a cast and he was unable to walk without crutches) that may have entirely prevented him from committing the violent murder of which he was accused. Yet his attorney failed to obtain his client's medical records and place them in evidence, and failed to call a medical expert at all at trial.**

To be sure, as emphasized above, the CRU also found it troubling that the police and prosecutors were not aware of the extent of, or even the existence of, any intellectual disability of Bloom. But with the most access to Bloom, the defense counsel was uniquely situated to advance this defense but failed to do so. The defense attorney then compounded his failure by advising Bloom—then a 63-year-old man with no arrest record—to plead guilty to the top count and a sentence in the mid-range of the statutory guidelines, plus the maximum post-release supervision, meaning that Bloom could have done no worse had he proceeded to trial and been found guilty by the jury.

Other cases provide additional examples of defense attorneys with an unfortunately incurious approach. Two involved the same defense attorney: Foster and Harrison. As discussed above, in the Foster case, during a proffer the defendant Foster discussed a different shooting purportedly committed by Ice Cold, the man whom Foster said was the actual shooter in Foster's case. Defense counsel never investigated that shooting or demanded relevant information about it from the government—in fact, the record shows that the defense attorney never hired an investigator at all. If he had, he likely would have discovered crucial impeachment evidence in the record of that other shooting.[205] And the attorney completely missed the particular significance of this proffer: he told the CRU that he thought Foster's story had been tailored to exploit the trial evidence, which was not true because the proffer came months before the defense counsel had received discovery.

In Harrison, the defendant had serious physical limitations (including the fact that at the time of the crime, Harrison's leg was in a cast and he was unable to walk without crutches) that may have entirely prevented him from committing

---

[203] *See supra* Section VI.A.

[204] Apart from being a potential full defense to the crime, evidence of Bloom's intellectual disability could have supported an attempt to obtain lower bail, to obtain special treatment or special services in jail, or to convince the prosecution or the court to offer a better plea disposition.

[205] That is, that P.A. had identified two different people as Ice Cold.  To be clear, as discussed above, it was primarily law enforcement's failing that this information was not affirmatively disclosed to the defense.  But the defense counsel's failure to inquire about the shooting that his own client raised was a missed opportunity to learn that key fact anyway.

---

the violent murder of which he was accused. Yet his attorney failed to obtain his client's medical records and place them in evidence, and failed to call a medical expert at all at trial.

## 2.    Deficiencies at Trial

Defense counsel's trial performance in several of these cases was problematic.

Most importantly for the CRU's purposes, in a number of cases the attorneys failed to put forward obvious arguments or evidence, many of which the CRU found compelling in its own analysis. This can be significant to the CRU because it means that the jury's verdict cannot be understood as rejecting these points:

- Miguel Foster's defense counsel inexplicably failed to call two witnesses who did not identify Foster in a lineup, or to elicit these no-hits from the detective on cross-examination.[206] One of these un-called witnesses even had said that he was "100% sure" that the shooter was not in the lineup.[207]

- First, consistent with his failure to seek medical records, Kevin Harrison's defense counsel failed to make the obvious argument that defendant's injuries made him simply physically incapable of carrying out the brutal crime. Second, the defense failed to request a crucial "missing witness" charge. There were two witnesses to the crime, but only one testified for the government at trial. The CRU determined that the defense would have been entitled to an instruction to the jury that it could infer that if the missing witness (S.N.) had testified, she would not have supported the prosecution's case. This charge alone should have created reasonable doubt, and yet the defense simply did not ask for it.

- Most crucially, the defense counsel for Brian Davidson failed to argue that during the lineup, N.W. may have simply recognized Davidson from the photo array shown to her two days earlier. He also failed to point out significant inconsistencies in her account, such as how Davidson did not match the victim's description of the alleged fourth perpetrator. And when he learned of prejudicial comments the detective made to the victim before the photo array, he failed to reopen the suppression hearing, thereby waiving the issue.

- Defense counsel in the Martinez/Velasco/Vargas case did not put in alibi defenses and failed to investigate sufficiently J.P.'s past, which might have revealed admissible evidence that she had lied about important matters in the past and that she had created a fire hazard in the building. They also failed to argue about the lack of physical evidence of arson, including that the lab test report failed to find evidence of accelerant.

- Scott Moore's lawyer failed to make any use of a report by his investigator indicating that a government's witness had made substantially inconsistent statements and had pointed to another person as the perpetrator.

At times, the lawyers were not just ineffective at making valuable arguments; they specifically took actions that made the case against their clients worse:

- First, when presented a government witness (Y.R.) who had *not* identified Miguel Foster in a lineup or at trial, defense counsel for no discernible reason gave him the lineup photo to look at on cross-examination. This was particularly dangerous because, unbeknownst to the jury but known to the defense, Y.R. had identified Foster in a prior photo array. Plus, Foster was the only person in the lineup photo sitting in the courtroom. This unsurprisingly led to Y.R. speculating that Foster looked "more close" to the shooter, which the prosecutor later mischaracterized as an "in-court identification."

---

[206] Bizarrely, the defense attorney did elicit that there were several no-hits on a different suspect's lineup, while failing to elicit the far more important fact that there were several no-hits on his client's lineup.

[207] The defense attorney spoke to this witness and said he decided not to call him for "strategic reasons," standard language to protect against a later claim of ineffective assistance. But it is difficult to imagine what these reasons were, particularly because the CRU spoke to this witness who was cooperative and said he would have testified if asked.

- Second, not only was the cross-examination of P.A. entirely ineffective (notwithstanding ample reasons to question her credibility, including that she claimed to see Foster at a wake that the defense could prove he was not at), the defense attorney managed to open the door to the introduction of grisly photos of the shooting victim which prejudiced his client.

- Scott Moore's lawyer had an unprepared Moore testify in a pre-trial hearing with no chance of success, creating a record that undermined his later trial testimony. He also put on obviously unprepared defense witnesses, who told inconsistent and contradictory stories.

More generally, many of the lawyers did not put forward anything approximating a vigorous defense. Moore's lawyer waived an opening statement (virtually unheard of in a murder trial), seldom asked prosecution witnesses any questions, seldom objected, and, when he participated in the defense at all, he was unprepared and unfamiliar with the basic facts. The attorneys for Velasco and Vargas also waived opening statement, and Martinez's lawyer's opening was entirely perfunctory. Davidson's lawyer told the jury in his summation, "I'm not going to be able to remember everything that was said" and indeed misstated a number of key facts and demonstrated a fundamental lack of understanding of the issues germane to his client's defense. And the lawyer who represented both Foster and Harrison gave perfunctory summations in both, lasting approximately twelve minutes each.[208]

Finally, in some cases the defense failed to object to improper prosecutorial conduct. To be clear, it is foremost the obligation of line prosecutors, their supervisors, and the elected District Attorney to ensure that prosecutors scrupulously work to do justice and adhere to the highest standards of conduct. And there may be legitimate strategic reasons (such as a desire not to further draw the jurors' attention to improper evidence or argument) not to lodge an objection mid-trial when misconduct occurs. At the same time, defense attorneys also have a role to play in this regard, and their failure to do so contributed to the unjust result in several cases here:

- While he may have been hampered in discovering, or worse if never provided, R.B.'s disavowal of the identification, Zander Wright's defense counsel should have objected to the extensive irrelevant testimony about the lineup procedure.[209] And he should have objected to the improper cross-examination that informed the jury a co-defendant's had implicated Wright and invited the jury to convict Wright through guilt-by-association.[210]

- Brian Davidson's defense attorney failed to object when the prosecution elicited impermissible testimony from a detective about a prior identification.[211] He also failed to object to multiple false statements and mischaracterizations of the record the prosecution made in summation.

- While the CRU faulted the prosecutor in the Gold case for his approach to disclosure (even under the less-protective law of the time), the CRU also found that the defense should have done more. Gold's defense attorney apparently made little or no effort to get discovery prior to trial and, even after getting favorable discovery rulings from the court, made no effort to delay the proceedings until the discovery was turned over—instead, he chose to complete all cross-examinations without receiving the ordered materials.

## H.    New Evidence and Expert Consultations

As the above sections reflect, the CRU seeks to investigate its cases thoroughly to identify any new evidence that may shed light on the case. This might include identifying new witnesses with relevant information, speaking to

---

[208] His cross-examination of P.A. similarly lasted no more than fifteen minutes. In a one-witness murder case, a usual defense counsel's cross-examination of the single witness can easily last a day or more.

[209] *See supra* Section VI.F.

[210] *See supra* Section VI.F.

[211] *See People v. Trowbridge*, 305 N.Y. 471 (1953).

previously known witnesses (including non-testifying) about the facts of the case, commissioning experts to analyze evidence that existed at the time of trial, or testing and analyzing new evidence that was not previously available. The CRU analyzes new or newly discovered information in an asymmetric way that is in favor of the defendant. New information that creates doubt about the defendants' guilt will be considered as a basis for exoneration. But new information that indicates guilt cannot save an otherwise wrongful conviction, because that evidence was not tested by a jury in court.

This section overviews the kinds of new evidence that the CRU obtained and explains how that evidence factored into its determinations to exonerate the defendants in these cases.

> **The CRU analyzes new or newly discovered information in an asymmetric way that is in favor of the defendant. New information that creates doubt about the defendants' guilt will be considered as a basis for exoneration. But new information that indicates guilt cannot save an otherwise wrongful conviction, because that evidence was not tested by a jury in court.**

### 1.    New Testimonial and Documentary Evidence

### a.    Statements of Defendants

In several cases, the CRU spoke with the convicted persons whose cases were under review or obtained other newly discovered statements from them that the CRU found significant in its recommendation to exonerate. Of course, not all such conversations were impactful—for instance, in Fitzgerald, Alvarez, and Warren—the CRU's conversations with the convicted persons did not meaningfully factor into the recommendation.[212] But in three cases—Gold, Foster, and Davidson—new or newly discovered statements from the convicted persons did play a role.

First, the CRU relied on a handwritten 28-page account that Gold prepared sometime shortly after his trial. Among other things, this account indicated that Gold overheard police threaten C.E. into identifying him. As explained above, the CRU found that the account had many indicia of reliability given how he described events that were verified by third parties and set forth facts that, if he were fabricating the events, should have been outside of his knowledge.[213] The CRU further noted that the report appeared to be a personal record of the events rather than something the defendant would use to convince anyone of his innocence.[214]

New and newly discovered statements from Foster were also significant to the CRU investigation. The CRU considered three such types of statements: (1) interviews that the CRU conducted with Foster, (2) recordings of calls he made from Rikers Island to family and friends after his arrest (that the prosecution did not review), and (3) a letter Foster sent to the victim's mother 2 years after his trial. Foster's story at a pretrial proffer and at trial was that local gang leader F.M., known as Ice Cold, came to Foster's house after the shooting to try to hide, and said that he (F.M.) killed the victim. Foster reiterated that narrative to the CRU, adding that F.M. promised to provide him and his family money for his silence while in prison, and that F.M. said the case against Foster would eventually fall apart and Foster could sue the city for even more. However, Foster said to the CRU, he eventually realized that F.M. had lied about helping him and the case falling apart, and so he came forward in the proffer about F.M.'s guilt when he felt it safe to do so.

The Rikers Island calls—which occurred well before the proffer or trial—corroborated this story. The CRU found that Foster seemed unguarded, natural and uncontrived on the calls. They showed him upset about F.M. not providing

---

[212] In fact, the CRU found there to be questions about Fitzgerald's credibility to the CRU, regarding what he knew and when about the actual perpetrator of the murder.

[213] *See supra* Section VI.B.

[214] For example, the CRU emphasized that, in discussing money taken from him by the police at the time of his arrest, the defendant did not use that as an opportunity to explain that he did not need to commit a robbery to get money.

him money, and initially confident that the case would be dismissed soon and he would be released; he even asked his mother to put a down payment on a car for him. Also corroborative was a letter Foster sent to the victim's mother 2 years after his trial, in which he explained that F.M. was the actual killer. Notably, the CRU found the letter to be highly personal and poignant, and not part of an orchestrated campaign to exonerate himself. In fact, Foster did not ask for any assistance and asked the victim's mother to keep the letter a secret. Overall, the CRU found that Foster has told a credible and consistent story for years about who committed the crime and how he came to falsely confess.

Finally, the CRU found similar credibility and consistency when speaking to Brian Davidson and his co-defendant. The CRU found Davidson to be calm and reasonable. The CRU also found it significant that he had maintained his innocence consistently since his initial arrest—including through each of his parole board appearances—even when doing so likely increased his time in prison. The CRU also found compelling the statement of a co-defendant who implicated himself in the crime but made clear that Davidson was not involved. That co-defendant's case was severed from Davidson's and then did not proceed because the victim could not testify due to her trauma; thus, the co-defendant had nothing to gain from speaking with the CRU and no reason to falsely exculpate Davidson. The co-defendant expressed great remorse, admitted his own involvement and that of others, and exonerated Davidson.

### b.    Statements of Third-Party Witnesses

Perhaps the most significant new testimonial evidence from third parties that the CRU relied upon are recantations of key prosecution witnesses. While courts generally disfavor witness recantations, the CRU found objective and compelling reasons to credit them in several cases.

As explained above, P.A. recanted her identification of Foster to the CRU, P.K. recanted in the Warren case, and (through her daughter), J.P. appears to have recanted her testimony shortly before she passed away in Martinez/Velasco/Vargas.[215] In addition, as also discussed above, in Oakley a witness did not so much recant as clarify that her testimony was not what the prosecutor spun it to be.[216] In conjunction with other evidence, the CRU determined that these recantations or clarifications were believable and thereby undermined the defendants' convictions.[217]

These exculpatory statements could also be from non-testifying witnesses. Two of Davidson's co-defendants told the CRU that Davidson was innocent and that they had perpetrated the robbery/rape with just one other individual. The CRU found both co-defendants' statements of Davidson's innocence to be credible. One co-defendant explained that he initially falsely implicated Davidson and did not speak out for years about his innocence because of a prior grudge. Eventually he did so when it weighed on his conscience, which was corroborated by letters he sent to the state on Davidson's behalf and his parole board hearings, in which he never mentioned Davidson's involvement. And the CRU found the other co-defendant to be an extremely credible witness who spoke remorsefully about what he had done. Notably, the CRU had not told that latter co-defendant whose conviction it was investigating, adding further credibility to his statement that Davidson was innocent.[218]

> Perhaps the most significant new testimonial evidence from third parties that the CRU relied upon are recantations of key prosecution witnesses. While courts generally disfavor witness recantations, the CRU found objective and compelling reasons to credit them in several cases.

---

[215] See supra Sections VI.B, VI.C.

[216] See supra Section VI.F.

[217] See supra Sections VI.B, VI.C, VI.F.

[218] The CRU was unable to locate M.Y., who like Z.A. had initially implicated Davidson to the police. But the CRU found it telling that in a 1995 parole interview, M.Y. only spoke of Z.A. and B.K. as co-perpetrators, not Davidson. The CRU found that M.Y. had initially implicated Davidson because he was pleading guilty and wanted to conform his plea to the government's theory.

New witnesses were particularly significant in the Foster case. The CRU spoke to Foster's family and friends who corroborated his narrative that F.M. came to the Fosters' house after the shooting. More significantly, a man named Y.G. came forward to say that he had been in prison with F.M., known as Ice Cold, when F.M. on several occasions admitted that he was the actual shooter in the murder charged to Foster.[219] Y.G., who had proven a credible informant as to other cases, was knowledgeable about F.M. and knew of Foster, and he provided information that the CRU was able to corroborate.[220] The CRU found that Y.G.'s account matched the defendant's in several respects, but also was satisfied that Y.G. and Foster did not get together to concoct their stories: Y.G.'s statement was offhand and came many years after the crime, at a time when Foster no longer was actively pressing his innocence.

Finally, in some cases government witnesses' conversations with the CRU further undermined their credibility.[221] In the Dawson case, the CRU learned that C.S had lied about her identity, and when she spoke with the CRU she was unable to describe the defendant or recognize him in a photo.[222] The fact that G.R., the victim's brother in the Dawson case, refused to speak to the CRU also was telling.

## 2.     New Expert and Scientific Evidence

Among the CRU's exonerations, seven cases (Bloom; Davidson; Hicks; Harrison; Mitchell; Martinez/Velasco/Vargas; Yeats/Watson) were based, at least in part, on new scientific evidence or expert consultation, including DNA analysis and consulting with experts in medicine, forensic psychology, and fire science.

In one case (Martinez/Velasco/Vargas), the CRU-retained expert found that scientific evidence provided in the original trial was not valid under modern standards. The other cases involved expert analysis, testing, or examination of medical records that had not occurred during the original proceedings.

### a.     DNA Evidence

DNA exonerations represent around 15% of all post-conviction exonerations in the U.S. justice system.[223] Among the CRU's exonerations, just two cases— Yeats/Watson and Mitchell—were based in part on DNA evidence.

In the Yeats/Watson case, the CRU found the results of new DNA analysis to be the most significant factor in its decision to vacate defendants' convictions. No DNA analysis had been conducted initially, as the technology existed in only rudimentary form at the time—the crime occurred in 1992 and the trials occurred in 1994, when comparatively large samples of biological material were required to obtain DNA results. As a result of one defendant's (Yeats) motion to vacate his conviction based in part on newly discovered evidence, however, the medical examiner used newly-available technology and tested DNA recovered from one victim's clothing as well as DNA from fingernail

> DNA exonerations represent around 15% of all post-conviction exonerations in the U.S. justice system.  Among the CRU's exonerations, just two cases—Yeats/Watson and Mitchell—were based in part on DNA evidence. . . . [In Yeats/Watson], the DNA profile recovered from the fingernail scrapings [of one victim] excluded both defendants and was also consistent with the DNA recovered from an unsolved homicide that occurred in 1999—5 years after the trials.

---

[219] In fact, Y.G.'s coming forward was what precipitated the CRU's investigation of this case.

[220] For instance, Y.G. was able to identify the basement hideout that F.M. would use after committing a crime. The CRU visited the common area of this basement and identified F.M. present there.

[221] See supra Section VI.C.

[222] See supra Section VI.C.

[223] Glinda S. Cooper et al., Innocents Who Plead Guilty: An Analysis of Patterns in DNA Exoneration Cases, 31 FED. SENTENCING REPORTER 234 (2019).

scrapings of another victim. The DNA profile recovered from the fingernail scrapings excluded both defendants, and was also consistent with the DNA recovered from an unsolved homicide that occurred in 1999—5 years after the trials.[224] Importantly, many of the circumstances of the 1999 homicide matched the circumstances of the Yeats/Watson case—*e.g.*, similar injuries, the victim was a drug abuser, and the victim was killed at a different location and the body was staged.

As discussed above, Mitchell's DNA was on a hat found outside the store where the shooting took place, evidence which the CRU concluded was fatally undermined because of serious questions about the police account regarding where that hat was found.[225] Another hat was found *inside* the store, with DNA from an unidentified major contributor and two unidentified minor contributors. The DNA found on this inside hat, however, was never analyzed against Mitchell's DNA profile, even though one witness claimed that the shooter had this hat and dropped it at the scene. At the CRU's request, the medical examiner's office performed this analysis and excluded Mitchell as a potential donor as to any of the DNA recovered on the inside hat.

This further undermined the verdict. In light of M.W's testimony, for Mitchell to have been the shooter, he would have had to possess the inside hat without leaving his DNA on it, drop that hat upon fleeing the location, and then either before or after, have disposed another hat with his DNA on it at some unknown location outside the store where no one but a canine officer would see it. The CRU determined this to be implausible.

> For Mitchell to have been the shooter, he would have had to possess the inside hat without leaving his DNA on it, drop that hat upon fleeing the location, and then either before or after, have disposed another hat with his DNA on it at some unknown location outside the store where no one but a canine officer would see it.

### b.    Fire Science

In Martinez/Velasco/Vargas, the three defendants were convicted of arson and felony murder based in part on the fire marshal's conclusion that the fire was set intentionally. The fire marshal based this conclusion on his determination that the fire originated in two separate locations and his determination that an accelerant was used.

During its investigation, the CRU reviewed a report prepared by a fire investigation expert recently retained by one of the defendants. This expert concluded that the fire marshal's determination that the fire was intentionally set was not supported by the evidence, based on the following:

1) While consistent with common understanding when the investigation was performed in 1980, the fire marshal's determination that the fire had multiple origins due to multiple low burn patterns does not comport with current knowledge. Modern fire science recognizes that those patterns can be explained by "flashover," where a fire gets so hot that the entire room catches on fire.

2) There was no reliable evidence to suggest that flammable fluid or accelerant was involved in starting the fire. Current fire protection standards provide against identifying the use of a flammable liquid through visual burn patterns, as the fire marshal did here. Rather, further testing or other corroboration is needed, but in this case lab tests came back negative for the presence of flammable liquids.[226]

---

[224] Yeats's DNA profile was recovered from the other another victim's clothing. But the CRU did not place much weight on this evidence because Yeats lived in this apartment and this was touch DNA that could have come from innocent contact with the victim. None of Watson's DNA was recovered from the items tested.

[225] *See supra* Section VI.E.

[226] It should be noted that accelerants can burn away completely, such that testing can be negative even when an accelerant is used.

---

3) The fire marshal likely carried expectation bias into his investigation due to the fact that he interviewed the key witness (J.P.)—who claimed the fire was a result of arson—before examining the scene of the fire.

The CRU consulted with another recognized fire investigations expert who generally agreed with this expert's conclusions. He said that there was not a single piece of evidence that would lead to the conclusion of an intentionally set fire under modern standards, and the fire cause should have been categorized as "undetermined."[227] The CRU concluded that the fact the jury was informed otherwise fatally undermined the verdict.

### c.    Medical Evidence

The CRU investigated two cases in which medical evidence contradicted the prosecution's theory regarding the details of the crime (Hicks) or the defendant's physical capacity to commit the crime (Harrison).

As discussed above, medical evidence contradicted the sole eyewitness's account of the shooting in the Hicks case.[228] The witness, N.K., testified that the shooting occurred within a small vestibule, and that, after being shot several times, the victim ran out of the vestibule down five stairs and out to the sidewalk where he collapsed.

**The CRU investigated two cases in which medical evidence contradicted the prosecution's theory regarding the details of the crime (Hicks) or the defendant's physical capacity to commit the crime (Harrison).**

The CRU consulted with a pathologist from the Office of the Chief Medical Examiner to determine the plausibility of the eyewitness's account. The doctor opined that, based on the injuries, the victim would have been immediately incapacitated, making it virtually impossible for him run from the vestibule some fifteen feet as the witness claimed he did.[229] Furthermore, he explained that, had the shooting taken place within the vestibule as N.K. claimed, there would have been blood both within the vestibule and on the sidewalk leading from the vestibule to where the victim was found near the curb.[230] No blood, however, was found in any of those places.

The CRU concluded that the medical and scientific evidence proved conclusively that the shooting did not occur as N.K. testified. As discussed above,[231] none of these anomalies or inconsistencies in the medical evidence was presented to the jury.

In Harrison, the defendant was convicted based on the premise that he beat the victim to death during a violent struggle and then dragged the victim's body some distance to where she was ultimately found. But the defendant's ability to commit such a crime was questionable based on the fact that he was injured and on crutches at the time.

During its investigation, the CRU obtained the defendant's medical records, which indicated that he had suffered two gunshot wounds less than a year prior to the crime. Furthermore, the records indicated that the defendant experienced several complications and additional surgeries due to the injuries and that those issues were not resolved in the months leading up to the crime. In fact, an examination from less than 3 weeks before the crime showed that the defendant's leg remained injured and that the defendant had to continue using crutches. Based on these

---

[227]  The CRU also interviewed the current fire chief marshal, who maintained that the fire had multiple origins and flashover was not the answer. He did concede that he could not come to a definitive conclusion that an ignitable liquid was used.

[228]  *See supra* Section VI.C.

[229]  The injuries included a broken ankle and a catastrophic gunshot wound to the heart.

[230]  The doctor also examined the paths and angles of the gunshot wounds sustained by the victim and concluded that this evidence (paired with the ballistic evidence indicating that two guns were discharged) indicated that there were in fact two shooters shooting from two locations, which is contrary to the witness's account there was only one shooter—the defendant.

[231]  *See supra* Sections VI.C, VI.F.

records, the CRU concluded that it would have been very difficult for the defendant to accomplish killing the victim and moving the body consistent with the prosecution's theory of the crime, which casts doubt on his guilt. The fact that the defendant's records were not obtained and entered into evidence contributed to the CRU's finding that the defendant was deprived of a fair trial.

### d.    Forensic Psychology

The CRU consulted with forensic psychology experts in two of the exoneration cases. In one case (Bloom), the experts identified issues with defendant's cognitive ability, and in the other (Davidson), the expert analyzed the record regarding the rape victim's eyewitness identification and observed the presence of multiple factors supporting a conclusion that she had unconsciously misidentified Davidson as one of her assailants.

As discussed above, Bloom pled guilty to raping a woman with intellectual disabilities, notwithstanding a potentially viable defense that he himself was too intellectually disabled to understand her ability to consent or the crime.

During its investigation, the CRU engaged a forensic psychologist to help determine the extent of the defendant's (and the victim's) intellectual disabilities. Based on mental status tests and review of medical records,[232] the psychologist concluded that the defendant suffered from significant neurocognitive disorder and possessed a low IQ equivalent to that of the victim and in the range of mental retardation. She opined that the defendant likely viewed the victim as his equal and could not understand or appreciate that the victim could not legally give consent. She further opined that the defendant was not even able to appreciate what he was pleading guilty to or being sentenced for, which was demonstrated by the defendant's confused responses during the plea proceedings.

On the basis of these conclusions—which was further supported by an expert independently retained by Bloom's post-conviction attorneys—the CRU determined that Bloom pled guilty to a crime which he may not have legally committed.[233] Furthermore, the CRU found that defendant's plea of guilty was probably unknowing and, consequently, involuntary.

As detailed above, the CRU retained an eyewitness identification expert who concluded that N.W.'s identification of Davidson in the rape/robbery was not reliable under modern psychological principles.[234] This expert found that N.W.'s inconsistent accounts over time and other factors demonstrated that she was not encoding memories properly due to the trauma of the attack.[235] Her ultimate identification of Davidson in a lineup can be explained by unconscious transference, given that just days prior she had been shown Davidson's photo in a photo array (and not identify him at that time).[236] The expert also explained how the certainty of the victim's identification in court was likely due to principles of commitment and confidence malleability, in which positive feedback and reinforcement makes the witness more certain of an erroneous identification.[237]

On the basis of these conclusions, the CRU concluded both that there was substantial doubt about the reliability of the rape victim's identification, and that the prosecution and defense's failures to appreciate the causes and risks of misidentification denied Davidson a fair trial.

---

[232] The defendant's biographical history and medical records revealed a previous severe head injury, family statements that the defendant had always been "slow" and "not too right in the head," and had a diagnosis of dementia shortly after his arrest.

[233] As discussed above, the CRU further faulted the defense, prosecution, and police for not recognizing this issue. *See supra* Sections VI.A, VI.G. The Court also should have recognized the issue based on Bloom' confusion during the plea and sentencing proceedings.

[234] *See supra* Section VI.B.

[235] *See supra* Section VI.B.

[236] *See supra* Section VI.B.

[237] *See supra* Section VI.B.

# VII. CONCLUSION

Understanding in some detail the systemic flaws that led to 25 wrongful convictions in Brooklyn, New York cannot cure the incalculable personal losses associated with them, but it may help to prevent future miscarriages of justice. As this Report explains, many factors at various stages of the criminal justice system may contribute to wrongful convictions: from interactions with police, prosecutors, defense lawyers, and judges, to unreliable science and human deceit or fallibility. The root causes identified by the CRU—induced false or unreliable confessions, eyewitness misidentifications, withholding favorable evidence, and incompetent defenses, among others—are all preventable. The common errors the CRU identified could have been avoided by the more faithful exercise of law enforcement functions, greater skepticism in investigations, discretion in prosecution, and diligence in defense.

Ultimately, we hope that the analysis here will help those involved in the criminal justice system and the public more broadly to determine what each of us must do to respond to systemic failures, to counter injustices, and to ensure that the tragedies of wrongful convictions do not continue. Of course, the Report also makes clear that conviction review units play a vital role. The hope is that existing and future conviction review units and innocence advocates across the country will have a better understanding of how to identify wrongful convictions and to address the many contributing factors that lead to wrongful convictions in the first instance.

# APPENDIX: CASE SUMMARIES

Consistent with the court order, the names of the defendants have been replaced with pseudonyms and witnesses are referred to only by initials, which have also been changed. The Report estimates the time served in prison to the nearest half-year, including any pre-trial jail time, by each wrongly convicted person based on the records available to the CRU at the time of this writing.

## Gold (1963)

*Dylan Gold pled guilty to Murder in the Second Degree and was sentenced to 30 years to life. After 9 years in prison, the New York governor commuted his sentence. The CRU recommended that Gold's plea be withdrawn given the problematic testimony of the prosecution's main witnesses, the likelihood that favorable information was withheld from defense counsel, and the fact that shortly after Gold pled guilty the law would change to provide substantial additional protections for criminal defendants.*

A gunman entered the home of J.E. demanding money. After J.E. refused, the intruder shot and killed J.E. in front of his wife, C.E., and two children. The police investigation revealed that the J.E. and C.E. had a stormy marriage and C.E. was having an affair.

The prosecution's case largely revolved around the testimony of R.J. and C.E. R.J., who had a lengthy criminal history, at first claimed not to know anything about the murder, but approximately a month after the shooting placed Gold near the crime scene. After he became the focus of the investigation, Gold gave the police a confused statement, which appeared to be taken in violation of his right to counsel, and he was placed in a lineup. Viewing the lineup, C.E. maintained that Gold was not the gunman, despite the detective's prompting and the grouping of men in the lineup that was apparently designed to make the defendant stand out. In a one-on-one show-up a few days later, however, C.E. identified Gold as the gunman. Gold was denied access to his lawyer throughout.

Gold was indicted for Murder in the First Degree, a charge that carried the death penalty at the time. Both R.J. and C.E. testified at trial, and C.E. identified the defendant in court. The young son of J.E. and C.E. also testified at trial but said that the perpetrator was not in the courtroom. Gold called three alibi witnesses, including his wife, who described what they had done the day J.E. was killed, and Gold's landlord, who testified that the defendant paid him rent in person on the day and around the time—but several miles from where—J.E. was killed.

Before trial concluded, Gold pled guilty to Murder in the Second Degree in order to avoid the death penalty. He was sentenced to 30 years to life in prison. Other than during his allocution, Gold consistently maintained his innocence. After serving 9 years in prison, the New York governor commuted Gold's sentence, and he was released to parole.

In reviewing this case, the CRU considered whether Gold's trial was fair under the law existing at the time and under current circumstances—a calculus made more complicated by the fact of Gold's guilty plea. Ultimately, the CRU had several concerns about the trial. First, CRU found multiple examples of impeachment material and potentially exculpatory evidence that was not turned over. C.E. was a key prosecution witness, but prior statements C.E. gave the police that could have been used to impeach her were not provided. Like C.E., R.J. was a critical but problematic witness. His statements putting Gold near the scene of the crime were critical for the prosecution, but questionable because he did not provide this information for months despite being interviewed by the police. Thus, impeaching his credibility was crucial, but the defense was not provided with evidence that he lied for the prosecution in a prior matter. Moreover, statements from another witness that could have provided the defense with an alternative theory of the crime also were withheld. Second, the CRU had significant concerns about the strength of the evidence. C.E.'s

in-court identification contradicted her prior inability to identify the defendant in a lineup and her son's testimony. In addition, the prosecution never really rebutted Gold's alibi, which was provided by credible witnesses and supported in part by his own testimony. Third, as to the plea itself, the CRU found there was pressure from both Gold's family and his own attorneys for him to plead guilty to avoid the death penalty. Finally, the legal landscape—in particular, the procedural safeguards to which the accused are entitled—significantly changed shortly after Gold pled guilty. The CRU found that, had Gold gone to trial after those changes, he may well have prevailed and likely would not have felt compelled to plead guilty.

## Martinez, Velasco, Vargas (1980)

*Lucas Martinez, Dante Velasco, and Milo Vargas were charged with one count of Arson in the Second Degree, and six counts of Murder in the Second Degree (felony murder) stemming from six deaths that occurred during a residential fire. They were convicted of all counts at trial and sentenced to concurrent terms of 25 years to life imprisonment on each of the six counts of Murder and 8 1/3 to 25 years to life imprisonment on the Arson in count. The CRU recommended that their convictions be vacated based on current understandings of fire science and issues with the prosecution's main witness's account. Velasco and Vargas each served approximately 32.5 years in prison. Martinez died in prison after close to 10 years.*

A fire destroyed a three-story residential building resulting in the deaths of six residents on the third floor. J.P., the owner of the building who lived on the second floor, reported to the police that she was in her kitchen when she heard the voices of the defendants speaking in Spanish in the common hallway, but decided not to investigate further. Shortly thereafter, she observed three men leaving her building and heard a loud "boom." She opened the door to her apartment and saw heavy black smoke coming from the first floor. J.P. said she knew the three men she observed leaving the building, the defendants, were responsible for the fire, because Martinez had threatened her the previous afternoon. The Fire Marshal determined that the fire originated in two separate and distinct locations on the first floor, both with the use of an accelerant, but the testing of the physical evidence did not support this conclusion; the tests for the presence of accelerant were negative.

At trial, J.P. told the jury a similar story. On cross examination, J.P. admitted that she previously supported herself by selling drugs, she pled guilty to a felony in connection with her drug arrest, and she was promised a sentence of probation in exchange for her testimony. She also admitted that she received a portion of the insurance payout from the fire. The Fire Marshal testified for the prosecution that, based on his investigation, there were two fires burning simultaneously, both of which had been enhanced by the use of an accelerant. Martinez's wife testified that he was at home at the time of the fire. Vargas's significant other testified that he was at home and asleep at the time of the fire. The jury found Martinez, Velasco, and Vargas guilty of Arson in the Second Degree and six counts of Murder in the Second Degree.

In finding the defendants' representation by their respective attorneys to be incompetent, the CRU noted that counsel for Martinez gave a two-sentence opening at trial while counsel for Velasco and Vargas each waived the right to make an opening statement. Counsel also chose not to produce character witnesses nor did they question J.P.'s character.

In 2015, the CRU interviewed J.P.'s daughters, L.P. and A.P., who lived with her at the time of the fire. L.P. described her mother as an alcoholic who lied frequently and stated that the first-floor apartment was vacant, unlocked, and frequented by drug users. A.P. recalled the regular use of candles in the first-floor apartment and stated that her mother ran wires to a streetlight for electricity since there was no power in the building. A.P. told the CRU that J.P. admitted on her deathbed that Martinez, Velasco, and Vargas were not responsible for the fire. The CRU found that J.P.'s statements to the police were inconsistent with one another and that she had motivation to lie.

The CRU also determined that modern understanding of fire science did not support the Fire Marshal's conclusion that there was a non-accidental fire caused by the use of an accelerant. Thus, modern science reflects that the jury should have been informed that the fire could also have been an accident. Had they been informed of this possibility, the jury would have been much more likely to find J.P.'s testimony incredible. This, combined with the additional evidence CRU discovered undermining J.P.'s testimony at trial, led the CRU to recommend that the conviction be vacated.

## Anderson and Jones (1985)

*Alan Anderson and Nathan Jones were convicted of Murder in the Second Degree. They were sentenced to 18 years to life in prison. The CRU recommended their convictions be vacated given inconsistent testimony offered at trial and the non-disclosure of materials important to the defense's ability to cross-examine witnesses. Jones served approximately 20 years in prison, and Anderson died in prison after 12 years.*

C.A. was shot and killed. When police arrived at the scene, Anderson was there along with J.L. and A.B., all of whom told police they arrived after the shooting.

Investigating detectives interviewed several people, including J.T., a nephew of the deceased. J.T. told the detectives that he saw Anderson shoot C.A. once in the arm, and when C.A. tried to run away, again in the back. J.T. stated that after the first shot, C.A. resisted and Jones attempted to rob C.A. Later, J.T. stated that he had seen C.A. with A.C., who told Anderson and Jones to rob C.A. J.T. indicated that "Duke" watched the attack and that he heard a woman say "Worldwide, why you shoot that man?" In a photo array, J.T. identified Anderson as "Worldwide," who shot C.A.; Jones as having taken money from C.A.; and J.L. as "Duke," who J.T. now stated held C.A. while Jones took the money. J.T. took a polygraph test. Two years later, detectives also interviewed E.F., who said she witnessed Anderson and Jones exchange shots with C.A. and that she saw Anderson take money from C.A. E.F. placed Duke at the scene as well.

At trial, J.T. testified that A.C. told a group of men to rob C.A. and that Anderson shot C.A. However, his trial testimony contradicted his earlier statements in a number of ways, including that Duke and someone named Jarron (the first time the name came up) chased C.A. and that "another guy" (not Jones) went through C.A.'s pockets for money. E.F. testified that she saw Anderson, Jones, and C.A. exchange gun shots, but there was no corroborating evidence that C.A. had a gun. E.F. testified that it was Anderson who took money from C.A. Consistent with her earlier statement, she testified she had seen Duke, but added that she had seen J.T. at the scene as well.

The CRU investigation found that J.T.'s polygraph materials, which contained statements inconsistent with his trial testimony, had not been turned over to the defense. Other detectives' files similarly may not have been disclosed, including notes of a witness's statement suggesting an alternative shooter. Although the CRU's view was that these notes did not necessarily constitute *Brady* material that the prosecution was constitutionally required to disclose, the CRU found the failure to disclose may have substantially hampered the defense and thus contributed to the unjust result. The CRU also noted the significance of the differing accounts offered by E.F. and J.T., inconsistencies in their own statements before and during trial, and E.F.'s inconsistencies with the physical evidence. Given these issues, the CRU determined that the defendants were denied a fair trial and that their convictions should be vacated.

## Moore and Stevens (1985)

*Scott Moore and Tony Stevens were convicted of murder, kidnapping, robbery, and weapons charges. Both men were sentenced to the maximum allowable term of imprisonment: 25 years to life. The CRU recommended vacating their convictions, which were unsupported—and in many instances directly contradicted—by physical or testimonial evidence. Moore served 29 years in prison and Stevens died in prison after 15 years.*

The victim was carjacked outside his home. Two boys who witnessed the crime told police that the assailants were two black men, one larger than the other, but the boys were too far away to describe facial features or make an identification. However, a woman washing her car nearby had been approached earlier that day by two black men, one larger than the other and one with braided hair. She believed that she would be able to identify the men.

The victim's body was found the next day. Police concluded that he had been shot with a .22 caliber revolver. They located the victim's burned-out car nearby and found a can of kerosene inside, which they traced to a local hardware store. They also determined that the victim's credit card had been used at a gas station after the murder.

Police spoke to two potential suspects—V.R. and K.C. They fit the witnesses' descriptions—two black men, one taller than the other and one with braided hair—and K.C. worked at the hardware store that was the source of the kerosene. But instead of displaying V.R. or K.C. to the witnesses, police pursued inculpatory information that K.C. gave about other individuals. K.C. said that "Prince" had been trying to sell a gun "with a body on it," but the gun actually belonged to "L." K.C.'s information led police to L.L., who said that the gun K.C. mentioned was his (without describing the gun in any way), but that he had given it to his aunt, who gave it to an acquaintance, who gave it to Stevens.

Police arrested Stevens, who confessed to the crime and named Moore, aka "Prince," as his accomplice and the triggerman. Police then took Moore into custody. He initially denied involvement but, when police said that Stevens had inculpated him, Moore confessed, saying that Stevens was the triggerman. Both Moore and Stevens later recanted these statements. At their joint trial, both testified that the lead detective had scripted and coerced their confessions and had told both that they could go home if they implicated the other.

The CRU concluded that there were strong reasons to doubt the confessions. First, fingerprints and DNA in the car did not match Moore or Stevens (or any plausible suspects). Second, L.L. was the only trial witness who linked either Moore or Stevens to the crime, his evidence was largely hearsay, and his aunt contradicted his claims. Third, Moore and Stevens did not match the witnesses' descriptions because they were both the same height. Fourth, the CRU found multiple other issues with the confessions (for example, neither Moore nor Stevens could drive, whereas the perpetrators drove the victim's car unremarkably for hours; neither mentioned taking the victim's wallet; and the confessions lacked detail, such as any description of the gun). Fifth, the CRU found V.R. and K.C. not credible and concluded that one or both may have played a role in the crime. Finally, the CRU concluded that Moore's counsel's performance was deficient citing to, among other issues, counsel's decision to waive an opening statement and seldomly objecting, indicating a general unpreparedness for trial.

## Warren (1986)

*Nicholas Warren was convicted of Burglary in the Second Degree. He was sentenced to 1.5 to 4.5 years' imprisonment and released from custody after serving the minimum term of his sentence. The CRU recommended that the conviction be vacated because it was based solely on the testimony of one witness, who admitted to fabricating the burglary. Warren served approximately 1.5 years in prison.*

As reported to the police, P.K. was sleeping in her bedroom with her granddaughter when she was awoken by a loud noise. She went into the living room and saw three men in her apartment, one of whom was holding a television. The man dropped the television, and all three men left. P.K. told police that Warren, whom she recognized because he had worked as a security guard in her apartment complex, was the man holding the television. P.K. also told police that some jewelry and a combination television/radio from her daughter's room were missing. Police did not find any usable fingerprints in the apartment or on any of the items allegedly handled by the intruders, and there was no sign of forced entry. Warren was arrested approximately a week after the alleged incident.

At trial, P.K. told the jury a similar story. For his defense, Warren called, among others, his sister, brother, and grandmother, who all testified that he was asleep at home the night of the purported burglary; a representative of the security company that employed him when he worked at P.K.'s apartment complex, who testified that their security guards did not have keys to individual apartments; and a security guard who testified that on the night Warren was arrested, P.K. told him that Warren had stolen her car; and a second security guard who said that P.K. offered him money and a promotion if he would testify against Warren. The jury found Warren guilty of Burglary in the Second Degree.

In 2015, P.K. was interviewed about the case. P.K. could not recall the burglary or a trial about the burglary and said she had never been burglarized, but she believed that Warren had stolen her car. P.K.'s daughter also said that she and the granddaughter were not living with P.K. at the time of the alleged burglary. When pressed, P.K. said she fabricated the burglary charges because she believed that Warren had stolen her car. Her recantation was credible in light of the testimony from other witnesses that cast doubt on the veracity of her claims. Because Warren's conviction was based solely on P.K.'s testimony, which no longer was plausible, the CRU recommended that his conviction be vacated.

## Davidson (1987)

*Brian Davidson was convicted of one count of Rape in the First Degree, two counts of Sodomy in the First Degree, one count of Robbery in the Second Degree, and two counts of Coercion in the First Degree for which the aggregate term of concurrent sentences was 19 to 57 years' imprisonment. The CRU recommended his conviction be vacated based on several factors, including its conclusion that the main witness for the prosecution had misidentified Davidson as one of her assailants. Davidson spent approximately 30 years in prison.*

While N.W. and O.C. were closing the restaurant where they worked, two masked men, at least one of whom displayed a handgun, demanded they open the restaurant safe and took approximately $3,000. N.W. was blindfolded and raped by each of the masked men and at least one additional perpetrator entered the restaurant and raped N.W. The perpetrators told O.C. to have sex with N.W., but he could not.

N.W. told the responding officers that she was raped by at least three black men. In later statements, she said there were four perpetrators. O.C. initially stated that he heard additional perpetrators join the first two intruders, but detectives' notes on his subsequent statements do not mention the additional entrants. N.W. and O.C. both gave a number of other accounts, which varied from their original statements including as to whether certain individuals had guns and how many men raped N.W. Medical records indicated N.W. told medical personnel she was raped by three people.

N.W. was presented with photo arrays on multiple occasions and in one identified Z.A., but she did not identify Davidson as a perpetrator. Three months after the incident, N.W. identified Davidson in a lineup, but only 2 days after seeing a photo array that included a photograph of Davidson (whom she did not identify) in which his appearance matched his appearance in the lineup. O.C., who was in a better position at the time of the crime to view and identify the perpetrators' facial features, did not identify Davidson.

At trial, O.C. testified that he saw three men in the room with N.W. at the time of the rape, maintaining as much when he was cross-examined on his prior statements indicating there were three or four men. O.C. had previously identified Z.A. in a line up and did so again in court. O.C. did not identify Davidson as one of the perpetrators and testified that he did not know whether Davidson was present. N.W. testified that there were two men who first entered the restaurant and raped her and then two more men, whom she identified as Z.A. and Davidson, arrived and raped her. On cross-examination, defense counsel elicited that N.W. had previously thought there were five people involved and that she could not place Davidson in the room.

The CRU consulted an expert in forensic psychology and eyewitness identification who reviewed the entire record and identified numerous factors that, in the expert's view, created a strong likelihood that the rape survivor had misidentified Davidson. The CRU concluded that Davidson was denied a fair trial in part based on these identification

issues, and further noted that defense counsel failed to argue key issues such as N.W.'s potentially tainted identification based on the photo array as opposed to recognizing him from the crime. The prosecutor exacerbated the issue by mischaracterizing N.W.'s testimony to suggest that N.W.'s identification was reliable because she had never seen Davidson before the lineup -- despite having seen him in the photo array. The CRU also noted that the prosecutor erred in eliciting testimony from the detective about the lineups, thus bolstering the credibility of N.W.'s potentially incorrect identification. Finally, both Z.A. and another co-defendant, B.K., admitted their own culpability to the CRU but stated that Davidson was not present during this crime. A third perpetrator who pled guilty described the actions of Z.A. and B.K. but never mentioned Davidson's name.

## Hart (1987)

*Ethan Hart was convicted of Murder in the Second Degree and sentenced to 18 years to life in prison. The CRU recommended that Hart's conviction be vacated due to serious concerns with the prosecution's main witness. Hart served 27 years in prison.*

Three men flagged down a cab, placed an injured B.G. in the back seat, and told the cab driver they would follow him to the nearest hospital. The three men did not in fact follow the cab, and B.G. was pronounced dead at the hospital of a single gunshot to the head.

The prosecution's case against Hart largely revolved around two witnesses: M.K. and L.R. M.K. claimed that she witnessed Hart shoot B.G. twice as a result of an argument over drugs and money. M.K., however, only came forward 2 months after the shooting; had previously claimed Hart was the perpetrator of a different murder and testified against him in that trial; offered inconsistent testimony, including between this case and the other case in which she testified against Hart; and had a criminal record and a history of drug use. L.R. testified that she overheard Hart admit to having killed B.G. The jury found Hart guilty of Murder in the Second Degree.

The CRU recommended that Hart's conviction be vacated because it had serious doubts that M.K. actually witnessed the murder. First, M.K. only came forward 2 months after the shooting despite having been in touch with detectives and prosecutors about other cases, including another case against Hart. Second, she only claimed to have witnessed B.G.'s murder after Hart had been released from prison in the other case and claimed to be looking for M.K. Third, M.K. became increasingly inconsistent and hostile over the course of the cases on which she cooperated with the KCDA. That progression, along with the fact that M.K. became increasingly erratic in her personal life, led the CRU to conclude that the prosecution's reliance on her as the principle witness undermined the integrity of the jury's fact-finding, the fairness of the trial, and the reliability of the verdict.

## Dawson (1988)

*Sonny Dawson was convicted of Criminal Possession of a Weapon in the Second Degree and sentenced to 7.5 to 15 years in prison. The CRU recommended that Dawson's conviction be vacated due to serious concerns about the credibility and reliability of the prosecution's main witness. Dawson served approximately 8 years in prison before being released on parole.*

One group of men in a car pulled over to another group standing on the sidewalk and an argument between the two groups ensued. According to witness statements and trial testimony, Dawson, who had been in the car, shot and killed G.B., who had been standing on the sidewalk.

The police interviewed D.A., F.J., and K.V., all of whom had been with G.B. at the time of the shooting (H.B. had been present as well but was not interviewed). Their statements were largely consistent, indicating that they saw Dawson

shoot G.B. F.J. and K.V. each identified Dawson as the shooter in a line-up as well. When those witnesses refused to testify at Dawson's trial, however, the prosecution at the last minute called A.L. to testify. A.L. testified that she had observed the shooting, but never told police. About 1 month after the shooting, A.L. told G.R., G.B.'s brother, what she had seen. A.L. stated that she had coincidentally called G.R. during the trial on the same day that the prosecution's other witnesses refused to testify and then agreed to testify the next day. A.L. was the only trial witness to identify Dawson as G.B.'s shooter.

The CRU recommended that Dawson's conviction be vacated given the substantial issues with the substance of A.L.'s testimony and the dubious timing of A.L.'s appearance. In particular, A.L. testified at trial under a false name, gave a false year of birth, and offered misleading statements about where she lived. Her testimony about the shooting also contradicted that of other witnesses. Importantly, the location where she claims to have seen Dawson prior to the shooting and the direction she claims to have seen him run conflict with accounts given by other witnesses with no reason to lie. This discrepancy is particularly problematic because the location and directions described by the other witnesses would have made it difficult if not impossible for A.L. to have seen what she claimed. The only identification A.L. made of Dawson was an in-court identification; she could not identify him in a photo line-up the CRU showed her, and her description of the shooter did not resemble Dawson. The CRU found that A.L.'s false statements about her identity limited the defense's ability to investigate and effectively cross-examine her at trial, depriving the jury of the ability to assess A.L.'s credibility.

## Fitzgerald (1989)

*Nathan Fitzgerald was convicted of Murder in the Second Degree and was sentenced to 25 years to life in prison. The CRU recommended his conviction be vacated based principally on the recantation of the sole identifying witness and the apparent failure to disclose a key document to the defense that directly supported Fitzgerald's alibi. Fitzgerald served approximately 24.5 years in prison.*

T.Y. was shot on a sidewalk in Brooklyn and pronounced dead at the hospital. The responding officers traced a blood trail to the window of an apartment where K.P. lived. In a police interview, K.P. indicated that on the previous day, two individuals who worked in the drug trade for Fitzgerald hid some money in her home. When the two individuals returned that day to retrieve the money, they claimed $200 was missing. The two individuals returned with a third person to take K.P.'s microwave in lieu of the missing money. Later that evening, the deceased came to K.P.'s apartment, and when K.P. described what had occurred, he told her he would get the microwave back. The investigation yielded only one witness—B.L.—who claimed to have seen the shooting and the perpetrators. When B.L. was interviewed, she told the police that on the night of the shooting, she saw the deceased arguing with Fitzgerald's "boys" and that she saw Fitzgerald and someone she knew as "D" pull out guns and shoot at T.Y. B.L. positively identified Fitzgerald in a photo array and in a confirmatory show up as one of the two people she saw shoot the deceased. In a police interview and a taped statement to the ADAs, Fitzgerald stated that he was in Florida with family at the time of the murder, and he told the police the hotel and rooms in which he and his family stayed.

At trial, B.L. testified that she saw Fitzgerald and a person known as "D" each fire shots at the deceased, whom she saw run down an alleyway holding his head. B.L. also testified that she then saw Fitzgerald and D drive away from the scene, and saw the deceased lying on the ground. The defense focused on Fitzgerald's alibi that he was in Florida with his family at the time of the shooting. In support of the alibi, the defense produced plane tickets, hotel reservations, home video, and testimony from Fitzgerald's family members. Fitzgerald did not testify at trial. The jury returned a guilty verdict on all counts.

After the verdict, but before sentencing, B.L. recanted her trial testimony in a sworn affidavit. At an evidentiary hearing on a defense motion to set aside the verdict, B.L. testified that she had lied to police, to the District Attorney's Office, to the grand jury, and at trial when she stated she had observed Fitzgerald and D shoot the deceased. B.L. testified she had fabricated Fitzgerald's participation in the murder to avoid being arrested after being caught sleeping in a stolen van. The judge denied the motion to set aside the verdict, stating that he did not find B.L.'s recantation credible. Fitzgerald was sentenced to 25 years to life in prison.

The CRU investigation found a Florida hotel receipt in the case detective's and prosecution's case file that had been taken from the defendant at the time of his arrest, showing payment of a phone bill on the evening of the shooting. This evidence was critical because it tended to support the central defense at trial: that Fitzgerald was in Florida at the time of the murder, and thus could not have been the shooter as the prosecution's witness testified. The receipt was never introduced into evidence, and the defense attorney told the CRU that the item was not disclosed. The CRU also discovered a credible witness who supported Fitzgerald's claim that he was in Florida when the shooting occurred, which further highlighted the importance of the withheld receipt. The CRU concluded that the failure to disclose the receipt resulted in an unfair trial. Because of this compelling new alibi evidence and the fact that the sole identifying witness had already recanted her testimony, the CRU recommended that the conviction be vacated.

## Green (1991)

*Carly Green was convicted of Manslaughter in the Second Degree, Robbery in the First Degree, and Burglary in the Second Degree. She was sentenced to 5 to 15 years' imprisonment. Given the issues with Green's confession—the sole piece of evidence upon which the prosecution was based—the CRU recommended that Green's conviction be vacated. Green served approximately 10 years in prison.*

H.W. was assaulted inside his first-floor apartment and suffered a subdural hematoma, among other injuries. He was taken to the hospital where he underwent two operations and lapsed into a post-surgical coma. He died several months later, with the cause of death determined to be a homicide.

Investigating detectives interviewed K.W., H.W.'s daughter, who stated that H.W. told her that he was attacked by "three girls": one who hit him with a crib leg, another who hit him with his cane, and a third who hit him with her hands. K.W. did not testify to H.W.'s description of the three women assailants because that description was deemed non-admissible hearsay. The detectives got descriptions of women who were known to visit H.W. and, a month after H.W.'s death and 6 months after the assault, approached the defendant because she fit one of those descriptions. At that point, Green gave a non-Mirandized statement that a woman known as "Deja" admitted to assaulting H.W. with an accomplice. The detectives interviewed K.P., who also went by "Deja." Shortly thereafter K.P. denied any involvement in the assault and implicated two other women. Green and K.P. both agreed to take polygraph tests, but they were not administered until five years later. After the detectives informed Green that her polygraph test indicated deception, she gave a written and videotaped confession. K.P. also gave a statement after failing the polygraph test but was not arrested and did not testify at trial.

The chief issue at trial was the voluntariness of Green's confession. Green alleged that one of the detectives told her that he had physical evidence connecting her to the crime, insisted that she was lying, and promised that she could go home once she confessed. She also alleged that the detectives fed her the details of the crime that constituted her confession.

The CRU concluded that there were enough factual errors in Green's confession to cast serious doubt on its reliability. Her confession contained multiple statements that conflicted with known physical evidence and with information

provided by H.W.'s daughter. The CRU did not find that the detectives engaged in illegal, immoral, or unethical conduct during the questioning, but did conclude that the detectives' targeting of the defendant was not the result of a reasoned re-examination of the case and that the flaws in the confession should have been evident before she was prosecuted.

## Hicks (1991)

*Robert Hicks was convicted of Murder in the Second Degree and sentenced to a prison term of 25 years to life. The CRU recommended vacatur because medical and scientific evidence proved that the prosecution's main witness testified falsely. Hicks served approximately 20.5 years in prison and was placed on lifetime parole.*

The deceased, R.S., was found lying face down in front of an apartment building with multiple gunshot wounds. The investigating officers found deformed bullets and discharged shell casings near the deceased's body and in the vestibule of the apartment building. No blood was found inside or outside the building, except near the deceased's body. N.K., initially identifying herself as E.L., told a detective that she was at a nearby store at the time of the shooting. The detective did not create an official report of this version of events, but he wrote a summary of the interview in his notebook. Later, N.K. (under her real name) told a different detective that she was present during the shooting and identified Hicks as the shooter. According to N.K.'s second statement, she and R.S. spent the night before the shooting in R.S.'s sister's apartment. On the morning of the incident, R.S. accompanied N.K. downstairs to the vestibule of the building where Hicks, along with three accomplices, approached R.S. One of the accomplices handed Hicks a gun, and Hicks shot at R.S. in the vestibule before running away. N.K. claimed that R.S. started to run after them but collapsed on the sidewalk.

At trial, N.K. told the jury a similar story. The defense confronted N.K. with a sworn affidavit detailing N.K.'s recantation of this version of events. N.K. claimed that Hicks threatened her family and pressured her into recanting. During trial, the prosecution told defense counsel that she did not know who E.J. was, though in fact, N.K. and E.J. were the same person, and E.J. initially told the investigating detective that she was not present at the scene. Defense counsel did not question N.K. on the subject. The defense did not call any additional witnesses but noted that two alibi witnesses—who were unavailable to testify—had come forward. After his conviction, Hicks pursued various appeals on grounds of ineffective assistance of counsel and actual innocence. Ultimately, he secured an appellate ruling remanding his case for a hearing on his actual innocence claim, at which time the CRU was assigned to independently review the case.

The CRU reviewed the medical and scientific evidence and found that it proved conclusively that the testimony of N.K.—the prosecution's sole witness at trial—was false. The nature of R.S.'s wounds made it unlikely, if not impossible, for him to run after his assailants as N.K. had claimed. N.K.'s statement that the shooting occurred inside the vestibule was not supported by any evidence of blood inside or around the vestibule or any evidence on R.S.'s clothing that he was shot in close range. The CRU noted that there was ballistic evidence supporting a finding that two different guns were used in the shooting, in contrast to N.K.'s claim that Hicks was the lone shooter. The CRU also found that the failure of the prosecution to identify N.K. and E.J. as the same person—and worse, the prosecutor's erroneous representation to defense counsel that they were different people—resulted in a failure to disclose a material, prior inconsistent statement from N.K. and violated Hicks's right to due process.

## Harrison (1991)

*Kevin Harrison was convicted of Murder in the Second Degree. He was sentenced to a term of 25 years to life. The CRU recommended that his conviction be vacated largely due to problems with the sole identifying witness at trial and because Harrison's physical condition at the time would have made it difficult for him to commit the crime. Harrison served approximately 25 years in prison.*

C.M. was found dead in a park one night. She was nude, had been strangled and badly beaten around the head, and had been dragged some distance. The police interviewed several individuals as part of the investigation, a couple of whom indicated that Harrison had been with C.M. the night she was found dead. Harrison told the police that he had been at C.M.'s home that night, but that C.M. left the home to buy crack cocaine and Harrison left before she returned.

L.M., who was in custody on other charges, told police officers that he was walking through a park with S.N. the night C.M. was found and that they witnessed a screaming woman lying on the ground and a man he knew from the neighborhood strike her. At one point, L.M. said that the man had a crutch with him, and at another point he said he was not sure but that the man he knew from the neighborhood often walked with a crutch. Detectives' notes indicate that L.M. witnessed the incident while under the influence of crack cocaine and that L.M. initially identified a man other than Harrison as the perpetrator. Those notes never were turned over to defense counsel. In a subsequent lineup, L.M. identified Harrison as the perpetrator. In another lineup, S.N. initially stated that she was not sure whether the perpetrator was included. The detective then asked each individual in the lineup to walk up to the one-way mirror, at which point S.N. identified Harrison as the perpetrator.

Harrison was tried twice. The first trial ended in a mistrial when the trial judge took the unusual step of finding defense counsel ineffective as a matter of law. During the second trial, L.M. testified that he had never smoked crack—a false claim that the prosecution did not correct. And despite the fact that during the first trial, L.M. testified that he initially identified someone else he thought resembled the assailant, that issue was not raised during the second trial. Further, police notes indicating he unequivocally identified this other individual (which conflicted with his testimony that described the identification as equivocal) were not disclosed. Finally, L.M.'s testimony indicated that the nighttime conditions under which he witnessed the incident were poor. Medical testimony indicated that C.M.'s injuries required a significant degree of force, but Harrison testified that, on the night of the incident, he had a cast on his leg and was using crutches due to a gunshot wound. On cross-examination, the prosecution appeared unprepared and followed irrelevant or inappropriate lines of questioning.

The CRU recommended that Harrison's conviction be vacated. The chief reason was that L.M. was the sole identifying witness at trial and his testimony was highly problematic: the physical circumstances under which he observed the incident were poor; his memory of whether the perpetrator had a crutch was inconsistent; and the jury was not informed that he identified another individual as the perpetrator or that L.M. had smoked crack cocaine the day he witnessed the incident. In addition, the CRU concluded that the evidence of L.M.'s other possibly unequivocal identification and drug use was never turned over to defense counsel. So too was S.N.'s identification of L.M. in the lineup problematic as he had likely limped when the detective asked him to step forward. Finally, from what is known of Harrison's physical condition at the time, it would have been difficult, if not impossible, for him to commit the close-range, violent crime that was depicted through the trial testimony.

## Oakley (1992)

*Patrick Oakley was charged with various election fraud crimes. After three separate trials, he was convicted on all counts and sentenced to probation. The CRU concluded that his conviction was politically motivated and recommended that it be vacated. Oakley did not spend any time in prison.*

Oakley resided, campaigned for office, and voted in his district from one address ("Address A") for several years. After redistricting rendered Address A outside of this district, Oakley claimed a residence in a basement apartment of a building still within the newly redrawn lines of his prior district ("Address B"). He subsequently voted in five elections over the course of one year under Address B. During that time period, he continued to maintain a lease, pay for utilities, and receive mail at Address A.

Challenges to Oakley's residency first arose during Oakley's campaigns for local offices against incumbents in the district where Address B was located. For several years, Oakley and his adversaries engaged in mutual challenges to each other's candidacy, including by alleging residency fraud. Oakley's adversaries brought two cases to the local Elections Board contesting Oakley's residency in the district, both of which terminated without any finding against Oakley. Despite the lack of rulings against Oakley, one of Oakley's political opponents sought the intervention of the state Elections Board. In coordination with Oakley's adversaries, the state Elections Board eventually sent the file on Oakley to the KCDA. The KCDA opened a grand jury investigation to consider Oakley's alleged criminal conduct with respect to his residency.

The prosecution's evidence in all three trials included testimony that Oakley's voter registration listed Address B during the contested period, that Oakley maintained his residence at Address A, and that Oakley never took up residence at Address B as the basement apartment where Oakley claimed to reside was uninhabitable. V.C. and J.Q., the prosecution witnesses who testified to the last point, were both heavily impeached on their criminal records, and both expressed open hostility toward Oakley. They testified that in exchange for their lying to others that Oakley in fact resided there, Oakley agreed to pay a sanitation summons. The defense, on the other hand, submitted documentary evidence that Oakley received important mail at Address B, and introduced testimony from friends, neighbors, and family members who had seen Oakley in or around Address B during the subject period. Oakley testified that his former girlfriend, M.L., owned the Address B building and allowed him to stay there free of charge until she sold the building to V.C. and J.Q., after which Oakley moved out. In the third trial that resulted in Oakley's conviction, the prosecution elicited testimony from N.O., the former owner of the building, who said that she and her husband did not construct an apartment in the basement and that she did not allow her son and his family to stay in the basement. She did not testify that the basement was uninhabitable, but by asking very narrow questions, the prosecutor elicited testimony that left this impression and then in his summation, the prosecutor presented her testimony to make it seem that she had testified as such.

During its investigation, the CRU found that V.C.'s and J.Q.'s testimony was not corroborated by any evidence, and in the case of the sanitation summons, contradicted as the summons in question was not issued until after Oakley left that residence. With regard to the prosecution, the CRU determined that Oakley was subject to a politically motivated prosecution and that the way the prosecution presented N.O.'s testimony was misleading.

## Yeats and Watson (1992)

*Julian Yeats and Curtis Watson each were charged with three counts of Murder in the Second Degree and both defendants were convicted at trial. Based on newly discovered DNA evidence, which excluded both Yeats and Watson and was consistent with DNA from the scene of another unsolved homicide, the CRU recommended their convictions be vacated. Yeats and Watson each served approximately 21.5 years in prison.*

Three victims of an apparent homicide were found in an apartment: a 40-year-old woman, S.Y.; her 12-year-old daughter, J.Y.; and her daughter's friend, also 12, N.H. All three had been repeatedly stabbed in the chest, their wrists bound, and electrical wire tied around their necks. The two girls also had their clothing pulled back and were partially exposed, but neither had been the victim of a sexual assault.

Yeats, then 18 years old, also lived in the apartment with his mother, S.Y., and sister, J.Y. Yeats discovered the bodies around 6:45 A.M. and told his uncle what he had found. Yeats and his uncle called 911. Yeats voluntarily went to the police station with the responding officers. Yeats's friend, Curtis Watson, accompanied him to the precinct. Yeats gave the police a statement, indicating that he had been with Watson the night before starting around 8 P.M. and returning home around 6 A.M. Watson confirmed this timeline in a separate statement. W.E., a friend of Yeats and Watson, however, stated that he dropped off the two defendants in a park some ways away from the Yeats apartment around 3:00 A.M.

Detectives spoke again with both Yeats and Watson. Watson, who stated he was 17 years old but was in fact only 15, was interviewed without a parent or guardian present (whom a 15-year-old would have been entitled to have present). Watson confessed to the three murders, stating that W.E.'s account of the timeline was correct. Watson told detectives that upon returning to the Yeats apartment, Yeats stabbed his mother, with Watson holding her. Yeats and Watson then removed the clothing of the girls, who were asleep in another room, and fondled them. When the girls woke up, Yeats and Watson stabbed them. After being told Watson confessed, Yeats confessed as well.

Watson was tried first and convicted of the three murders. Watson testified against Yeats at his trial, which resulted in a hung jury. Upon retrial, Yeats was convicted as well. During Yeats's appeals process, a judge granted his motion for post-conviction DNA testing. The results showed a mixture of DNA under S.Y.'s nails, including from a male that did not match any known offenders, but did match DNA recovered in an unsolved homicide that had similarities to the murders in the Yeats apartment.

In addition to the exculpatory DNA evidence, the CRU found that the two confessions were inconsistent with the medical evidence in several respects. Neither Yeats nor Watson said they strangled the victims, who, in addition to being stabbed, were strangled. The time frame described in the confessions was likely inaccurate given the amount of activity done purportedly in a short period of time. Moreover, that time frame conflicted with medical evidence. The CRU also noted that Watson's confession was the uncounseled statement of a 15-year-old, further adding to the CRU's serious concerns about its reliability and voluntariness. Ultimately, the CRU found that the DNA test results—including the consistent foreign DNA profile that was also found in an unrelated, similar homicide—constituted newly discovered evidence which alone was sufficient to recommended that both convictions be vacated.

## Wright (1995)

*Zander Wright was convicted of several charges, including Felony Murder. He was sentenced to 25 years to life on that charge. The CRU recommended his conviction be vacated based on multiple factors that denied him a fair trial, including that the prosecutor elicited inadmissible testimony regarding a witness's alleged identification and likely failed to disclose critical evidence to the contrary. Wright served approximately 20 years in prison.*

As many as eight armed males entered an apartment in which there were eight individuals, demanding money and drugs. At least two of the intruders shot guns as they left, injuring four victims and killing another. The other three individuals in the apartment were not shot, but one suffered burns to his face.

Over the course of the investigation, police interviewed all but one of the people who were in the apartment as well as other witnesses who lived in the same apartment building. According to police reports, R.B., who was one of the victims shot during the incident, positively identified seven males in a photo array, including Wright, as involved in the robbery and shooting.

Wright was arrested and allegedly stated to the investigating detectives that he was at the apartment, had a gun, and was involved in the robbery along with others he named. The same day, in police custody, Wright made a videotaped statement confessing that he participated as a look-out in the felony murder that was inconsistent in several key respects with his first statement. For example, in the taped statement, he said that he had never entered the apartment.

Prior to the grand jury, R.B. disavowed her identification of Wright. She said that she told the investigating detective that she only knew Wright from the building and could not identify him as involved in the crime. The prosecution appears to have failed to disclose the change in R.B.'s account, including during a pre-trial hearing at which the investigating detective testified only to R.B.'s initial positive identification of Wright.

At trial, R.B. and another victim implicated some of Wright's co-defendants, but not Wright. The prosecution questioned R.B. about the lineup procedure and R.B. testified that she identified Wright as having lived in the building; R.B. did not identify him as a participant in the crime. Through artfully sequenced questions, however, the prosecutor gave the false impression that R.B. did identify Wright as a perpetrator. And on cross-examination, the investigating detective testified that R.B. had previously identified Wright as having been present at the apartment with a gun.

The CRU found numerous, serious defects with the trial, in particular with the prosecution's presentation of R.B.'s alleged pretrial identification. For example, while R.B. did ultimately testify at trial that she did not identify Wright as a perpetrator, the prosecutor and investigating detective gave the jury the false and highly prejudicial impression that R.B. had previously done so. Wright's defense attorney failed to object to the hearsay evidence, and the court did not issue curative instructions to the jury. The prosecution also improperly asked Wright whether the investigating detective told Wright that each of his co-defendants had been convicted, thus making the jury aware of the outcomes in those cases and improperly suggesting Wright's guilt by association with others who were separately tried and convicted.

## Lewis (1997)

*Nelson Lewis was convicted of Murder in the Second Degree. He was sentenced to a term of imprisonment of 25 years to life. The CRU recommended vacating the conviction largely due to a key witness's false testimony. Lewis served 17.5 years in prison.*

A gunman fired several shots through the door leading to the vestibule of an apartment building, killing the victim but not injuring four other men who also were in the vestibule. After the shooting, detectives began receiving information that Lewis was the shooter and his target had been two men who had robbed him during a dice game.

Lewis agreed to speak with the police. In the car ride to the precinct, he told them that he was with his family in Manhattan at the time of the shooting. But after arriving at the stationhouse, he signed a statement saying that, on the day of the shooting, he was playing dice near the building where the victim was killed and saw another man walk up to the building and fire two or three shots into the vestibule. Lewis's wife later contended that detectives coerced Lewis into signing a false statement and that he feared he would not return home if he did not sign it.

Lewis ultimately was arrested and convicted at trial. His arrest and conviction were based largely on the accounts of two witnesses: S.J., the only one of the shooting's survivors who claimed to have witnessed anything; and N.L., who claimed to have seen both the dice-game robbery and the shooting. S.J. said that, through the Plexiglas window of the vestibule door, he saw a man approach the vestibule and motion to his waistband, and he saw a metal object that he thought was a belt buckle. He did not, however, see a gun or witness the man shoot. S.J. identified Lewis as the man he saw outside the vestibule, but his testimony was inconsistent regarding whether he had seen Lewis before and regarding whether anyone else was with or near him outside the vestibule. In addition, a crime scene photo indicated that it would have been difficult to see anyone through the Plexiglas window.

N.L. was in custody 5 months after the shooting for an alleged robbery when she told detectives that she had seen the shooting and identified Lewis as the shooter. The police ultimately declined to prosecute N.L. for the alleged robbery. N.L. also testified at trial that she had seen Lewis during the afternoon of the shooting and had witnessed the dice-game robbery. However, N.L.'s account of the shooting, including where she was and what she saw, changed over time. It was also implausible in several respects, including that she witnessed the start of the shooting while she was outside her apartment, but was able to run a distance back to her apartment and, from her window, see Lewis still shooting,

despite the fact that the shooting lasted at most 10 seconds and there were no windows in her apartment facing the direction of the shooting.

Ultimately, the CRU learned that N.L.'s testimony was materially false because she was in police custody when she claimed to have seen (a) the dice-game robbery and (b) Lewis before the shooting, testimony that was crucial to her identification of Lewis as the shooter. This information was not disclosed to Lewis's counsel.

The CRU recommended vacating Lewis's conviction largely because N.L.'s false testimony seriously called into question the conviction and the integrity of the trial, given that Lewis's counsel did not know about N.L.'s incarceration during key events to which she testified.

## Alvarez (2001)

*Jeremy Alvarez was convicted of Murder in the Second Degree, two counts of Attempted Robbery in the First Degree, and Assault in the Second Degree. The jury acquitted him of two weapons possession charges. He was sentenced to 20 years to life in prison. The CRU recommended his conviction be vacated in light of several errors in the case, including the prosecution's failure to carefully scrutinize the substantial false fact Alvarez's confession contained and to disclose detectives' notes from the investigation. Alvarez served approximately 17.5 years in prison.*

According to evidence presented at trial, Alvarez and D.N. were each armed with a gun when they attempted to rob F.C. and H.V. D.N. repeatedly hit F.C. with a gun and F.C. stabbed D.N. in the struggle. H.V. was fatally shot.

Both F.C. and Officer N.N., who had been in the area, initially reported seeing three individuals at the scene. F.C. also initially incorrectly identified two individuals (other than Alvarez or D.N.) as having been involved. Later, F.C. identified D.N. in a lineup as the person who hit him with a gun, but he did not identify Alvarez. Officer N.N. identified both D.N. and Alvarez.

Alvarez was apprehended and told investigating detectives that he was present at the scene when D.N. was stabbed and D.N. fired shots. In an interview later that day, which investigating detectives described as "spontaneous" (i.e., Alvarez asked to speak to them), Alvarez stated that he had stabbed H.V. An autopsy conducted after Alvarez's confession revealed that H.V. had not been stabbed; he was killed by gun shot. However, at the time Alvarez confessed, the detective had been advised by the hospital that the deceased died from a stab wound.

At trial, the investigating detective who interrogated Alvarez testified that he told Alvarez that someone was shot and someone was stabbed, but that he did not speak to Alvarez between Alvarez's exculpatory statement and his confession. Both F.C. and Officer N.N. testified to seeing two, not three, individuals at the scene of the crime. The defense impeached them based on prior statements in which they referred to three individuals. F.C. testified about his criminal history, and when the defense questioned that account, the prosecution represented to the court that a law enforcement agent from another jurisdiction confirmed F.C.'s account.

The CRU found several issues with the case that deprived Alvarez of a fair trial. First, it concluded that the prosecution should have more closely reviewed the circumstances surrounding Alvarez's confession and been more candid with the grand jury, the court and the jurors about the significant problem with the confession. In particular, the only direct evidence of Alvarez's guilt was his confession, which was consistent with the facts that the detectives believed were true at the time—that H.V. had been stabbed—but that turned out to be false. Accordingly, the CRU concluded that the police likely suggested to Alvarez that H.V. had been stabbed, and Alvarez adopted that false fact in his confession. Second, the detective's testimony at trial regarding the information he provided to Alvarez before he confessed was misleading because he did not admit what he previously told prosecutors -- that he had asked Alvarez specifically to explain how H.V. was stabbed in the chest. Third, the CRU found several apparent failures to disclose, or to disclose

in a timely fashion, detectives' notes to the defense. Included in these materials were notes containing information that (1) further supported the defense's position that three people were involved, a theory that undermined Alvarez's confession and the prosecution's theory of his involvement; (2) undermined Officer N.N.'s identification of Alvarez; and (3) reflected further details of F.C.'s criminal record (of which the prosecution was apparently also unaware).

## Mitchell (2005)

*Spencer Mitchell was convicted of Murder in the First Degree and various other charges in connection with two murders that occurred during an attempted robbery of a tire shop. He was sentenced to life imprisonment without the possibility of parole. The CRU recommended that his conviction be vacated because of issues with the integrity and origin of the physical evidence used to convict Mitchell, evidence undermining the reliability of the prosecution's eyewitness testimony, and failure to disclose exculpatory evidence. Mitchell served approximately 11 years in prison.*

An armed man attempted to rob a tire shop. The shop's owner, D.G., and a part-time employee were shot and killed, and the owner's son, N.G., was injured. W.P., a friend of D.G. who was at the tire shop during the attack, was uninjured.

W.P. told the police that he was visiting with D.G. in the back office of the tire shop when a man burst in with a gun. The office lights were somehow turned off while D.G. struggled with the armed man, and several shots were fired before the intruder fled the store, continuing to shoot. Later, W.P. told police that K.L., who was injured in another shooting nearby, looked like the tire shop gunman, but W.P. appears to have withdrawn that statement. In addition, a man in police custody reported to detectives that he had witnessed the tire shop shooting and identified the shooter as the same man who was apprehended for killing a police officer in a different incident. The defense was never made aware of those identifications.

Two knit hats were recovered at the scene of the crime, one inside the tire shop and one apparently outside the shop. After Mitchell's DNA was found on the outside hat and W.P. identified him in a lineup—2.5 years after the shooting— Mitchell was indicted for Murder in the First Degree and other charges related to the shooting.

At trial, W.P. identified Mitchell as the shooter. In addition, N.G. testified and pointed to Mitchell as the man who shot him and his father, despite having never previously made an out-of-court identification. The prosecution also introduced that Mitchell's DNA was found on the outside hat. Mitchell was convicted on all counts.

The CRU recommended that the conviction be vacated because of issues with each piece of evidence on which Mitchell's conviction rested: the hat DNA evidence, W.P.'s identification, and N.G.'s identification. First, in terms of the hats, the court initially granted the prosecution's request for a line-up of Mitchell based on the representation that the inside hat contained his DNA. That was wrong: the inside hat did not contain Mitchell's DNA. By trial, the prosecution made clear that the outside hat was the hat with Mitchell's DNA, but the CRU ultimately could not determine from where the outside hat came. Moreover, W.P. claimed the shooter wore the hat found inside the store, and as noted, the DNA on the inside hat excludes Mitchell.

Second, W.P. was the only witness to make an out-of-court identification of Mitchell, but it occurred years after the crime and with a lineup that was improperly suggestive. In addition, defense counsel never was made aware that W.P. told police that K.L. looked like the tire shop gunman. The prosecution also failed to disclose information in its own files documenting that another witness came forward less than two weeks after the crime, saying he was at the scene and identifying someone other than Mitchell as the shooter. Third, N.G. identified Mitchell as the shooter, but only at trial years after the shooting, and after he had suffered various impairments due to the shooting (including losing his memory for a period of time). In addition, his recollection of events changed slightly over the years and was inconsistent in several ways with W.P.'s.

## Foster (2007)

*Miguel Foster was convicted of murder in the second degree. He was sentenced to 25 years to life. For several reasons, the CRU recommended that his conviction be vacated: the only identifying eyewitness was not credible, while four other eyewitnesses did not identify Foster; Foster's confession was obviously false; the police may have influenced identifications and did not pursue more fruitful theories of the case; the prosecution overlooked and withheld* Brady *materials; and both defense counsel and the prosecutor performed objectionably at trial. Foster served about 7.5 years in prison.*

A gunman shot and killed 24-year-old D.B. at a street corner in Brooklyn. Detectives interviewed three eyewitnesses. After D.B.'s wake, a fourth purported eyewitness named P.A. claimed she saw a gang member called "Ice Cold" commit the shooting. She said she had been scared to come forward but was upset Ice Cold attended D.B.'s wake. A detective met P.A. at a park, and she picked Foster out of a photo array as the "Ice Cold" who shot D.B. The detective then showed another eyewitness, Y.R., the same array, and he picked out Foster, too. Foster was arrested. After the arrest, the (now four) eyewitnesses viewed a lineup including Foster. Only P.A. identified Foster as the shooter. Another eyewitness stated that he was "100% certain the shooter is not in this lineup."

In custody, Foster first said he was not involved in the homicide and did not know D.B. After the lineup, Foster said that he knew D.B. and had tried to resolve a dispute between D.B. and a member of his gang, L.E. The next day, however, Foster instead said that he had witnessed and been involved in the shooting—that he and L.E. were walking down the street when D.B. confronted them and, when D.B. seemed to begin drawing a gun, L.E. shot him three times, then dropped the gun and ran away. Foster claimed that he then picked up the gun, shot at D.B. once but missed and ran home. Foster was then arrested for and charged with murder in the second degree.

After over a year in custody, Foster made a materially different proffer. He said he was not involved with or present at the shooting, but that he knew the shooter was a gang leader and friend of his called Ice Cold ("F.M."). He explained that F.M. came to his house after the shooting, looking to hide-out or dispense with the gun. Foster said F.M. had been arrested for another shooting on the same block before the D.B. shooting. The trial prosecutor had the files from this case unsealed, which showed that P.A.—the same P.A. who was the sole identifying witness in Foster's case—had identified F.M. as Ice Cold and the shooter in that case, which was dismissed and sealed when she refused further cooperation.

Foster was tried and convicted of murder in the second degree.

The CRU found flaws with P.A.'s identification, Y.R.'s identification, and Foster's confession. First, P.A. could not have seen Foster at D.B.'s wake because Foster was incarcerated at the time. Second, P.A. identified a different individual—F.M.—as Ice Cold. Third, Foster was not known by the nickname Ice Cold. Nevertheless, the prosecution moved forward with the case and worse, failed to disclose this information to defense. For these reasons and more, the CRU found P.A.'s identification—which she recanted to the CRU—thoroughly discredited. Even by her account, P.A. was farther away than other witnesses, closed her eyes after six seconds, and was then a heavy user of alcohol and marijuana. She admitted to lying about seeing the shooter at D.B.'s wake and about seeing F.M. commit the other shooting. And P.A. said that the detective suggested Foster to her in the first photo array, which occurred under unusual circumstances. The CRU concluded that P.A. was not able to identify the shooter (if she saw the shooting at all), but was induced to testify against Foster by detectives who falsely told her that she was one of three identifying witnesses, not the only one.

The CRU found Y.R.'s photo identification also unreliable. The CRU noted that Y.R. did not identify Foster in a more reliable corporeal lineup and confirmed his photo identification at trial only uncertainly—and only after sitting facing Foster for thirty minutes in the courtroom. On the other hand, Y.R.'s other statement—that he followed the shooter to Foster's block—fit with Foster's claim that F.M. shot D.B.

Finally, the CRU found that Foster's statement that he was involved in the shooting had many hallmarks of a false confession. Foster was barely 18 years old at the time. His "confession" contradicts many established facts, including many basic non-inculpatory details. And Foster plausibly stated that the detectives fed him facts and pressured him to place himself at the scene by suggesting that L.E. was cooperating and implicating Foster.

The CRU therefore found numerous, serious issues with the conduct of both police and the prosecution, especially concerning P.A.'s identification and related exculpatory material that was not disclosed. The CRU also found that Foster's trial counsel was deficient, and the trial prosecutor's decision making at times objectionable. Substantial evidence gathered during the CRU investigation supported Foster's contention that he was not present at the shooting and that F.M. was the real shooter.

## Bloom (2011)

*Charlie Bloom pled guilty to Rape in the Second Degree and was sentenced to 4 years' imprisonment and 10 years of post-release supervision. The CRU recommended his conviction be vacated based on its conclusion that Bloom was likely mentally disabled at the time of the alleged offense. Bloom served close to 3.5 years in prison.*

V.B., who had an intellectual disability, learned that she was pregnant. After initially denying she ever had sex, V.B. then told a nurse that it was Bloom who had impregnated her, which a DNA test later confirmed. At the time of the incident, Bloom lived with V.B. and her grandmother.

V.B. told the investigating detective that she had sex with Bloom, that Bloom forced her to have sex, and that they had sex at least five times. Bloom told the detective that he had been having consensual sex with V.B. and that he never forced himself on her. However, according to detectives, he also stated he knew his actions were wrong because of her "mental sickness."

Bloom pled guilty to Rape in the Second Degree and was sentenced to 4 years' incarceration and 10 years of post-release supervision. During his plea colloquy, Bloom gave confused responses to several of the court's questions and stated, "I really didn't rape nobody."

Bloom's family described him as "slow," a condition worsened by a motorcycle accident that caused head trauma. After his arrest in this case, medical personnel noted his cognitive defects and a social worker classified him with an "Altered Mental Status/Dementia." A head scan found "extensive white matter" and a doctor recommended outpatient neurology for dementia.

The CRU retained a forensic psychologist who found that Bloom suffers from a significant neurocognitive disorder. The CRU deemed defense counsel ineffective for failing to perceive these issues and not considering an affirmative defense or pursuing a plea of not responsible by reason of mental disease or defect.

V.B.'s aunt told the CRU that she was never asked about the defendant during the investigation or prosecution. She told the CRU that had she spoken to defense counsel, she would have told him about the defendant's intellectual shortcomings. V.B.'s aunt also said that she had informed the police and prosecution that V.B. and the defendant had consensual sex, but the CRU did not find notes of her statements in the police or prosecution case files.

The forensic psychologist retained by the CRU also determined that V.B. was intellectually disabled, and that at the time of the incident, it was unlikely that V.B. could have fully consented to sexual intercourse. The forensic psychologist could not opine as to whether Bloom could understand, at the time of the alleged offense, that V.B. was unable to give consent and that his conduct was wrong.

In light of the fact that Bloom likely suffered from a significant neurocognitive disorder at the time of the incident in question, the CRU concluded that Bloom had pled guilty to a crime which he may not have legally been capable of committing. At the very least, the combination of Bloom's impairment and the victim's intellectual disabilities would have provided Bloom with a strong consent defense and undermined the fairness and reliability of his guilty plea. As such, the CRU recommended that Bloom's conviction be vacated.

# ACKNOWLEDGEMENTS

This Report was jointly authored by the Kings County District Attorney's Office, the Innocence Project, and Wilmer Cutler Pickering Hale and Dorr LLP.

The Report's authors and advisors from the Kings County District Attorney's Office were Tali Farhadian Weinstein (General Counsel), Mark Hale (Chief, Post-Conviction Justice Bureau and Chief, Conviction Review Unit), and Rachel Nash (Deputy Chief, Conviction Review Unit). The authors and researchers from the Innocence Project were Nina Morrison (Senior Litigation Counsel), Glinda Cooper (Director of Science and Research), and Vanessa Meterko (Research Analyst). The authors and researchers from Wilmer Cutler Pickering Hale and Dorr LLP were Debo P. Adegbile, Jeanine Alvarez, Emma Bennett, Alyssa R. Budihas, Danielle Calamari, Janet Carter, Matt Celestin, Ryan Chabot, Cyndy Chueh, Jamie Dycus, Alexandra Hiatt, Brittany Llewellyn, Saurabh Sanghvi, and Jarret Zafran.*

Additional colleagues from Wilmer Cutler Pickering Hale and Dorr LLP who supported the completion of the Report included Casandra Ferrante, Frank James, Lauren Kennedy, Amy Szydlo, and Flor Zervoudis.

Serrin Ransom (Design Director) of GMMB provided graphic design support for the Report.

---

\* Janet Carter, Cyndy Chueh, and Saurabh Sanghvi, who are alumni of Wilmer Cutler Pickering Hale and Dorr LLP, contributed to the analysis and drafting of the Report during their time at the Firm.



